No. 26-1844

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated; CHERYL ROGERS; GREG ROGERS; E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated; M.G., by and through her mother, Amber Galea; and W.M., by and through his mother, Kersey Clark,

*Plaintiffs-Appellees*,

v.

GREENVILLE COUNTY LIBRARY SYSTEM; BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System, and KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,

*Defendants-Appellants*.

On Appeal from the United States District
Court for the District of South Carolina
Case No. 6:25-cv-02599-DCC

# JOINT APPENDIX


David Allen Chaney, Jr.
ACLU OF S. CAROLINA
P.O. Box 1668
Columbia, SC 29202
(864)372-6681

Joshua A. Block
Shana A. Knizhnik
ACLU FOUNDATION INC.
125 Broad Street
18th Floor
New York, NY 10004
(212) 549-2493

*Counsel for Plaintiffs-Appellees*

NELSON MULLINS RILEY & SCARBOROUGH LLP
Miles E. Coleman
2 West Washington Street
Suite 400
Greenville, SC 29601
(864) 373-2300

WILSON JONES CARTER & BAXLEY, P.A.
Charles F. Turner, Jr.
J. Nathan Ozmint
325 Rocky Slope Rd.
Suite 201
Greenville, SC 29607
(864) 672-3711

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS

**Page**

**I. DOCKET REPORT**

District Court Docket Report....................................................JA1

**II. FILINGS IN CHRONOLOGICAL ORDER**

Plaintiff's First Amended Complaint (ECF No. 5) .........................JA11

Exhibit A – Collection Policy (ECF No. 5-1) ..............................JA48
Exhibit B – Library Reconsideration Form (ECF No. 5-2).........JA61
Exhibit C – Display of Library Materials (ECF No. 5-3)...........JA65
Exhibit D – Summons (ECF No. 5-4) .......................................JA67

Library Defendants' Motion to Dismiss (ECF. No. 20)..................JA69

Plaintiffs' Response in Opposition to the Motion to Dismiss (ECF No. 27) ........................................................................JA114

Library Defendants' Reply to Plaintiffs' Response to the Motion to Dismiss (ECF No. 33)................................................JA153

Transcript of Motion to Dismiss hearing held on January 29, 2026 (ECF No. 43) ....................................................................JA174

Order Granting in Part and Denying in Part the Defendants' Motion to Dismiss (ECF No. 44)................................................JA231

Supplemental Exhibit to the Library Defendants' Motion to Dismiss – Declaration of Beverly James (ECF No. 46) ...............JA266

Library Defendants' Motion for Certificate of Appealability or, Alternatively, for Reconsideration or for a Stay (ECF No. 47) ....JA270

**III. ORDER**

Order granting Motion for Certificate of Appealability and granting and denying various other motions (ECF No. 50).........JA288

APPEAL

# U.S. District Court
# District of South Carolina (Greenville)
# CIVIL DOCKET FOR CASE #: 6:25-cv-02599-DCC

O.R. et al v. Greenville County South Carolina et al
Assigned to: Honorable Donald C Coggins, Jr
Cause: 28:1343 Violation of Civil Rights

Date Filed: 03/26/2025
Jury Demand: Defendant
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**O.R.**
*by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated*

represented by **David Allen Chaney , Jr**
ACLU of South Carolina
P.O. Box 1668
Columbia, SC 29202
864-372-6681
Email: achaney@aclusc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
American Civil Liberties Union Foundation Inc
125 Broad Street
18th Floor
New York, NY 10004
212-549-2493
Email: jblock@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shana A Knizhnik**
American Civil Liberties Union Foundation Inc
125 Broad Street
18th Floor
New York, NY 10004
917-716-0609
Email: sknizhnik@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cheryl Rogers**

represented by **David Allen Chaney , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shana A Knizhnik**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Greg Rogers** represented by **David Allen Chaney , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shana A Knizhnik**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**E.G.**
*by and through her mother, Amber Galea, on behalf of herself and those similarly situated*

represented by **David Allen Chaney , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shana A Knizhnik**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**M.G.**
*by and through her mother, Amber Galea*

represented by **David Allen Chaney , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shana A Knizhnik**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**W.M.**
*by and through his mother, Kersey Clark*

represented by **David Allen Chaney , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua A Block**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shana A Knizhnik**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Greenville County South Carolina**

represented by **Andrew F Lindemann**
Lindemann Law Firm PA
PO Box 6923
Columbia, SC 29260
803-881-8920
Email: andrew@ldlawsc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Beverly James**
*in her official capacity as Executive Director of the Greenville County Library System*

represented by **Charles F Turner , Jr**
Wilson Jones Carter and Baxley PA
325 Rocky Slope Road
Suite 201
Greenville, SC 29607
864-672-3711
Fax: 864-373-7055
Email: CFTurner@wjlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Nathan Ozmint**
Willson Jones Carter and Baxley (Gre)
325 Rocky Slope Rd
Suite 201
Greenville, SC 29607
864-213-4146
Email: jnozmint@wjcblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John P Riordan**
Willson Jones Carter and Baxley (Gre)
325 Rocky Slope Rd
Suite 201
Greenville, SC 29607
864-672-3721
Email: jpriordan@wjcblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miles Edward Coleman**
Nelson Mullins Riley and Scarborough (GRE)
PO Box 10084
2 West Washington Street
Suite 400
Greenville, SC 29601
864-373-2352
Email: miles.coleman@nelsonmullins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Karen Allen**
*in her official capacity as Youth Services Manager of the Greenville County Library System*

represented by **Charles F Turner , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Nathan Ozmint**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John P Riordan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miles Edward Coleman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Greenville County Library System**

represented by **Charles F Turner , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Nathan Ozmint**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John P Riordan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miles Edward Coleman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/26/2025 | 1 | COMPLAINT against Karen Allen, Greenville County South Carolina, Beverly James ( Filing fee $ 405 receipt number BSCDC-12352638.), filed by W.M., Cheryl Rogers, E.G., M.G., O.R., Greg Rogers. Service due by 6/24/2025 (Attachments: # 1 Exhibit A-Collection Policy, # 2 Exhibit B-Library Reconsideration Form, # 3 Exhibit C-Display of Library Materials Policy)(alew) (Entered: 03/28/2025) |
| 03/26/2025 | 3 | Local Rule 26.01 Answers to Interrogatories by E.G., M.G., O.R., Cheryl Rogers, Greg Rogers, W.M..(alew) (Entered: 03/28/2025) |
| 03/28/2025 | 4 | Summons Issued as to Karen Allen, Greenville County South Carolina, Beverly James. (Attachments: # 1 Summons Greenville County South Carolina, # 2 Summons Karen Allen)(alew) (Entered: 03/28/2025) |
| 04/04/2025 | 5 | AMENDED COMPLAINT against All Defendants, filed by W.M., Cheryl Rogers, E.G., M.G., O.R., Greg Rogers. Service due by 7/3/2025 (Attachments: # 1 Exhibit A - Collection Policy, # 2 Exhibit B - Library Reconsideration Form, # 3 Exhibit C - Display of Library Materials, # 4 Summons) (Chaney, David) (Entered: 04/04/2025) |
| 04/04/2025 | 6 | Summons Issued as to Greenville County Library System. (alew) (Entered: 04/04/2025) |
| 04/24/2025 | 8 | SUMMONS Returned Executed by W.M., Cheryl Rogers, E.G., M.G., O.R., Greg Rogers. Greenville County South Carolina served on 4/24/2025, answer due 5/15/2025. (Attachments: # 1 Acceptance of Service -- Greenville County)(Chaney, David) Modified on 4/25/2025 to edit text (alew). (Entered: 04/24/2025) |
| 04/25/2025 | 9 | DELETION OF DOCKET ENTRY NUMBER 7 Reason: attorney refiled to make correction. Corrected Filing Document Number 8 . (alew) (Entered: 04/25/2025) |
| 05/15/2025 | 10 | LETTER EXTENDING TIME TO ANSWER Greenville County Library System answer due 6/13/2025; Beverly James answer due 6/13/2025; Karen Allen answer due 6/13/2025. (Attachments: # 1 Exhibit A: correspondence between counsel)(Coleman, Miles) (Entered: 05/15/2025) |
| 05/15/2025 | 11 | NOTICE of Appearance by Andrew F Lindemann on behalf of Greenville County South Carolina (Lindemann, Andrew) (Entered: 05/15/2025) |
| 05/15/2025 | 12 | LETTER EXTENDING TIME TO ANSWER Greenville County South Carolina answer due 6/13/2025. (Attachments: # 1 Exhibit A - Email from Plaintiffs' counsel)(Lindemann, Andrew) (Entered: 05/15/2025) |
| 05/20/2025 | 13 | NOTICE of Request for Protection from Court Appearance by Andrew F Lindemann for July 21, 2025 through August 1, 2025 & August 13, 2025 through August 15, 2025 (Lindemann, Andrew) (Entered: 05/20/2025) |

| | | |
|---|---|---|
| 05/23/2025 | 14 | MOTION to Appear Pro Hac Vice by Joshua Block ( Filing fee $ 350 receipt number ASCDC-12478116) by E.G., M.G., O.R., Cheryl Rogers, Greg Rogers, W.M.. Response to Motion due by 6/6/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Supporting Documents Application to Appear Pro Hac Vice, # 2 Supporting Documents Certificate of Good Standing)No proposed order.(Chaney, David) (Main Document 14 replaced on 6/3/2025) (alew). Modified on 6/3/2025 to replace with corrected document provided by filing user (alew). (Entered: 05/23/2025) |
| 06/03/2025 | 15 | **TEXT ORDER granting 14 Motion to Appear Pro Hac Vice as to Joshua A. Block for the plaintiffs. Signed by Honorable Donald C Coggins, Jr on 6/3/25.(alew)** (Entered: 06/03/2025) |
| 06/06/2025 | 16 | Consent MOTION for Extension of Time to File Answer by Karen Allen, Greenville County Library System, Beverly James. Response to Motion due by 6/20/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Coleman, Miles) Modified on 6/9/2025 to correct motion relief (alew). (Entered: 06/06/2025) |
| 06/09/2025 | 17 | **TEXT ORDER granting 16 motion for extension of time. Defendants the Greenville County Library System, Beverly James, and Karen Allen's responsive pleading is due by June 27, 2025. Signed by Honorable Donald C Coggins, Jr on 6/9/25.(alew)** (Entered: 06/09/2025) |
| 06/13/2025 | 18 | ANSWER to 5 Amended Complaint, by Greenville County South Carolina.(Lindemann, Andrew) (Main Document 18 replaced on 6/16/2025) (alew). Modified on 6/16/2025 to replace with corrected document per attorney request (typo, removal of text) (alew). (Entered: 06/13/2025) |
| 06/13/2025 | 19 | Local Rule 26.01 Answers to Interrogatories by Greenville County South Carolina. (Lindemann, Andrew) (Entered: 06/13/2025) |
| 06/27/2025 | 20 | MOTION to Dismiss for Lack of Jurisdiction, Motion to Dismiss for Failure to State a Claim by Karen Allen, Greenville County Library System, Beverly James. Response to Motion due by 7/11/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Coleman, Miles) . Added MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM on 7/2/2025; Modified on 7/2/2025 to add motion relief, to correct motion relief (alew) Modified on 9/19/2025; see 37 Notice of Supplemental Authorities (alew). Modified on 4/8/2026; see 46 additional attachment filed 4/8/26 (alew). (Entered: 06/27/2025) |
| 06/27/2025 | 21 | Local Rule 26.01 Answers to Interrogatories by Karen Allen, Greenville County Library System, Beverly James.(Coleman, Miles) (Entered: 06/27/2025) |
| 06/30/2025 | 22 | NOTICE of Appearance by Charles F Turner, Jr on behalf of Karen Allen, Greenville County Library System, Beverly James (Turner, Charles) (Main Document 22 replaced on 7/2/2025) (alew). Modified on 7/2/2025 to replace with corrected document provided by filing user (alew). (Entered: 06/30/2025) |
| 06/30/2025 | 23 | NOTICE of Appearance by James Nathan Ozmint on behalf of Karen Allen, Greenville County Library System, Beverly James (Ozmint, James) (Main Document 23 replaced on 7/2/2025) (alew). Modified on 7/2/2025 to replace with corrected document provided by filing user(alew). (Entered: 06/30/2025) |

| | | |
|---|---|---|
| 07/01/2025 | 24 | NOTICE of Appearance by John P Riordan on behalf of Karen Allen, Greenville County Library System, Beverly James (Riordan, John) (Main Document 24 replaced on 7/7/2025: to replace with corrected document (searchable, converted pdf) as provided by filing user) (kmca). (Entered: 07/01/2025) |
| 07/11/2025 | 25 | Consent MOTION for Extension of Time to File Response/Reply as to 20 MOTION to Dismiss for Lack of JurisdictionMOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by E.G., M.G., O.R., Cheryl Rogers, Greg Rogers, W.M.. Response to Motion due by 7/25/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Chaney, David) (Entered: 07/11/2025) |
| 07/14/2025 | 26 | **TEXT ORDER granting 25 motion for extension of time. Plaintiffs' response to the motion to dismiss is due by July 25, 2025. Signed by Honorable Donald C Coggins, Jr on 7/14/25.(alew)** (Entered: 07/14/2025) |
| 07/25/2025 | 27 | RESPONSE in Opposition re 20 MOTION to Dismiss for Lack of Jurisdiction, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. Response filed by E.G., M.G., O.R., Cheryl Rogers, Greg Rogers, W.M..Reply to Response to Motion due by 8/1/2025 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Chaney, David) (Main Document 27 replaced on 8/8/2025: to replace with corrected document (corrected caption) as provided by filing user) (kmca). Modified on 9/19/2025; see 37 Notice of Supplemental Authorities (alew). Modified on 10/29/2025: See 39 Notice of Supplemental Authorities (kmca). (Entered: 07/25/2025) |
| 07/30/2025 | 28 | MOTION for Extension of Time to File Response/Reply as to 20 MOTION to Dismiss for Lack of Jurisdiction, Motion to Dismiss for Failure to State a Claim by Karen Allen, Greenville County Library System, Beverly James. Response to Motion due by 8/13/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Coleman, Miles) (Main Document 28 replaced on 7/30/2025) (alew). Modified on 7/30/2025 to replace with corrected document provided by filing user (alew). Modified on 7/31/2025 to correct linkage (alew). (Entered: 07/30/2025) |
| 07/31/2025 | 29 | **TEXT ORDER granting 28 motion for extension of time. The Library Defendants' reply to the motion to dismiss is due by August 8, 2025. Signed by Honorable Donald C Coggins, Jr on 7/31/25.(alew)** (Entered: 07/31/2025) |
| 08/07/2025 | 30 | MOTION for Extension of Time to File Response/Reply as to 27 Response in Opposition to Motion, by Karen Allen, Greenville County Library System, Beverly James. Response to Motion due by 8/21/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Coleman, Miles) (Entered: 08/07/2025) |
| 08/08/2025 | 32 | **TEXT ORDER granting 30 motion for extension of time. The Library Defendants' reply to the motion to dismiss is due by August 15, 2025. Signed by Honorable Donald C Coggins, Jr on 8/8/2025. (alma, )** (Entered: 08/08/2025) |
| 08/15/2025 | 33 | REPLY to Response to Motion re 20 MOTION to Dismiss for Lack of Jurisdiction, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. Response filed by Karen Allen, Greenville County Library System, Beverly James. (Coleman, Miles) (Entered: 08/15/2025) |
| 08/27/2025 | 35 | MOTION to Appear Pro Hac Vice by Shana Knizhnik ( Filing fee $ 350 receipt number ASCDC-12708910) by E.G., M.G., O.R., Cheryl Rogers, Greg Rogers, W.M.. Response to Motion due by 9/10/2025. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Affidavit |

| | | |
|---|---|---|
| | | Application to Appear Pro Hac Vice, # 2 Supporting Documents Certificate of Good Standing)No proposed order.(Chaney, David) (Entered: 08/27/2025) |
| 08/27/2025 | 36 | **TEXT ORDER granting 35 Motion to Appear Pro Hac Vice as to Shana Knizhnik for the plaintiffs. Signed by Honorable Donald C Coggins, Jr on 8/27/25.(alew)** (Entered: 08/27/2025) |
| 09/18/2025 | 37 | NOTICE OF SUPPLEMENTAL AUTHORITIES by E.G., M.G., O.R., Cheryl Rogers, Greg Rogers, W.M. to 27 Response in Opposition to Motion, 20 MOTION to Dismiss for Lack of Jurisdiction, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . (Chaney, David) Modified on 9/19/2025 to edit text (alew). (Entered: 09/18/2025) |
| 10/02/2025 | 38 | REPLY by Karen Allen, Greenville County Library System, Beverly James to 37 Supplement. (kmca) Re-filed by clerk to correct event. (kmca) (Main Document 38 replaced on 10/3/2025: to replace with corrected document (partially missing footnote and a typo) as requested by and provided by filing user ) (kmca). (Entered: 10/03/2025) |
| 10/28/2025 | 39 | NOTICE of SUPPLEMENTAL AUTHORITY by E.G., M.G., O.R., Cheryl Rogers, Greg Rogers, W.M. to 27 Response in Opposition to Motion,, 20 MOTION to Dismiss for Lack of JurisdictionMOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . (Attachments: # 1 Exhibit A -- E.K. v. DoDEA)(Chaney, David) Modified on 10/29/2025: to edit text (notice..) (kmca). (Entered: 10/28/2025) |
| 01/16/2026 | 40 | NOTICE of Hearing on Motion- 20 MOTION to Dismiss for Lack of Jurisdiction, MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : Motion Hearing set for Thursday, 1/29/2026 10:00 AM in Spartanburg 2nd Floor, Donald S Russell Fed Bldg, 201 Magnolia St, Spartanburg before Honorable Donald C Coggins Jr. (alew) (Entered: 01/16/2026) |
| 01/29/2026 | 41 | **Minute Entry. Proceedings held before Honorable Donald C Coggins, Jr: Motion Hearing held on 1/29/2026 re 20 MOTION to Dismiss for Lack of Jurisdiction/MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Karen Allen, Greenville County Library System, Beverly James. Motion taken under advisement. Court Reporter Michele Becker (michele_becker@scd.uscourts.gov). (ncha, )** (Entered: 01/29/2026) |
| 02/13/2026 | 42 | MOTION for Extension of Time *To File Supplemental Exhibit to the Library Defendants' Motion to Dismiss* by Karen Allen, Greenville County Library System, Beverly James. Response to Motion due by 2/27/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A: Declaration of Beverly James)No proposed order.(Coleman, Miles) (Entered: 02/13/2026) |
| 03/04/2026 | 43 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings. Motions Hearing held on January 29, 2026, before Judge Donald C. Coggins, Jr.. Court Reporter/Transcriber Michele E. Becker, Telephone number/E-mail Michele_Becker@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction.. Redaction Request due 3/25/2026. Redacted Transcript Deadline set for 4/6/2026. Release of Transcript Restriction set for 6/2/2026. (mbec, ) (Entered: 03/04/2026) |
| 03/19/2026 | 44 | **ORDER granting in part and denying in part 20 Motion to Dismiss as set out. Signed by Honorable Donald C Coggins, Jr on 3/19/26.(alew)** (Entered: 03/19/2026) |
| 04/02/2026 | 45 | ANSWER to 5 Amended Complaint, by Karen Allen, Greenville County Library System, Beverly James.(Coleman, Miles) (Entered: 04/02/2026) |

| | | |
|---|---|---|
| 04/08/2026 | 46 | Additional Attachments to Main Document 20 MOTION to Dismiss for Lack of JurisdictionMOTION TO DISMISS FOR FAILURE TO STATE A CLAIM. First attachment description: Supplemental Exhibit: Declaration of Beverly James . (Coleman, Miles) (Entered: 04/08/2026) |
| 04/08/2026 | 47 | Unopposed MOTION for Certificate of Appealability or, Alternatively, for Reconsideration or for a Stay by Karen Allen, Greenville County Library System, Beverly James. Response to Motion due by 4/22/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Coleman, Miles). Added MOTION for Reconsideration, MOTION to Stay on 4/8/2026; modified to add motion relief (alew). (Entered: 04/08/2026) |
| 04/16/2026 | 48 | MOTION for Reconsideration re 44 Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Dismiss for Failure to State a Claim by Greenville County South Carolina. Response to Motion due by 4/30/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Lindemann, Andrew) (Entered: 04/16/2026) |
| 05/13/2026 | 49 | MOTION for Leave to File Opposition to 47 Library Defendants' Motion for Reconsideration by E.G., M.G., O.R., Cheryl Rogers, Greg Rogers, W.M.. Response to Motion due by 5/27/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Exhibit A -- Plaintiffs' Response in Opposition to Library Defendants' Motion for Reconsideration)No proposed order.(Chaney, David) Modified on 5/14/2026 to ad linkage (alew). (Entered: 05/13/2026) |
| 05/28/2026 | 50 | **ORDER granting 47 Motion for Certificate of Appealability; denying as moot 47 Motion for Reconsideration ; denying as moot 47 Motion to Stay; granting 48 Motion for Reconsideration as set out, and denying as moot 49 Motion for Leave to File. Signed by Honorable Donald C Coggins, Jr on 5/28/26.(alew)** (Entered: 05/28/2026) |
| 07/16/2026 | 52 | NOTICE OF INTERLOCUTORY APPEAL to pay the associated appeal filing fee only as to 44 Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Dismiss for Failure to State a Claim by Karen Allen, Greenville County Library System, Beverly James. Filing fee $ 605, receipt number ASCDC-13273502. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Coleman, Miles) Modified on 7/21/2026 to edit text (alew). (Entered: 07/16/2026) |
| 08/07/2026 | 53 | Consent MOTION to Stay *Discovery Pending Appeal* by Karen Allen, Greenville County Library System, Beverly James. Response to Motion due by 8/21/2026. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Coleman, Miles) (Entered: 08/07/2026) |
| 08/10/2026 | 54 | **TEXT ORDER granting 53 motion to stay discovery pending disposition of the interlocutory appeal. Signed by Honorable Donald C Coggins, Jr on 8/10/26.(alew)** (Entered: 08/10/2026) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 09/21/2026 16:41:40 | | | |
| **PACER Login:** | nmrs0004 | **Client Code:** | 088196/01500-mec |
| **Description:** | Docket Report | **Search Criteria:** | 6:25-cv-02599-DCC |

| | | | |
|---|---|---|---|
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| **O.R.**, by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated;<br><br>**CHERYL ROGERS**;<br><br>**GREG ROGERS**;<br><br>**E.G.**, by and through her mother, Amber Galea, on behalf of herself and those similarly situated;<br><br>**M.G** by and through her mother, Amber Galea; and<br><br>**W.M.**, by and through his mother, Kersey Clark;<br><br>*Plaintiffs*,<br><br>v.<br><br>**GREENVILLE COUNTY, SOUTH CAROLINA**;<br><br>**GREENVILLE COUNTY LIBRARY SYSTEM**;<br><br>**BEVERLY JAMES**, in her official capacity as Executive Director of the Greenville County Library System; and<br><br>**KAREN ALLEN**, in her official capacity as Youth Services Manager of the Greenville County Library System,<br><br>*Defendants*. | Case No. 6:25-cv-02599-DCC<br><br>**First *Amended* Complaint for Declaratory Judgment, Injunctive Relief, and Nominal Damages** |

## PRELIMINARY STATEMENT

1. For the last two years, the Greenville County Library System ("Greenville Library" or the "Library") has been systematically purging all positive portrayals of transgender or gender non-conforming people from the County's library shelves.

2. Much of this crusade has focused on the juvenile and young adult sections. Under newly adopted amendments, library policies now *require* the removal of all materials from the juvenile and young adult sections of the library that contain "illustrations, themes, or story lines [that] affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex" or with "illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning." As a Library Board member explained it: "the presence of a transgender character in a book . . . is grounds for relocating it to the adult section."

3. According to Library Board members, these policies do not rest on neutral curation criteria, but on members' discriminatory view that materials condoning gender transition are "trash" and that the "idea" of "transgenderism" is a "dangerous thing" and part of "a radical agenda" that the library has "every right . . . to take an ethical and moral stand" against. Despite the First Amendment concerns raised by two Board members, the Library Board voted against consulting with legal counsel before enacting the policies.

4. As part of its "ethical and moral stand" against transgender people, the Library has removed many critically acclaimed titles from the juvenile and young adult sections, and has thereby created unnecessary hurdles for anyone under 18 years old to read them. Removed titles include: *Julián is a Mermaid* by Jessica Love (an award-winning children's picture book about a young boy who wishes to dress up like a mermaid), *Ana on the Edge* by A.J. Sass (an award-winning book about a twelve-year-old nonbinary figure skater), and *Red: A Crayon's Story* by Michael Hall (an award-winning picture book about a blue crayon that was mistakenly labeled as "red"). Meanwhile, books that advocate against gender transition—such as the Christian-themed book, *God made Boys and Girls* by Marty Machowski—remain available in the juvenile section.

5. Beyond adopting an explicitly discriminatory policy for juvenile and young adult books, the Library also enforces a widespread custom and practice of discriminating against the collection, retention, and display of library materials—including books for adults—that positively portray LGBTQ people. Under that unwritten policy, Defendants have secretly removed dozens of LGBTQ titles from the Library collection for both children and adults, disproportionately refused requests by library patrons to order new LGBTQ materials, and granted over fifty requests from the Greenville County Republican Women's Club to remove LGBTQ materials. Defendants have also ordered librarians to remove book displays that feature LGBTQ materials, cancelled library events that involve LGBTQ individuals or themes, and removed promotional materials for a LGBTQ book club.

6. According to reporting by the *Greenville News*, Defendants' crusade against LGBTQ library materials has created a "culture of fear" amongst Greenville County librarians and caused the staff turnover rate to nearly double.

7. Defendants' policies and actions violate the United States Constitution. The First Amendment protects the right to receive information in public libraries, and it prohibits Defendants from "contract[ing] the spectrum of available knowledge" to achieve their own viewpoint-based "moral agenda." *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 547–48, 549 n.19 (N.D. Tex. 2000). Likewise, the Equal Protection Clause prohibits Defendants, as state actors, from using library policies to enforce their "moral and ethical stand" against transgender people. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–13 (4th Cir. 2020) (noting the dignitary harms associated with discrimination and holding that laws singling out transgender people must survive intermediate scrutiny).

8. Plaintiffs are members of the Greenville community, including some who identify as LGBTQ, who seek to read library materials positively portraying LGBTQ people, without discriminatory barriers impeding their ability to do so. By discriminatorily suppressing Plaintiffs' access to these materials on the basis of Defendants' animus towards gender transition and

transgender people, Defendants have violated—and continue to violate—Plaintiffs' rights under the First and Fourteenth Amendments, causing ongoing and irreparable harm.

## PARTIES

9. **Plaintiff O.R.** is 17 years old and brings his claims by and through his parents, **Plaintiffs Cheryl Rogers and Greg Rogers**. All three Plaintiffs in the Rogers family—O.R., Cheryl, and Greg—are residents of Greenville County, South Carolina and are patrons of the Greenville County Library System. **Plaintiff O.R.** brings his Equal Protection claims on behalf of himself and those similarly situated—namely, all minor, transgender library patrons who lack adult library cards.

10. **Plaintiffs E.G. and M.G.** bring their claims by and through their mother, Amber Galea. E.G. and M.G. are, respectively, 11- and 12-year-old residents of Greenville County, South Carolina, where they live with their mother, Amber Galea. **Plaintiff E.G.** brings her Equal Protection claims on behalf of herself and those similarly situated—namely, all individuals with adult, Greenville County library cards who identify as LGBTQ.

11. **Plaintiff W.M.** brings his claims by and through his mother, Kersey Clark. W.M. is a 9-year-old resident of Greenville County, South Carolina, where he lives with his mother, Kersey Clark.

12. **Defendant Greenville County**, South Carolina ("Greenville County" or the "County") is a "body politic and corporate," with the power to sue and be sued. S.C. Code § 4-1-10(1).

13. Greenville County operates a public library system, the Greenville County Library System ("Greenville Library" or the "Library"), as a "continuing function of county government." S.C. Code § 4-9-35(A).

14. All Library policies "shall not be inconsistent with the general policies established by the governing body of the county," S.C. Code § 4-9-36, and any Library regulations "shall not

be in conflict with policy or regulations established by the county governing body." S.C. Code § 4-9-37(b).

15. **Defendant Greenville County Library System** ("Greenville Library" or the "Library") is the public library system established by Greenville County. The Library is controlled and managed by a board of trustees ("the Board") appointed by the Greenville County Council. S.C. Code § 4-9-35(B).

16. The Board currently consists of eleven members: Brian Aufmuth, Kenneth Baxter, Gene Beckner, Elizabeth Collins, Stephanie Cunningham, S. Allan Hill, James Hoard, Tommy Hughes, Marcia Moston, Kristen Odom, and Joe Poore.

17. Pursuant to state statute, the Board is empowered to "[a]cquire books and other library materials and provide for use thereof throughout the county," S.C. Code § 4-9-36(3), to "[t]ake any actions deemed necessary and proper by the board to establish, equip, operate and maintain an effective library system within limits of approved appropriations of county council," S.C. Code § 4-9-36(9), to "[p]rovide and make available to the residents of the county books and library materials," S.C. Code § 4-9-37(a), and to "[a]dopt regulations necessary to insure effective operation, maintenance and security of the property of the library system." S.C. Code § 4-9-37(b).

18. Pursuant to Greenville Library's Collection Development and Maintenance Policy (the "Collection Policy") (attached as Exhibit A),[1] the Board "determines the Collection Development and Maintenance Policy and is the final authority in matters concerning its application." Ex. A.

19. **Defendant Beverly James** is sued in her official capacity as the Executive Director of Greenville Library. Pursuant to the Collection Policy, the Board "delegates responsibility for collection development and maintenance to the Executive Director and Library

[1] Exhibit A reflects the Collection Policy as amended in August 2024. The Board subsequently amended the Collection Policy in February 2025, changing the name of the "Young Adult Collection" to the "Teen Collection" and adding a policy regarding materials' inclusion in the adult collection based on target age ranges.

staff" including "collection development specialists" like the Youth Services Manager. The Board also "may authorize the Executive Director to make adjustments to the [Collection] policy based on budget, physical space, or other special concerns." Ex. A.

20. **Defendant Karen Allen** is sued in her official capacity as the Youth Services Manager of Greenville Library. As Youth Services Manager, she is responsible for selecting materials to add to the Youth and Juvenile Collections, which includes interpreting and enforcing the Collection Policy as to both the Juvenile and Young Adult Collections of the Library.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction pursuant 28 U.S.C. § 1331 (general federal question jurisdiction) and § 1343 (civil rights actions) because Plaintiffs' claims arise under the First and Fourteenth Amendments of the United States Constitution. This Court has jurisdiction to issue declaratory relief under 28 U.S.C. §§ 2201 and 2202.

22. Venue is proper in this district under 28 U.S.C. § 1391 because Defendants reside in this district and the action arose in this district.

23. Venue is proper in the Greenville division under Local rule 3.01 because a substantial portion of the events or omissions giving rise to the claims occurred in this division.

## FACTUAL ALLEGATIONS

### I. The Greenville Library acknowledges the need for, and claims to follow, non-discriminatory library-collection policies.

24. Greenville County is the most populous county in South Carolina. The library system is a "continuing function of county government." S.C. Code § 4-9-35(A).

25. In general, Greenville Library holds itself out as adhering to traditional, nondiscriminatory principles of library collection.

26. The stated mission of Greenville Library is "[t]o champion literacy, inspire learning, and foster community connection," its vision is "[t]o be Greenville County's first choice for exploration, discovery, and information," and it "remains dedicated to providing free

access to materials, experiences, and resources to communities throughout Greenville County." Greenville County Library System, *About Us*, available at https://www.greenvillelibrary.org/about-us.

27. Since 1999, the Board has adhered to an official Collection Development and Maintenance Policy ("the Collection Policy") which "provides direction to Library staff in the collection development and maintenance process as well as information for the public on the philosophy and rationale used to make collection development and maintenance decisions." Ex. A.

28. The Collection Policy defines "collection development and maintenance" as "the ongoing process of evaluating materials available for purchase or licensing and making decisions about adding, deleting, and retaining materials in the Library collections." *Id.*

29. The Collection Policy describes a philosophy that "strives to support an informed community by providing access to the world of ideas and information," and a "responsibility to acquire, as available, material presenting a wide variety of views and opinions on current and historical issues." *Id.* The Collection Policy proclaims that the "Library will neither promote nor censor any particular religious, moral, philosophical or political conviction or opinion" and that "[m]aterial will not be excluded because of the race or nationality or the religious, social, or political views of the author, publisher, or creator." *Id.* It also states that "[t]he Library recognizes that many materials are controversial and that any given item may offend some. Only individuals can determine what is most appropriate for their needs." *Id.*

30. With respect to its larger collection philosophy regarding material for children, the Collection Policy states that "[a]lthough the Library recognizes the need to be sensitive to the categorization of material that may be deemed inappropriate for some ages of children, parents and legal guardians have the responsibility for their children's use of library materials and are encouraged to define what material or information is consistent with their personal and family beliefs; only they can apply those values for themselves and their children." *Id.*

31. The Collection Policy lists the following "General Criteria" in its "Factors Considered in Material Selection":

- Reputation and qualifications of the creators, publisher or producer
- Community needs, interests, demands, and standards
- Importance as a document of the times
- Literary, artistic, and technical values
- Relationship to the existing collection
- Availability in other area libraries
- Suitability of physical form for library use
- Recommendations in reviews
- Durability
- Price
- Suitability of subject and style for intended audience
- Judgment of work as a whole
- Availability of equipment required for examination and use
- Publication date
- Availability for purchase

32. The Collection Policy also lists the following as "Content Criteria":

- Comprehensiveness and depth of treatment
- Accuracy of content
- Authority, skill, competence, and purpose of author/producer
- Objectivity
- Clarity
- Technical quality
- Vitality and originality
- Artistic presentation
- Effective characterization

- Sustained interest
- Relevance and use of the information
- Authenticity of history of social setting

33. The Greenville Library's stated principles are consistent with "best practices" standards promulgated by the American Library Association (ALA), which are undergirded by a philosophy that "all libraries are forums for information and ideas," and that "intellectual freedom," or "the right of library users to read, seek information, and speak freely as guaranteed by the First Amendment," "is one of the core values of the library profession."

34. With respect to "controversial topics," ALA states that "[i]t is the responsibility of all libraries to serve every member of their designated communities. It is not the responsibility of a library to promote one point of view over another. This requires that libraries collect material that represents majority beliefs as well as minority beliefs. The [ALA]'s Library Bill of Rights and Freedom to Read Statement provide ethical guidance to librarians on these issues. In providing access to a diversity of materials, some material may be offensive and/or controversial to some patrons. Libraries cannot reject and remove a resource because an individual or a group has found the material objectionable. Libraries must provide access to material that may be controversial to some patrons, while also providing a process by which individuals or groups may formally request reconsideration of material they find offensive or inaccurate."

35. ALA's Library Bill of Rights states that "Books and other library resources should be provided for the interest, information, and enlightenment of all people of the community the library serves. Materials should not be excluded because of the origin, background, or views of those contributing to their creation," and further, that "Libraries should provide materials and information presenting all points of view on current and historical issues. Materials should not be proscribed or removed because of partisan or doctrinal disapproval."

## II. The Greenville Library Board adopted formal policies that discriminate against LGBTQ-related library materials and impede library patrons' access to such materials.

36. By 2023 and 2024, treatment of transgender people had become a wedge political issue, both nationally and in South Carolina. Against that political background, the Library Board abandoned its commitment to "neither promote nor censor any particular religious, moral, philosophical or political conviction or opinion." Entering the political fray "to take an ethical and moral stand" against transgender people, the Library Board replaced its traditional and neutral policies with two new discriminatory policies that censored access to information and ideas that the Library Board wished to suppress. The Library Board started by focusing on books for young children and then moved on to books for young adults.

### A. <u>The Board Banishes Books with Transgender Characters and Themes from the Juvenile Section (0-12 year-olds)</u>

#### 1. *A patron requests to remove* Melissa *from Greenville Library collection.*

37. In early 2024, a library patron requested that the Library remove a book, *George* (later republished as *Melissa*), from the Library collection.

38. *Melissa* is a children's novel, targeting ages 8 to 12, originally published in 2015. It is about a 10-year-old transgender girl who struggles with how to show her true self to the world. The *School Library Journal* calls it "[a] required purchase for any collection that serves a middle grade population," *Kirkus Reviews* calls it "warm, funny, and inspiring," and *BookPage* says that "readers going through a similar experience will feel that they are no longer alone, and cisgender (non-transgender) readers may gain understanding and empathy." Among its numerous accolades are inclusion on *Kirkus*'s "Best Middle Grade Books" list, *Publishers Weekly*'s "Best Middle Grade Books," and ALA's Notable Children's Book List.

39. Under the Library's policies, library patrons may request that material in the Library's collections be "reconsidered" (*i.e.*, removed), by submitting a *Request for Reconsideration of Library Material* form ("Reconsideration Form"). The Reconsideration Form directs the Requester to indicate whether they (a) believe the material being objected to violates

the Collection Policy or (b) do not know if the material violates the Collection Policy, but find certain content objectionable; and to provide examples of the violative or objectionable content in either case. The form then asks what action the patron would prefer the Library take regarding the material in question.

40. The individual requesting that *Melissa* be removed from the Library's collection ("the complainant"), wrote on the Reconsideration Form that they objected "to the author describing gender dysphoria, or rejecting one's God-given sex, as normal and good." The complainant also stated that the book "normaliz[ed] behavior [that] rejects God's given sex," which the complainant described as "harmful, causing many adverse consequences." The complainant commented that "sex is a biological reality, and the suppression of this truth leads to significant confusion, instability, and disruptive behavior."

41. Pursuant to the Library's Reconsideration of Library Material Regulations (attached as Exhibit B), requests or "reconsideration forms" are evaluated by the Library Collection Development Committee, who must evaluate the item in question by (a) reading, viewing, and/or listening to the item, specifically considering the Requester's written concerns and the Collection Policy; (b) consulting reviews and recommended lists to determine the opinions of experts, critics, and others; and (c) meeting to discuss the requester's concern(s) and deciding whether the item meets selection criteria and its classification is in compliance with the Collection Policy. Based on this evaluation, the Collection Development Committee must then formulate a recommendation regarding the item's classification and retention in the collection. Ex. B.

42. In its original response to the complainant, the Library denied the request to remove the book because it had continued to be borrowed since being added to the Library collection in 2016. The response letter also cited the Collection Policy's philosophy that "only individuals can determine what is most appropriate for their needs."

2. *The Materials Committee votes to move* Melissa *and advance a new discriminatory policy for children's books.*

43. The complainant then appealed to the Board's Library Materials Committee ("the Materials Committee"), indicating a belief that Library policy required that "inappropriate material [be] restricted from children and removed," and stating that Executive Director James's reliance on the book being borrowed did "not substantiate that it is considered appropriate or that leadership maintain it in their collections."

44. On February 16, 2024, the' Materials Committee—consisting of Board members Marcia Moston (Committee Chair), Gene Beckner, Elizabeth Collins, and Tommy Hughes, with non-committee Board members Brian Aufmuth and James Hoard also present—met with two items on its agenda: (1) a Request to review a book, *George*, later republished as *Melissa*, from the Library collection and (2) the Collection Policy.

45. Board member Elizabeth Collins moved to recommend to the full board that *Melissa* be removed from the library collection, "both physical copies and the electronic resources." She gave her reasoning for this motion, indicating her agreement with the complainant that the book should be removed on the basis that it "describes gender dysphoria and rejects that biological sex is normal and good," thereby "promot[ing] confusion and destructive behavior." She opined that the book "talks about children's genitalia, it teaches that parents are not safe, and it normalizes the idea of biological males dominating in women's roles, and it talks about medical transitioning and puberty blockers for minors."

46. Board member Brian Aufmuth (not a member of the Materials Committee, but present) pointed out his view that the appeal from the complainant "seem[ed] to be religious based" and his concern "about censoring of materials based on a religious perspective."

47. Committee member Gene Beckner responded that his proposal of moving the book to "Parenting and Early Childhood" was because he "want[ed] to have the library recognize the primary source of education for their children is their parents, and so allowing a parent to make that decision for their child to have this book or not have this book." He continued that "there [were] a lot of things in this book that a nine-or ten-year-old is not going to fully comprehend and doesn't fully comprehend the consequences of some of these decisions."

48. "Parenting and Early Childhood" (PEC) refers to a specific section within the adult collection of the library, which only exists at half of the Library's twelve locations, and from which minors with juvenile or young adult library cards cannot check out books. Before it became a repository for books banished from the juvenile and young adult sections, the PEC collection housed materials intended *for parents and guardians*.

49. Aufmuth responded to member Beckner's proposal with the suggestion that, prior to the full Board vote, the Board should consult with an attorney, such as the county attorney.

50. Moston responded by stating that the issue with the book was "the presentation that [being transgender] is normal and good" and "also the normalizing of . . . something that . . has potentially dangerous consequences."

51. Moston then took the Committee vote to move *George* (*Melissa*) to the PEC section, from which minors cannot check out books. The four Committee members unanimously voted in favor of moving the book.

52. The Committee then moved to the second agenda item: a proposal to revise the Collection Policy to require that *all* books for children with depictions of transgender characters be placed in the adult section of the library from which children cannot check out books.

53. Moston stated that the Library lacked a policy for books containing transgender characters or themes "because . . . it's a relatively new explosion." She noted that this was the first challenge to a book "based around the idea of gender identity," but that she "expect[ed] that there [were] more challenges coming," and the library needed to "have a policy in place, so we have something to measure things by."

54. Moston presented the proposed policy to the Committee, which was ultimately passed 4-0 after several minor changes. The proposed policy would add the following language to the Juvenile Collection Policy:

> The library recognizes parents are the primary source of education for their children and that they have a fundamental right and responsibility to direct the upbringing and education of children under their control, including issues of moral, social, physical, civic, and spiritual development.

To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:

- Social transitioning: Pronouns or dress inconsistent with biological sex.
- Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.
- Gender fluidity: The possibility of changing genders at will or being no gender at all.

55. During the committee discussion, Aufmuth suggested removing the "Social transitioning" and "Gender fluidity" bullet points, indicating that the language was "vague," "overly broad," and "could be loosely interpreted" to include "materials that you're not intending to capture," using *To Kill a Mockingbird* as an example, based on the character Scout being "dressed like a boy most of the time."

56. Moston responded that "nobody wakes up one morning and decides to go and have their breasts cut off or to have any kind of genital surgery. This is a process." She described Oli London, a "detransitioner" whose "introduction to pronouns" allegedly "brought into his mind the idea that . . . you can change your sex; that it's possible to be someone else." Moston indicated her belief that "children's literature that embeds these ideas as though they were a fact into the stories" is "dangerous."

57. Aufmuth repeated his concern that the policy as written may create a situation where "the umbrella is too big," and certain books not intended to be targeted would have to be moved under the policy.

58. After some discussion, Collins conceded that the policy may well be overinclusive relative to its goals, but indicated her belief that the issue was "so serious," that she "would rather [the Library] err on the side of our net being too wide and catching some books that maybe shouldn't have gotten moved to PEC." She continued that she "would rather *To Kill a Mockingbird* end up in PEC than . . . signaling accidentally through our juvenile section that we

think this is appropriate for children to learn on their own." She reiterated that she would "rather cast too wide a net now than too small a net."

59. Once the vote was called, the Committee voted 4-0 to add the proposed language, which would go to the full Board the following week for more discussion.

3. *The Library Board votes on and passes the new discriminatory policy for children's books.*

60. On February 26, 2024, the full Library Board of Trustees convened, with all eleven board members participating (Kenneth Baxter, Gene Beckner, Elizabeth Collins, Stephanie Cunningham, S. Allan Hill, James Hoard, Tommy Hughes, Marcia Moston, Kristen Odom, and Joe Poore all participated in person, while Brian Aufmuth participated by phone). Greenville Library Executive Director (Defendant) Beverly James was also present and participated in the discussion.

61. Board Chair S. Allan Hill facilitated the Board meeting, beginning with a discussion of whether to endorse the Materials Committee's decision to move *Melissa* to the adult section of the library. Ten out of the eleven board members voted to uphold the Materials Committee's decision to move the book. The one dissenting vote was from Board Member Hoard, who wanted to remove *Melissa* from the library entirely Hoard stated his position on *Melissa* as follows: "I think it's trash. We're a taxpayer-funded facility and it's not the taxpayer's duty to subsidize trash."

62. After the vote on *Melissa*, Chair Hill explained why he thought the Board should adopt the new policy proposed by the Materials Committee. Chair Hill stated, "we realized that there's nothing in our policy because you know, before ten years ago, I can't even remember the first time I heard about kids talking about being a different gender. It hasn't been more than ten years ago. But we never had to have a policy specifically regarding transgender-type books in the children's section. And so . . . we became aware of that because of this appeal."

63. Hill later continued, "My now adult kids say, 'Why do you have to have a policy?' I say, 'Well, a few years ago, we had people with good sense. We didn't have to have a

policy that said that you didn't need to have transgender books, books about how do we make ourselves transgender, in the children's section. But now we do. So, the fact that this book was there and that there wasn't anything specific on it brought that to light. And so, we have a committee recommendation regarding that situation."

64. Board member Marcia Moston then spoke in favor of the new policy and read the proposed text into the record:

> The library recognizes parents are the primary source of education for their children and that they have a fundamental right and responsibility to direct the upbringing and education of children under their control, including issues of moral, social, physical, civic, and spiritual development.
>
> To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:
>
> - Social transitioning: Pronouns or dress inconsistent with biological sex.
> - Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.
> - Gender fluidity: The possibility of changing genders at will or being no gender at all.

65. Board member Hughes pointed out that the term "dress" was "vague," which Board member Poore agreed to, stating "I think we do have some vagueness here. What is dress inconsistent with biological sex? Can we add a definition of that? Like, is that, is that only, is that a male, is that males wearing dresses?" He also pointed out that it could be applied to instances where kids raid the closet and dress up, which he "d[id]n't think anybody's after."

66. Moston replied that "this policy is specific to gender identity issues, and not tomboy or imagination or play dressing. The policy is about changing your, that you are dressing for the purpose of identifying as a girl." She stated further, "I think even doing keyword searches on these books . . . some of these books pop up very quickly because it is specific to gender identity."

67. Based on Poore's concerns around the vagueness of "dress inconsistent with biological sex," Board member Kristen Odom suggested adding language to clarify that "we're specifically regarding affirming gender transition."

68. Based on this suggestion and discussion, Odom moved to add "for the purpose of affirming gender transition" to the first and last bullet points in the policy language.

69. This motion was voted on by voice vote, with only Member James Hoard voting against it, as he believed "we're going down a rabbit hole of trying to be too perfect, and it's just unnecessary."

70. Chair Hill then moved to the motion to add this amended language to the Collection Policy.

71. Board member Brian Aufmuth asked (over speakerphone) how many Library locations had PEC collections, to which Beverly James replied, "There's six. Not every location has one."

72. Greenville Library has twelve physical locations in total.

73. Member Odom asked whether it was possible for every branch to have one, to which Executive Director James responded, "Well, there's space issues that have to be considered. It may mean that we would transfer a book that doesn't have a PEC collection at the moment, then we would transfer that book to another location that does."

74. Chair Hill then called a voice vote on the amended policy. All eleven board members voted in favor of the policy, which ultimately added the following provision to the Juvenile Section of the Collection Policy:

> The library recognizes parents are the primary source of education for their children and that they have a fundamental right and responsibility to direct the upbringing and education of children under their control, including issues of moral, social, physical, civic, and spiritual development.
>
> To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in

ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:

- Social transitioning: Pronouns or dress inconsistent with biological sex for the purpose of affirming gender transitioning.
- Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.
- Gender fluidity: The possibility of changing genders at will or being no gender at all for the purpose of affirming gender transitioning.

75. Following the vote, Chair Hill addressed a previously raised concern, stating "I don't see this change in the policy as calling out staff to scour through all the books. I think the public, general public, is going to do that job for us as they find books that violate this policy."

76. Member Moston stated that "they're just simple keyboard search that doesn't require very much, and they're specifically described as gender identity or transgender, so right there, you know, that's the main topic."

77. Just prior to moving on, Chair Hill addressed the complainant who had appealed the denial of his challenge to *Melissa*, stating "I think the gentleman who filed the appeal is here today for the votes in question. Thank you for your diligence."

78. During the public comment portion of the meeting, ten members of the public spoke, each being given three minutes for comment. Of those ten members of the public, six spoke out against the censorship being imposed by the Library.

B. <u>The Board Banishes Books with Transgender Characters and Themes from the Young Adult Section (13-17 year-olds)</u>

79. On August 16, 2024, the Board's Library Materials Committee met to consider another new policy proposal. This second proposal targeted the books available for young adults, reading:

> The Library System recognizes that parents/legal guardians have a fundamental right to be involved in all aspects of their minor children's lives, especially in matters as life changing as gender identification.

> Therefore, materials targeting audiences aged 13-17 with characters who have transitioned or are in the process of transitioning from a gender that corresponds to their biological sex to a different gender will be located in the Adult Collection.
>
> This includes materials with illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning, whether changes are social (names, pronouns) or physical.

80. In a meeting that took a total of thirteen minutes, the Committee voted to advance the proposed language to the full Board.

81. On August 26, 2024, the full Board met to consider the new policy for young adult books.

82. Chair Hill and Member Moston both expressed their belief that this policy brought the Collection Policy in line with South Carolina law prohibiting anyone under 18 from receiving gender transition-related care. When Member Poore pointed out that "state law doesn't prevent using a pronoun," Moston replied that "using the pronouns is the first step of social transitioning."

83. Poore continued to raise First Amendment concerns with the policy amendment, specifically raising that the prohibition on any portrayal of transgender characters was overbroad. Poore questioned Marcia Moston's understanding of the policy, stating "The way I read this, is that if a book has a transgender character in it, of any type, in the book—not like it is a book about the character, it could be somebody's friend . . . —that book now becomes adult material. Is that, am I understand the policy correctly?" Moston responded, "Yes."

84. Poore argued that the policy whereby "the presence of a transgender character in a book, in any case, is grounds for relocating it to the adult section" seemed to be "discriminatory . . . and also just unnecessary."

85. Moston disagreed with the characterization of the policy as discriminatory, stating that the policy was "about putting ideas in the library, putting ideas in kids' minds that may not have already been there," which she characterized as "a dangerous thing" for which the library had "every right . . . to take an ethical and moral stand" against, by "putting it in an area where

parents who don't mind can give permission, parents who do mind can expect their young adult collection to . . . not expose their children to such a radical agenda."

86. Poore indicated that he agreed with the position that "we don't want material in the kids' section encouraging lifelong consequential decisions," but that "it is a different thing to say, 'we do not want to allow any book in the kids section that has a human being in it that is transgender.'" Poore questioned whether the Board had "a First Amendment lawyer look at this, because I'm pretty sure we probably haven't." He later described his belief that "trying to move books specifically because they promote or affirm or introduce gender transition ideology" was acceptable, because "[c]hanging their genitals falls under graphic sexuality," whereas this policy was "overly broad and discriminatory."

87. Chair Hill emphasized that "with regard to this situation, it is not safe for [13- to 17-year-olds] to get ideas, because it's not a good idea to encourage transgenderism with regard to 13- to 17-year-olds. And there's a state law, in fact, in effect, that says basically the same thing."

88. Member James Hoard argued that the debate was about "what shelf is this book going to be placed on," so the continued debate was unnecessary.

89. Member Aufmuth responded that the policy was in fact "restricting access to content," and raised the First Amendment concern, stating, "there's legal cases that talk of speech that is neither obscene as to use nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," and that the Board should seek "legal counsel to review this policy."

90. Aufmuth continued, "There are a lot of things in books in the young adult section that are dangerous to children, just as or more dangerous than transgender ideology." For example, he pointed out books about drugs and alcohol, as well as suicide, which he characterized as "a far greater threat to mental health to our youth than transgenderism," as well as "a lot of other topics," such as "gun violence" and the "trauma of kids going through school shootings," "broken families and divorce." He concluded, "There are a lot of topics that are

dangerous to children and that parents might not want their children exposed to. We can't regulate and move all topics that might be dangerous [or have a] negative impact to the adult section. We can't target one group just because we don't like that group."

91. Poore again tried to point out that this was "a form of restriction," even if parents could permit their children to have unrestricted library cards, and likened the policy to "think[ing] women should all stay home; they shouldn't work in the workforce" and then "tak[ing] away any book that portrays a woman working in the workforce" and not allowing it in that section of the library.

92. Poore tried to get an answer as to whether the policy amendment had been reviewed by outside counsel, but the Board voted to move the policy to a vote, suspending further debate.

93. Upon a voice vote, the Board passed the motion, with Poore and Aufmuth being the only members to vote against it.

94. Following an unrelated update from the Executive Director, Member Aufmuth introduced a motion to ask the Director to ask for "a First Amendment lawyer to take a look at our Collections, Development, and Maintenance Policy to determine whether we are in compliance constitutionally."

95. That motion failed, with four votes in favor, and seven votes against.

96. At no point during the February 2024 or August 2024 Board meetings did any Board member or Library patron identify a specific harm that had resulted from the targeted books being on the juvenile or young adult bookshelves. In fact, no Board member or Library patron identified any outcome whatsoever of an actual child being exposed to targeted materials. Rather, the only harms discussed were theoretical fears of "putting ideas in kids' minds that may not have already been there."

## III. Defendants also enforce and condone a widespread custom and practice of discriminating against and censoring LGBTQ-related library materials.

97. Beyond the 2024 amendments to the Collection Policy, the Library also enforces a widespread custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials, including with respect to books for adults.

98. *First*, the Library systematically ignores procurement requests for LGBTQ-related materials and fails to obtain new LGBTQ-related titles for the Juvenile Collection, the Young Adult collection, or Adult collection.

99. Library patrons can use the "Suggest a Title" forms on the Library website to request new library materials. These requests are generally approved, so long as they comply with the general curation criteria.

100. Defendants discriminate against requests for LGBTQ-related materials. Despite dozens of library patrons submitting requests for LGBTQ-related titles using "Suggest a Title" forms on the Library website, the Library denies these requests and has disproportionately failed to fulfill requests for LGBTQ-related titles as compared to other requests. In 2023, zero books containing LGBTQ characters were purchased for the Juvenile Collection, and less than 1% of the books purchased for the Young Adult collection contained LGBTQ stories.

101. *Second*, the Library has removed dozens of LGBTQ titles from its collection—including adult, young adult, and juvenile titles—with no explanation.

102. Between January 2023 and October 2023, thirty-six adult LGBTQ-related titles were removed entirely from the Library system: *The Man on the Third Floor* by Anne Bernays, *A Thin Bright Line* by Lucy Jane Bledsoe, *My Avant-Garde Education: A Memoir* by Bernard Cooper, *Coming Out Spiritually: The Next Step* by Christian de la Huerta, *Soon to Be a Major Motion Picture* by Warren Dunford, *Not Dark Yet* by Berit Ellingsen, *Willa & Hesper* by Amy Feltman, *Fire Year* by Jason K. Friedman, *We Were Witches* by Ariel Gore, *Less is Lost* by Andrew Sean Greer, *Homintern: How Gay Culture Liberated the Modern World* by Gregory Woods, *Hide* by Matthew Griffin, *Always* by Nicola Griffith, *Split Screen* by Brent Hartinger, *The Line of Beauty* by Allan Hollinghurst, *Blind Sight* by Meg Howrey, *Honor Betrayed: Sexual Abuse in America's Military* by Dr. Mic Hunter, *The Last Illusion* by Porochista Khakpour, *Skin*

*Hunger* by Eli Lang, *Escaping Indigo* by Eli Lang, *Common Murder: The Second Lindsay Gordon Mystery* by Val McDermid, *No Other World* by Rahul Mehta, *Murder Under the Fig Tree* by Kate Jessica Raphael, *Hot Rocks* by Lev Raphael, *Mother India* by Tova Reich, *Say Say Say* by Lila Savage, *I Heart Oklahoma!* By Roy Scranton, *Now is the Hour* by Tom Spanbauer, *Milk* by Darcey Steinke, *Delta Belles* by Penelope J. Stokes, *Someone Killed His Boyfriend* by David Stukas, *The Lauras* by Sara Taylor, *Pedal to the Metal* by Jesse J. Thoma, *Sergio Y* by Alexander Vidal Porto, *The Lucky Star* by William T. Vollmann, and *Bad Boy* by Elliot Wake.

103. Upon information and belief, numerous additional LGBTQ-related adult titles have been removed from the Library system since October 2023.

104. Between January 2023 and October 2023, twenty-three juvenile and young adult titles have been also removed entirely from the Library system: *LGBTQ Families: The Ultimate Teen Guide* by Eva Apelquist, *I am J* by Cris Beam, *Starting from Here* by Lisa Jenn Bigelow, *The Miseducation of Cameron Post* by Emily Danforth (in CD audiobook), *Same-Sex Parents* by Holly Duhig, *Sound* by Alexandra Dunan, *Moonstruck Magic to Brew* by Grace Ellis, *Tell Me Again How a Crush Should Feel* by Sara Farizan, *The Great American Whatever* by Tim Federle, *Tattoo Atlas* by Tim Floreen, *Willful Machines* by Tim Floreen, *The Stonewall Riots* by Laurie Collier Hillstrom, *The You I've Never Known* by Ellen Hopkins (in CD audiobook), *Black Wings Beating* by Alex London, *All Out* by Saundra Mitchell, *Classmates = Dou Kyu Sei* by Asumiko Nakamura, *The Truth Is* by NoNieqa Ramos (in e-book), *Lizard Radio* by Pat Schmatz, *Drag Teen: A Tale of Angst and Wigs* by Jeffery Self, *Stick* by Andrew Smith, *My Friends and Me* by Stephanie Stansbie, *Six Impossible Things* by Fiona Wood, and *Same-Cell Organism* by Sumomo Yumeka.

105. Upon information and belief, numerous additional LGBTQ-related juvenile and young adult titles have been removed from the Library system since October 2023.

106. *Third*, the Library has also adopted a widespread practice of moving LGBTQ titles from the Juvenile and Young Adult sections to the Adult section even when those books do not depict transgender people or gender transition.

107. Despite LGBTQ-related materials consisting of less than one-quarter of one percent of the Library's collection, the Library encourages employees to use routine maintenance procedures to thin the LGBTQ collection down even more. This includes library employees using "weeding"—a practice meant to be a routine removal of books in disrepair, books that are outdated or that contain incorrect information, and items that have never had interest from the public (with few or no check-outs)—to pretextually discard LGBTQ titles, including books purchased within the past five years.

108. Each of these practices is enforced and promulgated by Defendant Allen (with respect to the Juvenile and Young Adult collections) and Defendant James (with respect to the collection as a whole).

109. These practices are consistent with the many public statements and actions of Defendants reflecting deep and longstanding hostility to LGBTQ themes over the course of many years.

110. For example, in February 2019, a former librarian Jonathan Newton was forced out of his job of seventeen years for "insubordination" after refusing to succumb to a request from Executive Director Beverly James to cancel a planned "Drag Queen Story Hour" at the Five Forks branch of the Library.

111. On June 22, 2022, Pride Month displays at several Library branches were ordered to be taken down, and then subsequently allowed to return the next day following public backlash. Later reporting revealed that the decision to respond to the Pride displays was made between Board Chair S. Allan Hill and Executive Director Beverly James, and that former Library access manager Teresa Lanford was instructed to call each of the twelve branches and to read the following script: "The Library Board has received complaints about Pride displays in GCLS facilities. The Library Board Chair has directed Bev to have the displays taken down. Please remove any Pride-related displays in your location by the end of today. Thank you." Access and Discovery Manager Brian Morrison told Lanford it was necessary that the information was relayed over the phone, rather than over email or letter, in order to minimize

evidence. Based on this incident, one former Board member, Laura Baker, resigned on July 5, 2022, and called on James and Hill to resign.

112. At the September 2022 Board meeting, former Library Communications Director Daneen Schatzle reported being "asked to remove a TV slide promoting the LGBTQ book club" at one Library branch. She stated to the Board that it was the first time in her twelve years at the Library that she was asked to remove a TV slide, which was "a normal part of our publicity and marketing." Schatzle resigned from her position at the Library in October 2022.

113. At the same Board meeting, former manager of the Travelers Rest library branch Nathan Schmaltz and others reported feeling directly harassed and intimidated by Board Chair Hill, who had visited the branch on September 21, 2022 to directly complain about an LGBTQ book display, reportedly demanding over and over "Do you see why people don't like this? Do you see? Do you see?"

114. In April 2023, the Board enacted a policy that required branches to ask for permission to put up displays if they promoted certain regulated materials, and in October 2023 voted to pass a new policy (attached as Exhibit C) that eradicated themed displays altogether, aside from those "related to paid holidays observed by both the Greenville County Government and the Greenville County Library System." (Ex. C). The policy gives the Executive Director or a designee authority to "remove any material from a display if he/she determines the material is overly political, provocative, inappropriate, or not relevant to the respective holiday."

115. In October 2023, the *Greenville News* reported on the ongoing "culture of fear" amplified by Hill and the rest of the Board, as the jump in yearly turnover rate at the Greenville Library from 12% in 2018 to 20.4% in 2022.

## IV. The Library's discriminatory policies and practices have harmed, and will continue to harm, Plaintiffs and putative class members.

### A. <u>O.R., and his parents, Cheryl Rogers and Greg Rogers</u>

116. Plaintiff O.R. is 17 years old and was born and raised in Greenville County. He is the youngest of five children born to Cheryl and Greg Rogers.

117. The Rogers family has lived in Greenville County since 2001, when they moved from Ohio.

118. Cheryl and Greg, along with all five of their children, have been patrons of the Greenville County Library System since moving to Greenville.

119. O.R. came out as transgender to his parents in 2022.

120. At first, because Cheryl and Greg did not know any transgender people, they were apprehensive about this news.

121. Seeking support, Cheryl decided to read books about how to help and support a transgender child.

122. Cheryl and Greg became members of Greenville's chapter of PFLAG, which describes itself as "the nation's largest organization dedicated to supporting, educating, and advocating for LGBTQ+ people and those who love them."

123. After becoming involved with PFLAG, Cheryl read books with LGBTQ characters herself, which familiarized LGBTQ relationships and identities for her and provided invaluable perspective on her child's experience. She wanted to immerse herself in the community and did so primarily through literature. She was also interested in the books O.R. was reading, and they were able to share the experience of reading those books together.

124. O.R. loves reading and wants to be a writer. He feels that reading opens up entirely new universes for him, exposing him to new perspectives that he can relate to, no matter how different the character may be from himself.

125. O.R. is particularly interested in reading books with transgender and other LGBTQ characters. When O.R. first came out as transgender, reading LGBTQ-related books helped him feel less invisible, and like his experience was valid.

126. As a teenager, O.R. often goes to the library and checks out books by himself.

127. Because O.R. has a young adult library card, he cannot check out books from the adult sections of the library, including the Parenting and Early Childhood or Adult sections.

128. Cheryl and Greg believe that O.R. should be able to have privacy over the books he chooses to read, without having to ask for his parents to check books out for him using their adult cards, as long as the books are generally targeting his age group.

129. Cheryl and Greg do not wish to give O.R. access to the entire adult collection but believe he should be able to check out age-appropriate books and materials with transgender characters that he is no longer able to access due to the Library's policies.

130. O.R., and Cheryl and Greg, all believe that reading provides essential representation for individuals' identities, can provide the strength to say who you are, and to feel secure being yourself. But because of the Library's policies and practices, O.R. is restricted from full and free access to books that positively reflect his identity and experience. These policies limit O.R.'s ability to read the books he wants to read.

131. Cheryl and Greg also wish to be able to access the full array of LGBTQ-related books, including titles the Library has quietly removed from its shelves with no explanation.

132. O.R. feels denigrated and stigmatized by Defendants' anti-LGBTQ attitudes and practices. The Library's policies and practices send a message to O.R. that his identity is shameful and should not be discussed in public, and to O.R.'s parents that families like theirs are not acceptable in Greenville County.

133. When O.R. is unable to find a book he wants to read in the Young Adult section (whether because it was banished to the PEC section or removed from the library altogether), it makes him feel as if he's not seen, and like his identity is seen as vulgar or inappropriate by his community. It is similarly ostracizing that the Library would rather eradicate all themed displays than positively portray his community or existence. He also worries about the transgender and other LGBTQ children who may not have as supportive of families as his, and how it must feel for them. He wants to be treated as human by his community and wants the same for everyone else.

B. <u>E.G. and M.G.</u>

134. E.G. and M.G. are twelve and eleven years old, respectively. They live in Greenville County with their mother, Amber Galea.

135. The entire Galea family are patrons of the Greenville County Library System. Amber got both E.G. and M.G. library cards when each of them turned 5 years old, the earliest age possible.

136. M.G. has a juvenile library card, meaning she is only permitted by Library policy to check out books located in the juvenile section. E.G. has an unrestricted minor card.

137. E.G. identifies as queer, while M.G. does not.

138. During their most recent visit to the Hughes branch of the Library, there were several books E.G. and M.G. were interested in that were only located in the Parenting and Early Childhood section of the library, rather than the Juvenile section where M.G. and E.G. normally like to browse for books for their age group. These titles included *Hocus and Pocus and the Spell for Home* by A.R. Capetta, *The Cardboard Kingdom* by Chad Sell, *Red: A Crayon's Story* by Michael Hall, *Riding Freedom* by Pam Muñoz Ryan, and *Snapdragon* by Kat Leyh.

139. Both E.G. and M.G. wish to be able to read books about queer and transgender characters their age in the juvenile section of the library. They feel like some of their favorite books have been disappearing, and they do not understand why.

140. Although E.G. has an unrestricted minor library card (meaning she can check out any book in the library), she finds it frustrating to walk all over the library to find books targeting her age, simply because those books have characters in the LGBTQ community and other people who identify as outside societal norms. She feels indignant that these books aren't in the same section as other children's books.

141. M.G. feels similarly. She is particularly interested in children's graphic novels like *Cardboard Kingdom* and *Snapdragon*. During her last visit, M.G. tried to check out *Snapdragon* using her library card and was unable to do so. The experience made her feel that the library was trying to hide these books from her and from other kids her age.

142. Amber similarly wants her children to be able to check out any books they would like in the age-appropriate sections of the library, without having to use their parents' adult library cards (or granting them permission to have adult cards themselves) to do so.

143. Amber seeks to provide an accepting environment for her children, which includes providing access to LGBTQ-affirming books and films to her children.

144. Amber feels like the Greenville community does not want her family there, and that the Library's policies reinforce that impression.

C. W.M.

145. Plaintiff W.M. is 9 years old and was born and raised in Greenville County, where he lives with his mother, Kersey Clark.

146. Kersey has lived in Greenville County since 2004. She currently works as an office manager for an electrical service company. Previously, Kersey worked in various positions throughout the Greenville County Library System, including in circulation, processing, and tech services.

147. Kersey and W.M. are patrons of the Greenville County Library System.

148. W.M. has a juvenile card, meaning he is only able to check out books in the juvenile section, for books targeted at children under the age of thirteen.

149. W.M. does not currently identify as LGBTQ, but Kersey wants him to have access to a diverse array of books and materials, including with LGBTQ themes, so he can explore his own identity without needing permission from her. However, Kersey does not wish to give W.C. access to the entire adult collection of the library in order to do so.

150. W.M. believes moving books out of the juvenile section because they feature LGBTQ characters is unfair. He is interested in books that have been moved to the adult section under Greenville's policy, including the *Magnus Chase* series by Rick Riordan—a fantasy trilogy targeted at readers aged 9-11 that is part of the *Percy Jackson* universe and features a genderfluid character.

151. Since witnessing the influence of anti-LGBTQ policies and practices in the Library, Kersey and W.M. sometimes choose to drive further, out of the county, to the Spartanburg County public library, in order to access more materials than those available in the Greenville Library's juvenile section.

## V. Class Allegations

152. Plaintiffs O.R. and E.G., by and through their respective parents, bring their Fourteenth Amendment claims as class actions on behalf of themselves and all others similarly situated under Fed. R. Civ. P. 23(b)(2).

153. O.R., a 17-year-old transgender boy, represents the Juvenile & Young Adult Class of "all minor, transgender library patrons who lack adult library cards."

154. The Juvenile & Young Adult Class is sufficiently numerous such that "joinder of all class members is impractical." Fed. R. Civ. P. 23(a)(1). The Williams Institute estimates that there are about 3,700 transgender youth in South Carolina between the ages of 13 and 17. A significant portion of those live in Greenville, which is South Carolina's largest county.

155. O.R.'s claims are common to, and typical of, the Juvenile & Young Adult Class. Like all putative members of the Juvenile & Young Adult Class, O.R. suffers a continuing dignitary and stigmatic harm from Defendants' widespread, discriminatory, and animus-driven practices of, *inter alia*, removing dozens of books containing LGBTQ characters or themes, discriminatorily refusing requests for new library materials, and prohibiting display of LGBTQ events or clubs.

156. O.R., like all putative members of the Juvenile & Young Adult Class, also suffers both a concrete impediment to accessing library materials containing transgender characters or themes, as well as a continuing dignitary and stigmatic harm from Defendants' formal policies requiring the banishment of all books depicting transgender characters or themes from the juvenile and young adult sections to the Parenting and Early Childhood (PEC) section.

157. E.G., a 12-year-old girl that identifies as queer, represents the Unrestricted Library Card Class of "all LGBTQ-identifying library patrons who have adult or juvenile non-restricted library cards."

158. The Unrestricted Library Card Class is sufficiently numerous such that joinder would be impractical. Greenville Library has approximately 191,500 registered borrowers, and it is estimated that around 3.5% of South Carolina residents identify as LGBTQ.

159. E.G.'s claims are common to, and typical of, the Unrestricted Library Card Class. E.G., like all putative members of the Unrestricted Library Card Class, has no restrictions on her library card yet suffers a continuing dignitary and stigmatic harm from Defendants' widespread, discriminatory, and animus-driven practices of, *inter alia*, completely removing dozens of books containing LGBTQ characters or themes, discriminatorily refusing requests for new library materials featuring LGBTQ characters or themes, and prohibiting the display of LGBTQ-related events or clubs.

160. O.R. and E.G. can both fairly and adequately represent the interests of their respective classes. Neither has claims that conflict with the interests or claims of other putative class members.

161. Undersigned counsel are seasoned litigators with relevant experience litigating class claims on behalf of transgender plaintiffs, both in this District and across the country.

## CLAIMS FOR RELIEF

### Count One

**Violation of the First Amendment: Anti-Trans-Character Collection Policy**
**42 U.S.C. § 1983**

162. Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully here.

163. On its face, and as applied, the Board's February 2024 and August 2024 Collection Policy amendments violate the First Amendment rights of Plaintiffs and other minors

who wish to access books portraying gender transition and transgender people in a positive light, free from the government's viewpoint-based discrimination.

164. The Greenville Library holds itself out as a space for patrons to explore ideas and discover new works and perspectives. It purports to adhere to viewpoint-neutral and nondiscriminatory principles of library curation. Yet the February 2024 and August 2024 Collection Policy amendments are ideologically based on their faces and were not adopted based on viewpoint-neutral and nondiscriminatory principles of library curation. Instead, the February 2024 and August 2024 Collection Policy amendments were adopted based on a majority of the Board members' personal, political, moral, and religious opposition to gender transition and their desire to suppress the viewpoints and ideas contained in such portrayals.

165. It is a "central tenet of the First Amendment" that "the government must remain neutral in the marketplace of ideas." *FCC v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978). Viewpoint discrimination—*i.e.*, a policy that targets "particular views taken by speakers on a subject," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)—is "poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring), and is *per se* unconstitutional, *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (collecting cases).

166. Through the adoption of the February 2024 and August 2024 Collection Policy amendments, a majority of the Board unconstitutionally sought to "drive certain ideas or viewpoints"—namely, the acceptance of LGBTQ, and particularly transgender, individuals—"from the marketplace," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quotation marks and citation omitted), and "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality op.) (quoting *W.B. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). As a result, the Juvenile (February 2024) and Young Adult (August 2024) Collection Policy amendments are *per se* unconstitutional and infringe on

Plaintiffs' right to receive information under the First Amendment, as applicable to the states under the Fourteenth Amendment.

167. Pursuant to 42 U.S.C. § 1983, and *Monell v. Department of Social Services*, 436 U.S. 659 (1978), Defendant Greenville County and Defendant Greenville County Library System are liable for the violation of Plaintiffs' First Amendment rights because the Board has final policymaking authority for the County and Greenville Library with respect to adopting and promulgating a Collection Policy and the Board acted under color of state law.

168. Defendants Beverly James and Karen Allen, in their official capacities, are state actors responsible for enforcing the discriminatory Juvenile (February 2024) and Young Adult (August 2024) Collection Policy amendments. Pursuant to 42 U.S.C. § 1983, and *Ex parte Young*, 209 U.S. 123 (1908), prospective declaratory and injunctive relief is properly entered against them.

**Count Two**

**Violation of the Fourteenth Amendment: Anti-Trans-Character Collection Policy**
**42 U.S.C. § 1983**

169. The Board's Juvenile (February 2024) and Young Adult (August 2024) Collection Policies facially classify materials for exclusion based on sex and transgender status.

170. Because the challenged Collection Policies discriminate on the basis of sex and transgender status, they trigger heightened scrutiny under the Equal Protection Clause. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–12 (4th Cir. 2020).

171. The Policies' explicit classifications subject LGBTQ children and their parents to unequal treatment by preventing them from accessing library materials positively reflecting themselves and their families. By design, the exclusion also inflicts a dignitary injury on LGBTQ individuals by treating identities and experiences of LGBTQ children and their parents as unacceptable and unworthy of inclusion in public space.

172. To survive heightened scrutiny, Defendants must show that the challenged policies are "substantially related" to an "important interest." *Grimm*, 972 F.3d at 613. The

challenged policies cannot survive heightened scrutiny—or any standard of scrutiny—because the discrimination is rooted in animus, which is not a legitimate interest.

173. Pursuant to 42 U.S.C. § 1983, and *Monell v. Department of Social Services*, 436 U.S. 659 (1978), Defendant Greenville County and Defendant Greenville County Library System are liable for the violation of Plaintiffs' Fourteenth Amendment Rights because the Board has final policymaking authority for the County and Greenville Library with respect to adopting and promulgating a Collection Policy and the Board acted under color of state law.

174. Defendants Beverly James and Karen Allen, in their official capacities, are state actors responsible for enforcing the discriminatory Juvenile (February 2024) and Young Adult (August 2024) Collection Policy amendments. Pursuant to 42 U.S.C. § 1983, and *Ex parte Young*, 209 U.S. 123 (1908), prospective declaratory and injunctive relief is properly entered against them.

**Count Three**

**Violation of the First Amendment: Widespread Custom & Practices**
**42 U.S.C. § 1983**

175. The Library's widespread custom and practice of suppressing, excluding, relocating, and removing LGBTQ-related materials from the Greenville Library violates the First Amendment rights of Plaintiffs who seek to access information and materials that include LGBTQ people and their stories.

176. As evident by the Library's crackdowns on LGBTQ-affirming speech, events, and materials, these practices are not based on legitimate or content-neutral curatorial decisions, but rather on Defendants' personal opposition to LGBTQ-supportive materials and their desire to suppress the viewpoints contained in such materials.

177. As with the policy amendments, these practices seek to "drive certain ideas or viewpoints"—namely, the acceptance of LGBTQ, and particularly transgender, individuals—"from the marketplace," *Finley*, 524 U.S. at 587, and "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872. As a result, the

Library's custom and practice of discriminating against LGBTQ materials constitute rank viewpoint discrimination, is *per se* unconstitutional, and injure Plaintiffs' right to receive information under the First Amendment.

178. Pursuant to 42 U.S.C. § 1983, and *Monell v. Department of Social Services*, 436 U.S. 659 (1978), Defendant Greenville County and Defendant Greenville County Library System are liable for the violation of Plaintiffs' First Amendment Rights because the anti-LGBTQ practices of the Library Board and leadership are so "persistent and widespread" as to constitute a "custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

179. Pursuant to 42 U.S.C. § 1983, and *Ex parte Young*, 209 U.S. 123 (1908), Defendants Beverly James and Karen Allen, in their official capacities, are state actors and subject to injunctive and declaratory relief for enforcing this persistent custom and practice under color of state law.

**<u>Count Four</u>**

**Violation of the Fourteenth Amendment: Widespread Custom & Practices**
**42 U.S.C. § 1983**

180. The Library's widespread anti-LGBTQ practices likewise subject LGBTQ library patrons to unequal treatment by infringing on their ability to access library materials positively reflecting themselves and families and inflict a dignitary harm and unconstitutional stigma by treating identities and experiences of LGBTQ people as unacceptable and unworthy of inclusion in public space.

181. These discriminatory practices are subject to heightened scrutiny under the Equal Protection Clause and, to survive scrutiny, must be substantially related to an important governmental interest. The custom of suppressing these materials on the basis of their LGBTQ-supportive content cannot be justified under heightened scrutiny—or any standard of scrutiny—because the discrimination is rooted in animus and not rationally related to a legitimate governmental interest.

182. Pursuant to 42 U.S.C. § 1983, and *Monell v. Department of Social Services*, 436 U.S. 659 (1978), Defendant Greenville County and Defendant Greenville County Library System are liable for the violation of Plaintiffs' Fourteenth Amendment Rights because the anti-LGBTQ practices of the Library Board and leadership are so "persistent and widespread" as to constitute a "custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

183. Pursuant to 42 U.S.C. § 1983, and *Ex parte Young*, 209 U.S. 123 (1908), Defendants Beverly James and Karen Allen, in their official capacities, are state actors and subject to injunctive and declaratory relief for enforcing this persistent custom under color of state law.

## REQUEST FOR RELIEF

Plaintiffs respectfully request an order and judgment:

i. Certifying the Juvenile & Young Adult Class and the Unrestricted Library Card Class under Rule 23(b)(2) of the Federal Rules of Civil Procedure;

ii. Declaring that:

   a. Defendants' Juvenile (February 2024) Collection Policy amendment violates the First and Fourteenth Amendments;

   b. Defendants' Young Adult (August 2024) Collection Policy amendment violates the First and Fourteenth Amendments; and

   c. Defendants' pattern and practice of discriminating against library materials that positively portray LGBTQ characters or themes violate the First and Fourteenth Amendments;

iii. Permanently enjoining Defendants from enforcing:

   a. The amended Juvenile Collection Policy;

   b. The amended Young Adult Collection Policy; and

   c. Defendants' widespread custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials;

iv. Awarding Plaintiffs nominal damages against Defendants Greenville County and Greenville County Library System in the amount of $1.00 for each violation of Plaintiffs' constitutional rights;

v. Awarding Plaintiffs reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

vi. Granting Plaintiffs such other relief as this Court deems just and proper.

Dated: April 4, 2025

**ACLU OF SOUTH CAROLINA**

*/s/ Allen Chaney*

Allen Chaney
Fed. Id. No. 13181
P.O. Box 1668
Columbia, SC 29202
T: (864) 372-6881

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Shana Knizhnik*
Joshua Block*
125 Broad Street, Floor 18
New York, NY 10004
T: (212) 549-2500
E: sknizhnik@aclu.org
jblock@aclu.org

** Application for Admission Pro Hac Vice Forthcoming*

*Approved by the Board of Trustees on May 24, 1999*
*Revised 5/20/02; 9/25/06; 10/26/09; 12/10/12; 3/27/23; 2/26/24; 8/26/24*

# GREENVILLE (S.C.) COUNTY LIBRARY SYSTEM
# COLLECTION DEVELOPMENT AND MAINTENANCE POLICY

In order to provide quality resources for information, education, and leisure to Greenville County residents, the Greenville County Library System (hereinafter the "Library") has established this policy for the ongoing process of development and maintenance of the Library collection. This policy provides direction to Library staff in the collection development and maintenance process as well as information for the public on the philosophy and rationale used to make collection development and maintenance decisions.

**OVERVIEW AND AUTHORITY**
Collection development and maintenance is the ongoing process of evaluating materials available for purchase or licensing and making decisions about adding, deleting, and retaining materials in the Library collections. The Library Board delegates responsibility for collection development and maintenance to the Executive Director and Library staff. Primary responsibility rests with the Collection Development Coordinator who ensures continuity and relevance in the Library's collections through an organized structure for planning, budgeting, selecting, and managing library materials.

In addition to the librarians employed as collection development specialists, staff in each Library location participate in collection development and maintenance. Staff identify the needs of Library users and systematically relay that information to the Collection Development Coordinator. Staff also continuously evaluate the collections for condition, currency, and continued use.

The Library Board determines the *Collection Development and Maintenance Policy* and is the final authority in matters concerning its application. The Board may authorize the Executive Director to make adjustments to the policy based on budget, physical space, or other special concerns.

**MATERIALS SELECTION**
Selection refers to the act of identifying and evaluating specific items for addition to the Library's collections or the decision to provide access electronically. Staff involved in selection have wide reading backgrounds and interests and keep current in their assessments of user needs. In addition to responding to the demands of Library users, staff consult a variety of reviewing sources and community members with expertise in certain areas.

Effective collection development and maintenance is best achieved through the participatory efforts of staff and users. Recommendations for acquiring materials are welcomed from all members of the Library's community. It is the responsibility of staff to communicate users' requests and needs to Collection Development staff or to assist users in submitting requests directly. Users may submit their requests for purchase by completing the *Suggest to Purchase* form available on the Library's website. The Collection Development staff evaluate these requests according to the "Factors

Considered in Material Selection" listed in this policy. Therefore, items requested may not be purchased.

Patrons also have the right to request that material in the Library's collections be reconsidered. The Library provides procedures for handling these requests and outlines the steps to be followed. *Request for Reconsideration of Library Material* forms are available at all library locations.

**PHILOSOPHY OF SELECTION AND MAINTENANCE**

Through its collections, the Library strives to support an informed community by providing access to the world of ideas and information. The Library's collection is developed and managed to meet the informational, educational, cultural and recreational needs of the residents of Greenville County. The Library's responsibility is to provide circulating and reference material for the general public. Unless otherwise designated, materials are circulated according to the *Circulation Policy*. Special collections are maintained only when indicated by the demonstrated needs of the community and if funding is available.

The Library recognizes the need to balance budget, staffing and space limitations when making its decisions. The Library has an efficient request and courier system which allows patrons to request materials from other locations for delivery to a more convenient location.

The Library attempts to acquire or provide access to materials and information in a variety of formats. Staff evaluate new formats as they become available or as the public requests them.

The Library places priority on filling contemporary needs rather than building historical and rare book collections, except for the acquisition of materials of both past and current significance to the Greenville area.

Collection decisions are based on the merit of the work as it relates to the Library's mission and the work's ability to meet the expressed or anticipated needs and interests of the community. It is the Library's responsibility to acquire, as available, material presenting a wide variety of views and opinions on current and historical issues. The Library will neither promote nor censor any particular religious, moral, philosophical or political conviction or opinion. Material will not be excluded because of the race or nationality or the religious, social, or political views of the author, publisher, or creator. The inclusion of an item in the collection does not represent an endorsement of its contents.

The Library recognizes that many materials are controversial and that any given item may offend some. Only individuals can determine what is most appropriate for their needs. The Library will not label materials to indicate appropriateness or acceptability of contents. The Library will retain labeling provided by the publisher or manufacturer. These labels include the ratings of the Motion Picture Association of American and the advisory labels music publishers place on musical recordings. The Library will not expurgate or allow expurgation (e.g. the deletion, excision, alteration, editing or obliteration) of any Library material; these actions could result in copyright violations.

Although the Library recognizes the need to be sensitive to the categorization of material that may be deemed inappropriate for some ages of children, parents and legal guardians have the responsibility for their children's use of library materials and are encouraged to define what material or information is consistent with their personal and family beliefs; only they can apply those values for themselves and their children.

Maintenance of the collection is a fundamental responsibility of Library staff. Staff continuously evaluate materials, replacing or repairing those which are worn or damaged and removing items no longer current or in demand or of ongoing value as part of a core collection.

**FACTORS CONSIDERED IN MATERIALS SELECTION**

These factors are applicable to most selection decisions. Others may be taken into consideration, and the importance or weight of a particular factor will vary from one acquisition to another.

General Criteria:
* Reputation and qualifications of the creators, publisher or producer
* Community needs, interests, demands, and standards
* Importance as a document of the times
* Literary, artistic, and technical values
* Relationship to the existing collection
* Availability in other area libraries
* Suitability of physical form for library use
* Recommendations in reviews
* Durability
* Price
* Suitability of subject and style for intended audience
* Judgment of work as a whole
* Availability of equipment required for examination and use
* Publication date
* Availability for purchase

Content Criteria:
* Comprehensiveness and depth of treatment
* Accuracy of content
* Authority, skill, competence, and purpose of author/producer
* Objectivity
* Clarity
* Technical quality
* Vitality and originality
* Artistic presentation
* Effective characterization
* Sustained interest
* Relevance and use of the information
* Authenticity of history of social setting

Special considerations regarding electronic resources or format:

* Ease of use of the product
* Availability of the information to multiple simultaneous users
* Equipment needed to provide access to the information
* Technical support and training
* Availability of physical space needed to house and store information or equipment
* Conformance with the Library's *Internet Use Policy*

**DONATIONS**
The Library accepts donations of print and non-print materials (e.g. books, DVDs, CDs, etc.). All donated materials received at any Library location become the absolute property of the Library with no right of ownership from any other entity. Donated materials will not be returned to the donor. Using the selection evaluation factors delineated in this policy along with consideration of cataloging and processing costs, Library staff will determine if donated material is added to the Library's collections. The Library disposes of donated items in accordance with the Library's *Procurement Policy for the Purchase and Disposal of Library Materials.*

**WITHDRAWAL OF MATERIALS**
The process of removing items from the Library's collections is an integral part of collection maintenance. Materials are withdrawn in order to maintain a particular collection's usefulness, currency, and relevance. Materials may be moved from one Library location to another. Criteria for removal of material include, but are not limited to, condition, currency, and popularity of material. Special consideration is given to retaining last copies of fiction and biography titles.

The Library disposes of withdrawn materials in accordance with the Library's *Procurement Policy for the Purchase and Disposal of Library Materials.*

**ADULT COLLECTION**
The Library purchases a wide range of material reflecting the diverse interests of a public that varies greatly in education, taste, and reading ability. While supplying entertainment and information resources for the general public, the Library also makes an effort to support the basic needs of the local adult student population. Highly specialized and esoteric materials are not normally acquired.

<u>Fiction</u>
The adult fiction collection is maintained as a resource of recreational reading for the community and is aimed at serving patrons age 18 and above. The Library is unable to acquire all of the many fiction titles published each year but an attempt is made to purchase books representing a wide variety of fiction categories.

Although all of the selection factors listed above apply to fiction, public demand and published reviews are particularly relevant. The Library is very aware of public demand and will often purchase fiction titles that are not notable for literary quality or artistic merit but have substantial popular appeal. Popular titles are also duplicated as necessary to meet demand. Because of the abundance of available fiction titles, the Library staff makes extensive use of book reviews. Occasionally, staff members critique individual works when it is necessary to resolve disagreement among the reviewing sources or when an authoritative review cannot be found.

Non-Fiction

The adult non-fiction collection includes material on almost any topic that might be of interest or concern to Library's users age 13 and above. Popular items and subjects are sometimes duplicated. Unusually expensive materials and those with an extremely narrow or highly specialized focus are not normally acquired. The Library does not normally acquire textbooks but some textbooks may be purchased if necessary to provide coverage of certain subject areas.

Although accuracy of content and authority of a work's creators are important criteria in the selection of non-fiction materials, the Library does not assume responsibility for inaccuracies or errors in the works included in its collections. Opinion, hypothesis, and theory are as important to the Library's non-fiction collection as proven facts.

**AUDIOVISUAL MATERIALS**

The Library provides materials in a variety of audiovisual formats for all ages. In addition to the selection criteria used for print materials, the Library also considers quality of production, reputation of performer, and the ability of the public to access the format.

From time to time new forms of audiovisual media are introduced into the market place. Often these new products enjoy only brief popularity before losing their market to newer forms of audiovisual media. Library staff studies media forms to assess their suitability for public library use.

The Library cannot be held responsible for manufacturing defects or errors in the product that may result in damage to personal equipment or other inconvenience to the user.

Musical Sound Recordings

The Library selects, acquires and maintains a diversified collection of musical sound recordings. Review and selection decisions are based primarily upon popular demand and on published reviews. The Library attempts to collect recordings representing a wide range of musical genres.

Spoken Word Recordings

The Library selects, acquires and maintains a collection of spoken word recordings. This collection primarily contains popular fiction and non-fiction titles in unabridged versions. Abridged versions of titles may be acquired under special circumstances. Selection decisions are made based on demand, quality of recording and production, cost, shelving space, durability of materials, and ease of obtaining replacement discs.

Video Recordings

The Library selects, acquires and maintains a diversified collection of video recordings. This collection consists of informational, how-to, and popular entertainment video recordings. The collection includes feature length movies intended for home use and other private showings that do not constitute public performances. Review and selection decisions are based primarily on awards lists and published reviews. The Library purchases some popular feature films but places most of its effort in collecting informational, instructional and other video recordings not readily available from rental outlets. The Library is unable to acquire all of the many television series released on DVD; however, an attempt is made to purchase television series representing a wide variety of

categories. Video recordings produced specifically for instructional use in the classroom are generally not purchased.

**BOOKMOBILE COLLECTION**
The bookmobile carries a changing collection, relying heavily on the use of leased books. The bookmobile collection consists of a wide variety of popular materials for all ages in print and audiovisual formats. Patrons may request specific materials be brought to them at their bookmobile stop.

**BRAILLE AND TALKING BOOKS**
The South Carolina State Library provides free Talking Book and Braille services to eligible patrons via free mail service. Due to relatively easy access to these specialized materials, the Library does not purchase Talking Book materials and buys only a few Braille items, primarily to teach or to demonstrate the use of Braille.

**BRANCH LIBRARIES**
The branches of the Library provide a general collection of materials that meet the basic recreational and informational needs of the communities in which they are located. Branch library collections are not intended for in-depth research or scholarly work but include a selection of basic reference works and circulating materials in major fields of knowledge. Branch collections include materials intended for adults, teens and children. The circulating collections include current and popular bestsellers and popular titles in large print.

The branches provide a selection of popular general interest periodicals for adults, teens and children. Periodicals circulate and are generally kept for one year. Each branch library contains a small collection of audiovisual material available for circulation. These materials include video and musical recordings, spoken word recordings, and electronic resources.

**ELECTRONIC RESOURCES**
The Library also provides electronic resources which may include online databases, eBooks, downloadable video recordings, downloadable eAudiobooks, music and links to selected websites. These materials can be accessed using a computer at home and/or in any Library location.

<u>eBooks, eAudiobooks and Music</u>
The Library provides access to downloadable eBooks, eAudiobooks, and music. Availability of particular titles, loan periods, renewals and reserves of downloadable items are configured within the options offered by vendors. Restrictions imposed by individual vendors or by the terms of the Library’s purchase agreements often determine the number of items allowed for download, duration of loan periods, request list functionality, and/or the number of renewals.

<u>Internet</u>
The Internet provides access to ungoverned and unregulated sources of information. The Library's *Internet Use Policy* is intended to augment the Library's *Collection Development and Maintenance Policy*, determining the content offered by the Library via the Internet.

Online Databases

The Library provides free access to subscription-based electronic databases of information that are subject to formal publication or editorial procedures/criteria to ensure accuracy and timeliness. Some databases are available only from within a Library location. Remote access is provided to library card holders when permitted by the supplier and when financially feasible.

**FOREIGN LANGUAGE COLLECTION**

The Foreign Language Collection serves students and native speakers of foreign languages. This collection contains titles in various formats for recreational reading, listening, and viewing and for increasing fluency in a language.

Community demographics, circulation statistics and patron requests determine in which languages the Library purchases materials. Circulation and requests indicate the subjects and genres patrons prefer. Educational topics of interest to native speakers (GED study materials in Spanish, for example) may be purchased. For the juvenile collection, foreign language translations of English works are preferred.

Foreign language newspapers are not usually carried and only a few foreign language periodicals are acquired by the library. These are located at the Hughes Main Library unless community demand dictates that a title be located in a branch. Branch libraries may carry locally published Spanish language periodicals.

**GOVERNMENT PUBLICATIONS**

Federal Documents

As a selective depository, the Library receives federal documents through the Federal Depository Library Program. The Library also collects non-depository government materials to support its reference collection and provides and promotes electronic access to government information. Selection of federal documents is based on use and interest to the general public.

Most of the items in the Library's federal documents collection are discarded after five years. The discarding process is regulated by the South Carolina Federal Regional Depository Library at the University of South Carolina.

State and Local Documents

The Library receives South Carolina government publications from the South Carolina State Library and local government documents from Greenville County agencies and municipalities. Items considered useful for the Local History collection are transferred to the South Carolina Room Collection. Key legal publications of continuing value are retained in the documents collection. State and local documents are usually discarded after five years.

**INTERLIBRARY LOAN**

The Library supplements its collections through resource sharing agreements with other libraries. Patrons may request that items not included in the Library's collections be borrowed from other libraries. (See the Library's *Interlibrary Loan Policy*.)

*Approved by the Board of Trustees on May 24, 1999*
*Revised 5/20/02; 9/25/06; 10/26/09; 12/10/12; 3/27/23; 2/26/24; 8/26/24*

**JUVENILE COLLECTION**
Materials for children are selected to provide a balanced collection that encourages the love of reading and provides information in all areas of knowledge. The Library supplements school curricula when possible. Materials may be selected in a wide range of formats. Selection criteria include suitability and durability of a particular format for the age of the target audience.

The Library is very aware of public demand and will often purchase fiction titles that are not notable for literary quality or artistic merit but have substantial popular appeal. Popular titles are also duplicated as necessary to meet demand. Because of the abundance of available fiction titles, selectors make extensive use of book reviews. Staff members may critique individual works when an authoritative review cannot be found.

The Juvenile Collection's target audience is infancy through 12 years of age. Variations in reading levels of children, best available source of usable information, and expanded target audience of a particular work may call for the inclusion of material whose primary audience is teens or adults. Materials may be subdivided into areas according to interest, format and/or reading level; however, the Library makes no attempt to have separate subdivisions for every reading or interest level. Any restriction desired by parents and/or legal guardians on their own children's use of material is the parents' and/or legal guardians' responsibility.

The Library recognizes parents/legal guardians are the primary source of education for their children, and that they have a fundamental right and responsibility to direct the upbringing and education of children under their care including issues of moral, social, physical, civic, and spiritual development.

To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:

- Social transitioning: Pronouns or dress inconsistent with biological sex for the purpose of affirming gender transitioning.
- Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.
- Gender fluidity: The possibility of changing genders at will or being no gender at all for the purpose of affirming gender transitioning.

Materials that contain the following will not be included in the Juvenile Collection:

Explicit descriptions or depictions of sexual acts including vaginal, anal, oral, masturbation, incest or pedophilia.

For the purposes of this policy, material is considered graphic if a person applying contemporary community standards relating to the depiction or description of sexual conduct would find that the portion of material appeals to the prurient interest, and/or the material can be considered gratuitous sex because it involves descriptions or depictions of carnal detail of a sexual act or encounter.

Materials excluded by the above criteria will be included in the Parenting and Early Childhood (PEC) Collection.

Juvenile Programming Collection
The Juvenile Programming Collection is a collection of books, recorded music, puppets, felt board figures, and other items used in the creation and/or presentation of Library programs. These items are for Library staff use only and do not circulate to the general public. Most titles in this collection, however, are also purchased for the juvenile circulating collection.

Juvenile Reference Collection
The Juvenile Reference Collection contains both material to be used directly by children and material intended for use by adults assisting and/or working with children.

Parenting and Early Childhood (PEC) Collection
The Parenting and Early Childhood (PEC) Collection consists of child development, parenting, and teacher resource material as well as material intended for bibliotherapy or instructional use with children.

Play and Literacy Center Collection
The Play and Literacy Center Collection contains board books that are designated for use in the Play and Literacy (PAL) Center at the Hughes Main Library.

Quik-Kits
Quik-Kits are themed materials that circulate as a single unit. A kit may contain a variety of material formats. These kits are for use by adults working with children.

**KITS**
The Library provides themed materials for adults that circulate as a single unit. A kit may contain a variety of formats. These kits are intended for use as programming aids, with some specifically designed for book discussions.

**LARGE PRINT COLLECTION**
Large print books are made available to serve persons who cannot read regular print. Patron interest and the availability of titles dictate the composition of the collection which is 80-90% fiction. The majority of large print books are titles found in the Library in regular print. The most important factors in the selection of large print books are: popularity of author and/or genre, size of print, size of the volume, quality of paper and binding, and cost. Patron interest and availability of materials are also factors in determining the purchase of other large print items such as periodicals and newspapers.

**LEASED BOOKS**
The Library leases copies of high demand books in order to fill multiple requests for the same title more quickly. These materials are returned to the supplier when the Library no longer needs them.

**LOCAL (GREENVILLE COUNTY) AUTHORS' WORKS**

The Library may accept one donated copy of a local author's work and place it in the Local Author section at the Hughes Main Library. The Local Author must live in Greenville County. Donated works must be aimed at the general reader and may not be a textbook. The material must be sturdily bound and large enough to stand up on its own, not falling easily behind a shelf. It must be in a format that the Library currently collects. All donated works are subject to the same criteria for removal as other materials as stated in the Withdrawal of Materials Section of this policy.

**LOCAL HISTORY AND GENEALOGY**

Historical and rare materials of past and current significance to the Greenville area are stored in the South Carolina Room (SC Room) and its climate-controlled staff workroom and archives at the Hughes Main Library. Many of these materials are irreplaceable and precise humidity and temperature controls along with the use of special conservation techniques are necessary for their preservation. To ensure these items are available to researchers and the general public, they are designated for use only within the SC Room.

Genealogy Collection

The SC Room houses the major collection of genealogical research materials in the Western Carolinas which are of interest to researchers from throughout the region and other parts of the United States.

The collection's primary focus is on Upstate South Carolina as well as states along the migration route from the north (New York, Pennsylvania, Virginia, West Virginia, Maryland, North Carolina) into the Upstate and the states along the migration routes westward (Alabama, Mississippi, Tennessee, Kentucky, Ohio, Arkansas, Texas) and southward (Georgia, Florida) out of the Upstate.

The collection includes manuals and handbooks on how to do genealogical research, family histories, census schedules, probates and wills, land records, county histories, cemetery and religious records, immigration and naturalization records, military records, newspapers, vital records and indexes to these materials. Formats include many of those contained in the Library's other collections. Subscriptions to online genealogical databases are used to supplement the collection.

Local History Collection

The purpose of the Local History Collection is to preserve materials that document the history of Greenville County and Upstate South Carolina and to make these materials available to researchers and the general public. The major emphasis of the collection is information about Greenville County. Secondary emphasis is placed on information about the Upstate. Some materials on the state of South Carolina are also included.

Subject areas include early settlers, ethnic groups, businesses, arts and entertainment, and prominent individuals and events. The collection includes books, periodicals, pamphlets, maps, microform, photographs, newspaper clippings, scrapbooks, video and sound recordings, ledgers, aerial photos and Library related realia.

The collection also includes the works of some local authors. Local authors are defined as writers who have spent a significant part of their lives in the Greenville County area. Works by notable South Carolina authors may also be included. Works by these authors are collected if the work is relevant to the study of the history and culture of the Greenville area. Works of local imprint are added only when they contribute directly to the social, political, or cultural history of the region.

Books and papers originally owned and used by local residents are not added to the collection unless they contain local information otherwise unavailable or had a significant historical influence on the local population.

**MAGAZINES**
The Library maintains a representative collection of magazines intended to supplement the book collection. The focus of the magazine collection is on publications that will provide current information on a variety of popular and practical topics.

The main criteria used to determine whether a magazine title will be added are: demonstrated or perceived demand by current or potential Library users, the title's inclusion in indexes received by the Library, an examination of a sample copy, reviews of the publication, cost, the availability of the magazine at other area libraries and coverage of the publication's subject area in the Library's existing collections.

The Hughes Main Library maintains a small selection of magazines and journals in its Reference Collection to ensure that these materials are readily available as reference resources. Back files of some titles are available in bound volumes or on microfilm at the Hughes Main Library. Titles selected for retention include titles that are indexed and are useful for basic research on a variety of topics. Titles are retained in print format if the illustrations are deemed to be a significant part of the publication. Other titles are retained on microfilm. Magazines and journals that are not kept in the collection permanently are retained for one year.

Separate collections comprised of general interest titles for adults, teens and children are available for circulation at the Hughes Main Library. Branch libraries have small magazine collections that are also available for circulation.

**NEWSPAPERS**
The Hughes Main Library's newspaper collection consists of current issues of local papers and papers from larger cities in South Carolina and major cities in the United States as well as select international papers. Microfilmed copies of back issues of *The Greenville News, Greenville Piedmont* and other newspapers published in Greenville dating back to 1874 have been acquired and are available for viewing as part of the South Carolina Room Collection. Other local papers also may be considered for permanent retention.

Most newspapers are retained for one week. Print issues of a selection of regional and national newspapers are retained for three months as part of the Reference Collection. Microfilmed copies of back issues of select major newspapers such as *The New York Times, The Wall Street Journal* and *The Washington Post* are also part of the Reference Collection.

Branch libraries acquire *The Greenville News,* other local community newspapers and notable national newspapers when community interest warrants. Issues are generally retained for one week.

**PAPERBACK BOOKS**
Due to the popularity of the paperback format and because many titles are not otherwise available, the Library maintains a large collection of mass market paperback books. Because of their relatively low cost and ephemeral nature, these paperbacks are not fully cataloged but are searchable in the catalog by author and title.

The Library is very much aware of public demand and often purchases or accepts donations of paperback titles which are not notable for their content, literary quality or artistic merit but which have substantial popular appeal. Series and genres for which there is established demand are emphasized. Paperback editions of cataloged titles are purchased to help meet temporary demand. The Library also may purchase paperback titles in a new genre to establish demand for that genre.

**RARE BOOKS**
Although the South Carolina Room contains some rare items in its collections and provides for their special handling and housing, the Library does not intentionally collect rare material.

**REFERENCE**
Reference materials are those designed to be consulted for specific items of information rather than read in their entirety. Reference works typically include encyclopedias, dictionaries, almanacs, atlases, indexes, directories, bibliographies and similar informational resources. These materials are used frequently by the public and the Library staff and are designated for use within the Library. Virtually any item in the collection may be designated for the Reference Collection if staff determines that it is desirable to have the item consistently available. Duplicate copies of reference materials may by purchased for the circulating collection if the price is not prohibitive.

Reference materials are selected with the goal of providing current information on a wide variety of subjects and historical information in subject areas where experience indicates a demand. Factors to be used in selecting reference materials are as follows: demonstrated or perceived demand by Library users or potential users, favorable reviews, inclusion in basic collection guides, reputation of the author, currency of information, cost, format, durability, ease of use, and relation to the existing collection. In selecting electronic reference sources, additional factors include the ability to make these sources available at all Library locations and to Library patrons by remote access.

The Reference Collection is intended to yield information useful for basic research in most fields of knowledge and to vary in depth from an introductory level to a beginning research level. Highly specialized and esoteric materials are not normally acquired.

The Hughes Main Library serves as the primary resource and reference center for the Library. Branch library reference collections provide staff and users with basic,

generalized research tools. Patrons with in-depth reference needs are referred to the Hughes Main Library.

**YOUNG ADULT COLLECTION**

The Young Adult Collection consists of material considered of particular interest to teens aged 13 through 18 or eighth through twelfth grade. Because of the wide range of maturity and reading levels among individual teens, the suitability of any particular item for a teen must be determined on an individual basis by the parent/legal guardian of that teen.

Fiction material is classified as Young Adult (YA) when its target audience falls within the 13 to 18 age range. Typically, the novel has teen protagonists and deals with such subjects as school, dating, peer-pressure, and coming-of-age issues as teens transition into adulthood. Emphasis is on material that widens the boundaries of teens' thinking, enriches their lives, and helps fulfill their recreational or emotional needs.

The Hughes Main Library provides a browsing YA nonfiction collection of materials suitable for this age group. Branch libraries also provide some YA nonfiction materials.

Materials that contain the following will not be included in the Young Adult Collection:
1. graphic depictions or descriptions of rape or pedophilia
2. graphic sexual depictions or descriptions

For the purposes of this policy, material is considered graphic if a person applying contemporary community standards relating to the depiction or description of sexual conduct would find that the portion of material appeals to the prurient interest, and/or the material can be considered gratuitous sex because it involves descriptions or depictions of carnal detail of a sexual act or encounter.

Materials excluded by the above criteria will be included in the Adult Collection.

The Library System recognizes that parents/legal guardians have a fundamental right to be involved in all aspects of their minor children’s lives, especially in matters as life changing as gender identification.

Therefore, materials targeting audiences aged 13-17 with characters who have transitioned or are in the process of transitioning from a gender that corresponds to their biological sex to a different gender will be located in the Adult Collection.

This includes materials with illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning, whether changes are social (names, pronouns) or physical.

*Approved by the Board of Trustees*
*December 10, 2012; Revised 6/24/24*

GREENVILLE COUNTY Library SYSTEM

## RECONSIDERATION OF LIBRARY MATERIAL REGULATIONS

Any Greenville County adult may request that the location or inclusion of an item in the materials collection of the Greenville County Library System (Library System) be reconsidered by completing a *Request for Reconsideration of Library Materia*l form.

**Request for Reconsideration Form:**

1. A *Request for Reconsideration of Library Material* form may be obtained from a Library System staff member or the Library System website.

2. A completed and signed form may be given to any Library System staff member, emailed to RFR@greenvillelibrary.org or mailed to Technical Services Manager, Greenville County Library System, 25 Heritage Green Place, Greenville, SC 29601.

3. Requests are considered in the order they are received. A 90-day response time is allowed for each request. If additional time is needed, the Executive Director will notify the Library Board and the person who submitted the request (Requester).

4. The Executive Director shall send the Requester a response approximately 90 days from when the Technical Services Manager receives the form.

**Reconsideration Process:**

1. When a form is received, Library System staff shall complete the applicable parts of the Library System Use Only section and send it to the Technical Services Manager.

2. The Technical Services Manager shall forward the form to the Executive Director, Collection Development Committee, and/or other designated Library System staff members for review. Those staff members may place a priority hold on the item in question so as to obtain it as soon as possible.

3. The Collection Development Committee and/or other designated Library System staff shall evaluate the item in question using the following processes:

    a. Reading, viewing, and/or listening to the item, specifically considering the Requester's written concerns and the *Collection Development and Maintenance Policy*;

    b. Consulting reviews and recommended lists to determine the opinions of experts, critics, and others;

c. Meeting to discuss the Requester's concern(s) and deciding whether the item meets selection criteria and its classification is in compliance with the *Collection Development and Maintenance Policy*.

4. Based on their evaluation, the Collection Development Committee and/or other designated Library System staff shall formulate a recommendation regarding the item's classification and retention in the materials collection. The Technical Services Manager or other designated Library System staff shall report the recommendation to the Executive Director.

5. The Executive Director shall consider the recommendation from staff and send the Requester a letter that includes the decision(s) regarding the item in question and how to submit an appeal.

**Appeal Process:**

1. If not satisfied with the Executive Director's decision, a Requester may submit a written appeal to the Library Materials Committee of the Library Board of Trustees at 25 Heritage Green Place, Greenville, SC 29601 within thirty (30) days of receiving the Executive Director's letter.

2. The Library Materials Committee of the Library Board shall consider an appeal and make a recommendation regarding it to the Library Board of Trustees.

3. The Library Board of Trustees shall consider the Library Materials Committee recommendation at a future regularly scheduled Library Board Meeting.

4. The Executive Director shall inform the Requester of the date the Library Board is scheduled to vote on the appeal.

5. The Library Board Chair shall inform the Requester in writing of the Library Board's action.

6. The Library Board of Trustees is the final authority in determining whether an item is reclassified or retained in the Library System's materials collection.

*Approved by the Board of Trustees*
*November 20, 2002;*
*Revised 11/19/12, 6/24/24*

GREENVILLE COUNTY Library SYSTEM

## REQUEST FOR RECONSIDERATION OF LIBRARY MATERIAL

**Information about the Item** (*Please print*):

Title: ______________________________________________

Author: ______________________________________________

Date of publication: _________

**Type of Material** *(Please check all that apply)*:

☐ Book ☐ Magazine ☐ Musical Recording ☐ Newspaper

☐ Spoken Word Recording ☐ Video Recording ☐ Other

**Contact Information** (*Please print*):

Requester: ______________________________________________

Address: ______________________________________________

City: ____________________ County:_______________ State: ____ Zip Code:_________

Telephone: ________________ Email: ______________________________

**You will receive a written response in approximately 90 days.** A 90-day response time is allowed for each request. If additional time is needed, you will be notified.

For further information, see "Reconsideration of Library Materials Regulations" on Library System website.

***For Library System use only:***

| | | |
|---|---|---|
| Date form received: | Initials: | Unit/Location: |
| Date form sent to Technical Services Manager: | | |
| Date form received by Technical Services Manager: | | |
| Date of response from Executive Director: | | |

*Approved by the Board of Trustees*
*November 20, 2002;*
*Revised 11/19/12, 6/24/24*

**Nature of Concern** (*Please print)*:

1.a. ☐ I believe this material violates the Library System's *Collection Development and Maintenance Policy.* (Please cite examples of how the material violates the policy. See *Collection Development and Maintenance Policy* on Library System website. If additional space is needed, please attach another sheet.)

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

b. ☐ I don't know if this material violates the Library System's *Collection Development and Maintenance Policy*, but I find the following content objectionable. (Please provide specific examples.)

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

2. What action would you prefer the Library System take regarding this material?

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

______________________________________________________________________________

____________________________________________
Signature

____________________________________________
Date

**Please return this form to the nearest Library System location, email it to RFR@greenvillelibrary.org, or mail it to:**

**Technical Services Manager**
**Greenville County Library System**
**25 Heritage Green Place**
**Greenville, SC 29601-2034**

GREENVILLE COUNTY Library SYSTEM

*Approved by the Library Board of Trustees 12/5/22*
*Revised 4/24/23; 10/23/23*

# GREENVILLE (SC) COUNTY LIBRARY SYSTEM

## DISPLAY OF LIBRARY MATERIALS AND INFORMATION POLICY

**Materials**

Greenville County Library System (Library System) staff may display only new arrivals and other unrelated items face out.

Items displayed face out shall be appropriate for all audiences regardless of where they are placed in a Library System facility. To be considered appropriate for all audiences the cover of an item must not include a depiction of cruelty or violence, anything sexual in nature, profanity, or vulgar language.

- Materials displayed together shall include only items classified for one age group: children, teens/young adults, or adults.
- Only materials classified for children are to be displayed in the children's area of Library System facilities.
- One item may be placed with its cover face out when there is enough empty space on that item's shelf to accommodate the item in that position.
- One non-fiction title about the same subject or one title per fiction genre or author pulled from the materials shelved on the double-faced ranges of shelving attached to an end panel, may be placed with their cover facing out on that end panel.
- Unrelated children's books classified as Easy (E) may be placed with their covers facing out on the top of shelving and on display furniture in children's areas.
- The following disclaimer statement shall appear where five or more items are displayed together:
  "The Library System offers resources that present a wide variety of views and opinions on current and historical issues. The inclusion of an item in a Library System materials collection or on display with its cover face out does not represent an endorsement of the item's content by the Library System."
- New arrivals classified for adults shall be placed with their covers facing out on display furniture, where available, with a "New Arrivals" sign that includes the above disclaimer statement. (The New York Times Bestseller Lists may be placed in the vicinity of new arrivals.)
- New arrivals classified for young adults may be placed with their covers facing out on display furniture, where available, with a "New Arrivals" sign that includes the above disclaimer statement.
- New arrivals classified for children may be placed with their covers facing out on the top of shelving and display furniture, where available, in children's areas with a "New Arrivals" sign that includes the above disclaimer statement.
- Library Materials related to paid holidays observed by both Greenville County Government and the Greenville County Library System may be displayed together with their covers facing out on display furniture, where available, with a sign that includes only the same name of the holiday as used on the closure schedule published by GCLS and the above disclaimer statement. Holiday library materials displays should go up no earlier than two weeks prior to the Library's closure date for that holiday and should be taken down no later than two days after the closure date. The executive director or his/her designee may remove any material

from a display if he/she determines the material is overtly political, provocative, inappropriate, or not relevant to the respective holiday.

Library System materials related to a Library System event shall be displayed in the event space during the event.

**Informational Postings**
Only informational items supplied or authorized by the Library System Executive Director or their designee may be displayed solely on Library System bulletin boards, foyer cases, or windows in public areas. Such items shall be limited to:

- promotion of Library System resources, services, and events
- information from other governmental agencies, identified as such on the items.

Informational items and decorations are not to be attached to public services desks, walls, columns, or floors, or suspended from ceilings or fixtures in public areas. Items and decorations related to a Library System event held in a meeting room are permitted in the event space.

**Items for Distribution**
Only items supplied or authorized by the Library System Executive Director or their designee may be made available for distribution at any Library System facility or outreach event. Such items shall be limited to:

- promotion of Library System resources, services, and events
- items from other governmental agencies, identified as such on the items.

Only publications produced or authorized by Community Engagement, or handouts created using a Community Engagement-produced template for the purpose of promoting a Library System event, may be made available for distribution on public service desks.

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated;CHERYL ROGERS; GREG ROGERS; E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated; M.G by and through her mother, Amber Galea; and W.M., by and through his mother, Kersey Clark;

*Plaintiff(s)*

v.

GREENVILLE COUNTY, SOUTH CAROLINA; BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System

*Defendant(s)*

Civil Action No. 6:25-cv-02599-DCC

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* Greenville County Library System
25 Heritage Green Pl
Greenville, SC 29601

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Allen Chaney
ACLU of South Carolina
P.O. Box 1668
Columbia, SC 29202
achaney@aclusc.org

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ____________________

____________________
*Signature of Clerk or Deputy Clerk*

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________
was received by me on *(date)* ______________ .

❒ I personally served the summons on the individual at *(place)* ______________________
______________________ on *(date)* ______________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________ on *(date)* ______________ ; or

❒ I returned the summons unexecuted because ______________________ ; or

❒ Other *(specify)*:

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated;<br><br>CHERYL ROGERS;<br><br>GREG ROGERS;<br><br>E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated;<br><br>M.G., by and through her mother, Amber Galea; and<br><br>W.M., by and through his mother, Kersey Clark;,<br><br>*Plaintiffs*,<br><br>v.<br><br>GREENVILLE COUNTY, SOUTH CAROLINA;<br><br>GREENVILLE COUNTY LIBRARY SYSTEM;<br><br>BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and<br><br>KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,<br><br>*Defendants*. | C/A No. 6:25-cv-02599-DCC |

**MOTION TO DISMISS**

Oral argument requested

WILSON JONES CARTER & BAXLEY, P.A.

Charles F. Turner, Jr.
Fed. ID No. 05849
cfturner@wjcblaw.com
325 Rocky Slope Rd., Suite 201
Greenville, South Carolina 29607
(864) 672-3711

NELSON MULLINS RILEY & SCARBOROUGH LLP

Miles E. Coleman
Fed. ID No. 11594
miles.coleman@nelsonmullins.com
2 West Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300

*Attorneys for Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System; and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 3

STANDARD OF REVIEW .......... 5

ARGUMENT .......... 6

I. The case should be dismissed because Plaintiffs lack standing. .......... 6

A. Plaintiffs O.R., Cheryl Rogers, and Greg Rogers (O.R.'s parents) lack standing to assert their First Amendment claims. .......... 8

B. Plaintiff E.G. lacks standing to assert her First Amendment claims. .......... 9

C. Plaintiff M.G. lacks standing to asset her First Amendment claims. .......... 10

D. Plaintiff W.M. lacks standing to assert his First Amendment claims. .......... 12

E. Plaintiffs all lack standing to assert claims based on alleged widespread custom and practice of discrimination (Counts Three and Four). .......... 12

F. Plaintiffs all lack standing to assert their Equal Protection claims. .......... 13

II. Plaintiffs fail to state viable First Amendment claims. .......... 15

A. The so-called right to receive information does not obligate the government itself to provide (or keep providing) information that a plaintiff desires. .......... 15

B. Defendants' selection, curation, and placement of library materials is government speech that is not subject to the Free Speech Clause. .......... 18

1. Case law. .......... 19

2. Forum analysis. .......... 22

3. The *Shurtleff* factors. .......... 23

C. Even under the plurality opinion by Justice Brennan in *Pico*—a standard that neither this Court, the Fourth Circuit, nor the Supreme Court has ever adopted—the Defendants have not violated the First Amendment. .......... 25

III. Plaintiffs fail to state viable Equal Protection claims. .......... 28

A. Reframing a failed First Amendment claim as an Equal Protection claim can't create a viable cause of action where none exists. .......... 28

B. Plaintiffs' equal protection claims fail because the Collection Policy treats all similarly situated patrons of the Greenville Library System equally. ....29

IV. Defendants James and Allen are entitled to qualified immunity. ....32

V. Plaintiffs' class allegations and their anticipated request for class certification are not yet before the Court, and, in any event, lack merit. ....34

CONCLUSION ....35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ....................7, 8, 26

*ACLU of N. Carolina v. Tennyson*,
815 F.3d 183 (4th Cir. 2016) ....................21

*Am. Civil Liberties Union v. Mote*,
423 F.3d 438 (4th Cir. 2005) ....................22

*Anderson v. Creighton*,
483 U.S. 635 (1987)....................33

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)....................19

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011)....................33

*Bazen v. Bazen*,
837 S.E.2d 23 (S.C. 2019) ....................11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................6

*Bellotti v. Baird*,
443 U.S. 622 (1979)....................11

*Bd. of Ed., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)....................25, 26, 27

*Bostic v. Schaefer*,
760 F.3d 352 (4th Cir. 2014) ....................13

*Bryant v. Food Lion, Inc.*,
774 F. Supp. 1484 (D.S.C. 1991)....................35

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ....................20

*Bryant v. Muth*,
994 F.2d 1082 (4th Cir. 1993) ....................33

*Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*,
457 F.3d 376 (4th Cir. 2006) ....................22

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) ....................34

*City of Pleasant Grove v. Summum*,
555 U.S. 460 (2009)....................18, 19, 20, 22, 23

*Cooper v. Sheehan*,
735 F.3d 153 (4th Cir. 2013) ....................33

*Corbitt v. Sec'y of the Alabama L. Enf't Agency*,
115 F.4th 1335 (11th Cir. 2024) ....................31

*Doe v. Obama*,
631 F.3d 157 (4th Cir. 2011) ....................6, 7, 35

*Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.*,
213 F.3d 175 (4th Cir. 2000) ....................6

*Edwards v. City of Goldsboro*,
178 F.3d231 (4th Cir. 1999) ....................28

*Feminist Majority Found. v. Hurley*,
911 F.3d 674 (4th Cir. 2018) ....................33

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....................13, 14, 27

*Franklin v. City of Charlotte*,
64 F.4th 519 (4th Cir. 2023) ....................33

*Freedom from Religion Found., Inc. v. City of Warren, Mich.*,
707 F.3d 686 (6th Cir. 2013) ....................15, 22

*Ginsberg v. New York*,
390 U.S. 629 (1968)....................11

*Gore v. Lee*,
107 F.4th 548 (6th Cir. 2024) ....................31

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ....................30, 31

*Hurley v. Irish–Amer. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*,
515 U.S. 557 (1995)....................19

*Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Natural Res.*,
584 F.3d 719 (7th Cir. 2009) ....................22

*Katyle v. Penn Nat. Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) ....................6

*Kreimer v. Bureau of Police for Town of Morristown*,
958 F.2d 1242 (3d Cir. 1992)....................16

*Laird v. Tatum*,
408 U.S. 1 (1972)....................12

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965)....................15

*Lee v. York Cnty. Sch. Div.*,
418 F. Supp. 2d 816 (E.D. Va. 2006) ....................28

*Little v. Llano Cnty.*,
138 F.4th 834 (5th Cir. 2025) (en banc) ....................2, 17, 18, 19, 20, 23, 24, 25, 34

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................6, 7, 8

*Mahmoud v. Taylor*,
605 U.S. __, No. 24-297 (June 27, 2025) ....................27

*Manuel v. Wells Fargo Bank, Nat. Ass'n*,
123 F. Supp. 3d 810 (E.D. Va. 2015) ....................35

*Martin v. City of Struthers*,
319 U.S. 141 (1943)....................15

*Massachusetts Bd. of Retirement v. Murgia*,
427 U.S. 307 (1976)....................29

*McGriff v. City of Miami Beach*,
84 F.4th 1330 (11th Cir. 2023) ....................22, 23

*Meyer v. Nebraska*,
262 U.S. 390 (1923)....................27

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................19

*Morrison v. Garraghty*,
239 F.3d 648 (4th Cir. 2001) ....................30

*Mr. Dee's Inc. v. Inmar, Inc.*,
127 F.4th 925 (4th Cir. 2025) ....................34

*Muir v. Ala. Educ. Television Comm'n*,
688 F.2d 1033 (5th Cir. 1982) (*en banc*) (plurality opinion of Hill, J.)....................26

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993)....................13

*Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*,
346 F.3d 585 (6th Cir. 2003) ....................16

*Newton v. LePage*,
700 F.3d 595 (1st Cir. 2012)....................21, 22

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978)....................35

*Orin v. Barclay*,
272 F.3d 1207 (9th Cir. 2001) ....................28

*Page v. Lexington Cnty. Sch. Dist.*,
No. 3:06-249-CMC, 2007 WL 2123784 (D.S.C. July 20, 2007)....................34

*Pahls v. Thomas*,
718 F.3d 1210 (10th Cir. 2013) ....................16

*Pearson v. Callahan*,
555 U.S. 223 (2009)....................33

*People for the Ethical Treatment of Animals v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005)....................20, 22, 34

*Perry Educ. Ass'n v. Perry Local Educators Ass'n*,
460 U.S. 37 (1983)....................22

*Pers. Adm'r of Massachusetts v. Feeney*,
442 U.S. 256 (1979)....................30

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999) ....................3

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925)....................27

*Pinkley, Inc. v. City of Fredrick*,
191 F.3d 394 (4th Cir. 1999) ....................5

*Presidents Council, District 25 v. Community School Board No. 25*,
457 F.2d 289 (2nd Cir. 1972)....................34

*Richmond, Fredericksburg & Potomac R.R. v. United States*,
945 F.2d 765 (4th Cir. 1991) ....................5

*Shurtleff v. City of Boton.*,
596 U.S. 243 (2022)....................18, 19, 22, 23, 24, 25

*Stafford v. Bojangles' Restaurants, Inc.*,
123 F.4th 671 (4th Cir. 2024) ....................34

*Sutliffe v. Epping Sch. Dist.*,
584 F.3d 314 (1st Cir. 2009)....................21

*Tenn. Conf. of NAACP v. Lee*,
-- F.4th --, No. 24-5546, 2025 WL 1587965 (6th Cir. June 5, 2025)....................9

*Thomas v. Collins*,
323 U.S. 516 (1945)....................15

*Toledo Area AFL-CIO Council v. Pizza*,
154 F.3d 307 (6th Cir. 1998) ....................16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................7

*Troxel v. Granville*,
530 U.S. 57 (2000) (Scalia, J. dissenting)....................27

*United States v. Am. Libr. Ass'n, Inc.*,
539 U.S. 194 (2003)....................20, 21, 23, 34

*United States v. Skrmetti*,
605 U.S. __, No. 23-477 (2025) ....................31, 32

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982)....................9

*Vista-Graphics, Inc. v. Virginia Dep't of Transportation*,
682 F. App'x 231 (4th Cir. 2017) ....................21

*Warth v. Seldin*,
422 U.S. 490 (1975)....................5, 14

*Wells v. City & Cnty. of Denver*,
257 F.3d 1132 (10th Cir. 2001) ....................22

*White Tail Park, Inc. v. Stroube*,
413 F.3d 451 (4th Cir. 2005) ....................................................................................3

*Willis v. Town of Marshall*,
426 F.3d 251 (4th Cir. 2005) ..............................................................................16, 17

**Rules**

Fed. R. Civ. P. 12(b)(1).............................................................................1, 3, 5, 6, 35

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 6, 35

Fed. R. Civ. P. 23 ..........................................................................................................34

Fed. R. Civ. P. 23(b)(2)..................................................................................................34

Local R. Civ. P. 7.04 D ....................................................................................................1

**Statutes**

S.C. Code Ann. § 4-9-36(3) ............................................................................................3

S.C. Code Ann. § 16-23-30(A)(3) .................................................................................11

S.C. Code Ann. § 16-23-30(B) ......................................................................................11

S.C. Code Ann. § 65-5-340............................................................................................11

S.C. Code Ann. § 65-5-350............................................................................................11

S.C. Code § 20-1-250.....................................................................................................11

**Other Authorities**

Bradley A. Smith, *Money Talks: Speech, Corruption, Equality, and Campaign Finance*, 86 GEO. L.J 45, 67 (1997)......................................................................16

Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation of the First Amendment*, 3 DUKE J. CONST. LAW & PUB. POL'Y 113, 140 (2008)....................16

Lillian R. Bevier, *Specious Arguments, Intractable Dilemmas*, 94 COLUM. L. REV. 1258, 1277 (1994)........................................................................................................16

Ronald D. Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 18.39 (5th ed. 2013)...........................................................28

WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1785 (3d ed. 2025) ..........................35

Greenville County Library System (the "Library"), Beverly James, in her official capacity as Executive Director of the Greenville County Library System, and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System (and, together with the Library and Ms. James, the "Defendants") move under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss the Plaintiffs' suit because the Plaintiffs lack standing and they have failed to state causes of action on which relief can be granted.[1]

## INTRODUCTION

Plaintiffs ask this Court to substitute its judgment regarding what books to put on the shelves of Greenville County libraries—and where to put them—for that of Library officials. They assert a constitutional right to receive information of their choosing in public libraries, and they claim that Defendants' collection and shelving decisions and policies violated that supposed right.

If the Constitution recognizes such a right, courts are in for a heap of trouble. Libraries are not infinite repositories of information. A library has limited shelf space and must make constant purchasing, shelving, and weeding decisions. If a person has a right to receive specific information from specific books in a specific library, does that mean a public library has no discretion in its purchasing, shelving, and weeding decisions? That can't possibly be right. But what then is the standard a court must apply when determining if a library is impermissibly refusing to purchase a book or impermissibly weeding it out? Thankfully, this Court need not answer that challenging question. Instead, the Court should dismiss this suit for at least three reasons.

*First,* Plaintiffs lack standing. Some of them assert merely abstract disagreement with the Library's policies and an inchoate desire to some day check out unidentified books that are allegedly no longer in the children's or young adult's collection, but they fail to identify a single book that

[1] Pursuant to Local Civil Rule 7.04 D.S.C., a full explanation of the motion is provided herein, and, accordingly, a separate supporting memorandum would serve no useful purpose.

they specifically wanted to check out or imminently planned to check out but were unable to. In the absence of a concrete, particularized injury, these abstract "someday" intentions can't establish constitutional standing. Another Plaintiff concedes she has an "unrestricted" library card and can check out any book she wants, but finds it inconvenient to walk a few more steps from the young adult section to the adult section of the library, where those books are allegedly now housed. That's not enough to satisfy even the de minimis injury required for First Amendment standing. Other Plaintiffs are minors with "restricted" library cards and identify a book or two that they can't check out without parental permission.

*Second*, even if the Plaintiffs had standing, their suit should be dismissed because they failed to state viable claims for relief. Start with the First Amendment claims. Neither this Court, the Fourth Circuit, nor the Supreme Court have ever held that a library patron has a constitutional right to force the government to provide (or keep providing) him with specific books of his choosing at taxpayer expense, much less to provide those books on the shelves he wants or at the specific library branch location he wishes. In fact, the law is to the contrary. "A plaintiff may not invoke [the right to receive information] to challenge a library's decisions about which books to buy, which books to keep, or which books to remove." *Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir. 2025) (en banc). This conclusion, which is supported both by common sense and relevant case law, disposes of the entire complaint brought by Plaintiffs because each of their claims—including their Equal Protection claims—relies on this alleged right to receive information. Without that right, their claims fail. Their First Amendment claims fail for another reason, too, namely that the selection, curation, and management of public library materials are government speech not subject to or constrained by the Free Speech Clause.

*Third*, the Equal Protection claims are equally flawed. Plaintiffs attempt to reframe their non-viable First Amendment claims as Equal Protection claims, but that new packaging can't

create plausible causes of action where none exist. Furthermore, even if the claims are considered under an Equal Protection analysis, they fail for the fundamental reason that Defendants' challenged actions draw no distinction on the basis of sexual orientation, gender identity, or any other class or status, and, in contrast, treat all similarly situated library patrons similarly.

Finally, even if Plaintiffs' claims were viable, the two individual Defendants named in their official capacities are entitled to qualified immunity. The supposed rights asserted by Plaintiffs were not "clearly established" or settled "beyond debate." Indeed, they're not established at all.

## FACTUAL BACKGROUND[2]

The Greenville Library System is a public library system established by Greenville County, the most populous county in the state. Am. Comp. ¶ 13, 24. The library system is controlled and managed by a county-appointed board currently consisting of eleven members (the "Board"). *Id.* at ¶¶ 15–16. As part of its management of the library system, the Board is empowered by law to

- "Acquire books and other library materials and provide for use throughout the county," S.C. Code Ann. § 4-9-36(3);
- "Take any actions deemed necessary and proper by the board to establish, equip, operate, and maintain an effective library system within the limits of approved appropriations of county council," *id*. § 4-9-36(9);
- "Provide and make available to residents of the county books and library materials," *id*. § 4-9-37(a); and
- "Adopt regulations necessary to insure effective operation, maintenance and security of the property of the library system," *id*. § 4-9-37(b).

The Board is also responsible for establishing and applying its Collection and Development Maintenance Policy (the "Collection Policy"), which is intended to assist library staff and inform the public of its collection decisions. *See* Am. Comp. ¶¶ 18, 27. The Board regularly updates and

[2] These facts are drawn from the allegations of the Amended Complaint and the documents incorporated therein. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). In addition, to the extent this Motion arises under Rule 12(b)(1) for lack of standing, the facts include those from the parties' declarations and exhibits. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).

maintains this policy, with the most recent amendment taking effect in February 2025. Under this policy, the library system undertakes an ongoing process of evaluating materials to determine if they should be added, removed, or retained in the library's collection. Such decisions are made following different criteria outlined in the policy and are ultimately left to the Board's discretion.

In addition to the Board's ongoing collection decision-making, the Greenville Library System also offers a process by which community members may challenge certain collection decisions. This process begins with a community member lodging a formal complaint, which the Library Collection Development Committee subsequently reviews. *See* Am. Comp. Ex. B. The committee then develops a recommendation to the Board under library regulations. *Id*. If the complainant disagrees with the committee's recommendation, the complainant may appeal to the Board's Library Materials Committee, which may make further recommendations to the Board.

In 2024, the Library Board amended the Collection Policy in two ways, which form the basis for this lawsuit. *First*, the Board added the following provision to the Juvenile Collection (whose target audience is infancy through 12 years of age) section of the Policy:

> The Library recognizes parents/legal guardians are the primary source of education for their children, and that they have a fundamental right and responsibility to direct the upbringing and education of children under their care including issues of moral, social, physical, civic, and spiritual development.
>
> To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:
>
> - Social transitioning: Pronouns or dress inconsistent with biological sex for the purpose of affirming gender transitioning.
> - Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.
> - Gender fluidity: The possibility of changing genders at will or being no gender at all for the purpose of affirming gender transitioning.

Am. Comp. ¶ 74; *see also* Am. Comp. Ex. B at 8.

*Second*, the Board added a provision to the Young Adult Collection (aimed at teens aged 13 through 18) section of the Policy, which reads:

> The Library System recognizes that parents/legal guardians have a fundamental right to be involved in all aspects of their minor children's lives, especially in matters as life changing as gender identification.
>
> Therefore, materials targeting audiences aged 13–17 with characters who have transitioned or are in the process of transitioning from a gender that corresponds to their biological sex to a different gender will be located in the Adult Collection.
>
> This includes materials with illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning, whether changes are social (names, pronouns) or physical.

Am. Comp. ¶ 79; *see also* Am. Comp. Ex. B at 13.

Plaintiffs brought suit on March 26, 2025, and filed an Amended Complaint on April 4, 2025. The main thrust of Plaintiffs' complaint is that the two new provisions of the Policy dealing with gender transitioning violate their First Amendment and Equal Protection Rights. Am. Comp. ¶¶ 36–96. Additionally, they claim that "the Library also enforces a widespread custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials, including with respect to books for adults." Am. Comp. ¶ 97. But none of the Plaintiffs have asserted any specific alleged interaction with or injury caused by these supposedly widespread customs and practices.

## STANDARD OF REVIEW

**Standing.** "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick*, 191 F.3d 394, 399 (4th Cir. 1999). Whether a plaintiff has standing to warrant the invocation of federal court jurisdiction presents a threshold question in every federal case. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The burden of proving subject matter jurisdiction in response to a Rule 12(b)(1) motion to dismiss is on the plaintiff, the party asserting jurisdiction. *Richmond, Fredericksburg & Potomac*

*R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). When the Rule 12(b)(1) motion challenges the facts underlying a Complaint's jurisdictional assertions, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.*

**Failure to state a claim.** A motion to dismiss under Rule 12(b)(6) tests the complaint's legal sufficiency. *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.,* 213 F.3d 175, 180 (4th Cir. 2000). The court must take the facts in the light most favorable to the plaintiff, but need not accept the legal conclusions drawn from the facts. *Id.* at 175. The court need not accept "unwarranted inferences, unreasonable conclusions, or arguments" as true. *Id.* at 175. A complaint must provide more than labels and conclusions to survive a 12(b)(6) motion. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." *Id.* Courts may consider documents integral to the complaint or referenced in it, even if not physically attached to the complaint. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011).

## ARGUMENT

### I. The case should be dismissed because Plaintiffs lack standing.

Article III of the Constitution limits the federal courts to adjudicating actual "cases" and "controversies." *See Doe v. Obama,* 631 F.3d 157, 160 (4th Cir. 2011). "[S]tanding is an essential and unchanging part" of that case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing requires a plaintiff to plead and prove (1) that she suffered an "injury in fact," meaning an invasion of a legally protected interest which is concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical,'" (2) a causal connection between the injury and the conduct complained of, and (3) that it is "likely," not merely "speculative" that the injury will be "redressed by a favorable

decision." *Id*. at 560–61. Because "standing is not dispensed in gross," "plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

In *Lujan*, the Supreme Court addressed two plaintiffs' challenge to a regulation that interpreted the Endangered Species Act as not applying to foreign nations. *Id.* at 564. The plaintiffs claimed they had standing because they had visited other countries to observe endangered species and intended to do so again in the future. *Id.* at 563–64. The Supreme Court disagreed, finding these indefinite plans insufficient to confer standing: "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564.

In *Doe v. Obama*, the Fourth Circuit interpreted, applied, and expounded on the Supreme Court's "some day intentions" language. 631 F.3d at 163. The plaintiffs asserted that parents who "are actively considering adopting" human embryos had standing to challenge an executive order that removed restrictions on research involving human embryonic stem cells, claiming that the order would reduce the number of *in vitro* human embryos available for adoption such that they will be unable to adopt." *Id.* at 159, 162. The court concluded the plaintiffs lacked standing, reasoning that "*Lujan*'s requirement that plaintiffs have some concrete plan constrains us" because "[t]he plaintiff parents here did not allege that they have already tried and failed to adopt embryos, nor do they allege any concrete plans for future adoption, so the possibility that they will never suffer the alleged injury looms too large." *Id.* at 163.

The Eleventh Circuit's decision in *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.* is instructive. 557 F.3d 1177 (11th Cir. 2009). In that case, the ACLU of Florida sued a school board for removing *Vamos a Cuba* and other books in a series called "A Visit to" from the school's libraries as a violation of their members' First Amendment rights to freedom of speech and access

to information. *Id.* at 1188. Mark Balzli, a member of that chapter of the ACLU, swore in his declaration that: (1) his son was a student at North Beach Elementary School; (2) he wanted his son to have access to *Vamos a Cuba* and the other books in the "A Visit to" series; (3) he saw *Vamos a Cuba* in the North Beach Elementary library; and (4) he had planned to check the book out of the library with his son "in the future," but they "will be unable to do so when school resumes on August 14, 2006" because of the school board's order removing the series. *Id*. The court concluded that Mr. Balzli's declaration established an injury in fact as to *Vamos a Cuba* but not as to the other books in the "A Visit to" series. *Id*. at 1195, 1197–98.

The court observed that Mr. Balzli's declaration, dated July 5, 2006, stated that he anticipated checking out *Vamos a Cuba* "when school resumes on August 14, 2006," and that this showed a specific intention pegged to a sufficiently fixed period. *Id.* at 1194. But the plaintiffs' declarations failed to establish that they faced a threat of imminent injury from the removal of any of the *other* "A Visit to" books. *Id*. at 1197. The court concluded that the plaintiffs' "declarations merely establish a free-floating desire to access the other books in the 'A Visit to' series, a desire untethered to any intended action during any reasonably specific period of time." *Id.* at 1196. This free-floating desire was like the declarations in *Lujan*, and therefore did not confer standing. *Id.*

**A. Plaintiffs O.R., Cheryl Rogers, and Greg Rogers lack standing to assert their First Amendment claims.**

The specific allegations about O.R. and Cheryl and Greg Rogers (O.R.'s parents) are insufficient to satisfy the injury-in-fact requirement. Am. Comp. ¶¶ 116–33. O.R. is 17 years old, identifies as transgender, and has a young adult library card, meaning O.R. cannot check out books from the adult sections of the library. Am. Comp. ¶¶ 116, 127. Notably, neither O.R. nor either parent has identified a single book that any of them has wanted to check out but have been unable to because of the library's policy. O.R. allegedly "is particularly interested in reading books with

transgender and other LGTBQ characters" and "often goes to the library and checks out books by himself," but alleges that "[b]ecause O.R. has a young adult library card, he cannot check out books from the adult sections of the library." Am. Comp. ¶¶ 125–27. But, again, O.R. has not identified a single book that is unavailable to him because of the policy at issue here.

O.R.'s further allegations that when he "is unable to find a book he wants to read in the Young Adult section (whether because it was banished to the PEC section or removed from the library altogether), it makes him feel as if he's not seen, and like his identity is seen as vulgar or inappropriate by his community" are also insufficient to confer standing. Am. Comp. ¶ 133. Importantly, a plaintiff "cannot sue based on the psychological distress they may suffer from a law they dislike." *Tenn. Conf. of NAACP v. Lee*, -- F.4th --, No. 24-5546, 2025 WL 1587965, at *4 (6th Cir. June 5, 2025); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) ("the psychological consequences presumably produced by observation of conduct with which one disagrees [is] not an injury sufficient to confer standing under Art. III"). O.R. lacks standing based on any alleged past or future psychological distress. Nor can the allegation that O.R. is "unable to find a book he wants to read" establish standing because, again, O.R. hasn't pled with any degree of specificity a single book title that's been made inaccessible by the library's collection decisions. O.R.'s parents likewise lack have Article III standing. They claim that they "also wish to be able to access the full array of LGBTQ-related books, including titles the Library has quietly removed from its shelves with no explanation." Am. Comp. ¶ 131. But like the plaintiffs in *ACLU of Fla.*, the Rogers' mere "wish" to access unidentified books at an unspecified time in the future is too speculative to constitute an injury-in-fact.

**B. Plaintiff E.G. lacks standing to assert her First Amendment claims.**

E.G. is 12 years old and identifies as "queer." Am. Comp. ¶¶ 134, 137. E.G. has an unrestricted minor library card, meaning she can check out any book she wants from the library. *Id*.

at ¶¶ 136, 140. Although she has access to and the ability to check out any book in the library, E.G. claims that she wants "to be able to read books about queer and transgender characters [her] age in the juvenile section of the library," and "finds it frustrating to walk all over the library to find books targeting her age, simply because those books have characters in the LGBTQ community and other people who identify as outside societal norms." *Id*. ¶¶ 138, 140. She claims she "feels indignant that these books aren't in the same section as other children's books." *Id*. at ¶ 140. E.G., however, has not alleged a cognizable Article III injury. She has not alleged that there are any books that have been removed from the library that she wants to check out. And although she has identified several specific books that she was interested in that are now allegedly located in the Parenting and Early Childhood ("PEC") section of the library, *id*. at ¶ 138, she admits that she has access to these books and the ability to check them out on her own library card. Her "frustrati[on]" and "indignan[ce]" at having to walk a few extra steps to the PEC section of the library to locate these books are not sufficient for Article III purposes and a First Amendment claim.

**C. Plaintiff M.G. lacks standing to assert her First Amendment claims.**

M.G. is 11 years old; she is E.G.'s sister. Am. Comp. ¶ 134. She has a juvenile library card, which allows her to check out books only from the juvenile section of the library. *Id.* ¶ 136. She has identified one book—*Snapdragon*—that she was allegedly unable to check out using her library card. *Id.* ¶ 141. But, notably, M.G. can still walk to where *Snapdragon* has been shelved, pull down the book, and sit and read it in the library. Furthermore, her mother, Amber Galea, or another parent or legal guardian, or even her sister, E.G., could check the book out for her. There's no allegation that her mother *wouldn't* consent to checking the book out for her, and presumably she would, given that Ms. Galea was willing to file a federal lawsuit to access the book. Nor is there any allegation that her mother wouldn't consent to M.G. having an unrestricted minor card, which she approved E.G. having.

Even in the First Amendment context, children have fewer constitutional protections than adults because of the "concern over the inability of children to make mature choices." *Bellotti v. Baird*, 443 U.S. 622, 636 (1979) (plurality); *see also Ginsberg v. New York*, 390 U.S. 629, 638 (1968) (upholding constitutionality of New York law that forbid the sale of "girlie" magazines to minors under the age of 17, even though the statute covered material that was not obscene for adults).[3] Conditioning a minor's exercise of constitutional rights on parental consent is hardly a novel or unconstitutional practice. *See Bellotti*, 443 U.S. at 637 (plurality) ("The State commonly protects its youth from adverse governmental action and from their own immaturity by requiring parental consent to or involvement in important decisions by minors."); *Bazen v. Bazen*, 837 S.E.2d 23, 27 (S.C. 2019) ("The Due Process Clause of the Fourteenth Amendment to the Constitution of the United States protects a parent's 'fundamental right/ to make decisions concerning the welfare and upbringing of her minor children."). For example, in South Carolina, a health services provider must generally obtain the consent of a parent to provide treatment to a minor under the age of 16, S.C. Code Ann. §§ 65-5-340, -350, and a minor aged 16 or 17 can only obtain a marriage license upon the sworn affidavit of a parent or legal guardian giving consent for the child to marry, *id.* § 20-1-250. A state can even completely restrict some constitutional rights—*e.g.*, the right to bear arms—to a minor. *See* S.C. Code Ann. § 16-23-30(A)(3), (B) (making it unlawful for a person under the age of 18 to possess or acquire a handgun in South Carolina). In short, M.G. has not suffered an Article III injury, especially in light of the public library's recognition of and deference to parents' right to supervise the care and upbringing of their children.

---

[3] *See also Ginsberg*, 390 U.S. at 638 (Stewart, J. concurring) ("at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees," which justifies why "a State may deprive children of other rights—the right to marry, for example, or the right to vote—deprivations that would be constitutionally intolerable for adults").

### D. Plaintiff W.M. lacks standing to assert his First Amendment claims.

W.M. is 9 years old and has a juvenile library card, meaning he can only check out books from the juvenile section. Am. Comp. ¶ 148. He "believes moving books out of the juvenile section because they feature LGBTQ characters is unfair," and "is interested in books that have been moved to the adult section under Greenville's policy, including the *Magnus Chase* series by Rick Riordan[.]" Am. Comp. ¶ 150. W.M.'s allegations are insufficient to confer standing. His sense that the policy is "unfair" is the sort of psychological injury that is not cognizable under Article III. Further, he has not alleged that he has been unable to access any of the *Magnus Chase* books, or any other books he wants to read because of the Policy. For example, there is no allegation that his mother cannot or will not check the books out for him, or even that he has been burdened in any way by the placement of the series in the adult section of the library.

### E. Plaintiffs all lack standing to assert claims based on alleged widespread custom and practice of discrimination (Counts Three and Four).

Plaintiffs all lack standing to assert their claims that the Library "enforces a widespread custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials, including with respect to books for adults." Am. Comp. ¶¶ 97, 175, 180. Notably, none of the Plaintiffs have asserted any specific alleged interaction with or injury caused by these supposedly widespread customs and practices. In the absence of specific allegation of injury (and there are none), the claims relating to these alleged customs and practices are nothing more than abstract policy disagreements that seek an advisory opinion from the Court. Since there is no claimed injury resulting from the claimed widespread custom and practice complained of here, there is no Article III standing. *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; the federal courts established pursuant to Article III of the

Constitution do not render advisory opinions.") (quotations and citation omitted).

**F. Plaintiffs all lack standing to assert their Equal Protection claims.**

Plaintiffs' standing (or the lack thereof) to assert their Equal Protection claims can be treated *en masse* because they all suffer from the same jurisdictional shortcoming, namely, the failure plausibly to allege a cognizable constitutional injury by pleading that *they* have been subjected to disparate treatment. "The 'injury in fact' in an equal protection case . . . is the denial of equal treatment resulting from the imposition of the barrier" that "makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666 (1993). The Library's policies do not erect such a barrier, and Plaintiffs don't plausibly allege otherwise.

There is no barrier that is unique to Plaintiffs or that differs at all from the barrier that applies to every other similarly-situated minor patron. The challenged policies—both facially and as allegedly applied—apply equally to *all* minor patrons, regardless of their gender identity or sexual orientation. *All* minor patrons who have a restricted library card have the same limitation on their access to books outside of the children's and young adults' sections. And *all* minor patrons with unrestricted library cards have equal access to all library materials. Stated differently, all similarly situated individuals are treated similarly. In the absence of a plausible allegation of disparate treatment of similarly situated people (and there is none in the Amended Complaint), Plaintiffs lack an injury and therefore, lack standing to assert their Equal Protection claims.

Even so-called stigmatic injury standing (if that's the angle some of the Plaintiffs are pursuing) requires them to show they are subjected to "discriminatory treatment" that differed from the way other similarly-situated individuals were treated and that imposed concrete burdens or the denial of benefits that, again, differed from the treatment of other similarly-situated individuals. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (holding that LGBTQ plaintiffs

asserting an Equal Protection claim can establish stigmatic injury standing only if they identify a "concrete interest with respect to which he or she is personally subject to discriminatory treatment and that interest independently satisfies the causation requirement of standing doctrine") (cleaned up). Here, Plaintiffs have not identified any way in which they have personally been subject to discriminatory treatment different from the treatment of other similarly-situated patrons.

Because Plaintiffs have not claimed (and cannot plausibly claim) that they are treated differently from other similarly-situated patrons, they may try to reframe their standing as resting on the allegedly disparate accessibility of particular materials. *E.g.*, Am. Comp. ¶ 4 (alleging that books celebrating gender transition were relocated to the Parenting and Early Childhood section while a book portraying a traditional religious view of gender identity and sexuality allegedly remained in the juvenile section); *id.* ¶ 169 (alleging the challenged policies "classify *materials* for exclusion based on sex and transgender status") (emphasis added); *see also id.* ¶¶ 171, 180 (claiming unequal treatment due to supposed lack of access to certain material). Even so, they still lack standing. To the extent that Plaintiffs' base their claims on the allegedly wrongful or unequal treatment or classification of *materials*, they lack standing to assert claims on behalf of those materials or third parties. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381–82 (2024) (requiring an injury in fact for a plaintiff to have standing and noting that "[t]he injury in fact requirement prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'") (internal quotation omitted); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (noting that a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

Because Plaintiffs lack standing to assert claims on behalf of the materials that were supposedly subject to disparate treatment and because they've not alleged facts to support their novel viewpoint-inaccessibility injury, they lack standing to assert their Equal Protection claims.

## II. Plaintiffs fail to state viable First Amendment claims.

### A. The so-called right to receive information does not obligate the government itself to provide (or keep providing) information that a plaintiff desires.

Even if Plaintiffs have standing (and, as explained above, they don't), their First Amendment claims nonetheless fail on the merits. Plaintiffs' First Amendment claims rely on their alleged "right to receive information in public libraries." Am. Comp. ¶ 7; *see also id.* ¶ 167 (claiming that the "Juvenile (February 2024) and Young Adult (August 2024) Collection Policy amendments are per se unconstitutional and infringe on Plaintiffs' right to receive information under the First Amendment"). The problem with this argument is that any right to receive information in or from a public library does not entitle a person to have access to specific books or material. In other words, a library's decision to remove a book, not purchase a book, or move a book to a different section of the library does not implicate the First Amendment right to receive information.

True, the Supreme Court has generally recognized that the First Amendment sometimes limits the government's power to prevent one person from receiving another's speech. *See*, *e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 142–43 (1943) (holding that a city's prohibition on door-to-door distribution of "handbills, circulars[,] or other advertisements" violated the First Amendment based on a person's "right to distribute literature" and another's "right to receive it"); *Thomas v. Collins*, 323 U.S. 516, 538 (1945) (holding a court could not bar a union organizer from delivering a speech to company employees); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 306 (1965) (holding the government could not burden someone's right to receive political literature through the mail). But none of the right-to-receive-information cases concerned the alleged right to receive information *from* the government. And the Supreme Court has never suggested that the First Amendment obligates the government to provide information to anyone. Instead, the right to receive information is a *negative* right—the negative right to be free from "government

interference with the exchange of information by private citizens." Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation of the First Amendment*, 3 DUKE J. CONST. LAW & PUB. POL'Y 113, 140 (2008); *see also Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 319 (6th Cir. 1998) ("the First Amendment only 'protects individuals' 'negative' rights to be free from government action and does not create 'positive' rights—requirements that the government act'") (quoting Bradley A. Smith, *Money Talks: Speech, Corruption, Equality, and Campaign Finance*, 86 GEO. L.J 45, 67 (1997)); *Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013) ("The First Amendment does not impose upon public officials an affirmative duty to ensure a balanced presentation of competing viewpoints" given that "freedom of speech is a negative liberty."); Lillian R. Bevier, *Specious Arguments, Intractable Dilemmas*, 94 COLUM. L. REV. 1258, 1277 (1994) (the First Amendment "is a source of negative rights against the government, not a repository of positive entitlement to government favors"). This negative-rights understanding of the Free Speech Clause is consistent with the constitutional text, which simply restricts the government's power to "abridge[]" speech. U.S. Const., amend. I.

The right-to-receive-information case law pertaining to public libraries is consistent with the understanding that this right is a negative right. *See, e.g.*, *Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*, 346 F.3d 585, 590 (6th Cir. 2003); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1247–48 (3d Cir. 1992); *Willis v. Town of Marshall,* 426 F.3d 251, 260 (4th Cir. 2005). *Kreimer,* for example, held that a library could evict a vagrant whose "odor was often so offensive that it prevented the [l]ibrary patrons from using certain areas of the [l]ibrary," but also determined that the right to receive information "includes the right to some level of ***access*** to a public library, the quintessential locus of the receipt of information." 958 F.2d at 1255 (emphasis added); *see also Neinast,* 346 F.3d at 591 (quoting *Kreimer* in determining that the First Amendment includes the right to some level of access to a public library). Somewhat

analogously, the Fourth Circuit in *Willis* held that plaintiff had a First Amendment right to listen to musical performances at a town community center, and further noted that this right seemed less compelling than "the right to use a public library." 426 F.3d at 260. These cases generally stand for the proposition that the government cannot categorically exclude someone from a public library (in other words, there's a negative right not to be excluded). However, not being excluded—or, stated differently, having the right to access or use a public library generally—is a far cry from having the right to access or receive specific information, materials, or books from the government. Neither the precedents of the Supreme Court nor the federal circuits support the recognition of such a broad First Amendment positive right.

The Fifth Circuit's recent *en banc* decision in *Little v. Llano County* is instructive. 138 F.4th 834 (5th Cir. 2025) (*en banc*). In that case, patrons of a county library in Texas sued the local librarian and other officials, alleging they removed 17 books because of their treatment of racial and sexual themes. *Id.* at 836. The district court concluded that defendants abridged plaintiffs' "right to receive information" under the First Amendment and ordered the books be returned to the shelves; a divided Fifth Circuit panel affirmed in part. *Id.* The en banc court reversed, holding that "plaintiffs cannot challenge the library's decision to remove the 17 by invoking a right to receive information" because there is no right to *receive* "a book of their choice at taxpayer expense." *Id.* at 848, 850–51.[4] The court reasoned that if a public library declines to purchase a book or removes a book from the shelves that it previously purchased, "the library does not prevent anyone from 'receiving' the information in it." *Id.* Because the library does not own every copy of every book, someone could buy the book themself, borrow it from a friend, or even look for it at another library. *Id.*

[4] Ten of the 17 judges of the Fifth Circuit joined the part of the opinion holding that the defendants' decision to remove the 17 books did not infringe plaintiffs' alleged right to receive information.

Consistent with Supreme Court case law and the Fifth Circuit's recent *Little* decision, this Court should dismiss Plaintiffs' First Amendment claims. These claims rely on an alleged right to receive information from the government at taxpayer expense in a public library. But such a right does not exist under the First Amendment. Plaintiffs, therefore, have failed to state viable First Amendment claims, and their claims should be dismissed.

### B. Defendants' selection, curation, and placement of library materials is government speech that is not subject to the Free Speech Clause.

A public library's selection, curation, and placement of library materials is not the type of speech to which the First Amendment applies. In other words, even if the Defendants engaged in content or viewpoint discrimination (which is denied), their actions are not a violation of the First Amendment's Free Speech Clause because governments *can* and inevitably *do* select between and among viewpoints when deciding what message the government wants to convey.

Start with the general, undisputed proposition: the Free Speech Clause does not regulate government speech. *See City of Pleasant Grove v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.") (citations omitted). When, as here, government officials determine how public funds and spaces will be used to present ideas and messages, those decisions constitute government speech. *See id.* at 467–72 (holding that a city's decision of what privately-created material it would select and display on public grounds "constitute[s] government speech" and was a government-controlled message" that involved the government "speak[ing] for itself"); *Shurtleff v. City of Bos.*, 596 U.S. 243, 252 (2022) ("When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say."). And importantly, "when the government speaks for itself, the First Amendment does not demand airtime for all views." *Shurtleff*, 596 U.S. at 247–48.

This principle also applies in the public library context. Again, the recent Fifth Circuit *en banc* decision in *Little* is instructive. A seven-judge plurality in *Little* held that a public library's collection decisions are government speech. 138 F.4th at 865 (Duncan, J., plurality op.) In reaching this conclusion, the plurality relied on (1) case law instructing that the government engages in expressive activity by selecting and presenting a curated collection of third-party speech; (2) its conclusion that a library's collection is not a public forum; and (3) application of the *Shurtleff* factors. These three rationales apply with equal force here.

**1. Case law**

In *Moody v. NetChoice, LLC*, the Supreme Court stated that "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." 603 U.S. 707 (2024). In other words, the *speaker* is the one who selects, compiles, and presents the curated collection. *See Hurley v. Irish–Amer. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 570 (1995). And if it's the government that is doing the curating, then it is the government that is doing the speaking. *See, e.g., Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity.") (citation omitted).

A key precedent in *Little*—and here—is *City of Pleasant Grove v. Summum*, 555 U.S. 460. In that case, the city created displays in a public park by accepting privately donated monuments, including one of the Ten Commandments. After the city refused to include a religious organization's monument, the organization sued, arguing that the city engaged in viewpoint discrimination and violated the Free Speech Clause. *Id.* at 464–66. The Supreme Court disagreed, holding that the city's selection to display some monuments but not others "constituted government speech," even though private sculptors created the monuments. *Id.* at 472–74. It was

not the monuments themselves that constituted the relevant speech, but rather the government's choice in picking the ones it wished to display. *Id.* at 473 ("The City has selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park[.]").

The *Little* plurality concluded that *Summum* "maps neatly onto" the public library context. *Little*, 138 F.4th at 852. Just as a city or county selects private speech (monuments) to display in a public park, a city or county selects private speech (books) and displays them on the library shelf; the "relevant expression lies not in the monuments or the books themselves, but in the government's selecting and presenting the ones it wants." *Id.* at 853. So too here. Defendants' decision to purchase (or not purchase), remove (or not remove), or keep shelved (or shelve elsewhere) a book is expressive conduct that constitutes government speech.

Other courts and jurists have likewise concluded that library curation is government speech. *See People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (hereinafter "*PETA*") ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."); *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries[.]"); *see also United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194 (2003) ("*ALA*") (plurality) ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.").[5]

---

[5] *See also ALA*, 539 U.S. at 204 (plurality) ("To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons."); *id*. (a library's "goal has never been to provide 'universal coverage,'" but rather "to provide materials 'that would be of the greatest direct benefit or interest to the community'") (citation omitted); *id*. ("libraries collect only those materials deemed to have 'requisite and appropriate quality'"); *id*. at 208 ("A library's need to exercise judgment in making collection decisions depends on its traditional role

Case law from the Fourth Circuit is also instructive. *See Am. C.L. Union of N. Carolina v. Tennyson*, 815 F.3d 183 (4th Cir. 2016); *Vista-Graphics, Inc. v. Virginia Dep't of Transportation*, 682 F. App'x 231, 235 (4th Cir. 2017). In *Tennyson*, the court considered whether North Carolina's specialty license plate program constitutes government speech. 815 F.3d at 185. Under that program, North Carolina had approved a "Choose Life" plate but repeatedly rejected efforts to include a pro-choice plate. *Id.* at 184. The Fourth Circuit, relying on the Supreme Court's decision in *Walker*, concluded that the program amounted to government speech and "North Carolina is therefore free to reject license plate designs that convey messages with which it disagrees." *Id.* at 185. Similarly, in *Vista-Graphics, Inc.*, the court held that a program instituted by the Virginia Department of Transportation creating content restrictions on material displayed at public rest areas and welcome centers did not violate the Free Speech Clause. 682 F. App'x at 237. The court "easily conclude[d] that the plaintiffs' guides displayed at rest areas operated by the Commonwealth constitute government speech," rejecting a rule requiring a state to display guides promoting every potential point of view given the "obvious" infirmity of such a rule, which would require a state to display information denigrating state facilities or promoting out-of-state tourist attractions." *Id.* at 237. Even though the content of the information contained in the guides was created by private individuals or businesses—just like the books in a library—the decision whether to allow placement of the guides in a public rest facility constitutes government speech not subject to the First Amendment. *Id.*[6]

---

in identifying suitable and worthwhile material[.]"); *id*. at 217 (Breyer, J., concurring in judgment) (referring to "the discretion necessary to create, maintain, or select a library's 'collection'").

[6] *See also Newton v. LePage*, 700 F.3d 595, 602 (1st Cir. 2012) (Governor's removal of a "pro labor" mural did not violate the First Amendment because the decision to keep the mural or take it down was government speech); *Sutliffe v. Epping School District*, 584 F.3d 314 (1st Cir. 2009) (town's decision to not include a nonprofit group's hyperlink on the town's website did not implicate the First Amendment because the decision of what to include on the town's own website

### 2. Forum analysis

Governmental entities are limited in their ability to regulate private speech in public fora. *Shurtleff*, 596 U.S. at 252.[7] The Supreme Court recognizes two categories of public fora: "traditional public forums" and "limited (or designated) public forums." *Am. Civil Liberties Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005). In traditional public fora—sidewalks, streets, and parks—"the government may only establish content-neutral 'time, place, and manner' restrictions or content-based rules that are 'necessary to achieve a compelling state interest' and are 'narrowly drawn to achieve that interest.'" *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 383 (4th Cir. 2006) (quoting *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45 (1983)). The government has more latitude in regulating limited public fora, which are places that the government has opened for public expression of particular kinds or by particular groups, but still the restrictions "must be both reasonable and viewpoint neutral." *Id.*

A public library's *bookshelves* are neither a traditional public forum nor a limited public forum. If they were, libraries would have to remain "viewpoint neutral" when choosing books. *See Summum*, 555 U.S. at 470 (limited public fora restrictions must be "viewpoint neutral"). But that's

---

was "an expressive act by the government"); *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023) (the city was speaking in installation and curation of art: "Having bought the artwork, the City's decision to display it, or not display it, was classic government speech."); *PETA*, 414 F.3d at 28 (government did not violate PETA's free speech rights when it declined to include a painting of "a sad, shackled circus elephant with a trainer poking a sharp stick at him" in a public art installation); ); *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Natural Res.*, 584 F.3d 719 (7th Cir. 2009) (no First Amendment violation when state park decided not to display certain items on display racks); *Wells v. City & Cnty. of Denver,* 257 F.3d 1132, 1137, 1143–44 (10th Cir. 2001) (holiday display was government speech, thus Denver had no First Amendment duty to add a sign saying, "The 'Christ Child' is a religious myth"); *Freedom from Religion Found., Inc. v. City of Warren, Mich.*, 707 F.3d 686, 696 (6th Cir. 2013) (city's holiday display was government speech).

[7] Notably, "[t]he public forum analysis has been much criticized." *Newton v. LePage*, 700 F.3d 595, 602 (1st Cir. 2012) (citing cases and a law review article criticizing the doctrine). But this Court need not resolve the tension in the public-forum case law, given that the books on the shelves of a public library do not fit within *any* category of recognized public forum.

absurd. Libraries are entitled to shelve books celebrating the Civil Rights Movement or Holocaust survivors, while declining to shelve books celebrating the KKK or Nazis. The very task of a librarian is to make decisions about content. There is, after all, only a limited amount of shelf space in a library. If libraries were required to be content and viewpoint-neutral, they'd all have to be shut down. But "where the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place." *Summum*, 555 U.S. at 480; *see also ALA*, 539 U.S. at 205 (plurality) ("[F]orum analysis and heightened judicial scrutiny are . . . incompatible with the discretion that public libraries must have to fulfill their traditional missions.").

True, some *portion* of a library facility may be a public forum—if, for example, there is a space within the library designated for book discussions or author readings—but that's very different from claiming that the library bookshelves and book collection are a public forum. *ALA*, 539 U.S. at 206 (plurality) ("A public library does not acquire Internet terminals in order to create a public forum any more than it collects books in order to provide a public forum for the authors of books to speak."); *Little*, 138 F.4th at 859 (plurality) (reasoning that while a "library might open one of its rooms to poetry readings by the public and thereby create a limited public forum . . . Forum analysis has no place on a library's bookshelves"). Forum analysis is not applicable here and does not further Plaintiffs' First Amendment claims.

**3. The *Shurtleff* factors**

To determine whether speech is government speech, and therefore does not implicate the Free Speech Clause, courts often examine several factors (the *Shurtleff* factors), including (1) the history of the expression at issue, (2) the public's likely perception as to whether the government or a private party is speaking, and (3) the extent of government control of the expression. *Shurtleff*, 596 U.S. at 252. These factors "are not exhaustive," "will not be relevant in every case," and "are neither individually nor jointly necessary for speech to constitute government speech." *McGriff v.*

*City of Miami Beach*, 84 F.4th 1330, 1334 (11th Cir. 2023) (quotations and citations omitted); *see also Shurtleff*, 596 U.S. at 252 (the court's "review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors").

All three factors support the conclusion that a public library's collection decisions are government speech. Defendants will not belabor the argument but point this Court to the plurality's thorough analysis of the *Shurtleff* factors in the context of public libraries in *Little*. 138 F.4th at 861–65 (plurality) (concluding that all three factors supported the conclusion that a library's choice of books is government speech). As to the first factor, the *Little* plurality reasoned that both in terms of historical and contemporary practice, public libraries intentionally choose books they think are worth reading and merit the public's attention. *Id.* at 862–63. This is true of the Greenville County Library System, as evidenced by its 13-page Collection Policy. Am. Comp., Exhibit B. Among other things, that Policy teaches that "[c]ollection decisions are based on the merit of the work as it relates to the Library's mission" and on "[c]ommunity needs, interests, demands, and standards. (Doc 5-1 at 2–3.) Notably, the Policy also has "content criteria"—further showing that libraries necessarily discriminate based on content—which includes "comprehensiveness and depth of treatment," "authority, skill, competence and purpose of author/producer," and "vitality and originality." Collection Policy at 2–3. These are the sorts of standards that public libraries have always used in creating their collections. *Little*, 138 F.4th at 862–63 (plurality). But they are not the sort of standards that courts can—or should—police.

Second, the public knows that the speech at issue—the library's collection decisions—is speech made by the government, and not by a private person. Again, it's important to remember that the Defendants' speech here is the selection and shelving of books (the curation of a collection), *not* the content of the books (the author's words on the page). The content of the books is obviously that of the author of the book, whether that author be Shakespeare, Willa Cather,

Stephanie Meyer, or Malcolm Gladwell. But the library collection as a whole, which is a compilation of thousands of library decisions regarding what is worthwhile, meritorious, and otherwise of value to the reading public, is government speech. In other words, "the library conveys its *own* message (which books are worth reading) by collecting third-party speech (books)." *Little,* 138 F.4th at 864 (plurality) (emphasis in original).

Third, necessarily the government has actively shaped the expression. Indeed, this is the very reason a public library exists: to curate a collection of books for consumption by the reading public. There may be more books in a library than paintings in a museum or sculptures in a park, but the basic government speech is the same. As *Little* reasoned, "literally from the moment they arose in the mid-19th century, public libraries have been shaping their collections for specific educational, civic, and moral purposes," and "still do today." 138 F.4th at 865 (plurality).

Analysis of the *Shurtleff* factors here further demonstrates that the speech at issue here is government speech that does not implicate Defendants' free speech rights.

### C. Even under the plurality opinion by Justice Brennan in *Pico*—a standard that neither this Court, the Fourth Circuit, nor the Supreme Court has ever adopted—the Defendants have not violated the First Amendment.

The conclusion that a public library collection is government speech is not altered by *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). As explained below, *Pico's* fractured opinions provide no applicable, controlling precedent here, and Plaintiffs cannot show that Defendants violated the First Amendment even under the most favorable (to them) standard articulated by several members of the Supreme Court.

In *Pico*, a school board voted to remove nine books from the district's middle and high school libraries because they posed a "moral danger" to the students. *See* 457 U.S. at 857. Students at the school sued, claiming that the board violated their First Amendment rights by removing the books for "social, political, and moral" reasons. *Id*. at 865, 858–59. After the district court granted

summary judgment for the school board, the Second Circuit reversed and remanded on the First Amendment claim. *Id*. at 859–60. The Supreme Court affirmed in a severely fractured decision.

The lead opinion by Justice Brennan was joined in full by only two justices (Justices Marshall and Stevens) and joined in part by Justice Blackmun. *Id*. at 855, 882. In total, seven Justices filed opinions in *Pico,* and the Court was divided four-to-four on the constitutional issue of whether and how, if at all, the First Amendment limits a school board's discretion to remove books from a school library. The result is that "*Pico* is of no precedential value as to the application of the First Amendment to these issues." *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (*en banc*) (plurality opinion of Hill, J.). With numerous opinions and "no part of any of them gathering five votes from among the nine justices . . . *Pico* is a non-decision so far as precedent is concerned. It establishes no standard." *Am. Civ. Lib. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009).

*Pico* does not and cannot control. It does not establish a standard of review. It has no precedential value for the First Amendment issue of whether school districts (or, by analogy, public libraries) have the discretion to purchase, remove, or reshelve books from their libraries. Plaintiffs' claim depends on this Court adopting a legal theory not established by any controlling precedent.

Even if this Court finds that Plaintiffs are entitled to the most favorable (to them) standard in *Pico*, Plaintiffs still cannot show that Defendants violated the First Amendment. The best-case scenario for Plaintiffs is for this Court to adopt a standard that failed to attract a majority in *Pico*: that officials may not remove books from library shelves "simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872; *see* Am. Comp. ¶¶ 166, 177. Even so, Plaintiffs' claims fail. Their First Amendment allegations are twofold: that Defendants violated their First Amendment rights by (1) removing certain books, and (2) reshelving certain

books in a different section of the library. Even if *Pico* applies, Plaintiffs' claims *still* fail because they have not plausibly alleged that Defendants removed or reshelved any books for illicit reasons rather than for legitimate, constitutionally compliant reasons.

Plaintiffs' reshelving claim does not implicate *Pico*. The *Pico* plurality was clear that its holding "affects only the discretion to *remove* books," not "the discretion of a local school board to choose books to *add* to the libraries of their schools," nor by extension the discretion of the library to simply move a book from one section of the library to another. 457 U.S. at 871–72 (emphasis in original). Further, the library's choice to reshelve material in the PEC or Adult collections is consistent with the long-recognized constitutional right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925) (the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control").

Indeed, just *today*, the Supreme Court again reaffirmed the fundamental right of parents to supervise, educate, and instill moral convictions in their children—including by controlling the books they're exposed to relating to themes of gender identity and sexual orientation—in an analogous, albeit slightly different, context. *See Mahmoud v. Taylor*, 605 U.S. __, No. 24-297 (June 27, 2025); *see also Troxel v. Granville*, 530 U.S. 57, 91 (2000) (Scalia, J. dissenting) ("In my view, a right of parents to direct the upbringing of their children is among the 'unalienable Rights' with which the Declaration of Independence proclaims 'all men . . . are endowed by their Creator.' And in my view that right is also among the 'othe[r] [rights] retained by the people' which the Ninth Amendment says the Constitution's enumeration of rights 'shall not be construed to deny or disparage.'"). Far from prescribing what shall be orthodox in politics, nationalism, religion, or other matters to children and young adults, the Library's viewpoint-neutral Collection Policy—which applies to *all* books geared toward 0–12 year olds, or 13–17 year olds, dealing with gender

transitioning (whether the book takes a positive or negative view of the subject)— does the opposite here, placing the responsibility to determine what is suitable for a child or young adult where it belongs: with parents. *See* Collection Policy at 8 ("The Library recognizes parents/legal guardians are the primary source of education for their children, and they have a fundamental right and responsibility to direct the upbringing and education of children under their care, including issues of moral, social, physical, civic, and spiritual development.").

## III. Plaintiffs fail to state viable Equal Protection claims.

### A. Reframing a failed First Amendment claim as an Equal Protection claim can't create a viable cause of action where none exists.

A plaintiff cannot manufacture a plausible claim by reframing a failed First Amendment claim as an Equal Protection claim. *See Orin v. Barclay*, 272 F.3d 1207, 1213 n. 3 (9th Cir. 2001) (finding that the Equal Protection claim was "no more than a First Amendment claim dressed in equal protection clothing" and was "subsumed by, and co-extensive with" plaintiff's First Amendment claim); *Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 834 (E.D. Va. 2006) (finding it inappropriate to address an Equal Protection argument that was "'a mere rewording of a First Amendment claim'" because plaintiff "asks this court to do under the Fourteenth Amendment what he asks it to do under the First Amendment: to evaluate the constitutionality of [the challenged statute]") (*quoting Edwards v. City of Goldsboro*, 178 F.3d231, 250 (4th Cir. 1999)); Ronald D. Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 18.39 (5th ed. 2013) ("[L]aws that classify persons in terms of their abilities to exercise rights that have specific recognition in the first eight Amendments do not generally arise as equal protection issues. In these instances, the denial of the right to one class of persons is likely to be held a violation of the specific guarantee without any need to resort to equal protection analysis."). But that's precisely what Plaintiffs have done here. As argued above, their First Amendment claims fail as a

matter of law. They repurpose those same arguments in an attempt to fit them within the framework of Equal Protection jurisprudence. But even with a new title, the claims still fail.

Plaintiffs' equal protection claim relies on their allegation that the "Policies' explicit classifications subject LGBTQ children and their parents to unequal treatment by ***preventing them from accessing*** library materials reflecting themselves and their families." Comp. ¶ 171 (articulating the alleged equal protection injury of Count Two of the Complaint) (emphasis added); *see also* Comp. ¶ 180 (claiming that the Library's practices "subject LGBTQ patrons to unequal treatment by infringing on their ability to access library materials positively reflecting themselves and families"). In other words, Plaintiffs' equal protection claims rely on their alleged right-to-receive argument, which is a First Amendment claim lacking merit. That Plaintiffs additionally allege that this may be done on the basis of a classification does not change the essential character of this claim, nor does it make Plaintiffs' Equal Protection claim viable.

### B. Plaintiffs' Equal Protection claims fail because the Collection Policy treats all similarly situated patrons of the Greenville Library System equally.

Plaintiffs' Equal Protection claims also fails for another reason: lack of disparate treatment. Specifically, all similarly situated Greenville County library patrons are treated the same under the Collection Policy. The policy does not discriminate or distinguish based on sex or LGBTQ status. True, the Policy does discriminate based on *age*—classifying and shelving books either as appropriate for those aged 0–12, 13–17, or for an adult. But Plaintiffs do not allege that their constitutional rights have been infringed because of this age classification. Nor would their claim be successful if they did, because age status is not a suspect class, and age classifications are subject to only rational basis review. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312–14 (1976). Plaintiffs' failure to plausibly plead that the Collection Policy or actions of the Library discriminate or distinguish based on sex or LGBTQ status is fatal to their Equal Protection claims.

To have a viable equal protection claim, plaintiffs must sufficiently allege: (1) disparate treatment from those similarly situated, (2) that such unequal treatment was the result of intentional or purposeful discrimination, and (3) that the "disparity in treatment can[not] be justified under the requisite level of scrutiny." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272–73 (1979); U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). It is insufficient for a classification merely to have a disproportionate effect on a particular group. *Pers. Adm'r of Massachusetts*, 442 U.S. at 271–72. Generally, courts apply a rational basis review to equal protection claims, unless the classification is based upon a suspect or quasi-suspect class. *Morrison*, 239 F.3d at 654.

The Collection Policy does not prevent any child identifying as LGBTQ from accessing any book that a child who does not identify as LGBTQ could access, or vice versa. All similarly situated children who patronize the Greenville Library System are subject to the same limitations on what they can check out from the library. For example, no ten-year-old child can check out *Melissa*, or any comparable book, from the Greenville Library System (unless they have an unrestricted card), regardless of whether the child identifies as LGBTQ or not. The Collection Policy does not distinguish its patrons by sex or by gender identity—again, only by age.

The Court need not rely on Plaintiffs' conclusory allegation that the Collection Policy "discriminate[s] on the basis of sex and transgender status" when the plain text of the Collection Policy shows that any resulting classification is by age. Am. Comp. ¶ 170. All minors are treated the same under the policy, as are all adults. Plaintiffs cite to *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020), for the proposition that the Collection Policy distinguishes by "sex and transgender status," requiring application of heightened (intermediate) scrutiny. Comp. ¶ 170. Even a cursory comparison of the instant case to that of

*Grimm* demonstrates that the Collection Policy does not distinguish patrons by these characteristics. *Grimm* involved a school board's policy requiring that students may only use the school locker room or bathroom corresponding with their biological gender. 972 F.3d at 599. As explained by the Fourth Circuit, the policy in *Grimm* distinguished students by sex by reference to "biological gender" and the application of sex stereotypes. *Id.* at 608. Here, there is *no* reference to a child's gender or status (except age) or any sex stereotypes in the Collection Policy or its application. Nor does the Collection Policy distinguish by whether a child is transgender when determining whether that child can check out certain books from the library. In short, *Grimm* is inapplicable.[8]

While *Grimm* is of little help here, the Supreme Court's recent opinion in *United States v. Skrmetti* is instructive. 605 U.S. __, No. 23-477 (2025). That case involved a Tennessee law limiting all minors in accessing certain medical treatments for "gender dysphoria, gender identity disorder, or gender incongruence." *Id.* slip op. at 9. The Court held that the statute did not distinguish by sex when it did "not prohibit conduct for one sex that it permits for another." *Id.* at 13. The Court explained that, under the law, "*no* minor" could receive certain treatments for the cited conditions, regardless of sex or gender identity. *Id.* (emphasis in original). Intermediate scrutiny was not triggered by merely implicating sex. *Id.* at 9–15. Rather, the law created two classifications wholly independent of sex and transgender status: age and medical condition. *Id.* at 9. Neither category triggered heightened scrutiny, and the law easily survived rational basis review.

---

[8] There is reason to doubt whether *Grimm* was rightly decided, and whether it accurately reflects current law. Notably, other federal circuits have held that transgender status does not constitute a suspect class and have applied rational basis review to equal protection claims based on transgender status. *See, e.g.*, *Gore v. Lee*, 107 F.4th 548, 558 (6th Cir. 2024); *Corbitt v. Sec'y of the Alabama L. Enf't Agency*, 115 F.4th 1335, 1347 n.9 (11th Cir. 2024). Further, Justice Barrett (joined by Justice Thomas) and Justice Alito both recently wrote in *Skrmetti* to explain why transgender status does not constitute a suspect class. *Skrmetti*. 605 U.S. __, No. 23-477 (June 18, 2025) (Barrett, J. concurring) (Barrett concurring slip op. at 1); *id.* (Alito, J. concurring) (Alito concurring slip op. at 1). At the very least, the Supreme Court has never "previously held that transgender individuals are a suspect or quasi-suspect class." *Id.* (majority slip op. at 16).

Similarly, the Collection Policy does not prevent *any* child from checking out a book based on the child's sex, gender identity, or transgender status. Even if Plaintiffs correctly assert that transgender individuals represent a quasi-suspect class—which Defendants dispute—Plaintiffs fail to allege that the Collection Policy actually differentiates by this trait. Instead, as in *Skrmetti*, the Collection Policy does not distinguish based on transgender (or sex, or sexual orientation) but only on the basis of age. The Collection Policy, therefore, is only subject to rational basis review.

The Collection Policy easily satisfies rational basis review. As argued *supra*, the intent of the challenged portions of the policy is unimpeachable: to recognize and promote the primacy of parents and legal guardians to direct the upbringing and education of their children. *See* Collection Policy, at 8 ("The Library recognizes parents/legal guardians are the primary source of education for their children, and that they have a fundamental right and responsibility to direct the upbringing and education of children under their care including issues of moral, social, physical, civic, and spiritual development"); *id.* at 13 ("The Library System recognizes that parents/legal guardians have a fundamental right to be involved in all aspects of their minor children's lives, especially in matters as life changing as gender identification."). This goal is rationally related to the means chosen: removing certain books from the juvenile and young adult sections of the library and placing them in the Adult or PEC sections of the library. The Policy survives rational basis.

Again, Plaintiffs' Equal Protection claims are not really Equal Protection claims at all. Both of the Equal Protection claims are based on an alleged right to "access library materials positively reflecting themselves and families." *See* Am. Comp. ¶¶ 171, 180. But this right simply doesn't exist. This Court should dismiss the Equal Protection claims for failure to state a claim.

**IV. Defendants James and Allen are entitled to qualified immunity.**

Plaintiffs assert claims against Defendants James and Allen in their official capacities under Section 1983, which "creates a cause of action against any person who, acting under color

of state law, abridges a right arising under the Constitution or laws of the United States." *Franklin v. City of Charlotte*, 64 F.4th 519, 530 (4th Cir. 2023) (quoting *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013)). It is not entirely clear from the Amended Complaint whether Plaintiffs seek only declaratory and injunctive relief against Ms. James and Ms. Allen or if they also seek monetary damages and attorneys' fees. (*Compare* Am. Compl. at ¶¶ 168, 174, 179, 183, and Requests for Relief ii, iii, and iv *with* Requests for Relief v and vi (seeking, respectively, attorneys' fees and "other relief" without limiting such requests to the non-officer Defendants).)

To the extent that the suit seeks a civil liability or award against Ms. James or Ms. Allen, under the doctrine of qualified immunity, a state official is immune from civil liability if her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In determining whether qualified immunity is appropriate, courts consider whether (1) the officer "violated a federal statutory or constitutional right," and (2) "the unlawfulness of their conduct was clearly established at the time" of the conduct at issue. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 699 (4th Cir. 2018).

For a right to be "clearly established," it must be sufficiently particularized to put potential defendants on notice that the unlawfulness of their conduct is "apparent" under the clearly-established law in place at the time of the conduct. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Unlawfulness is "apparent" only when "*every* reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (emphasis added and quotation omitted)). "[E]xisting precedent must have placed the statutory or constitutional question *beyond debate*." *Id*. (emphasis added) (citation omitted). The burden is on the plaintiff to establish both the violation and that the right was "clearly established." *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993).

Plaintiffs cannot establish that the rights they claim here, if such rights even existed, were so "clearly established" that any government officials in Ms. James' or Ms. Allen's positions would have known that their conduct was unlawful. There are no cases under South Carolina or Fourth Circuit law involving facts precisely like this case and establishing that minor library patrons have a constitutional right to check out books provided by a public library at taxpayer expense in the children's or young adults' sections of the library containing portrayals of or information about gender transition or transgender status. To the contrary, the extant law then (and, even more so, now) pointed in the opposite direction. *See ALA*, 539 U.S. at 204–08; *PETA*, 414 F.3d at 28; *see also Little*, 138 F.4th 834 (5th Cir. 2025) (*en banc*) (rejecting claims strikingly similar to those presented in this suit); *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005); *Presidents Council, District 25 v. Community School Board No. 25*, 457 F.2d 289 (2nd Cir. 1972); *Page v. Lexington Cnty. Sch. Dist.*, No. 3:06-249-CMC, 2007 WL 2123784, at *6 (D.S.C. July 20, 2007).

Because the alleged rights that are claimed by Plaintiffs and were supposedly violated by Defendants were not clearly established (assuming they exist at all), Defendants James and Allen are entitled to qualified immunity.

**V. Plaintiffs' class allegations and their anticipated request for class certification are not yet before the Court, and, in any event, lack merit.**

Plaintiffs' Amended Complaint asserts putative class allegations and seeks, among other things, certification of two classes. *See* Am. Comp. ¶¶ 152–61 (setting forth the putative class allegations); *id*. at p. 36 (requesting that this Court "certify[] the Juvenile & Young Adult Class and Unrestricted Library Card Class under Rule 23(b)(2) of the Federal Rules of Civil Procedure"). Plaintiffs have not yet moved for class certification, so that question is not presently before the Court. *See Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671, 679 (4th Cir. 2024) (requiring plaintiffs to affirmatively show Rule 23 compliance in order for a class to be certified); *Mr. Dee's*

*Inc. v. Inmar, Inc*., 127 F.4th 925, 931 (4th Cir. 2025) (explaining that it is the "burden of the party seeking class certification, not the district court's" to show why certification is appropriate); 7AA WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1785 (3d ed. 2025) (noting that the question of whether to certify a class is normally raised by either the plaintiff or defendant making a motion to certify or deny certification, respectively).

Furthermore, Plaintiffs' class allegations and putative claims are fundamentally flawed. Because the named Plaintiffs lack standing and have not asserted viable claims, the putative class allegations and claims must necessarily fail, too. *See, e.g.*, *Manuel v. Wells Fargo Bank, Nat. Ass'n*, 123 F. Supp. 3d 810, 816 (E.D. Va. 2015) ("If a named plaintiff in a putative class action cannot establish that he has standing to pursue a claim or claims, then the entire action must be dismissed as to the claim or claims as to which standing is lacking."); *see also Doe v. Obama*, 631 F.3d 157, 161 (4th Cir. 2011). To the extent any of Plaintiffs' claims survive this Motion to Dismiss, Defendants reserve—and expressly do not waive—the right to oppose class certification and seek appropriate pre-certification discovery in aid of their opposition. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) (noting that discovery is often used to address issues related to class action certification); *Bryant v. Food Lion, Inc*., 774 F. Supp. 1484 (D.S.C. 1991) (allowing parties to conduct discovery regarding "issues relevant to class certification" prior to deciding whether to certify a class).

## CONCLUSION

For the reasons stated above, this action should be dismissed because the Plaintiffs lack standing under Fed. R. Civ. P. 12(b)(1) and the Plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6). Defendants respectfully request that this Court enter an Order dismissing this action with prejudice and awarding such other relief as this Court deems just and appropriate.

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s Miles E. Coleman
Miles E. Coleman (Fed. Bar No. 11594)
E-Mail: miles.coleman@nelsonmullins.com
2 W. Washington Street / Suite 400
Greenville, SC 29601
(864) 373-2300

WILSON JONES CARTER & BAXLEY

Charles F. Turner, Jr.
Fed. ID No. 05849
cfturner@wjcblaw.com
325 Rocky Slope Rd., Suite 201
Greenville, South Carolina 29607
(864) 672-3711

*Attorneys for Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System; and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

Greenville, South Carolina
June 27, 2025

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| **O.R.**, by and through his parents, Cheryl Rogers and Greg Rogers; **CHERYL ROGERS**; **GREG ROGERS**; **E.G. and M.G.**, by and through their mother, Amber Galea; and **W.M.**, by and through his mother, Kersey Clark,<br><br>*Plaintiffs*,<br><br>v.<br><br>**BEVERLY JAMES**, in her official capacity as Executive Director of the Greenville County Library System; **KAREN ALLEN**, in her official capacity as Youth Services Manager of the Greenville County Library System, **GREENVILLE COUNTY**, South Carolina; **GREENVILLE COUNTY LIBRARY SYSTEM**,<br><br>*Defendants*. | Case No. 6:25-cv-02599-DCC |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'[1] MOTION TO DISMISS**

[1] Throughout this Response, Plaintiffs use "Defendants" to refer only to Defendant Greenville County Library System, Defendant Executive Director Beverly James, and Defendant Youth Services Manager Karen Allen. Defendant Greenville County did not move to dismiss. *See* ECF No. 19 (Answer to Amended Complaint of Defendants Greenville County).

# TABLE OF CONTENTS


INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 2

LEGAL STANDARD ..... 4

ARGUMENT ..... 5

I. Plaintiffs have Article III standing. ..... 5

A. All plaintiffs are suffering an actual and ongoing injury because Defendants have impeded their ability to access library materials they wish to read or discover through browsing. ..... 5

B. Plaintiffs need not assert an intent to access specific removed books to establish standing. ..... 8

II. Plaintiffs assert plausible First Amendment claims. ..... 11

A. The First Amendment prohibits removal or restriction of library materials based on invidious viewpoint discrimination. ..... 12

B. Taken as true, Plaintiffs' factual allegations establish First Amendment violations. ..... 17

C. Library curation is not government speech. ..... 19

D. Defendants' invocation of 'parental rights' cannot justify their discriminatory policies. ..... 22

III. Plaintiffs assert plausible Equal Protection claims. ..... 22

A. The Library's Policies result in differential treatment for LGBTQ, and particularly transgender, library patrons. ..... 23

1. The Written Policy facially discriminates based on sex and transgender status. ..... 24

2. The Unwritten Policy Facially Discriminates Based on Sex and Transgender Status. ..... 27

B. The Unwritten Policy and Written Policy disparately impact LGBTQ Plaintiffs and were motivated by a discriminatory purpose. ..... 28

C. The Library's Policies cannot survive any level of scrutiny. ..... 32

1. The Library's Policies trigger heightened scrutiny and are not substantially related to a sufficiently important government interest. ................................ 32

2. The Library's Policies are based in animus and thus cannot survive even rational basis review. ........................................................................ 33

D. Plaintiffs' Equal Protection claims are distinct from their First Amendment claims. ........................................................................................................ 33

IV. Qualified immunity does not apply to claims for prospective relief. ......................... 35

CONCLUSION ........................................................................................................ 35

## INTRODUCTION

Through a patchwork of facially discriminatory policies, the Greenville County Library (the "Library") has systematically removed and relocated library materials that contain LGBTQ-affirming themes and characters. Dozens of books have been hidden from view, and dozens more have been purged entirely. Because Plaintiffs have plausibly alleged that these policies inflict actual and ongoing injuries-in-fact and violate their First and Fourteenth Amendment rights, Defendants' Motion to Dismiss should be denied.

Public libraries are a "mighty resource in the free marketplace of ideas," *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976) (citing *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)), and "the quintessential locus of the receipt of information." *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992). They are "dedicated to quiet, to knowledge, and to beauty," *Brown v. Louisiana*, 383 U.S. 131, 142 (1966), and designed to "facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 206 (2003) [hereinafter *ALA*] (plurality opinion). Defendants seek to change all of that.

Rather than facilitating "freewheeling inquiry," *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 915 (1982) (Rehnquist, J., dissenting), Defendants have weaponized Library policies to—in Defendants' own words—take an "ethical and moral stand" against the "dangerous" "idea" of "transgenderism." ECF No. 5 at ¶ 3. They ask the Court to depart from decades of settled law, throw out the First Amendment right to receive information, and convert public libraries into venues for propagation of a government-approved message. But libraries are designed to facilitate access to private speech, not to convey government orthodoxy. When the government creates a medium for facilitating access to a wide range of private speech, the First Amendment does not tolerate invidious viewpoint discrimination.

Defendants' standing arguments fall flat. As patrons of the Greenville Library, Plaintiffs are unquestionably injured by Defendants' ideological crusade. Through facially discriminatory policies, Defendants have "limit[ed] the books and materials [Plaintiffs] can obtain" and

"blocked [their] access to new ideas and viewpoints." *Penguin Random House LLC v. Robbins*, 774 F. Supp. 3d 1001, 1014 (S.D. Iowa 2025). Plaintiffs claim they want to "read[] books with transgender and other LGBTQ characters," ECF No. 5 at ¶125, and cannot do so because of Defendants' censorship. That establishes an actual and ongoing injury to Plaintiffs' First Amendment rights to access information, and no more is required to establish standing.

Defendants' Policies also violate the Equal Protection Clause. To start, the challenged policies treat LGBTQ library patrons—particularly transgender youth—differently than their cisgender peers. When browsing the juvenile and young adult sections, cisgender youth will see a diverse array of materials that depict their lived experiences. Transgender youth, by contrast, will find none. Those harms are felt throughout the library as well, where LGBTQ-affirming materials have been secretly culled from the shelves. Beyond disparate treatment, Plaintiffs also state a plausible claim of purposeful discrimination under *Arlington Heights*. And because the Library's stated interest—suppressing the mere existence of transgender people, a quasi-suspect class under *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–13 (4th Cir. 2020), because Board Members find their experiences "dangerous"—satisfies no level of scrutiny, Plaintiffs are likely to prevail.

## Statement of Facts

For the last several years, government officials have been systematically purging books featuring transgender and other LGBTQ characters from the Greenville County Library System's shelves. Under policy amendments passed in 2024 (the "Written Policy"), any juvenile or young adult materials that contain even a single transgender character or portrayal of gender transition must be moved to a separate, adult section[2] of the library, where minors are unable to check out

[2] Materials targeting audiences aged 0–12 violating the Written Policy must be moved to the "Parenting and Early Childhood (PEC) collection," ECF No. 5 at ¶ 74, while materials targeting audiences aged 13-17 must be moved to the "Adult Collection." *Id.* at ¶ 79.

books with a regular library card.[3] ECF No. 5 at ¶¶ 36, 52–74, 79–93. In doing so, officials did not rely on neutral, professional library curatorial standards but rather on Greenville County Board of Trustees members' own political and moral disapproval of transgender people, as evidenced by multiple statements made during the Board's consideration of the amendments—including that such materials were "trash" and promoted a "dangerous" "radical agenda" against which the Library had "every right . . . to take an ethical and moral stand." *Id.* at ¶¶ 3, 61, 85.

These formal policy amendments were passed amidst a broader custom and practice (the "Unwritten Policy") enforced by the Greenville Library in recent years of discriminating against the collection, retention, and display of library materials—including books for adults—that positively portray LGBTQ people. *Id.* at ¶¶ 97–107. As a result, the Library has secretly removed dozens of LGBTQ titles from its shelves, banned all themed displays, and instilled a "culture of fear" amongst the Greenville Library staff. *Id.* at ¶¶ 101–115.

The Written Policy and Unwritten Policy (together, the "Policies"), directly contradict the Greenville Library's proclaimed philosophy of providing access to "material presenting a wide variety of views and opinions on current and historical issues," *Id.* at ¶ 29, and "neither promot[ing] nor censor[ing] any particular religious, moral, philosophical or political conviction or opinion." *Id.* Further, the Library contradicts any asserted government interest in disclaiming the ideas contained in books containing disfavored ideas by advising the public that "[t]he inclusion of an item in the collection does not represent an endorsement of its contents." ECF No. 1-1 at 2.

Plaintiffs are residents of Greenville, South Carolina—some of whom are transgender or otherwise members of the LGBTQ community—who wish to freely access materials featuring transgender and other LGBTQ characters in their local library, without discriminatory barriers

[3] For minors to have the ability to check out books in the adult sections of the Greenville Library, their parents must choose for them to have an "Unrestricted Minor" library card, which gives them access to *all* adult materials in the Library collection. Otherwise, minors with Juvenile or Young Adult library cards are not permitted to check out books from adult sections of the Library on their own—they must have one of their parents check out such books for them.

impeding their ability to do so. ECF No. 5 at ¶¶ 116–151. Plaintiffs have experienced and continue to experience cognizable injuries because of the challenged Written Policy and Unwritten Policy (together, the "Policies"). For example, eleven- and nine-year-old Plaintiffs M.G. and W.M. are not LGBTQ-identified but still wish to access books with LGBTQ characters in the age-appropriate sections of the Library. *Id.* at ¶¶ 134–150. The Policies have limited their ability to find, read, and bring home the books they want to read, and they believe the Policies are an unfair attempt by the Library to hide these books from them. *Id.* at ¶¶ 139–141, 149–150.

Additionally, seventeen-year-old O.R. is a transgender boy with a Young Adult library card who seeks out LGBTQ-related books at the Library to feel less invisible and to find the strength to be himself. *Id.* at ¶¶ 125–130. O.R.'s parents, Plaintiffs Cheryl and Greg Rogers, support O.R. and want him to be able to check out age-appropriate books and materials with transgender characters, but they do not wish to give him access to the entire adult collection to do so. *Id.* at ¶¶ 123, 129. Because of the Policies, O.R. is often unable to find books that positively reflect his identity and experience in the sections of the library from which he can check out books, which makes him feel "denigrated and stigmatized," "as if he's not seen, and like his identity is seen as vulgar or inappropriate by his community." *Id.* at ¶¶ 130, 132–133. Similarly, although Plaintiff E.G., a twelve-year-old girl who identifies as queer, has an unrestricted minor library card, she "finds it frustrating to walk all over the library to find books targeting her age, simply because those books have characters in the LGBTQ community." *Id.* at ¶¶ 134–140. In addition to the First Amendment harms to all Plaintiffs, the Policies inflict a "continuing dignitary and stigmatic harm" on these two LGBTQ Plaintiffs. *Id.* at ¶¶ 152–159.

Based on these injuries, Plaintiffs sued to enjoin the Written Policy and Unwritten Policy as violations of their rights under the First and Fourteenth Amendments of the U.S. Constitution.

## LEGAL STANDARD

When evaluating a motion to dismiss, either on substantive claims or standing, courts must accept as true all material allegations of the complaint, draw all reasonable inferences from

those facts in the plaintiff's favor, and construe them in the light most favorable to the plaintiff. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207–208 (4th Cir. 2017); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Notably, standing requirements are "relaxed" in First Amendment cases. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (citing *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984)). The court may dismiss the case only if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (citations omitted). If a complaint contains facts sufficient to state a claim for relief that is plausible on its face, the court must deny the motion. *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I. Plaintiffs have Article III standing.

Standing has three elements: injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs easily satisfy all three requirements. As discussed below, all Plaintiffs have suffered—and continue to suffer—injuries in fact from Defendants' Policies of restricting access to library books with transgender characters or other LGBTQ library materials. These injuries were directly caused by Defendants, and the Court can redress these injuries by enjoining Defendants' unlawful conduct.

#### A. All plaintiffs are suffering an actual and ongoing injury because Defendants have impeded their ability to access library materials they wish to read or discover through browsing.

To demonstrate injury in fact, a plaintiff must show "an invasion of a legally protected interest" that is "concrete and particularized" as well as "actual or imminent." *Id.* at 560.[4] As part of Library Board Members' "ethical and moral stand" against the "dangerous" and "trash" "idea" of "transgenderism," Defendants imposed restrictions on patrons' access to library materials that

[4] The injury-in-fact requirement is "relaxed" in First Amendment cases, *Cooksey*, 721 F.3d at 235, and "[t]he loss of First Amendment rights, even minimally, is injurious." *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003).

contain transgender characters. ECF No. 1-1. These restrictions unquestionably burden all Plaintiffs' ability to access the restricted materials. For example, with a Young Adult library card, O.R. cannot check out *any* books with transgender characters. *Id.*; ECF No. 5 at ¶ 127. The same is true for M.G. and W.M., who may only access the juvenile section. *Id.* at ¶¶ 136, 148. Even E.G., who can check out any book in the library, must leave the children's section to hunt those books down. *Id.* at ¶ 140. For LGBTQ Plaintiffs, these injuries are also cognizable under the Fourteenth Amendment because they treat transgender patrons differently from their cisgender peers based on Library officials' discriminatory intent against LGBTQ people.

Defendants' restriction of library materials interferes with Plaintiffs' legally protected interests under the First and Fourteenth Amendments. All Plaintiffs have a legally protected interest under the First Amendment in accessing library materials free from invidious government viewpoint discrimination. *See infra* § II.A. The LGBTQ Plaintiffs, O.R. and E.G., have a legally protected interest under the Equal Protection Clause in accessing library materials reflecting their identities free from government discrimination based on sex and transgender status. *See infra* § III. Defendants' Policies interfere with these legally protected interests by selectively restricting access to library materials based on officials' personal disapproval of the ideas contained in them and of transgender people in general. *See* ECF No. 5 at ¶¶ 3-4, 61, 85.

As many other courts have held, these impediments to Plaintiffs' ability to access information constitute injuries in fact. *See, e.g.*, *Virden v. Crawford Cnty.*, No. 2:23-CV-2071, 2023 WL 5944154, at *3 (W.D. Ark. Sept. 12, 2023); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003). Indeed, the court in *Virden* found that plaintiffs had standing under an identical set of facts. 2023 WL 5944154 at *3. There, like here, *see* ECF No. 5 at ¶ 2, a public library implemented a policy that removed all books with LGBTQ themes from the children's section and placed them in a separate section. *Virden*, 2023 WL 5944154 at *3. The *Virden* court found that even though it was *possible* to access the books, the policy injured the plaintiffs' First Amendment right to access information because the books were no longer "where children and their parents would expect to find them." *Id.; see also Sund v. City of*

*Wichita Falls*, 121 F. Supp. 2d 530, 534 (N.D. Tex. 2000) (explaining that removing books from children's section of the library burdens access to information because "youths who simply wish to browse in the children's sections of the Library will never find the censored Books"), *abrogated by Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025) (en banc).

*Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) is also instructive. There, the plaintiff challenged her school's requirement that students have parental permission to check out books from the *Harry Potter* series. *Id.* at 1001. The plaintiff *had* parental permission and owned several of the books, *id.*, just as Plaintiffs O.R., E.G., M.G., and W.M. have their parents' permission to check out books containing LGBTQ characters or themes they wish to read. *See* ECF No. 5 at ¶¶ 128–129, 142–144, 149. Nonetheless, the *Counts* court ruled that the plaintiff was injured by the school's imposition of a parental-consent requirement. 295 F. Supp. 2d at 999–1000; *see id.* at 1002 ("[T]he fact that [plaintiff] cannot simply go in the library, take the books off the shelf and thumb through them . . . without going through the permission and check-out process is a restriction on her access."). The same burden exists here.

Defendants insist that there is no injury because Plaintiffs can still browse the adult section and read restricted books within the library. ECF No. 20 at 10. But that "confuses restriction with outright prohibition." *Virden*, 2023 WL 5944154 at *3; *see also Counts*, 295 F. Supp. 2d at 999. A state-imposed restriction on access to information—however small—establishes an injury in fact. *Virden*, 2023 WL 5944154 at *3; *see Elrod v. Burns*, 427 U.S. 347, 359 n.13 (1976). Similarly, under the Equal Protection Clause, an injury in fact exists when the state creates a barrier that makes it harder for members of one group to obtain a benefit than it is for members of another group. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014).

Moreover, Defendants' argument invites the question: why implement the Written Policy if they did not think it would impede Plaintiffs' access? Before the Written Policy's approval, members of the library board *admitted* that they were trying to make the material less accessible. Board Member Moston said that the Written Policy was about placing these books "in an area where . . . [parents] can expect their young adult collection to . . . not expose their children to

such a radical agenda." ECF No. 5 at ¶ 85. Chair Hill justified the Written Policy by saying "it's not a good idea to encourage transgenderism with regard to 13- to 17-year-olds." *Id.* at ¶ 87. Mission accomplished. Defendants have forced Plaintiffs to wander the library hunting for books that should have been easy to find, and that most are not permitted to take home using their own library card. *Id.* at ¶¶ 127–130, 139–141, 148–150. That is more than enough to constitute injury in fact. *Virden*, 2023 WL 5944154 at *3.

Plaintiffs also allege that Defendants have systematically removed dozens of books because they contain transgender or LGBTQ characters, discuss LGBTQ issues, or both. ECF No. 5 at ¶¶ 101–103. Unquestionably, library patrons are injured by a policy that results in the complete removal of books. *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024) (holding that plaintiffs had standing to assert pre-enforcement challenge to library program that required the removal of books with sexual content). Plaintiffs cannot even struggle to find these books in the library system—they simply are not there.

B. <u>Plaintiffs need not assert an intent to access specific removed books to establish standing.</u>

Defendants also argue that because not all Plaintiffs identify books they have been unable to check out, their injury is not sufficiently imminent. ECF No. 20 at 8–9. In two ways, this misapprehends the nature of the right at issue.

*First*, Defendants' actions *do* inflict acute harms related to Plaintiffs' access to particular book titles—e.g., impeding E.G. and M.G.'s access to *The Cardboard Kingdom* and *Red: A Crayon's Story*. ECF No. 5 at ¶ 138. But they also result in a library system where *ideas* that are disliked by the library board—and depictions of people disliked by the board—are systematically excluded from view, such that Plaintiffs and other "youths who simply wish to browse in the children's sections of the Library will never find," let alone come across or stumble upon, books containing them. *Sund*, 121 F. Supp. 2d at 534. Under the Written Policy, Defendants relocated *every* children's book with a transgender character or that makes any reference to ideas like "gender fluidity" or "social transitioning." ECF No. 5 at ¶¶ 74, 79–80. Under the Unwritten

Policy, Defendants impede access to books, *id.* at ¶¶ 106–108, refuse to honor patrons' requests to add new titles, *id.* at ¶¶ 98–100, and even surreptitiously remove dozens of books from the library catalogue, *id*. at ¶¶ 101–105. The injuries here do not arise merely from the removal of individual titles, but from Defendants' systematic discrimination against all materials with LGBTQ themes and characters, which all Plaintiffs would like to access. Thus, while some Plaintiffs do allege title-specific harms, *see, e.g.*, *id.* at ¶ 141 (describing M.G.'s inability to check out *Snapdragon*), every Plaintiff is harmed by the restriction on their ability to access LGBTQ library materials even beyond the specific books they've already identified that they wish to read.

Contrary to Defendants' assertions, these broader harms from the removal of a wide swath of materials on a particular subject matter differ from the harm at issue in *ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1197 (11th Cir. 2009). There, because the school board removed a particular educational book series from the curriculum, the plaintiffs challenging that removal needed to allege a specific desire to access those books. *Id.* But here, Defendants aren't attempting merely to ban specific books, but an entire class of ideas and perspectives. When Defendants rid the Library's shelves of disfavored viewpoints, Plaintiffs are unable to freely browse or peruse the sections of the library targeting their age group and discover new books that reflect these ideas. Defendants assert that Plaintiffs must somehow "know[] *in advance*" what books the library has removed, *Sund*, 121 F. Supp. 2d at 550 (emphasis in original), but the systematic removal of these ideas injures every library patron who wishes to access them—even those who cannot say which books are missing. *See, e.g.*, *Robbins*, 774 F. Supp. 3d at 1011, 1014 (holding that student had standing to assert pre-enforcement challenge to law that "directly limits the books and materials she can obtain" including specific books "she otherwise would have read" but also more broadly "stunting [her] academic development and personal growth" and "block[ing] her access to new ideas and viewpoints, as well as information about history, politics, and science."); *see also Llano Cnty.*, 138 F.4th at 882 (Higginson, J., dissenting) (explaining that the First Amendment conveys "a negative right

against government censorship that is targeted at denying them access to disfavored, even outcast, information and ideas").

*Second*, Defendants are wrong to treat Plaintiffs' injuries as future harms. Restrictions on library access do not cause a *future* injury; they cause a present, ongoing, and *actual* injury to Plaintiffs' First Amendment right to receive information. *See Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 188–89 (4th Cir. 2018) ("The Supreme Court has always described and treated the two concepts—actual, ongoing injury vs. imminent injury—as disjunctive." (citing *Lujan,* 504 U.S. at 560)). The right of access protected by the First Amendment is ongoing; it does not extinguish once someone has read a particular book. *See Minarcini*, 541 F.2d at 583 (discussing the right to receive)*; see also Counts*, 295 F. Supp. 2d at 1002 (striking down library restriction that infringed on plaintiff's right to "simply go in the library, take the books off the shelf and thumb through them."). If First Amendment rights were not ongoing, many Supreme Court decisions would not make sense. For example, the Supreme Court struck down a ban on political canvassing because it restricted "spontaneous" *future* speech, and "any action of the government by means of which it might prevent free and general discussion" offended the First Amendment. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167–68 (2002) (quoting *Grosjean v. Am. Press Co.,* 297 U.S. 233, 249–50 (1936)). The right to receive information works the same way—the harm begins when access to these ideas is restricted and continues until access is restored. *See Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *9 (4th Cir. July 1, 2025) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod*, 427 U.S. at 373)). The First Amendment protects a plaintiff's right to "simply go in the library, take the books off the shelf and thumb through them." *Counts*, 295 F. Supp. 2d at 1002. A plaintiff need not allege a concrete plan to check out a specific book on a specific date to satisfy the "lenient and forgiving" injury-in-fact standard in First Amendment cases. *GLBT Youth*, 114 F.4th at 667.

Defendants' attempt to reduce Plaintiffs' injuries to psychological distress is similarly unavailing. ECF No. 20 at 9. True, psychological distress that arises from the mere observation

of conduct with which one disagrees may not be enough for standing. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). But Plaintiffs are not mere observers; they are library patrons whose access to constitutionally protected materials is directly affected by Defendants' actions, and the harm they experience—of the government communicating that the ideas they desire to access are not acceptable—is a paradigmatic First Amendment injury. Moreover, the Fourth Circuit has held that feelings of marginalization and exclusion—like those Plaintiffs experience—are cognizable forms of injury under the First Amendment. *See Deal*, 911 F.3d at 188–89. Similarly, under the Fourteenth Amendment, "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy participants in the political community," inflicts a cognizable dignitary harm on "those persons who are personally denied equal treatment." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984).

Moreover, in addition to the First Amendment harms that affect all Plaintiffs, the LGBTQ Plaintiffs experience an additional layer of differential treatment: an inability or difficulty finding books about people like themselves at the Library. ECF No. 5 at ¶¶ 124–140. By moving, or removing, LGBTQ-related books, the Library has made it difficult for O.R. and E.G. to connect with characters that are also LGBTQ. Cisgender minors face no such obstacle; the juvenile and young adult sections still contain books with cisgender, heterosexual characters. Moreover, Defendants' actions—as an "ethical and moral stand" against LGBTQ people—stigmatize the LGBTQ Plaintiffs who use the library as inferior, resulting in Plaintiffs feeling as if they and their families are "not want[ed]" and "seen as vulgar or inappropriate by [their] community." *Id.* at ¶¶ 4, 144, 133.

## II. Plaintiffs assert plausible First Amendment claims.

The First Amendment "prohibits government officials from wielding their power selectively to punish or suppress speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024). That is true even where the government's purported object is to protect children from

dangerous, harmful, or inappropriate ideas because, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). This principle is true in the private sphere, and it is just as true in public libraries, spaces where anyone—no matter their background, income, or identity—can explore the world of ideas, information, and creativity in "a place dedicated to quiet, to knowledge, and to beauty." *Brown*, 383 U.S. at 142. Defendants' widespread and ideologically driven suppression of books with LGBTQ themes and characters fundamentally violates these principles. Thus, their motion to dismiss Plaintiffs' First Amendment claims should be denied.

A. <u>The First Amendment prohibits removal or restriction of library materials based on invidious viewpoint discrimination.</u>

The First Amendment prohibits "viewpoint discrimination in curating a public library branch." *Davison v. Randall*, 912 F.3d 666, 685 (4th Cir. 2019) (citing *Pico*, 457 U.S. at 870–71 (plurality opinion)). This is tied to the First Amendment's protection of "*both* a speaker's right to communicate information and ideas to a broad audience, *and* the intended recipients' right to receive that information and those ideas." *Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) (citing *Pico*, 457 U.S. at 867) (plurality opinion) (emphasis in original).

In its first decision considering library censorship, which arose in the context of school rather than public libraries, the Supreme Court held that schools "possess significant discretion to determine the content of their school libraries" but school officials "may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Pico*, 457 U.S. at 870, 872 (plurality opinion) (quoting *Barnette*, 319 U.S. at 642); *accord id.* at 879 n.2 (Blackmun, J., concurring) (finding "crucial" to the First Amendment analysis "the State's decision to single out an idea for disapproval and then deny access to it").

Although *Pico*'s holding commanded only a plurality of the Court, every Justice agreed that the removal of library books could violate students' First Amendment rights. *Id.* at 872 (plurality opinion); *id.* at 879–89 (Blackmun, J., concurring); *id.* at 883–84 (White, J., concurring); *id.* at 907 (Rehnquist, J., dissenting). Even the dissenting Justices "cheerfully concede[d]" that it would violate students' right to receive information if libraries removed books in a "narrowly partisan or political manner." *Id.* Thus, the Justices' disagreement in *Pico* "was not over whether the right to access information existed at all, but rather over how it should be balanced against the unique pedagogical and disciplinary concerns that are present in a public-school environment." *Virden*, 2023 WL 5944154, *5; *see also Fayetteville Pub. Libr. v. Crawford Cnty.*, 684 F. Supp. 3d 879, 909 (W.D. Ark. 2023). Because this case is about a public library, those concerns are not present here.

Lower courts have been virtually unanimous in applying the principles announced in *Pico* despite its status as a plurality decision.[5] In doing so, courts have recognized that "[t]he

[5] *See*, *e.g. ACLU of Fla.*, 557 F.3d at 1200, 1227 (writing that "*Pico* is of no precedential value," but also concluding that "the real issue for the federal courts . . . is whether [government actors'] decision to remove the book from school library shelves was motivated by . . . a desire to promote political orthodoxy and by opposition to the viewpoint of the book"); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1179 (D. Colo. 2025) (noting that although "the precedential value of *Pico* has perplexed courts for years," it "remains a useful starting point in determining the constitutionality of [a school district's] book-removal decision" and concluding that officials' anti-LGBTQ motivations for book removals were "blatantly unconstitutional under *Pico* and other precedents"); *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) (explaining the lack of clarity regarding "[t]he applicable legal standard for evaluating alleged First Amendment violations in the school library context," but noting the "common theme" that "content-based removal decisions based on legitimate pedagogical concerns" were constitutionally permissible, while "remov[ing] books solely because they disagree with the views expressed in the books" was not); *Counts*, 295 F. Supp. 2d at 1004–05 (applying *Pico*'s prohibition on "the official suppression of ideas" to reject school district moving the *Harry Potter* book series to a special area for students who presented signed parental permission slips, as the policy was based in part on officials' "personal distaste" for "witchcraft"); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995) (finding that "[t]he plurality decision in *Pico* is not binding precedent" but following its analysis to conclude that the "decisive factor behind" a school board's book removal "was the school board members' personal disapproval of the ideas contained in the book," thereby violating the First Amendment).

principles set forth in *Pico*—a school library case—have even greater force when applied to public libraries." *See Sund*, 121 F. Supp. 2d at 548; *Virden*, 2023 WL 5944154 at *5 (explaining that the First Amendment right to receive information is broader in a public library than a school library); *see also Mainstream Loudoun v. Bd. of Trs. of Loudoun Cnty. Libr.*, 2 F. Supp. 2d 783, 794 (E.D. Va. 1998) ("[N]either the dissent nor the plurality of *Pico* can be said to support defendants' argument that public libraries enjoy unfettered discretion to remove materials from their collections.").

Despite playing no inculcative function, public libraries are still afforded "broad discretion" to make content-based decisions about what materials have the "requisite and appropriate quality" to be included in their collections. *ALA*, 539 U.S. at 204–05. But that does not mean the First Amendment plays no role. To the contrary, *Pico*'s distinction between legitimate content-based restrictions and invidious viewpoint discrimination is a familiar feature of First Amendment law. When the government facilitates or subsidizes private speech through a government program or nonpublic forum,[6] it can make content-based distinctions consistent with the program's nature, but *cannot* engage in "invidious viewpoint discrimination" that seeks to "drive certain ideas or viewpoints from the marketplace." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (marks and citation omitted).

---

[6] Defendants argue that "[a] public library's bookshelves are neither a traditional public forum nor a limited public forum" and therefore that the government has no obligation to be "viewpoint neutral." ECF No. 20 at 22. But there are two obvious problems. First, Defendants apparently forget about the third option: the *nonpublic* forum. *See Ark. Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). In a nonpublic forum, the government may "make distinctions in access on the basis of subject matter and speaker identity," but still cannot "employ[] viewpoint-discriminatory criteria." *Shurtleff v. City of Boston*, 596 U.S. 243, 275–76 (2022) (Alito, J., concurring). Rather, such restrictions must still be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). And second, Defendants decline to mention that this District has treated libraries as limited public fora. *Grant-Davis v. Bd. of Trs. of Charleston Cnty. Pub. Libr.*, No. 2:15-CV-2676-PMD-MGB, 2017 WL 9360875, at *20 (D.S.C. May 24, 2017) (collecting cases), *report and recommendation adopted,* No. 2:15-CV-2676-PMD-MGB, 2017 WL 3634070 (D.S.C. Aug. 24, 2017), *aff'd,* 710 F. App'x 134 (4th Cir. 2018).

The First Amendment forbids the government from "using an existing medium of expression and to control it . . . in ways which distort its usual functioning." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 543 (2001). Even where "content-based considerations . . . may be taken into account" because of "the nature" of the program, those considerations must be tethered to the program's purpose and usual functioning. *Finley*, 524 U.S. at 585 (explaining that the NEA can consider subjective criteria such as "artistic excellence" but may not engage in invidious viewpoint discrimination); *see also Ark. Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (emphasizing the "nature" of public broadcasting in explaining what First Amendment restrictions apply to it).

Similarly, when the government creates a nonpublic forum, the government can make content-based distinctions to ensure that speech is "compatible with the intended purpose of the property" and "reasonable in light of the purpose which the forum at issue serves." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 49 (1983). But those restrictions must still be "viewpoint neutral," and cannot be imposed "solely to suppress the point of view [a speaker] espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). These holdings apply forcefully to public libraries.[7] Curatorial decisions that are aimed at "the suppression of dangerous ideas," *Finley*, 524 U.S. at 587 (quotation omitted), would "distort" the "usual functioning" of a public library and be fundamentally inconsistent with "the purpose" that a library "serves." *Velazquez*, 531 U.S. at 543. The "usual functioning" of public libraries is "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *ALA*, 539 U.S. at 206 (plurality opinion). A library's "mission [is] to provide the citizenry with access to a wide array of information, viewpoints, and content." *Fayetteville Pub. Lib.*, 684 F. Supp. 3d at 891.

---

[7] Indeed, the *ALA* plurality appeared to apply the nonpublic forum doctrine in its evaluation of the Children's Internet Protection Act, citing *Cornelius* and *Perry* (nonpublic forum cases) and determining that the law's "approach" in excluding "certain categories of content"—namely, obscenity and child pornography—was "entirely reasonable" given public libraries' "traditional role in identifying suitable and worthwhile material." *ALA*, 539 U.S. at 207–08.

The Greenville Library is no exception. Its mission is to "champion literacy, inspire learning, and foster community connection" by being residents' "first choice for exploration, discovery, and information." ECF No. 5 at ¶ 26. The Library asserts that it "strives to support an informed community by providing access to the world of ideas and information," by providing access to "material presenting a wide variety of views and opinions on current and historical issues." *Id.* at ¶ 29. To that end, the Library's Collection Policy proclaims that the "Library will neither promote nor censor any particular religious, moral, philosophical or political conviction or opinion" and that "[m]aterial will not be excluded because of the race or nationality or the religious, social, or political views of the author, publisher, or creator." *Id.*

Defendants argue that the Court should depart from the overwhelming consensus among lower courts and follow the Fifth Circuit's recent decision in *Little v. Llano County*, 138 F.4th 834, 860–65 (5th Cir. 2025) (en banc). In that case, a majority of the en banc Fifth Circuit held that plaintiffs could not challenge a library's book-removal decisions "by invoking a right to receive information," overruling its prior decision in *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184 (5th Cir. 1995). *Llano Cnty.*, 138 F.4th at 850–51. As the *Llano County* dissent pointed out in detail, the majority's decision ignores the distinction between public libraries and school libraries, which even "the dissenting Justices in *Pico* took great care to emphasize," "sanctions government censorship in every section of every public library in [the Fifth C]ircuit," "forsakes core First Amendment principles," "not only reaches a result directly contrary to *Pico*, but also casts aside the reasoning of a supermajority of the Court in the process," and "overturns decades of settled First Amendment law." *Id.* at 869–89 (Higginson, J., dissenting). The Fifth Circuit's decision in *Llano County* contains no limiting principle whatsoever and would allow any public library to engage in the very conduct proscribed by a supermajority of the *Pico* court: the wholesale suppression of disfavored speech for narrow partisan reasons. This Court should not follow in its footsteps.

By nature, public libraries are "designed for freewheeling inquiry," not "for the selective conveyance of ideas." *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting) (distinguishing public

libraries from school libraries). Greenville County public officials' interventions suppressing books for ideological reasons unrelated to traditional library collection criteria have distorted the functioning of the library and are not "reasonable in light of the purpose which [a public library] serves." *Perry*, 460 U.S. at 49; *see also ALA*, 539 U.S. at 207–208. As a result, the Library's Policies have transgressed the protections of the First Amendment.

B. <u>Taken as true, Plaintiffs' factual allegations establish First Amendment violations.</u>

Plaintiffs assert that the challenged Policies (which have resulted in the removal and/or restriction of dozens of books with LGBTQ characters or themes) were adopted with the explicit goal of "tak[ing] an ethical and moral stand" against the "dangerous thing" and "radical agenda" of "transgenderism," by "trying to move books specifically because they promote or affirm or introduce gender transition ideology," and thus avoiding "putting ideas in kids' minds that may not have already been there." ECF No. 5 at ¶¶ 3–4, 85–87.[8] These allegations, which must be taken as true at this stage, are based on public statements by Library Board Members, are more than plausible explanations for Defendants' conduct, and are paradigmatic examples of unconstitutional viewpoint discrimination. The First Amendment does not allow Greenville Library officials' "personal distaste," *Counts*, 295 F. Supp. 2d at 1004, or "ideological objections," *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024), to transgender and other LGBTQ experiences and identities to limit Plaintiffs' (and all Greenville Library patrons') access to materials reflecting those experiences and identities.

Cases from other federal districts agree. As discussed above, in *Virden*, plaintiffs challenged a library policy that required branches to "remove from their children's sections all books containing LGBTQ themes, affix a prominent color label to those books, and place them in a newly-created section called the 'social section.'" 2023 WL 5944154 at *1. Plaintiffs alleged

---

[8]Defendants unconvincingly maintain that Library's policy is "viewpoint neutral" because it "applies to *all* books geared toward [children] . . . dealing with gender transitioning." ECF No. 20 at 27–28. But the *purpose* of the restriction is to hide positive portrayals of gender transition. ECF No. 5 at ¶¶ 50, 56 (statements of Board Member Moston).

that the policy violated the First Amendment, in part because the policy was adopted "in response to political pressure from constituents who objected, at least partly on religious grounds, to the presence of the[] books in the children's section." *Id.* This allegation was "sufficient to state a 'plausible' claim that the County has restricted [plaintiffs'] access to information for political or partisan motives." *Id.* at *7 (quoting *Iqbal*, 556 U.S. at 678). So too here. *See* ECF No. 5 at ¶ 46 (Board Member Aufmuth noting that the complaint about *Melissa* "seem[ed] to be religious based."). In fact, Plaintiffs' Complaint asserts stronger evidence of impermissible intent by the Greenville Library than was enough to grant summary judgment for the *Virden* plaintiffs. *Compare Virden*, 2024 WL 4360495 at *3–4 (describing summary judgment record), *with* ECF No. 5 at ¶¶ 3–4, 55–58, 85–87.

The *Sund* case is also instructive. That case involved the Wichita Falls City Council's reaction to a public library's purchase of children's books about children with gay and lesbian parents. *Sund*, 121 F. Supp. 2d at 532. The City Council ordered the library to remove all books from the children's section that were determined to need "parental approval and/or supervision" in the opinion of at least 300 petition signatories. *Id.* at 534. The head librarian testified that the books at issue were age-appropriate for their target audiences and were not obscene or otherwise inappropriate. *Id.* at 543.[9] The books' opponents testified that the books supported the "homosexual agenda" and were trying to "brainwash" children into this "destructive lifestyle." *Id.* at 544. Ultimately, the court concluded that these opponents "made no pretenses about their objectives" "[i]n advancing their overall 'moral' agenda." *Id.* at 549 n.19. Finding that "[t]here simply is no interest, *let alone a compelling one,* in restricting access to non-obscene, fully-protected library books solely on the basis of the majority's disagreement with their perceived message," *id.* at 552 (emphasis in original), the court ruled that city council placed "an

[9] The *Sund* court also considered the testimony of an education expert who testified about the importance of "books and libraries validat[ing] and speak[ing] to life experiences for children, because when children find nothing that speaks to who they are and to validate them, then they have feelings of insignificance and unimportance." 121 F. Supp. 2d at 538.

unconstitutional burden on Plaintiffs' right to receive information under the First Amendment." *Id.* at 551.

By explicitly targeting any children's books with transgender characters because of officials' personal disapproval of gender transition, Defendants here have similarly taken overt "aim at the suppression of dangerous ideas" and have sought to "impos[e] a disproportionate burden calculated to drive [those] ideas or viewpoints from the marketplace." *Finley*, 524 U.S. at 587 (internal quotations omitted). The same is true for Defendants' Unwritten Policy of suppressing other LGBTQ-related materials, which Defendants do not seriously dispute. Indeed, Defendants never even attempt to articulate what "legitimate, constitutionally compliant reasons" they supposedly have for their egregiously discriminatory policies. ECF No. 20 at 36. That is because no such reasons exist.

The Court must deny Defendants' motion to dismiss for failure to state a claim because the First Amendment protects against such viewpoint-based suppression of ideas by the state.

C. Library curation is not government speech.

No court has *ever* held that the removal, relocation, or curation of library materials is government speech. *See, e.g.*, *GLBT Youth*, 114 F.4th at 667–68 (rejecting the idea that "placement and removal of books in school libraries" is government speech); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1175 (D. Colo. 2025) (same); *PEN Am. Ctr., Inc.*, 711 F. Supp. 3d at 1331 (same); *Virden*, 2024 WL 4360495 at *5 (same); *Fayetteville Pub. Libr*, 760 F. Supp. 3d at 834 (same); *but see Llano Cnty.*, 138 F.4th at 860–65 (seven out of seventeen judges sitting en banc would hold that "a library's choice of the books on its shelves is government speech"). And for good reason: the Supreme Court has cautioned that the government speech doctrine is "susceptible to dangerous misuse" because "private speech could be passed off as government speech," thereby allowing the government to "silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). If Defendants were correct, public libraries could remove every book with Christian characters, or

that supports Republican or Democratic ideas. Fortunately, that is not the law. Courts consistently hold that library collections are not government speech.

Defendants (and the Fifth Circuit plurality) invoke *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), a case about *private* speech, to argue that whenever the government exercises editorial discretion over what private speech to facilitate, the government necessarily engages in government speech. ECF No. 20 at 18–19. But that argument forgets that the Government is bound by the First Amendment, not protected by it. *See Shurtleff v. City of Boston*, 596 U.S. 243, 268–269 (2022) (Alito, J., concurring) ("[T]he government-speech doctrine is not based on the view . . . that governmental entities have First Amendment rights."). That expression would be protected if committed by a private actor does not, *ipso facto*, make the expression "government speech" when the government is the speaker. *Id.* Were that true, "[n]aked censorship of a speaker based on viewpoint," which "might well constitute 'expression' in the thin sense that it conveys the government's disapproval of the speaker's message," could be deemed government speech and thus immunized from First Amendment scrutiny. *Id.* "But plainly that kind of action cannot fall beyond the reach of the First Amendment." *Id.*

Rather, to determine whether the government's editorial decisions constitute government speech, the court must conduct a "holistic inquiry" examining (1) "the history of the expression at issue"; (2) "the public's likely perception as to who is speaking"; and (3) "the extent to which the government has shaped or controlled the expression." *Id.* at 252 (majority opinion). Defendants' proposed rule would collapse the holistic inquiry into a test based only on the third factor. But "analyzing that factor in isolation . . . flattens the distinction between government speech and speech tolerated by the censor." *Id.* at 264 (Alito, J., concurring). Applying the holistic inquiry reveals the obvious: curation of a public library's collection is not government speech.

*First*, there is no history showing that public library collections are government speech. Unlike the park monuments in *Pleasant Grove City v. Summum*, the government has not historically used library collections to speak to the public. *GLBT Youth,* 114 F.4th at 668–69

(citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)). Rather, the government's role in establishing and maintaining public libraries is "deciding what private speech to make available to the public." *ALA*, 539 U.S. at 195; *see also Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting) (contrasting the "inculcative" role of school libraries with "university or public libraries," which are "designed for freewheeling inquiry"). Further, most public libraries house voluminous collections spanning the vast array of private expression. To the extent libraries are selective in the texts that they choose to accept and present, it is merely to choose materials "of requisite and appropriate quality." *ALA*, 539 U.S. at 195.[10] In short, library collections have not historically been "closely identified in the public mind with the government," and their contents are not "meant to convey" and do not "have the effect of conveying a government message." *GLBT Youth,* 114 F.4th at 668 (quoting *Matal*, 852 U.S. at 238.).

*Second*, no one considers the library catalogue to be an expression of the state's own views. *Id.* In fact, the Library itself disclaims that idea, maintaining in its Collection Policy that "[t]he inclusion of an item in the collection *does not* represent an endorsement of its contents." ECF No. 1-1 at 2 (emphasis added). As the Eighth Circuit pointed out in *GLBT Youth*, well-appointed libraries contain texts that contradict one another. 114 F.4th at 668. Thus, if this is the government speaking, it is "babbling prodigiously and incoherently." *Matal* 582 U.S. at 236.

*Third*, as in *GLBT Youth*, South Carolina does not have a history of actively "assert[ing] extensive control over removing books from public libraries," 114 F.4th at 668–69. To the contrary, the challenged policies sharply diverge from the careful, diverse, and pluralistic curatorial approach described in Library's Collection Policy. Indeed, it states that the Library has the responsibility to acquire "material presenting a wide variety of views," and that it will

[10] The Greenville Library itself sets forth many curatorial criteria to guide this general quality assessment in its Collection Policy, such as "[l]iterary, artistic, and technical values," "[r]ecommendations in reviews," "[j]udgment of work as a whole," "authority, skill, competence, and purpose of author/producer," "[o]bjectivity," "[c]larity," "[t]echnical quality," [v]itality and originality," and "[a]rtistic presentation," among others. ECF No. 5 at ¶¶ 31-32.

"neither promote nor censor any particular religious, moral, philosophical, or political conviction or opinion." *See* ECF No. 1-1 at 2.

In sum: Public libraries "democratize access to a broad range of often-contradictory ideas and provide fertile ground for our minds to grow." *Llano Cnty.*, 138 F.4th at 888 (Higginson, J., dissenting). They "offer every one of us the tools to educate and entertain ourselves, to embrace or reject new ideas, and, above all, to engage and challenge our minds." *Id.* They are not institutions designed for the government to promote or "express its own message." *Shurtleff*, 596 U.S. at 271 (Alito, J., concurring). As a result, the First Amendment applies, and the government speech doctrine does not.

D. <u>Defendants' invocation of 'parental rights' cannot justify their discriminatory policies.</u>

To the extent Defendants posit that minor Plaintiffs' First Amendment rights are not implicated because exercise of their rights is conditioned on their parent's consent, ECF No. 20 at 10–11, Defendants are mistaken. First, that parents have an interest in controlling their children does not extinguish the children's right to receive information. Second, the Policies abridge the rights of minors whose parents support their children reading books with LGBTQ characters. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 805 (2011) (violent video games ban "abridges the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime."). Like the law in *Entertainment Merchants Ass'n*, the Policies "do not enforce parental authority over children's speech" but instead "impose governmental authority, subject only to a parental veto." *Id.* at 795 n.3. The Policies' "entire effect is only in support of what the State thinks parents ought to want," not what all parents *actually* want. *Id.* at 804.

## III. Plaintiffs assert plausible Equal Protection claims.

The Equal Protection Clause of the Fourteenth Amendment "protects us not just from state-imposed classifications, but also from 'intentional and arbitrary discrimination.'" *Grimm*,

972 F.3d at 606–07 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)), *as amended* (Aug. 28, 2020). Here, Defendants have transgressed both.

To survive a motion to dismiss an equal protection claim on a facial disparate-treatment theory, a plaintiff must plead facts sufficient to demonstrate that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Veney v. Wyche,* 293 F.3d 726, 730–31 (4th Cir. 2002) (quoting *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001)). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison*, 239 F.3d at 654. Conversely, a plaintiff may also plead facts sufficient to show that an otherwise facially neutral "action disparately impacts a [protected] group," and "that the action was motivated, at least in part, by an 'invidiously discriminatory' intent." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). Here, the facially discriminatory nature of both the Written Policy and Unwritten Policy result in different treatment for LGBTQ Plaintiffs O.R. and E.G., as well as the classes they seek to represent, as compared to other similarly situated library patrons. It also disparately impacts transgender and other LGBTQ library patrons. Because both the disparate impact and "unequal treatment [are] the result of intentional or purposeful discrimination," *Morrison*, 239 F.3d at 654, and cannot be justified under any level of scrutiny, Defendants' motion should be denied.

### A. <u>The Library's Policies result in differential treatment for LGBTQ, and particularly transgender, library patrons.</u>

The Policies create a system by which transgender and other LGBTQ patrons are uniquely banished to a separate section of the library to attempt—and often fail—to find stories that represent their experiences. These burdens intentionally inflict an unconstitutional stigma on transgender and other LGBTQ library patrons, communicating to them and the entire community that they and their families do not belong. These injuries establish valid equal protection claims that easily survive a motion to dismiss.

Both Policies are facially discriminatory. But even if this Court concludes that the Policies are facially neutral, they nonetheless violate LGBTQ Plaintiffs' equal protection rights because they disparately impact LGBTQ Plaintiffs and are motivated by discriminatory intent. *See infra* § III.B.

*1. The Written Policy facially discriminates based on sex and transgender status.*

The Written Policy facially discriminates based on sex and transgender status. The Juvenile Section of the Written Policy explicitly targets any "materials targeting audiences aged 0–12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex," including any depictions of "[p]ronouns or dress inconsistent with biological sex for the purpose of affirming gender transitioning," the use of "[p]uberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning," as well as "[t]he possibility of changing genders at will or being no gender at all for the purpose of affirming gender transitioning." ECF No. 5 at ¶ 74. The Young Adult Section of the Written Policy likewise explicitly targets "materials targeting audiences aged 13–17 with characters who have transitioned or are in the process of transitioning from a gender that corresponds to their biological sex to a different gender," which includes "materials with illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning, whether changes are social (names, pronouns) or physical." *Id.* at ¶ 79. The Policy forbids any such materials from being in the Juvenile or Young Adult sections of the Library, requiring that they be moved to the PEC or Adult sections, respectively.

Unlike the law at issue in *United States v. Skrmetti*, the Written Policy explicitly classifies based on sex and transgender status, not merely based on a particular medical treatment. In *Skrmetti*, the Supreme Court held that a Tennessee law banning medical treatment for gender dysphoria in minors classified based on medical use, not sex or transgender status. 145 S. Ct. 1816, 1829–830, 1833 (2025). Critically, the law in *Skrmetti* did "not regulate any other behavior

in which minors might engage for the purpose of expressing their gender identity," such as "names, pronouns, hair styles, [or] attire." *Id.* at 1859 (Alito, J., concurring). All the Justices in *Skrmetti* agreed that, unlike the law in *Skrmetti*, a hypothetical law requiring all children to wear "sex-consistent clothing" would be a facial sex classification. *Id.* at 1832 (majority opinion); *id.* at 1874 (Sotomayor, J., dissenting). Similarly, all Justices agreed that a hypothetical law would classify based on transgender status if, instead of "regulat[ing] a class or [medical] treatments or conditions," a law were to "regulate[] a class of *persons* identified on the basis of a specified characteristic," such as having undergone a particular medical procedure. *Id.* at 1834 n.3 (majority opinion).

The Written Policy triggers heightened scrutiny. By creating a system of differential treatment for patrons based on whether or not they are living consistently with their "biological sex"—whether that be via medical transition or merely "[p]ronouns or dress"—the Written Policy "necessarily rests on a sex classification" and "punish[es] transgender persons for gender non-conformity, thereby relying on sex stereotypes." *Grimm*, 972 F.3d at 608. Transgender people are, by definition, in some stage of "the process of transitioning from a gender that corresponds to their biological sex to a different gender." ECF No. 5 at ¶ 79. The effect of the Written Policy is that a minor patron who identifies with their sex assigned at birth can freely browse and access materials "celebrat[ing], portray[ing], or affirm[ing]" their identity and experience in the section of the library geared toward their age group, while a transgender minor patron, like O.R., cannot—merely because that minor patron is in some stage of living "inconsistent[ly] with [their] biological sex." *Id.*

Defendants' discrimination against books with transgender *characters* is also necessarily discrimination against transgender *people* using the library. Other library patrons are able to brose the bookshelves to easily find books book "celebrat[ing], portray[ing], or affirm[ing]" any identity or experience that mirrors their own. *Id.* But if a transgender minor library patron wishes to do so, they must (1) be sure to be in one of the Greenville Library branches that even have a PEC section (only half do), (2) find that section, which is located separately from the section full

of other books targeting their age group; and (3) find the specific book they may be interested in reading (among books intended "for parents and guardians"). *Id.* at ¶ 48. Even then, if the transgender minor patron does not have an unrestricted library card, which requires separate parental permission to access *all* adult materials, they may not check the book out themselves. *Id.* at ¶ 127.

This unequal treatment is accompanied by a powerful stigma. Both the Written Policy and Unwritten Policy additionally subject transgender and other LGBTQ library patrons to differential treatment by inflicting an unconstitutional stigma upon them. "[D]iscrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler*, 465 U.S. at 739–40 (cleaned up). By systematically suppressing materials reflecting their and their loved ones' experiences, or by segregating materials with even a single character sharing their identity, the Greenville Library "stigmatiz[es] their families." *Bostic*, 760 F.3d at 383. The exclusion "tells those [individuals], and all the world, that their otherwise valid [identities] are unworthy of . . . recognition." *United States v. Windsor*, 570 U.S. 744, 772 (2013). Ultimately, these policies "den[y] the equal dignity" of Plaintiffs and other LGBTQ library patrons, which the Equal Protection Clause does not permit. *Obergefell v. Hodges*, 576 U.S. 644, 674 (2015).[11]

Defendants assert that the policies treat everyone equally because no one, whether transgender or cisgender, can easily access books with LGBTQ characters. But that "equal application" reasoning has been rejected time and again. *See Grimm*, 972 F.3d at 609 (rejecting argument that prohibiting transgender people from using restrooms consistent with their identity treats all students "the same, regardless of sex" because "that is like saying that racially

[11] As discussed above, that the discrimination communicates a stigmatizing message does not mean that the discrimination constitutes "government speech." *See*, *e.g.*, *Shurtleff*, 596 U.S. at 269 (2022) (Alito, J., concurring).

segregated bathrooms treated everyone equally"); *Obergefell*, 576 U.S. at 671 (rejecting argument that petitioners did "not seek to exercise the right to marry but rather a new and nonexistent 'right to same-sex marriage'" just as "*Loving* did not ask about a 'right to interracial marriage.'"). When a policy facially classifies based on sex or transgender status, there is a facial classification even when it applies "equally" to all sexes or equally to both transgender and cisgender people.

*2. The Unwritten Policy Facially Discriminates Based on Sex and Transgender Status.*

Plaintiffs also allege that the Library has a longstanding practice of "discriminating against the collection, retention, and display of LGBTQ library materials, including with respect to books for adults," i.e., an Unwritten Policy. ECF No. 5 at ¶ 97. Specifically, the Greenville Library (1) "systematically ignores procurement requests for LGBTQ-related materials and fails to obtain new LGBTQ-related titles for the Juvenile Collection, the Young Adult collection, or Adult collection," *Id.* at ¶ 98, (2) "has removed dozens of LGBTQ titles from its collection—including adult, young adult, and juvenile titles—with no explanation," *Id.* at ¶ 101, and (3) has "adopted a widespread practice of moving LGBTQ titles from the Juvenile and Young Adult sections to the Adult section even when those books do not depict transgender people or gender transition." *Id.* at ¶ 106. This Unwritten Policy is facially discriminatory. *See*, *e.g.*, *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1196 n.1 (10th Cir. 2005) (permitting "facial challenges to unwritten policies"); *Everts v. Sushi Brokers LLC*, 247 F. Supp. 3d 1075, 1080 (D. Ariz. 2017) (holding that unwritten policy of reassigning pregnant servers to lower-paid hostess position was facially discriminatory under Title VII).

And in the same way that anti-transgender discrimination constitutes sex discrimination, so too does discrimination based on an individual's sexuality. *See Grimm*, 972 F.3d at 616 ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020))).

The Unwritten Policy imposes the same harms on LGBTQ library patrons that the Written Policy imposes on transgender minor patrons. Namely, it makes it significantly more difficult for LGBTQ library patrons to be able to browse and freely obtain materials that reflect their identities and experiences as compared to non-LGBTQ patrons seeking to do the same. In other words, the Greenville Library's Unwritten Policy of suppressing LGBTQ-related materials treats LGBTQ patrons differently than non-LGBTQ patrons.

B. The Unwritten Policy and Written Policy disparately impact LGBTQ Plaintiffs and were motivated by a discriminatory purpose.

Even if the Library's Policies were not facially discriminatory, they would still trigger heightened scrutiny because they disparately impact LGBTQ Plaintiffs[12] and were motivated by a discriminatory purpose. To trigger heightened scrutiny, Plaintiffs "need not show that discriminatory purpose was the 'sole' or even a 'primary' motive for the legislation, just that it was 'a motivating factor.'" *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (cleaned up) (quoting *Arlington Heights*, 429 U.S. at 265–66). Nor must Plaintiffs show outright animus to prove a discriminatory purpose. *Hassan v. City of New York*, 804 F.3d 277, 298 (3d Cir. 2015), *as amended* (Feb. 2, 2016) ("intentional discrimination" need not be motivated by "ill will, enmity, or hostility" to contravene the Equal Protection Clause). Moreover, at the motion to dismiss stage, allegations regarding "the 'purposeful discrimination' necessary to support a disparate-impact theory" need not yet have all the "meat on the bones" required to "ultimately prevail under this theory." *Wood v. Fla. Dep't of Educ.*, 730 F. Supp. 3d

[12] Although Defendants claim that the Written Policy is neutral because it "applies to *all* books geared toward 0–12 year olds, or 13–17 year olds, dealing with gender transitioning (whether the book takes a positive or negative view of the subject)," ECF No. 20, at 27–28, the record shows otherwise. The Written Policy explicitly targets materials that "*affirm* gender transitioning." ECF 5 at ¶¶ 2, 54, 64, 67 (Board Member Odom: "We're specifically targeting *affirming* gender transition") (emphasis added). Moreover, "books that advocate against gender transition—such as the Christian-themed book, *God Made Boys and Girls* by Marty Machowski—remain available in the juvenile section." *Id.* at ¶ 4.

1232, 1241 (N.D. Fla. 2024) (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979); *Arlington Heights*, 429 U.S. at 264–66).

The presence of discriminatory intent is "evaluated using the 'sensitive inquiry' established in *Village of Arlington Heights*." *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019), as amended (Feb. 25, 2019) (quoting *Arlington Heights*, 429 U.S. at 266–68). This inquiry must take into account all available "circumstantial and direct evidence" of possible discriminatory intent, including but not limited to: (1) "[t]he impact of the official action and whether it bears more heavily on one [group] than another," (2) "[t]he historical background of the [action], particularly if it reveals a series of official actions taken for invidious purposes," (3) "[t]he specific sequence of events leading to the challenged" action, (4) any "[d]epartures from . . . normal procedur[es]" or "[s]ubstantive . . . factors usually considered important," and (5) the relevant "legislative or administrative history . . . , especially where there are contemporary statements by members of the decision-making body." *Arlington Heights*, 429 U.S. at 266–68.

Even without the benefit of discovery, Plaintiffs in this case have provided overwhelming evidence of discriminatory motive by the Greenville Library officials who passed the Written Policy and who have implemented and enforced the longstanding Unwritten Policy of suppressing LGBTQ-related materials. *First*, as described above, these policies harm LGBTQ patrons seeking to access materials in their public library that reflect them and their experiences.

*Second*, the "historical background" of the Policy and Practice does in fact, "reveal[] a series of official actions taken for invidious purposes," and *third*, the "specific sequence of events leading to" these policies' enactment does "shed light" on a discriminatory purpose. *Id.* at 267. Specifically, Defendants have demonstrated a "deep and longstanding hostility to LGBTQ themes over the course of many years," including by publicly and controversially firing an employee for refusing to cancel a planned "Drag Queen Story Hour," instructing all branches to remove Pride-themed public displays (and taking care to do so orally, rather than in writing, to minimize evidence), ordering an employee to "remove a TV slide promoting the LGBTQ book

club," harassing and intimidating other library branch employees for an LGBTQ book display, subsequently passing a policy eradicating themed displays altogether aside from those about government holidays, and instilling a "culture of fear" amongst staff based on these incidents. ECF No. 5 at ¶¶ 109–115.

*Fourth*, Defendants "substantive[ly] depart[ed]" from "the factors usually considered important" in the Library's own Collection Policy by passing the Written Policy and in enforcing the Unwritten Policy. *Arlington Heights*, 429 U.S. at 267. Most significantly, Defendants' Policies fly directly in the face of the Greenville Library's proclamations that it "strives to support an informed community by providing access to the world of ideas and information," has a "responsibility to acquire, as available, material presenting a wide variety of views and opinions on current and historical issues," and that the "Library will neither promote nor censor any particular religious, moral, philosophical or political conviction or opinion" nor exclude material "because of the race or nationality or the religious, social, or political views of the author, publisher, or creator." ECF No. 5 at ¶ 29.

*Fifth*, the relevant "administrative history" of the Policy is replete with "contemporary statements by members of the decision-making body" demonstrating their discriminatory intent. *Arlington Heights*, 429 U.S. at 268. These include statements that a book about a transgender girl was objectionable because it "present[ed]" that experience as "normal and good," ECF No. 5 at ¶ 50, that presenting the possibility of transgender experience was "dangerous," *id.* at ¶ 56, that such a book was "trash," *id*. at ¶ 61, that "putting [these] ideas in kids' minds that may not have already been there" was "a dangerous thing" and a "radical agenda" against which the library had "every right to take an ethical and moral stand." *Id*. at ¶ 85. Simultaneously, several dissenting members of the decision-making body pointed out the discriminatory nature of the Policy (to no avail), *id.*at ¶ 84, 86, and Library Board Member Brian Aufmuth even lamented, "We can't target one group just because we don't like that group." *Id*. at ¶ 90.

The Ninth Circuit's decision in *Arce v. Douglas*, in which it considered the constitutionality of a law that eliminated the Mexican-American Studies ("MAS") program

established by the Tucson public school board, is particularly instructive. *See* 793 F.3d 968, 973 (9th Cir. 2015). That Arizona statute did not mention the MAS program on its face, but prohibited Arizona schools from offering any classes that "[p]romote[d] resentment toward a race or class of people," "[we]re designed primarily for pupils of a particular ethnic group," or "[a]dvocate[d] ethnic solidarity instead of the treatment of pupils as individuals." *Id.* (quoting A.R.S. § 15–112(A)). Just as the Library's Written Policy was enacted in response to complaints about specific transgender-themed books, ECF No. 5 at ¶¶ 37–77, the *Arce* court found that the "enactment and enforcement of [the Arizona law] had a disproportionate impact on Mexican-American and other Hispanic students," in part because it "was enacted in response to complaints about the MAS program" and had "been enforced only against the MAS program, even though two other ethnic studies programs in Arizona were alleged by the state superintendent to seemingly violate" the statute. 793 F.3d at 978. As is true in this case, various public statements made by Arizona officials seeking to target the program, "especially when coupled with the administrative history . . . that immediately preceded enactment, raise[d] at least a plausible inference that racial animus underlay passage of the legislation." *Id.* at 979. Based on that evidence—even absent a full record of statements and general climate (like the anti-LGBTQ climate in this case) "evincing animus against Mexican Americans," *id.* at 979 n.5—the court found that the district court's grant of summary judgment for defendants on the Equal Protection claim was in error. *Id.* at 981.[13]

Library Board Member Aufmuth was correct—Defendants cannot discriminatorily target transgender and other LGBTQ library materials (and, by extension, transgender and LGBTQ library patrons) merely because they disapprove of them. The "wishes or objections of some fraction of the body politic" cannot be the basis for official government discrimination. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). "Private biases may be outside the

[13] *See also Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, No. 4:22CV304, 2022 WL 20099419, at *3 (N.D. Fla. Nov. 22, 2022) (holding that plaintiffs had stated plausible Equal Protection claims challenging Florida's "Individual Freedom Act," also known as the "Stop WOKE Act," sufficient to survive motion to dismiss).

reach of the law, but the law cannot, directly or indirectly, give them effect." *Id.* (quoting *Palmore v. Sidoti,* 466 U.S. 429, 433 (1984)). Because the Library's Policies were "elected or reaffirmed . . . at least in part 'because of,' not merely 'in spite of,' [their] adverse effects upon an identifiable group," *C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) (quoting *Feeney*, 442 U.S. at 279), Defendant's motion to dismiss Plaintiffs' Equal Protection claims must be denied.

C. The Library's Policies cannot survive any level of scrutiny.

*1. The Library's Policies trigger heightened scrutiny and are not substantially related to a sufficiently important government interest.*

Because the Library's Policies discriminate based on sex and transgender status, they are subject to heightened scrutiny. *See Grimm*, 972 F.3d at 607.[14] To survive that demanding standard, Defendants must show that "the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). Defendants submit that "the intent of the . . . Policy is . . . to recognize and promote the primacy of parents and legal guardians to direct the upbringing and education of their children." ECF No. 20 at 32. To start, the record shows a different motive. *See infra* § III.C.2; *United States v. Virginia*, 518 U.S. 515, 533 (1996) (holding that the "justification must be genuine"). But beyond that, Defendants do not seriously attempt to explain how restricting a specific class of materials representing a disfavored group of people and imposing a targeted burden on that group furthers "the primacy of parents." Parents who wish to monitor the content of their children's acquisitions at the library are in no different position under the challenged policies.[15] Because the Written

---

[14] Because *Skrmetti* did not resolve the standard of scrutiny for discrimination against transgender people, the Fourth Circuit's precedent from *Grimm* applying heightened scrutiny to intentional discrimination against transgender people remains binding in this Circuit. *See Grimm*, 972 F.3d at 611-612 (reciting the history of discrimination against transgender people).

[15] If anything, in *contravention* of *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025), the primacy of parents is *negatively* affected by the challenged policies, as there is no ability for

Policy and Unwritten Policy are not substantially related to a sufficiently important governmental interest, Defendants' motion must be denied.

*2. The Library's Policies are based in animus and thus cannot survive even rational basis review.*

In addition to failing heightened scrutiny, the Library's anti-LGBTQ policies and practices cannot survive *any* level of judicial review. Plaintiffs have amply demonstrated that the challenged policies are "inexplicable by anything but animus toward" transgender and other LGBTQ individuals. *Romer v. Evans*, 517 U.S. 620, 632 (1996). Because "a bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest," *id.* at 634 (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)), "no legitimate purpose overcomes" the policies' animating "purpose and effect to disparage and to injure" transgender and LGBTQ+ people. *Windsor*, 570 U.S. at 775; s*ee also id.* at 771 (explaining that "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality" constitutes an unconstitutional discriminatory purpose).

D. Plaintiffs' Equal Protection claims are distinct from their First Amendment claims.

Defendants are mistaken in their assertion that Plaintiffs seek to "manufacture a plausible claim by reframing a failed First Amendment claim as an Equal Protection claim." ECF No. 20 at 28. Of course, the Supreme Court has long held that Equal Protection claims may be "closely intertwined with First Amendment interests," *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972), and the Fourth Circuit recognizes the same. *See Courthouse News Serv. v. Smith*, 126 F.4th 899, 918 (4th Cir. 2025) ("The equal protection interests involved in the differential

---

LGBTQ-supportive parents to opt out of the policies without giving their children access to *all* adult material in the library. In other words, as stated above, the Policies only enforce "what the State thinks parents ought to want" and "do not enforce parental authority" but instead "impose governmental authority, subject only to a parental veto." *Ent. Merchs. Ass'n*, 564 U.S. at 804, 795 n.3.

treatment of speech are inextricably intertwined with First Amendment concerns." (internal alteration omitted) (quoting *McGuire v. Reilly*, 260 F.3d 36, 49 (1st Cir. 2001))). This case lies at this "First Amendment-Equal Protection intersection." *Mosley*, 408 U.S. at 95 n.3.

That both claims are factually tied Plaintiffs' access to certain library materials does not mean that the Equal Protection claims are "subsumed by, and co-extensive with" their First Amendment claims. *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001) (declining to reach plaintiff's Equal Protection claim in case challenging arrest for criminal trespass for anti-abortion protest on college campus where plaintiff "made only passing reference to Equal Protection in his Complaint and dedicated to it only one sentence in his opening brief on appeal"); *see also Llano Cnty.*, 138 F.4th at 865 n.59 (plurality opinion) (leaving open the possibility that book removals "can be challenged under other parts of the Constitution" (citing *Summum*, 555 U.S. at 468)); *People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (noting that although First Amendment did not place limits on an art exhibition deemed government speech, "other constitutional constraints not at issue here, such as the Equal Protection Clause, might").

Unlike the cases cited by Defendants, Plaintiffs O.R. and E.G. and the classes they seek to represent *do* "contend that [they are] treated disparately in [a] way other than through alleged discrimination against [their] viewpoints." *Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 834 (E.D. Va. 2006) (finding that Equal Protection and free speech claims coextensive in employee speech case where teacher sued after religious materials he posted on his classroom walls were removed); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999) (finding police officer's "pure or generic retaliation claim" did "not implicate the Equal Protection Clause" and declining to reach theory that "selective[] enforce[ment] [of] a policy or regulation against an individual, who is not a member of an identifiable group" can violate the Equal Protection Clause).

Here, several Plaintiffs *are* "member[s] of an identifiable group," *id.*, and that membership forms the basis of their Equal Protection claims. Specifically, O.R. is "a 17-year-old

transgender boy" who seeks to represent a class of "all minor, transgender library patrons who lack adult library cards" (the "Juvenile & Young Adult Class") and E.G. is "a 12-year-old girl that identifies as queer" who seeks to represent a class of "all LGBTQ-identifying library patrons who have adult or juvenile non-restricted library cards" (the "Unrestricted Library Card Class"). ECF No. 5 at ¶¶ 153, 157. Just as the Mexican-American plaintiffs in *Arce* brought both First and Fourteenth Amendment claims, so too do Plaintiffs in this case. *See* 793 F.3d at 976–986. The Written Policy and Unwritten Policy inflict First Amendment injuries on *all* Plaintiffs (both LGBTQ and not), because all Plaintiffs wish to access books portraying transgender and other LGBTQ stories without impediment or burden. But they inflict Equal Protection injuries on both the Juvenile & Young Adult and Unrestricted Library Card classes (i.e. all "LGBTQ library patrons") *specifically* by subjecting them to "unequal treatment," in part based on the impediment on their "ability to access library materials positively reflecting themselves and families," and *also* the "dignitary harm and unconstitutional stigma" of their LGBTQ "identities and experiences" being treated as "unacceptable and unworthy of inclusion in public space." ECF No. 5 at ¶¶ 171, 180. Although these injuries and claims overlap, they are distinct. The Equal Protection claims are premised on the ways in which these policies affect transgender and other LGBTQ patrons *differently* than other patrons, based on their sex and/or LGBTQ status.

## IV. Qualified immunity does not apply to claims for prospective relief.

"[Q]ualified immunity does not apply against . . . prospective relief." *Henderson v. Harmon*, 102 F.4th 242, 251 n.6 (4th Cir. 2024). Thus, Defendants' assertion of qualified immunity is immaterial. *See* ECF 5 at 36–37 (Requested Relief).

## CONCLUSION

Taking the well-pleaded allegations as true, Plaintiffs have stated plausible claims for relief under the First Amendment and Equal Protection Clause. The Court should deny the Motion to Dismiss.

Dated: July 25, 2025

**ACLU OF SOUTH CAROLINA**

*/s/ Allen Chaney*
Allen Chaney, Fed. ID No. 13181
Samuel Kennedy*
P.O. Box 1668
Columbia, SC 29202
T: (864) 372-6881
E: achaney@aclusc.org

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Shana Knizhnik*
Joshua Block (*pro hac vice*)
125 Broad Street, Floor 18
New York, NY 10004
T: (212) 549-2500
E: sknizhnik@aclu.org
jblock@aclu.org

** Application for Admission Pro Hac Vice Forthcoming*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated;

CHERYL ROGERS;

GREG ROGERS;

E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated;

M.G., by and through her mother, Amber Galea; and

W.M., by and through his mother, Kersey Clark,

*Plaintiffs*,

v.

GREENVILLE COUNTY, SOUTH CAROLINA;

GREENVILLE COUNTY LIBRARY SYSTEM;

BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and

KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,

*Defendants*.

C/A No. 6:25-cv-02599-DCC

**REPLY IN SUPPORT OF THE LIBRARY DEFENDANTS' MOTION TO DISMISS**

WILSON JONES CARTER & BAXLEY, P.A.

Charles F. Turner, Jr. (Fed. ID No. 05849)
J. Nathan Ozmint (Fed. ID No. 14360)
John P. "Jack" Riordan (Fed. ID No. 07314)
325 Rocky Slope Rd., Suite 201
Greenville, South Carolina 29607
(864) 672-3711
cfturner@wjcblaw.com
jpriordan@wjcblaw.com
jnozmint@wjcblaw.com

NELSON MULLINS RILEY & SCARBOROUGH LLP

Miles E. Coleman (Fed. ID No. 11594)
2 West Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300
miles.coleman@nelsonmullins.com

*Attorneys for Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System; and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

1 Plaintiffs lack standing because there is no constitutional right to receive content from the government. ........ 2

2. *Pico* has little bearing on Plaintiffs' claims. ........ 4

3. Public library shelves are not a nonpublic forum. ........ 6

4. Library curation is government speech. ........ 7

5. Plaintiffs have no answer to *Little's* thorough, thoughtful, and well-reasoned en banc decision. ........ 9

6. Plaintiffs have not plausibly alleged an Equal Protection violation. ........ 10

7. *Mahmoud*, *Skrmetti*, and *Free Speech Coalition v. Paxton* are instructive. ........ 12

CONCLUSION ........ 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arkansas Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)....6

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986)....14

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982)....4, 5, 10, 14

*Boring v. Buncombe Cnty. Bd. of Educ.*,
136 F.3d 364 (4th Cir. 1998) (en banc)....9

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005)....6

*City of Pleasant Grove v. Summum*,
555 U.S. 460 (2009)....8

*Crookshanks v. Elizabeth School District*,
Case No. 25-1105 (10th Cir.)....7

*David v. Alphin*,
704 F.3d 327 (4th Cir. 2013)....2

*Davison v. Randall*, 912 F.3d 666, 685 (4th Cir. 2019)....5, 6

*Espinoza v. Montana Dept. of Revenue*,
591 U.S. 464 (2020)....12

*Free Speech Coal., Inc. v. Paxton*,
145 S. Ct. 2291 (2025)....8, 14

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)....14

*Little v. Llano Cnty.*,
138 F.4th 834 (5th Cir. 2025) (en banc)....7, 9, 10

*Mahmoud v. Taylor*,
145 S. Ct. 2332 (2025)....9, 12, 13, 14

*Marks v. United States*,
430 U.S. 188 (1977)....4

*McConnell v. Fed. Election Comm'n*,
540 U.S. 93 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ........ 3

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 8

*Morrison v. Garraghty*,
239 F.3d 648 (4th Cir. 2001) ........ 11

*Peck v. Upshur County Bd. of Ed.*,
155 F.3d 274 (4th Cir. 1998) ........ 14

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) ........ 1

*S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*,
333 F.3d 417 (3d Cir. 2003) ........ 14

*Shelley v. Kraemer*,
334 U.S. 1 (1948) ........ 10

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) (Alito, J., concurring) ........ 6, 9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ........ 10

*Tuffendsam v. Dearborn County Board of Health*,
385 F.3d 1124 (7th Cir. 2004) (Posner, J.) ........ 1

*United States v. Am. Library Ass'n Inc.*,
539 U.S. 194 (2003) ........ 5, 6

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025) ........ 11, 12, 13

*Veney v. Wyche*,
293 F.3d 726 (4th Cir. 2002) ........ 11

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ........ 7

*Walker-Serrano ex rel. Walker v. Leonard*,
325 F.3d 412 (3d Cir. 2003) ........ 14

*Walls v. Sanders*,
__ F.4th __, 2025 WL 1948450 (8th Cir. July 16, 2025) ........ 9

*Warth v. Seldin*,
422 U.S. 490 (1975)....................................................................................................2

*White Coat Waste Project v. Greater Richmond Transit Co.*,
35 F.4th 179 (4th Cir. 2022) ...........................................................................................6

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)....................................................................................................12

*Ysursa v. Pocatello Educational Ass'n*,
555 U.S. 353 (2009)....................................................................................................1

**Other Authorities**

*Board of Education v. Pico: The Supreme Court's Answer to School Library Censorship*, 44 OHIO STATE L.J. 1103, 1113 (1983) ................................................4

David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. CHI. L. REV. 864 (1986)....................................................................................................1

Euguene Volokh, *Does The First Amendment Bar Public Schools from Removing Public Library Books Based on Their Viewpoints?*, REASON (May 18, 2022, 8:01 a.m.), https://reason.com/volokh/2022/05/18/does-the-first-amendment-bar-public-schools-from-removing-library-books-based-on-their-viewpoints/ [perma.cc/P47R-D5N6] ..........................................................................................4

Sean Maloney, *Political Advocacy Groups: The Puppet Masters Behind Public School Boards' Banning of Books*, 73 DEPAUL L. REV. 129, 143 (2023) ................................4

W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)..................5

The Library Defendants explained that the Court must dismiss Plaintiffs' suit because Plaintiffs lack standing and have failed to state causes of action on which relief can be granted.[1] (*See* ECF 20.) Nothing in Plaintiffs' Response changes that conclusion.

## INTRODUCTION

Plaintiffs' claims are fatally and fundamentally flawed. All four of their claims rely on an alleged constitutional right to receive information (or content) *from the government*. The problem is that no such right exists. The First Amendment recognizes a negative right to be free from government infringement of speech.[2] But it does not grant a corresponding right to receive specific content from the government at taxpayer expense. *See Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353, 355 (2009) ("The First Amendment prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use government … mechanisms for the purpose of obtaining funds for expression."); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.").

The practical consequence of Plaintiffs' novel theory would be to either (a) require every public library to become a warehouse of books espousing every idea ever penned or (b) shutter their doors. Thankfully, the First Amendment requires neither. Plaintiffs can access much of the content they want at Greenville County libraries (albeit sometimes in a different section of the

---

[1] The "Library Defendants" are, collectively, Greenville County Library System, Beverly James, in her official capacity as Executive Director of the Greenville County Library System, and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System.

[2] *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1126 (7th Cir. 2004) (Posner, J.) ("The Constitution is, with immaterial exceptions, a charter of negative rather than positive liberties. … It limits the powers of government but does not give people legally enforceable rights to demand public services and to obtain damages or other legal relief if the government fails to provide them."); David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. CHI. L. REV. 864 (1986).

library than where Plaintiffs prefer it to be placed). Plaintiffs are free to obtain the rest of the content of their choice (not located at a local public library) from a variety of sources (such as Amazon.com or a private bookstore). Defendants' refusal to subsidize the content of Plaintiffs' choosing is not a constitutional violation. Because Plaintiffs' First Amendment and Equal Protection rights have not been violated, their amended complaint should be dismissed.

## ARGUMENT

### 1. Plaintiffs lack standing because there is no constitutional right to receive content from the government.

Plaintiffs argue they have standing because "Defendants have impeded their ability to access library materials they wish to read or discover through browsing." Pls. Resp. at 5 (ECF No. 27). In other words, Plaintiffs' claimed injury—denial of access to content at government expense—is identical to what they claim the constitutional violation to be—denial of access to content at government expense.

Accordingly, there is a chicken or egg problem. Plaintiffs' alleged injury depends on (and is coextensive with) the existence of the alleged right, meaning they can't establish standing without first proving the alleged right exists. Plaintiffs claim they have standing because they are injured by the lack of access to specific content, but Defendants claim there is no such thing as a constitutional right to receive specific content from the government. If Defendants are correct, and there's no constitutional right, then there can be no deprivation of that right. If there's no deprivation, then there's no constitutional injury. If no injury, then no standing.

To have Article III standing, a plaintiff bears the burden of establishing "a concrete and particularized invasion of a ***legally protected interest***." *David v. Alphin,* 704 F.3d 327, 333 (4th Cir. 2013) (cleaned up) (emphasis added). "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, ... it often turns on the nature and source

of the claim asserted." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (internal quotation marks and citations omitted). If the nature and source of the claim asserted is not a legally cognizable right, then plaintiffs asserting such a claim lack standing. For example, in *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 227 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010), plaintiffs claimed that increases in hard-money campaign contributions in a federal law deprived them of an "equal ability to participate in the election process based on their economic status." *Id.* The Supreme Court held that plaintiffs lacked standing because the Court had "never recognized a legal right comparable to the broad and diffuse injury asserted" by the plaintiffs. *Id.* So too here.

Although the Supreme Court has generally recognized that the First Amendment sometimes limits the government's power to prevent *one person from receiving another's speech*, *see* Defs. Mem. In Supp. of Mot. to Dismiss at 16–17 (ECF No. 20), the Court has never recognized a right to receive content *from the government*. Plaintiffs' right-to-receive-content-from-the-government claim is novel, involving a "broad and diffuse injury," *McConnell*, 540 U.S. at 227, that is not legally cognizable. Accordingly, Plaintiffs' claims should be dismissed for lack standing.

This argument isn't putting the merits horse before the standing cart. Defendants do not ask the Court to determine (at least, not in *this* threshold argument) whether a particular plaintiff's claim is viable under the alleged facts, but whether that claim could be viable *under any set of facts*. Stated differently, it asks not whether *these* plaintiffs have standing, but whether any person *could* have standing. If the alleged right on which the claim rests doesn't exist (as in *McConnell*), then no one—including these plaintiffs—have standing to sue for an alleged violation of that supposed right.

In short, the standing analysis requires the court to determine whether the allegedly violated right is, in fact, a cognizable right. Here, it's not, and Plaintiffs, therefore, lack standing.

**2. *Pico* has little bearing on Plaintiffs' claims.**

Plaintiffs rely heavily on *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) to support their claim that the First Amendment prohibits "viewpoint" discrimination in public library curation decisions. *See* Pls. Resp. at 12–14 (ECF No. 27). Plaintiffs argue that "[l]ower courts have been virtually unanimous in applying the principles announced in *Pico* despite its status as a plurality decision." *Id.* at 13. They are wrong. As soon as *Pico* was decided, commentators recognized that "[b]ecause a majority of justices did not concur in any one opinion, the authority of *Pico* is limited." Helen M. Quenemoen, *Board of Education v. Pico: The Supreme Court's Answer to School Library Censorship*, 44 OHIO STATE L.J. 1103, 1113 (1983). Numerous courts have agreed. Indeed, the First, Fifth, and Eleventh Circuits have all held that *Pico* lacks precedential value. Sean Maloney, *Political Advocacy Groups: The Puppet Masters Behind Public School Boards' Banning of Books*, 73 DEPAUL L. REV. 129, 143 (2023) ("These circuits are clear: *Pico* lacks precedential effect.").[3]

Further, Plaintiffs are wrong that *Pico* prohibits "viewpoint" discrimination in school (or public) library curation decisions. *Pico* says nothing of the sort. The *Pico* plurality opinion only says that school libraries may not weed books "in a narrowly partisan or political manner," 457 U.S. at 870 (plurality op.), which is a far cry from Plaintiffs' assertion that public libraries may not engage in any viewpoint discrimination. But more importantly, the Brennan plurality opinion in *Pico* was joined by only three justices, *so it has no status as law*. In cases which fail to garner at least five votes for a single rationale, the lower courts must follow the opinion of the Justice who "concurred in the judgment on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193

[3] *See also* Euguene Volokh, *Does The First Amendment Bar Public Schools from Removing Public Library Books Based on Their Viewpoints?*, REASON (May 18, 2022, 8:01 a.m.), https://reason.com/volokh/2022/05/18/does-the-first-amendment-bar-public-schools-from-removing-library-books-based-on-their-viewpoints/ [perma.cc/P47R-D5N6].

(1977). In *Pico*, the controlling opinion belonged to Justice White, who concurred in the judgment only, refused to join any portion of Justice Brennan's plurality opinion, and expressly disclaimed reaching the First Amendment issues in the case. *Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment) ("The plurality seems compelled to go further and issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library. *I see no necessity for doing so at this point*.") (emphasis added).

To the extent that any portion of the Brennan plurality in *Pico* could be read as prohibiting "viewpoint" discrimination in public libraries, that opinion is not just non-controlling, it's fatally flawed. Libraries inevitably, unavoidably, and permissibly engage in *viewpoint discrimination* when making curation decisions, as they are expected to. *See United States v. Am. Library Ass'n Inc.*, 539 U.S. 194, 204 205 (2003) [hereafter "*ALA*"] (plurality op. of Rehnquist, C.J.) ("'The librarian's responsibility . . . is to separate out the gold from the garbage, not to preserve everything.'") (quoting W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)).[4] There is nothing inherently wrong or illegal with a library refusing to shelve (or removing) books that, for example, espouse racist or sexist ideas, promote crackpot scientific theories, or contain blatant factual inaccuracies. But all these curation decisions evince, necessarily, viewpoint discrimination. A public library could not function if its librarians are prohibited from making content- or viewpoint-based collection decisions, or if it could be sued whenever a library patron suspects that a curation decision was influenced by the content or viewpoints expressed in a book.[5]

---

[4] So, too, *content discrimination* is inevitable when libraries make collection decisions. *See id.* at 205 ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.").

[5] Plaintiffs cite *Davison v. Randall*, 912 F.3d 666, 685 (4th Cir. 2019) as if that case held that "The First Amendment prohibits 'viewpoint discrimination in curating a public library branch.'" Pls.

**3. Public library shelves are not a nonpublic forum**.

Contrary to Plaintiffs' claim to the contrary, a public library's shelves are not a nonpublic (or public) forum. *See* Pls. Resp. 14 n.6 (ECF No. 27) (arguing that a public library is a nonpublic forum and therefore "cannot 'employ[] viewpoint-discriminatory criteria.'") (quoting *Shurtleff v. City of Boston*, 596 U.S. 243, 275–76 (2022) (Alito, J., concurring)) (alteration in original). Plaintiffs claim that "the *ALA* plurality appeared to apply the nonpublic forum doctrine in its evaluation of the Children's Internet Protection Act[.]" *Id.* at 15 n.7. They are wrong. The *ALA* plurality expressly concluded that "'forum analysis and heightened judicial scrutiny are incompatible . . . with the discretion that public libraries must have to fulfill their traditional missions." *Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005) (quoting *ALA*, 539 U.S. at 205) (plurality opinion of Rehnquist, C.J.).

Although a portion of a library's physical campus may constitute a public or nonpublic forum—if, for example, the library makes a meeting space available for book clubs or other public gatherings—the library *shelves* themselves are not a forum of any sort. This fourth category— "not a forum at all"—has been recognized by the Supreme Court. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998) ("Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum *or not a forum at all*.") (emphasis added). Simply put, public library shelves are not open in any manner as a forum for public speech. Instead, as discussed *infra*, these shelves are solely a forum for *government speech*. A library's shelves do not have "speech limitations" applicable to the public writ large; rather these shelves and the placement and selection of which books they

---

Resp. at 12 (ECF 27). But that's not what *Davison* held; it's not even what *Davison* was about. *Davison* merely concluded that certain portions of a library official's official Facebook page, in which he had invited public commentary, constituted a forum in which private speakers could not be excluded based on their viewpoints.

contain constitute government speech. *See White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 (4th Cir. 2022) ("Speech limitations in these nonpublic forums must survive only a much more limited review—they only need to be reasonable and viewpoint-neutral.") (quotation and citation omitted).

Even if public library shelves constitute a nonpublic forum—which they don't—Plaintiffs' claims would still fail. This is so because no Plaintiff has alleged that they have been excluded from participation in the forum. Plaintiffs lack standing to contest the alleged exclusion of other voices from the claimed nonpublic forum. True, Plaintiffs' claim violation of an alleged right to receive content. But as discussed *supra*, there is no such thing as a right to receive content from the government and, to the extent nonpublic-forum analysis is applicable, Plaintiffs' nonpublic-forum argument fails.

**4. Library curation is government speech.**

Whether library curation is government speech is a relatively novel question. True, several out-of-circuit federal district courts have rejected this argument.[6] *See* Pls. Resp. at 19 (ECF No. 27). But notably, seven of the seventeen active Fifth Circuit judges concluded that public library curation decisions constitute government speech. *Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025) (en banc). (Duncan, J., plurality op.) Plaintiffs do not seriously contend with Judge Duncan's thorough and thoughtful analysis, nor with Defendants' government-speech argument. *See* Defs. Memo. in Supp. at 18–28 (ECF No. 20).

Under the Supreme Court's government-speech doctrine, whenever the government joins or assists others in propagating a message, it is engaged in government speech and may choose the speech that it will subsidize, and decline to subsidize speech to which it disapproves, without

[6] The issue of whether school library curation is government speech is currently pending before the Tenth Circuit in *Crookshanks v. Elizabeth School District*, Case No. 25-1105.

violating the First Amendment's general prohibition against viewpoint discrimination. *See, e.g.*, *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015) ("Texas offers [specialty license] plates that say 'Fight Terrorism.' But it need not issue plates promoting al Qaeda.") (citation omitted); *City of Pleasant Grove v. Summum*, 555 U.S. 460, 468 (2009) ("It is the very business of government to favor and disfavor points of view.") (citation and internal quotation marks omitted). This is true even when the government-supported speech is created or delivered by private citizens. It is the use of government resources to promote and convey these ideas—the act of curating private speech—that constitutes government speech in these instances.

Indeed, a library's curation decisions are no less "speech" than a social-media company's decisions regarding the third-party speech that it chooses to convey on its platforms. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) ("An entity exercising editorial discretion in the selection and presentation of content is engaged in speech activity.") (quotations and citation omitted) (cleaned up). *Moody* held that "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Id.* Plaintiffs' contention that *Moody* is inapplicable because it concerned "*private* speech," not government speech, is a distinction without a difference. Pls. Resp. at 20 (ECF No. 27). The salient point is that, when an entity compiles and curates the private speech of others into a collection for others to browse, that "editorial function itself is an aspect of speech." *Moody*, 603 U.S. at 731 (citation and quotation omitted). This is true whether a private corporation or a public library is doing the curating. In both instances, the curated collection is itself speech. And notably, the fact that the curated collection might be very large, encompassing many (even most) voices—consider the size and diversity of voices on a social media website—does not negate the fact that the curated collection is *speech*. *Id.* at 732 (the analysis does not change "just because a compiler includes most items and excludes just a few").

That's not to say that Plaintiffs are powerless to dispute the government's speech decisions. But the place to wage that fight is at the ballot box, not by expecting federal courts to act as über librarians to review and endorse the decisions of local library officials. Our Constitution relies "on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Shurtleff*, 596 U.S. at 252.

Because the conduct at issue here—the acquisition, placement, and removal of library books—constitutes government speech, Plaintiffs' claims fail.

**5. Plaintiffs have no answer to *Little's* thorough, thoughtful, and well-reasoned en banc decision.**

In Plaintiffs' desperation to avoid the powerful persuasive authority of the Fifth Circuit's recent en banc opinion in *Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025), they resort to a self-contradicting (and incorrect) characterization of the Library Defendants' argument (and *Little's* holding). They mischaracterize the argument in two ways:

*First*, Plaintiffs wrongly claim that the Library Defendants' argument about the lack of a cognizable constitutional right to receive information from the government "contains no limiting principle whatsoever." Pls. Resp. at 16 (ECF No. 27). But that's not true, and Plaintiffs know it. They admit as much later in their Response, when they admit that *Little's* holding "le[ft] open the possibility that book removals 'can be challenged under other parts of the Constitution.'" *Id.* at 34 (quoting *Little*, 138 F.4th at 865 n.59). One of those avenues—one of the "limiting principle[s]" that Plaintiffs say doesn't exist—was illustrated two months ago in *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2341–42 (2025). There, even the selection of classroom curriculum—a quintessential example of government speech to which the Free Speech Clause doesn't apply, *see, e.g.*, *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 366 (4th Cir. 1998) (en banc)—was subject to the plaintiffs' Free Exercise rights. *See also Walls v. Sanders*, __ F.4th __, 2025 WL 1948450, at *4

(8th Cir. July 16, 2025) ("Government speech is not immune from all constitutional challenges . . . . The Establishment Clause, for example, limits government speech."). In short, Plaintiffs' supposed right to receive information from the government lacks any constitutional foundation. But, contrary to Plaintiffs' assertion, that conclusion doesn't wholly neuter the Constitution.

*Second*, Plaintiffs incorrectly argue that *Little's* holding—namely, that the Constitution contains no right to receive information from the government—is contrary to *Pico*. *See* Pls. Resp. at 16 (ECF No. 27) (arguing that *Little* would allow the "very conduct proscribed by a supermajority of *Pico*"). Wrong again. As expressly noted by the *Little* majority, a majority of Justices in *Pico* agreed that there is no right to receive information from the government. *Little*, 138 F.4th at 844 n.15. Consistent with *Little* and the Defendants' memorandum in support of motion to dismiss analyzing *Little*, this Court should reject Plaintiffs' assertion of a right to receive content from the government. No such right exists.

**6. Plaintiffs have not plausibly alleged an Equal Protection violation.**

Plaintiffs' Equal Protection claims fail, for multiple reasons. As an initial matter, contrary to Plaintiffs' contention to the contrary, the Collection Policy is plainly facially neutral. The Collection Policy does not prevent any child identifying as LGBTQ+ from accessing any book that a child who does not identify as LGBTQ+ could access, or vice versa. All similarly situated children who patronize the Greenville Library System are subject to the same limitations on what they can check out from the library. Because all minors are treated the same under the policy (as are all adults), Plaintiffs have not stated an Equal Protection claim.

Further, Plaintiffs conflate the rights of natural persons with those of book characters. The law, however, is clear—a violation of the Equal Protection Clause is one that denies ***people*** equal treatment. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 202 (2023)("'[T]he broad and benign provisions of the Fourteenth Amendment'

apply '*to all persons*'") (emphasis added); *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) ("The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the *individual*. The rights established are *personal rights*.") (emphasis added).

Plaintiffs' Response acknowledges that its equal protection claim can only survive a motion to dismiss if the Complaint alleges that "'*he* has been treated differently from *others*.'" Pls. Resp. at 23 (ECF No. 27) (quoting *Veney v. Wyche*, 293 F.3d 726, 730–31 (4th Cir. 2002) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)) (emphasis added). Plaintiffs do not make any plausible allegations that satisfy this test. At most, Plaintiffs have alleged that the Library's policies discriminate, if at all, against *materials*, not persons. *See id.* at 24 (alleging the policy "targets any '*materials*'"); *id.* ("explicitly targets '*materials*'"); *id.* ("forbids any such *materials* from being in [certain places]"); *id.* at 26 ("systematically suppressing *materials*"); *id.* ("segregating *materials*"); *id.* at 27 ("the Library has a longstanding practice of 'discriminating against . . . LGBTQ library *materials*'") (quoting Am. Compl. ¶ 97, ECF No. 5); *id.* at 28 n.12 ("The Written Policy explicitly targets *materials*"); *id.* at 29 (describing the alleged "Unwritten Policy of suppressing LGBTQ-related *materials*") (emphases added in all instances).

That's the end of the road for this claim. In the absence of government regulation of *persons*, Plaintiffs' Equal Protection claims fail. Plaintiffs admit this, too, in their Response, which concedes (in italics, no less) that a critical fact in the Supreme Court's opinion in *Skrmetti*, which rejected those plaintiffs' Equal Protection claim, was that the law challenged in that suit didn't regulate "'a class of *persons*.'" Pls. Resp. at 25 (ECF No. 27) (quoting *United States v. Skrmetti*, 145 S. Ct. 1816, 1834 n.3 (2025) (emphasis in Plaintiffs' Response). So, too, here.

Having claimed that Library policies discriminate against *materials*, Plaintiffs then make a necessary (but unconvincing) leap of logic: "Defendants' discrimination against books with transgender *characters* is also necessarily discrimination against transgender people using the

*library*." *Id.* at 25 (emphasis in original). Plaintiffs broad and bold claim—unsupported by any citation to case law—should be rejected. Plaintiffs' theory posits that the government has an obligation not just to ***not discriminate*** against a person but to take affirmative steps to ***positively portray and affirm*** that person's chosen identity. *See id.* (arguing that the Written Policy impedes transgender minor library patrons from finding books "celebrat[ing], portray[ing], or affirm[ing]" their identity or experience) (alteration in original); *id.* at 28 (stating that the Unwritten Policy "makes it significantly more difficult for LGBTQ library patrons to be able to browse and freely obtain materials that reflect their identities and experiences as compared to non-LGBTQ patrons seeking to do the same").

Plaintiffs' novel theory should be rejected. To the Library Defendants' knowledge, no court has ever adopted that theory. This Court shouldn't be the first. The alleged right to receive content with a positive portrayal of one's identity at government expense simply does not exist. Equal Protection jurisprudence forbids government discrimination. It does not create an affirmative right to positive portrayal. In essence, Plaintiffs' Equal Protection claims are First Amendment right-to-receive-content claims in Equal Protection clothing. But as discussed, *supra*, Plaintiffs' have no right to receive specific content from the government. Accordingly, Plaintiffs' Equal Protection claims fail as a matter of law.

**7. *Mahmoud*, *Skrmetti*, and *Free Speech Coalition v. Paxton* are instructive.**

Plaintiffs give short shrift to several recent, important Supreme Court decisions with direct implications here. *First*, in *Mahmoud v. Taylor*, the Court considered a Maryland school board's inclusion of "LGBTQ+ inclusive" storybooks in its elementary school curriculum "designed to 'disrupt' children's thinking about sexuality and gender." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2341–42 (2025). The Court acknowledged that it has "long recognized the rights of parents to direct 'the religious upbringing' of their children," *Mahmoud*, 145 S. Ct. at 2350 (quoting *Espinoza*

*v. Montana Dept. of Revenue*, 591 U.S. 464, 486 (2020) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–214 (1972)), and concluded that the school board's "introduction of the 'LGBTQ+-inclusive' storybooks, along with its decision to withhold opt outs, places an unconstitutional burden on the parents' rights to the free exercise of their religion." *Id.* at 2363.[7] Plaintiffs here may not like the fact that parents have a constitutional right to direct the religious upbringing of their children (including in matters about sexuality and gender), or that the Defendants through the Collection Policy seek to affirm and protect this fundamental parental right, but that does not change the fact that this parental right exists. Defendants should be credited with respecting the boundaries of the Constitution and proactively affirming the primacy of a parent's role (and right) to direct the upbringing of their children (including in matters about sexuality and gender), not forced to defend themselves in litigation over their Collection Policy.

*Second*, in *United States v. Skrmetti*, the Supreme Court analyzed a Tennessee law limiting all minors in accessing certain medical treatments for "gender dysphoria, gender identity disorder, or gender incongruence." 145 S. Ct. 1816, 1829 (2025). Like the Collection Policy at issue here, the Tennessee law involved issues of gender identity and gender transitioning. But like the Collection Policy, the Tennessee law didn't classify based on sex or any other suspect class. Instead, it classified based on age and medical use, and such classifications are only subject to rational basis review. *Id.* Likewise, the Collection Policy here classifies based only on age. All similarly situated children (and adults) who patronize the Greenville Library System are subject to the same limitations on what they can check out from the library. A person identifying as LGBTQ+

[7] Justice Thomas rightly noted that "[n]ot only are 'sexual orientation and gender identity' sensitive political topics, … but education about these subjects is uniquely likely to interfere with children's religious development," because these "subjects relate to the very architecture of many faiths." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2380 n.7 (2025) (Thomas, J., concurring) (internal quotations and citations omitted).

has access to the exact same library content as a straight or gender conforming person. Again, Plaintiffs' equal protection claim rises (and falls) based on their assertion that LGBTQ+ individuals have a tougher time locating library materials that positively portray their identities than do straight and gender conforming individuals. But again, there is no right to receive this positive-portrayal content from the government. *See Pico*, 457 U.S. at 888 ("[T]he right to receive information and ideas does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government.") (Burger, C.J., dissenting).

*Third*, in *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291 (2025) ("*FSC*"), the Court reiterated that a minor's First Amendment rights are not co-extensive with an adult's rights. *Id.* at 2303–04. Specifically, "States can impose greater limits on children's access to sexually explicit speech than they can on adults' access." *Id.* A minor's speech rights are also limited in certain environments, such as in a public school. *See, e.g.*, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988). Indeed, the "Supreme Court has recognized that a balance must be struck between the student's rights and the school's role in fostering what the Court in *Fraser* termed 'socially appropriate behavior.'" *S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 422 (3d Cir. 2003) (quoting *Fraser*, 478 U.S. at 681). And the younger the student, the less First Amendment rights they have. *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 416–17 (3d Cir. 2003) ("There can be little doubt that speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students.); *Cf. Peck v. Upshur County Bd. of Ed.*, 155 F.3d 274, 288 n.* (4th Cir. 1998) ("In elementary schools, the concerns animating the coercion principle are at their strongest because of the impressionability of young elementary-age children.").

Although *FSC* is not directly implicated here, its general premise (that a minor's First Amendment rights are not co-extensive with an adults) coupled with the reaffirmation in *Mahmoud*

that parents have a constitutional right to direct the religious upbringing of their children, is instructive. Far from violating a minor's First Amendment rights (or an adult's for that matter), the Collection Policy at issue here recognizes (a) that content appropriate for an adult might not be appropriate for a minor, and (b) determining whether certain content dealing with controversial topics of sexuality and gender is appropriate for a given child is best left in the hands of parents.

## CONCLUSION

For the foregoing reasons, and those asserted in the Library Defendants' Memorandum in Support of its Motion to Dismiss (ECF No. 20), Defendants respectfully ask the Court to grant their Motion and dismiss Plaintiffs' claims.

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ Miles E. Coleman
Miles E. Coleman (Fed. ID No. 11594)
E-Mail: miles.coleman@nelsonmullins.com
2 W. Washington Street / Suite 400
Greenville, SC 29601
(864) 373-2300

WILSON JONES CARTER & BAXLEY

Charles F. Turner, Jr. (Fed. ID No. 05849)
J. Nathan Ozmint (Fed. ID No. 14360)
John P. "Jack" Riordan (Fed. ID No. 07314)
325 Rocky Slope Rd., Suite 201
Greenville, South Carolina 29607
(864) 672-3711
cfturner@wjcblaw.com
jpriordan@wjcblaw.com
jnozmint@wjcblaw.com

*Attorneys for Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System; and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

Greenville, South Carolina
August 15, 2025

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| O.R., CHERYL ROGERS, GREG ROGERS, E.G., M.G., W.M., Plaintiffs, | CIVIL NO. 6:25-CV-02599<br>JANUARY 29, 2026 9:59 A.M.<br>MOTIONS HEARING |
| v | |
| GREENVILLE COUNTY SOUTH CAROLINA, BEVERLY JAMES, KAREN ALLEN, GREENVILLE COUNTY LIBRARY SYSTEM, Defendants. | Before:<br>HONORABLE DONALD C. COGGINS, JR.<br>UNITED STATES DISTRICT JUDGE<br>DISTRICT OF SOUTH CAROLINA |

For the Plaintiffs:

SHANA A. KNIZHNIK, ESQUIRE
JOSHUA A. BLOCK, ESQUIRE
American Civil Liberties Union Foundation Inc.
125 Broad Street, 18th Floor
New York, NY 10004

DAVID ALLEN CHANEY, JR., ESQUIRE
ACLU of South Carolina
P.O. Box 1668
Columbia, SC 29202

For the Defendants:

MILES EDWARD COLEMAN, ESQUIRE
Nelson Mullins Riley & Scarborough
2 West Washington Street, Suite 400
Greenville, SC 29601

CHARLES F. TURNER, JR.,ESQUIRE
Willson Jones Carter & Baxley, P.A.
325 Rocky Slope Road, Suite 201
Greenville, SC 29607

ANDREW F. LINDEMANN, ESQUIRE
Lindemann Law Firm, P.A.
P.O. Box 6923
Columbia, SC 29260

(Proceedings recorded by mechanical stenography, transcript produced by computer-aided software.)

REPORTED BY: Michele E. Becker, RMR, CRR, RPR
U.S. District Court Reporter
250 East North Street, Room 3404
Greenville, SC 29601.

P R O C E E D I N G S

(Court is called to order on Thursday, the 29the day of January 2026, at 9:59 a.m.)

**THE COURT:** All right. This morning we are here in the matter of O.R., et al versus Greenville County South Carolina, et al. The Case No. is 6:25-cv-2599 and we're here on the defendant's motion to dismiss. And so I will hear from the defense first.

And Mr. Coleman, are you going to be addressing this issue?

**MR. COLEMAN:** Yes, Your Honor.

**THE COURT:** I will be glad to hear from you.

**MR. COLEMAN:** Thank you. Good morning, Your Honor. May it please the Court?

I'm Miles Coleman. I represent the library system and its two employees who have been named as individual defendants. This Court should dismiss this case for any one of three reasons: First, the plaintiffs claims rest on an alleged right that doesn't exist. As a result the Court doesn't have subject matter jurisdiction and it's impossible for the plaintiffs to have standing; second, even if they had cognizable claims, they don't have standing because they

haven't been injured; and third, even if they had standing they haven't asserted viable First Amendment or equal protection claims.

I'll start naturally enough with the first of those three points. Plaintiffs claims fail as a threshold jurisdictional matter because they don't allege the violation that many cognizable legally protected right. Courts from the Supreme Court all the way down to the District of South Carolina have recognized when a claim is premised on a right that doesn't exist, the Court should dismiss it. Some courts have treated that as a lack of subject matter jurisdiction. Others have treated it under the injury prong of the standing analysis. In *Lujan*, in *Warth v. Seldin*, the Court recognized as many courts have that the injury that must be alleged to establish Article III standing is the invasion of a legally protected right. When there isn't a legally protected right, there can be no injury. Others court have treated it as a matter of subject matter jurisdiction. The problem here for the plaintiffs is that all of their claims, all four of them, rest on an alleged right that doesn't exist. In fact, their claims are doubly barred under that analysis. First, because they're all premised on the supposed right to receive information from the government, and second, because there's no free speech right to challenge the government's own speech. On the first, the so-called right to receive information from

the government, it doesn't exist.

**THE COURT:** Well, let me ask this question: Is there a difference between an alleged right to information that seeks to allow plaintiffs to have some degree of control over the decisions of the library board regarding their collection in terms of what books to procure, what books to take out of the collection, and where to shelve those books? Is there a difference -- for example, obviously if I'm a library card holder, and let's say I'm a John Grisham fan. I don't have a right, a constitutional right to require the library to stock and shelve every John Grisham novel. But does the library have the right to make collection decisions solely on the basis of the characterization of a topic or characters within books that may very well run contrary to equal protections for that class of persons in other areas of the law?

For example, if the predominant political and religious feeling of the day was to the effect that interracial relationships were harmful and that exposing impressionable young minds to interracial relationships would be harmful and therefore those books should not be allowed in the juvenile, or preteen, teen, whatever categories, in those areas of the library. Any books that relate to the issue of interracial marriage, interracial relationships, or put those relationships in a favorable light, or even include a biracial

character. Would the public be -- or the library card holders be without any remedy to challenge that despite the fact that that would be a characterization and a decision clearly at odds with established law?

**MR. COLEMAN:** Your Honor, we could certainly hypothesize scenarios including the one that you've mentioned that would at least be a closer case or a more difficult case than this one.

**THE COURT:** Well, the problem I have, Mr. Coleman, is that the argument you make in your briefing is that this is not even a close question. That basically the library has practical immunity because they don't have any duty to supply any kind of information. That they can make these decisions essentially with immunity because there is no standing, there is no right, there is no remedy for the members of the public who hold library cards. And I believe -- while I understand the cases that you cite in support of those propositions, I'm not so sure you're not overstating what those cases hold. So, if we have a situation where there are other legal protections with regard to discrimination and retaliation for members of the LGBTQ community, in other words, discrimination based on sexual orientation or gender identification, how is that not the same as racial identification?

**MR. COLEMAN:** A few points in response, Your Honor. First, with respect to whether we've overstated some of the

cases. If the Supreme Court decision in *Pico* stands for anything, which is a difficult question in itself --

**THE COURT:** Well, *Pico* is kind of like Forrest Gump's box of chocolates. It just depends on which opinion you reach into as to what you get.

**MR. COLEMAN:** But if there's any one thing, perhaps the only one thing that gathered five votes, it was that there is no right to receive information from the government. If there was anything that the majority in *Pico* agreed upon it's that. If you look at *Little v. Llano County*, Footnote 15, it compiles the five different opinions that reach that opinion, that conclusion. So if anything, that's a Supreme Court case that says the thing that I'm saying.

To move back to your question though, certainly we could think of some scenarios in which a hypothetical library could take hypothetical actions that would infringe on equal protection. They could, for example, say any minors identifying as members of the LGBTQ community may not read certain books. Might have an equal protection problem there. It's like *Skrmetti*, the Tennessee medical transition case. If the Tennessee legislature had said you can't use these particular procedures or treatments on children identifying as members of the LGBTQ community, a different outcome? Maybe. But that's not what Tennessee did. That's not what the library did here. They treated every person, every similarly

situated person the same way. So I don't think that's an equal protection violation.

In terms of your hypothetical of, if the content or the viewpoints being regulated or discussed had to do with racial themes, for example, interracial marriage, maybe that would be a more difficult call. I don't know. But what would at least make it more difficult in this case, is in this case we've got *Mahmoud* just this past term, which the Supreme Court expressly recognized and reaffirmed the parental right over this exact type of thing, books talking about these matters that are matters on which people of good faith and good will can disagree.

**THE COURT:** But parents retain the right to supervise their children in what books they can read and what books they can check out without the library board acting as mommy and daddy and putting those books in a separate section that previously was reserved for parental education books.

I mean, don't you agree that if a parent takes their child to the library to look at books and check out books, and when we're talking about children under 12 the, you know, the children's section -- teenagers may be a little different -- but children's section. If there's a parent there with them, aren't most parents -- well, let me ask it this way: In the Greenville County Library system parents have the right to accompany their children into the children's section and they

have the right to exercise supervision over what books their children look at and check out, do they not?

**MR. COLEMAN:** They can, but they don't always do.

**THE COURT:** But isn't that the parent's choice? Is it the Greenville County Library board's job to be the parent?

**MR. COLEMAN:** I think the question though is not whether the parent can accompany them because that would be one way.

**THE COURT:** No. I'm saying if the rationale for moving the books to a -- I forget. I think it's parental education, maybe PEC, something like that.

**MR. COLEMAN:** Parenting and early childhood.

**THE COURT:** Early childhood. If the rationale behind making that move is that children should not be able to look at these books and obtain these books without parental guidance because from the Supreme Court on down we believe that parents have the right to have say-so over what their children see, read, whatever, even if those books are in the children's section and whether it's these books or any others, there may be other books that have more of an adult theme that are completely unrelated to gender identity or sexual orientation, parents still have that right. And under the rules and regulations of the library system can exercise that right by accompanying their children and giving hands-on supervision as to what they see, what they read, what they

check out. If they choose not to because, you know, either they're negligent or that's their parenting style, again, that's the parent's decision. And if we're leaving it to the parents, don't we need to leave it to the parents?

**MR. COLEMAN:** Respectfully, Your Honor, and here's why.

**THE COURT:** Okay.

**MR. COLEMAN:** To secure that right, which exactly we all agree is a legitimate, indeed, a fundamental right --

**THE COURT:** I don't think you're going to get any argument about that.

**MR. COLEMAN:** Let me use an example from my own life. I hope I'm not a negligent parent or absentee one. But my wife and I both work. So right now my young children are at home with our babysitter, our nanny. She often takes them to the library where they can check books out by themselves without me being there. Indeed, the nanny might not even know or look at what books they're checking out. She might be attending to the four-year-old or while the six-year-old checks out a book.

**THE COURT:** If you and your wife feel strongly about it you can instruct the nanny because she works for you and you can let her know what subject matter you think is appropriate and what subject matter you don't think is appropriate, isn't that right?

**MR. COLEMAN:** We could, Your Honor. But here's my point. We can easily think of a dozen scenarios in which a child with a library card could go to the library without his parents, indeed without his parents' knowledge and without a policy such as this, access books that his parents might not wish him to read without their input and guidance. And that's what the library is trying to protect is against that scenario.

**THE COURT:** Except in this case you have parents who say they want these children to have access to these books so you don't have a parental consensus.

**MR. COLEMAN:** Right. And that, again, goes to understanding that these children have access to the books they want.

**THE COURT:** That's a question I'm going to be asking the other side about.

**MR. COLEMAN:** If the parent is willing to invoke the Article III jurisdiction of the Court or attempt to, surely they're willing to allow their kid to check out the book. And the fact that one set of -- the plaintiffs here, that one set of families wants access to the book and has access to the books doesn't mean, however, that there aren't scenarios in which, again, a child could go to the library without his parents' knowledge or consent or supervision and access books that would be, in *Mahmoud's* terms, intended to disrupt the

child and the family's beliefs and thinking about matters such as gender, marriage, and sexuality. That's what the library is trying to protect against.

One of the other things I'll mention, Your Honor -- there's more than just this one thing. For the moment, one thing I'll mention in addition to that point. On these two threshold arguments of whether there even is a right to receive information from the government and whether the curation of library collections is government speech. Both of those issues are currently before the Fourth Circuit. In August or September Judge Lydon dismissed a lawsuit brought by the NAACP that's not exactly the same as this but it's adjacent. The arguments there were similar to the two I'm making here. And just two weeks ago we filed our brief with the Fourth Circuit raising those two matters as threshold jurisdictional matter. The Court could decide them or it could not. There's other bases on which it could affirm. I mention that just for contextual awareness that the Fourth Circuit hasn't yet ruled on those questions. The Fifth, the Eighth in *Walls versus Sanders* have. And in *Pico* five justices have agreed with that position. Nevertheless, it's possible that in the next few months the Fourth Circuit could rule on them.

Let me transition briefly to the government speech argument. Of course we briefed it. I know Your Honor and

your clerk have read the briefs. I don't intend to rehash everything in them. But again, in both *Little*, which is the closest analogue to this case, the Fifth Circuit *en banc*. In that case not a majority of the *en banc* court but a plurality of it found this government speech test satisfied. In other context the Fourth Circuit, District of South Carolina, have recognized that when the government is speaking there isn't a free speech right to police the government's speech. There again here, of course, is a selection, curation, removal, placement of books on this shelf or that shelf is government's speech. We briefed it. I won't rehash it endlessly here.

Moving from that first point which was that there's no cognizable claim, it's not just that they don't have standing, that nobody could have standing. It's impossible to have standing to assert a right that doesn't exist. Let's assume, pivot to argument two. Let's assume that there is a cognizable claim. Again, we think there's not. The Fourth Circuit may soon instruct us on that. But even if there is, they don't have standing. We've touched on this already briefly. Of the four pseudonymous minor plaintiffs, two of them haven't even alleged any specific book that they wanted to access and couldn't. They haven't alleged any particular action or claim or decision by the library that prevented them. Essentially they're seeking advisory opinion. They don't like the curation collection -- excuse me, the

collection policy. They would like this Court to agree with them despite the fact that they haven't alleged concrete particularized and imminent injury. The two adults listed as plaintiffs, Cheryl and Greg Rogers, have even less of a claim. They can check out any book they want in the library. So they've alleged no injury whatsoever. The two minor plaintiffs who have at least tried to allege an injury, that would be M.G. and W.M., they've identified in the case of M.G. one book that she can't check out because it's a few feet over, not in the children's section but in the PEC section. And she only has the young person's version of the library card.

A few problems with the standing argument there for the plaintiffs. One, similarly to *Little*, she can still walk across, pull the book off the shelf, sit down and read it. So she does still have access to that information assuming that's a right at all. She just can't take it home to read it, but she could read it there. Secondly, she has even alleged --

**THE COURT:** There's no standing if access is restricted as long as there is some access.

**MR. COLEMAN:** Yes, part one. And part two, in support of that argument is that she does, in fact, have, based on the allegations of the complaint, I guess we just don't know. We have to presume that she has access being that there's no allegation that she's asked her sister who has an

adult card to check it out, or asked her mom who brought this lawsuit to check it out. There's no allegation that she's asked her mom if she could have an adult library card just like her sister who's one year older than her. There's no allegation that her mom refused. So not only does the kid have access to go pull the book off the shelf and read it in the library. All she's got to do is ask her mom who, again, presumably would grant that. Now, of course the counterargument for my friends on the other side will be, even asking mom to check the book out is some sort of *di minimis* injury that's enough to satisfy standard.

**THE COURT:** Well, apparently it would be because let's assume her mom works like you and your wife work and they're not available to be there to check it out for her.

**MR. COLEMAN:** But mom could let her get an adult unrestricted library card just like her sister who's only a year older.

**THE COURT:** So if a parent comes in and makes the application, the library will issue an adult card to a child --

**MR. COLEMAN:** Yes.

**THE COURT:** -- so that they have access to check out in the adult section?

**MR. COLEMAN:** Correct.

**THE COURT:** All right.

**MR. COLEMAN:** The other point I'll make on that is, even in the post-*Dobbs* abortion world, the pre-*Dobbs* cases don't necessarily apply in the abortion context. But here's the principle we can draw it on. The U.S. Supreme Court in *Bellotti*, plurality held that even a minor's then constitutionally protected right to an abortion could constitutionally be conditioned on parental consent. If that's true in that context, I think it's true in this context. The condition again -- even assuming there's a constitutional right to get to the book, it's constitutional to condition that on the parents' consent.

**THE COURT:** You and I both realize that's a little bit of a generalization of the parental consent laws, but I understand your point.

**MR. COLEMAN:** At a top level contour as a principle, it is not inherently --

**THE COURT:** Yeah. That is accurate at a 30,000-foot level.

**MR. COLEMAN:** It's not inherently unconstitutional to condition a minor's constitutional right on parental consent.

The other minor plaintiff, W.M., same story. He's identified some books he wishes to check out but hasn't alleged he's asked a parent, asked for unrestricted adult library card, et cetera. So at the end of the day on

plaintiffs, none of them have alleged a cognizable injury under *Lujan*. So even if there was a right, which is not conceded by any means which would be contrary to *Pico*, they don't have standing. Even if they had standing -- well, before I move on to the viability of the claim. We were there talking mostly about the First Amendment claims, the right to receive -- the alleged right to receive information. The two other claims they assert, one is based on alleged widespread customs and practices? There's discussion in the complaint about years ago a drag queen story hour getting canceled. There's a bunch of allegations. That didn't affect these plaintiffs. There's no factual allegations that these plaintiffs were affected by any of that. They've not got standing to seek an advisory opinion from the Court for those practices.

**THE COURT:** Depending where we go with this, if you think you need to file a motion to strike, we'll see where we are on that. But I understand that's maybe historical context of some form, but it doesn't really apply to this.

**MR. COLEMAN:** And then on the equal protection claim, and I'll concede that the standing argument there looks pretty similar to the merits argument on equal protection. In part they sort of collapse into one another because the claim that's being asserted is identical with the injury being alleged. And so they fail for the same reason and it's that

the 14 Amendment Equal Protection Clause doesn't protect books. It doesn't protect fictional characters. It protects people. Brings us back to *Skrmetti*. If the law discriminates, if it treats similarly situated people differently from one another, then maybe we can talk about the equal protection clause. But when it treats books differently from one another but every person similarly situated has the same right of access to them, every minor with an unrestricted card has access to the exact same set of books, every minor with an adult card has access to the same exact same set of books, the students -- excuse me, the minor patrons aren't being treated differently from one another. And just like in *Skrmetti*, no equal protection violation.

To the extent that the allegations in the complaint are that by moving those books from these shelves to those shelves it's stigmatizing or in some ways makes these patrons feel unwanted --

**THE COURT:** Something like separate but equal?

**MR. COLEMAN:** Respectfully, Your Honor, no, because under "separate but equal" different people were treated differently. On one scale --

**THE COURT:** Well, in this case isn't part of the plaintiffs' argument that the young readers who would be interested in these books are part of an identifiable group that is portrayed in these books or that, you know, is part of

the subject matter of these books, and so therefore since there is a particular part of the population who identifies with these characters, identifies with these books, that by moving these books you are treating that part of the minor population differently. I understand that on the surface level its books are being moved, children aren't. That everybody with a library card is being treated the same way. But as I understand the plaintiff's argument, it is because the subject matter of these books would be of interest to children who identify in a particular manner, in a way that is recognized as we said earlier in some civil rights laws as an identifiable group. And they have particular interest in these books by moving these books. You are treating them differently in saying you can't read books about you and people like you in your section. You have to go over here to this other section and you have to jump through these hoops to get to those books. Now, I'm not making any comments on whether that's a winning argument. But what I'm saying is, as I read the complaint, that's the allegation about how the children are being treated differently.

**MR. COLEMAN:** I agree that that is an accurate and thorough summary of their perspective of the case. But it's wrong for three reasons. Number one, members of the LGBTQ community are not a protected class in the Fourth Circuit or elsewhere. The Fourth Circuit case holding thusly, *Kadel* has

been summarily vacated and remanded by the Supreme Court after *Skrmetti*. Point number two, *Skrmetti* -- what you've just described as their argument is *Skrmetti*. Were there children in Tennessee who due to their identification as LGBTQ minors were particularly interested in accessing those treatments? Absolutely there were. It's undisputed. But even so, that wasn't enough to give rise to an equal protection claim because all of the minors, the ones who were interested and ones who weren't were treated equally. That's this case exactly. Different thing they're trying to get to.

I had a third point but now I've forgotten it.

**THE COURT:** It happens.

**MR. COLEMAN:** It does happen. I think maybe this was the third point. Maybe just the next one I was going to go into. It would work as the third point.

Again, if under that stigmatic injury though, even under the Fourth Circuit *Bostic v. Schaefer*, 2014 opinion, LGBTQ plaintiffs asserting equal protection claim, they can only establish a stigmatic injury if they've identified, quote, a concrete interest with respect to which he or she is personally treated differently. That's not true here. They haven't personally been treated differently. And perhaps this is my third point, we'll make it my fourth: I'm not aware of any cases espousing this theory of the equal protection doctrine that when the state regulates items or materials but

treats the people evenhandedly, that can give rise to an equal protection claim. We'll put a bow on all of that understanding. Let me move to the merits. I appreciate Your Honor's patience. I'll try not to belabor the point we've already made in our briefing.

First we've already talked about a little bit, plaintiffs rely on *Pico* to support their First Amendment claims. *Pico* is a complicated case. Seven opinions. Lots of courts have concluded that it's not of precedential value. But, nevertheless, some courts, including the Fourth Circuit in some context, have looked to it for principles or ideas that might be useful to guide their thinking. Even if we assume that to be true, *Pico* doesn't help them. It helps us. Why? Because the one thing that garnered five separate votes were that there's no right to receive information from the government. And that's the distinction between many perhaps all of the right-to-receive cases that they cite. Is there a right for one private person to receive information from another private person without the government getting in the way of it in just sort of out in normal life, in public fora? Sure. Is there a right under the First Amendment to compel the government to provide me with information that I want? There's not. Their reliance on forum analysis fails as well. Obviously, Your Honor is familiar with traditional fora, limited public fora, designated like limited. Their argument

here is that the library is a nonpublic fora. Perhaps the lessor known cousin of the traditional and limited public fora. That is doesn't work for two reasons. Nonpublic fora involved government property that's being used for government operational purposes. For example, this courthouse, perhaps at least parts of it, is considered a nonpublic fora where members of the public don't have right -- free speech rights to come in here and talk, but for operational purposes perhaps employees have some limited free speech rights. That gets complicated. *Garsetti V Sovalo, Pickering*, et cetera. That's not what's going on here. We're not talking about library employees who are on the government property having that sort of nonpublic fora.

The second reason it doesn't work is even better than the first. Is that numerous courts, including the U.S. Supreme Court, stated that forum analysis doesn't apply to public libraries. That's in the *American Library Association*, a lay opinion. It's in *Little* from the Fifth Circuit. It's in *Arkansas versus Educational Television Commission* which recognizes that there's a fourth category that is not a forum at all. Now, in a public library are there particular rooms or meeting rooms, for example, that in some cases could be limited public fora? Sure. And there's plenty of cases that talk about that. There's equal access rights perhaps to use those rooms free from viewpoint discrimination. But the

shelves of the library, the collection itself? No.

Moving from the First Amendment to the equal protection. We've touched on this a little bit because the merits and the -- kind of collapse into one another. First, this claim is just a repackaged version of their First Amendment claim. Sort of a back-stop argument that also relies on the right to access information. Again, there's no viable right -- under the First Amendment there's not a viable right there under the equal protection clause. We breached that in our motion pages 28 to 29. We've already talked about how each minor plaintiff is treated similarly. To the extent that *Grimm v. Gloucester Count*y is of interest, it's easily distinguishable on the facts. An individual, a transgendered student was treated differently than other students. And with respect to the Fourth Circuit, *Grimm* is on its last breath. *BPJ* and *Hecox* recently argued by opposing counsel at the U.S. Supreme Court, seems likely to undermine if not completely do away with *Grimm's* reasoning. The better analogy of course is *Skrmetti*, which we've already discovered this morning.

Your Honor, I don't want to take up more time saying things we've already said in the briefing which I know you have read. If you have further questions, I'd be happy to answer them, or I can respond to any questions after my friends on the other side.

**THE COURT:** I was going to say, let me hear from the

plaintiffs. I'll give you an opportunity for reply. I may have some questions at that time.

**MR. COLEMAN:** Thank you, Your Honor.

**THE COURT:** Thank you. I know I'm going to mess this up. Is it Ms. Knizhnik?

**MS. KNIZHNIK:** Knizhnik, Your Honor.

**THE COURT:** Ms. Knizhnik, be happy to hear from you.

**MS. KNIZHNIK:** Thank you. Good morning, Your Honor. May it please the Court?

Shana Knizhnik for the plaintiffs. Your Honor, the leadership of the Greenville County Library System has engaged in a systematic campaign to suppress materials with LGBTQ themes from its shelves resulting in dozens of LGBTQ themed books being secretly removed from the library's collection based on library officials' anti-LGBTQ discriminatory intent. Then in 2024, the library board of trustees passed two explicit policies based on the same stated moral disapproval of transgender people. These written policies require that even a mention of a transgender person or character means that such a book cannot be in the juvenile or young adult sections of the library. Federal courts faced with similar cases of anti-LGBTQ book removals or restrictions have for almost 40 years consistently found that they have violated the Constitution. Defendants ask this Court to abandon the long-standing consensus and adopt a radical new theory, that

there are no constitutional limits whatsoever when government officials seek to suppress materials in public libraries, even when as in this case they target entire classes of books based on moral disapproval of a class of people represented in them unrelated to any regular curation process by library professionals. Defendants arguments in this case would fundamentally change the nature of public libraries from places of intellectual freedom and exploration to vessels for the government to convey its own political or social orthodoxy. The First and Fourteen Amendments prohibit the kind of blatant suppression of ideas and discrimination demonstrated in plaintiffs well pleaded complaint, which this Court must access as true, drawing all reasonable inferences in favor of and construed in the light most favorable to plaintiffs. As a result this Court must deny defendants motion to dismiss for failure to state a claim.

Now, moving to standing. Plaintiffs have alleged sufficient facts to establish standing in order to survive a motion to dismiss. To satisfy standing we just have to plausibly allege an injury-in-fact that is concrete and particularized, and we have more than done that here.

**THE COURT:** What is the injury?

**MS. KNIZHNIK:** So plaintiff O.R. has to go searching for and cannot check out books about transgender people, young people like him. We have alleged that plaintiff M.G. in fact

tried to check out a specific --

**THE COURT:** How does O.R. have to go searching beyond simply asking a librarian, looking it up in the system? If O.R. was looking for a particular subject matter in the children's section or young adult section, they would still have to look for the book. Here they have to look for the book and they'll just find it in a different section of the library; isn't that correct?

**MS. KNIZHNIK:** That's correct, Your Honor.

**THE COURT:** Is there any constitutional requirement that a library have books in a particular area?

**MS. KNIZHNIK:** There is no affirmative constitutional right to have --

**THE COURT:** Doesn't the library retain the authority to make decisions about their collection in terms of what to add to it, what to remove from it, and where to shelve it?

**MS. KNIZHNIK:** Of course decisions made for innocuous reasons about what books to include or not include or where to shelve those books, we are not asserting any affirmative, certainly a constitutional right to demand that public libraries include every book and place it where any individual plaintiff asks for --

**THE COURT:** Sure. I apologize for talking over you.

**MS. KNIZHNIK:** No worries.

**THE COURT:** Here's my concern. As I read the

complaint there is no specific allegation about any book -- and if I missed it, correct me -- any book that has been removed, that one of these plaintiffs tried to access and couldn't access. So, the part of your argument about removal may be historical context, but it really is not germane to the claims that you're making here. The claims you're making here relate to these books being moved from one section of the library to the other, or at least that's the predominant claim. And my question is, if lack of access is the injury and the books are still accessible, where's the injury?

**MS. KNIZHNIK:** Well, burden on access is still an injury under the First Amendment, Your Honor, and that's demonstrated in the *Counts* case, the *Virden* case that we have submitted. *Counts* was a case about parental permission. The plaintiffs in that case had the *Harry Potter* books at home and had parental permission to access them.

**THE COURT:** I don't think much of their argument about, "you can access it other ways." I mean, if they're going to make it available, then I think they have a duty to make access available to everybody. And that, again, that's an oversimplification without getting into the various case holdings. But in this case their argument is that while they have made a policy decision regarding where the books should be shelved, the books remain accessible to any reader, any library card holder, even those who don't hold an adult card

because it is a fairly easy process for them to get access through a parent, through an older sibling, or as Mr. Coleman indicated if they simply have their parent authorize them to have an adult card because the parent believes that they're, you know, mature enough to have that. So, if there are all these ways to access the books even if they're physically differently located, again, I come back to, what's the injury? I understand your burden argument, but I'm not sure that because you have to walk across the library or up to the next floor or to a different section, that that's even *di minimis* much less a substantial burden.

**MS. KNIZHNIK:** Two points, Your Honor. We submit that it is, in fact, a burden. The library board members purposely tried to make it more difficult to access these books, that it was their intention. And that's exactly what they did. And the Supreme Court just last term stated that the loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury. That was in the context of a preliminary injunction. But here we have the library board purposefully requiring that individuals who want to check out these books jump through hoops to do so, and that is a First Amendment injury. But second, I want to --

**THE COURT:** Let's go back to the defendant's first argument, and I guess the more basic issue here. I want to

hear your description of the legally recognized constitutional right that plaintiffs claim has been infringed by the defendant.

**MS. KNIZHNIK:** Well, yes, Your Honor. First of all, I do want to address the overarching, the unwritten policy of removals as well. But to answer your question right now, courts have held for over 30 years that public officials violate the First Amendment when they remove or otherwise restrict access to LGBTQ themed library books based solely on disapproval of LGBTQ people and themes. Now, attempting to reframe the Greenville County Library System's actions in this case as standard curation decisions made by library professionals for legitimate reasons, could not be further from the actual allegations that represent the facts in this case. What they have done, what the officials have done is not about evaluating individual books on their merits based on neutral standards, which of course they may do. But rather they have imposed a blanket policy restricting access to an entire class of books triggered from even a single mention of a transgender person existing based on moral disapproval of transgender people. And again, plaintiffs are not asserting a generalized right to demand that the government provide any book that they desire. Indeed, the government could theoretically choose to not fund libraries at all. But when the government chooses to create institutions, programs, or

subsidies that facilitate or curate private speech, they must act consistent with the purpose of those institutions. They cannot suppress viewpoints that they dislike. That is the very principle invoked by *Pico*, and it's the same rule that generally applies when the government chooses to facilitate access to private speech.

Now the Supreme Court made that clear in *Finley* where despite the inherently discretionary nature of an arts funding program like the National Endowment of the Arts, that discretion, though it exists, must be exercised in a viewpoint neutral manner. And *Pico* is essentially applying the same principles to libraries, although public libraries have significant discretion in making collection decisions and they may consider the content of the books when they make those decisions. The application of that discretion must still be consistent with the history and institutional purposes of public libraries which are designed to provide access to a wide array of materials representing diverse viewpoints. They're not designed or nor have they historically been repositories of government-approved messages.

The government asks this Court not to follow the reasoning of both the plurality and the dissent in *Pico*, but to follow instead the Fifth Circuit's recent decision in *Little v. Llano County*. I want to take issue with what my friend on the other side said as to what a majority of the

*Pico* court agreed upon, because what I read *Pico* to read when I agree that there's a little bit of everything for what you -- for anyone in that decision in all the opinions, but what the plurality and the dissent agreed upon in that case was that certain examples of suppression of books in libraries would obviously be unconstitutional. This is the cheerful concession in Justice Rehnquist's dissent that obviously would violate the Constitution if in that context a school library were to, based on racial animus, determine that all books by or about black people had to be removed from the library, or an all democratic school board decided that all books by or about Republicans had to be removed from the school board. Both the plurality and Rehnquist dissent agreed obviously that those would violate the Constitution, and that's unfortunately quite like what we have in this case. *Little* did not even -- the *Little* plurality or majority decision did not actually grapple with those egregious examples at all. And we submit that *Little's* holding and the government's argument would allow those very egregious examples to go unchallenged.

As Your Honor said, there is no limiting principle to the notion that what the government chooses to place in its libraries or any restrictions on entire classes of books is beyond the reach of the Constitution. But moreover, *Little* was not only wrong on the law, it's also distinguishable on the facts. It was about the removal of 17 specific books for

reasons that were disputed. Here the Greenville County Library board enacted a written policy that categorically removes an entire class of books even mentioning transgender people or gender transition, and they announced in so doing that it was based on moral disapproval. Little is an outlier case. Almost all courts have come out in the other direction. And that again is not surprising given the fact they did not grapple with those egregious examples and it contains no limiting principle. *Little* confused permissible content based distinctions with impermissible imposition of governmental orthodoxy.

And that brings me to the government's speech argument that defendants maintain. No court, not even the little majority, has ever accepted the argument that library collections are government speech. And that's not surprising given the nature of library collections. Since as the Eighth Circuit noted in the LGBTQ, an *Iowa Schools* case, quoting Justice Alito in the *Matal* case, that would be the government babbling prodigiously and incoherently. Obviously library collections contain conflicting views. That's the entire point of a public library, to provide access to diverse and conflicting viewpoints. And the Greenville Library itself disavows the notion that its collection represents its own speech. It makes clear in its collection policy that the inclusion of an item in the collection does not represent an

endorsement of its contents. And if we look at the *Shurtleff* factors, they all weigh against the notion that government -- that library collections constitute government speech. And I know that my friend on the other side submits that it is the curation -- the collection itself. It's one step removed from the content of the books. The books themselves are not the speech at issue, but that simply is not the case. You have to look at the speech at issue. And here we're talking about books. A library is not a museum or a collection of monuments. It's not an instrument of political communication and it's not designed to convey some thought or instill some feeling the way that the Supreme Court described statues in a public park owned by the government in the *Summum* case. Libraries are about choosing materials of appropriate quality. That's from the *ALA* case, that are by design diverse and contradictory.

And I want to also address the forum analysis question. We are not submitting per se that libraries are a limited -- nonpublic forum. However, the forum cases are instructive to this Court to understand how it should be evaluating the kind of institutions like public libraries where the government is facilitating access to private speech. The ALA decision, although it says that forum analysis is not appropriate in the context of libraries, it actually goes on to apply and say that the cases that do apply forum analysis

in the nonpublic forum context, like *Finley* in the context of arts funding, like Forbes in the context of public broadcasting, that those were applicable in the library context as well. And you have to look at the government interest at stake, the government's role with respect to the institution or the program or the subsidy. And when it comes to libraries, again, the government's role is determining appropriate quality base on neutral curation standards. Not to create a repository of government propaganda, which is what the government's position would allow public libraries to be. The government could choose to create a different institution that whose purpose is that. But that's not what Greenville has done.

**THE COURT:** Let me ask this: Within the library's prerogative to curate their collection and determine placement, do you take the position that the library does not have the discretion to make decisions about what is age appropriate for a particular section of the library? In other words, the books are not -- and, you know, if there are specific incidents of books being removed that one of these plaintiffs wanted to have access to and was denied access and the book was removed, we can get into removal. But again, going back to this policy of moving these books from one section to another, isn't it fundamentally a decision of the library as to whether or not a book is age appropriate for a

children or youth section, or whether even though it may involve youthful characters, the subject matter is more appropriate in an adult section? And that would not necessarily just be involved with gender identity issues. That could be all sorts of adult situations whether sexual relationships or whatever that might not be appropriate for young readers. I mean, isn't that a fundamental part of what the library does?

**MS. KNIZHNIK:** Yes, Your Honor. Of course, again, plaintiffs do not contest the fact that libraries have the ability to make individualized determinations on specific books. But the point is that it matters. First of all, the motivations behind those decisions or choices that are being made, and it also matters the process and the procedures that are being used. Again, we're not talking about regular curation decisions that are made in the regular course of a library's work which is looking at a specific book, looking at the themes in that book, determining whether or not that that book is age appropriate. And of course there are certain categories of speech like obscenity, vulgarity, that there's no question that the government has a compelling even interest perhaps in, depending on the circumstances, in preventing children from viewing. But that's not what we're talking about here. We're talking about a governmental body, the library board of trustees, that has stated that per se even

the inclusion of the notion of the existence of a transgender character makes all books that contain such characters per se inappropriate, per se beyond even the parental consent of the -- they have to make the decision for the parents. As Your Honor mentioned, if we're going to leave it to the parents, we should leave it to the parents. And we mentioned a book about a crayon that is not -- that does not even mention gender identity whatsoever. It's about a red crayon -- or a blue crayon that has a red label on it. There is no mention of gender there. That is an age appropriate book by anyone's definition. But because some could see it as a metaphor, I don't even think that that was the author's intention in terms of gender identity, that that book was deemed inappropriate based on this blanket policy, based on the moral disapproval of a class of people that are a protected class in the Fourth Circuit.

**THE COURT:** And this may be a good transitional point to your equal protection argument.

**MS. KNIZHNIK:** Yes, Your Honor. We submit that the policies do constitute both disparate treatment and disparate impact with discriminatory intent. The disparate treatment here is then banishment of transgender youth patrons to a separate section of the library which only half of the library locations even have in order to find stories for their age group that represent their experiences. No one would doubt,

as Your Honor yourself mentioned, that a policy banning all books with black characters to a separate section perhaps in the back of the library would be differential treatment to black library patrons even though such open policy would also apply to nonblack patrons. That's exactly the kind of differential treatment that exists here. Again, it's not about an affirmative right to positive portrayal as defendants claim, but rather a right to not have a government suppress all materials with positive portrayals of that group. And even if the Court believes that the policies themselves are facially neutral, we have pled sufficient facts to show that the policies disparately impact a protected group and were motivated by an invidiously discriminatory intent. Again, the written policy was expressly based on moral disapproval of trans people. And, again, the open declarations that were given by the library board who passed the written policies are not by themselves in the complaint.

The discriminatory intent is also clear under the *Arlington Heights* factors. That's where the history of the anti-LBGTQ action is taken by the library in the years leading up to these written policies being passed while they were also secretly removing dozens of books that were removing entirely both adult and juvenile books with positive portrayals of the LGBTQ community. That history of anti-LGBTQ actions is in fact relevant under those *Arlington Heights* factors. That I

believe is number 3 of the *Arlington Heights* factors, the specific sequence of events that led to the challenged action as well as the relevant, legislative, or administrative history.

Here the policies trigger heightened scrutiny for two reasons. They do discriminate based on transgender status and based on sex. And despite my friend on the other side's claim that *Grimm* is on thin ice, transgender status is a quasi suspect class in the Fourth Circuit under *Grimm* and recently affirmed just this past August in the *Doe v South Carolina* case. And even if this Court believes that the continued validity of those precedence is doubtful, Judge Agee's concurrence in the *Doe* case makes even clear that even if you think *Grimm* was wrongly decided, the Fourth Circuit is bound by it.

Now, these policies also discriminate based on sex because they rely explicitly on sex stereotypes about the ways that boys and girls, men and women, ought to live, including that they should only be romantically interested in the people of opposite sex, or that they should live outwardly in ways even including pronouns and dress that are not consistent -- that are not inconsistent with their sex assigned at birth. And because heightened scrutiny applies, defendants must show that the classification serves important government objectives and that a discriminatory means employed or substantially

related to the achievement of those objectives.

But the government offers no important government objectives and barely articulates any interest at al. The only interest that the defendants name is to recognize and promote the primacy of parents and legal guardians to direct the upbringing and education of their children. But as Your Honor pointed out, the government is not promoting the primacy of parents. It is establishing a heckler's veto, imposing its own view and the view of some parents on others like plaintiffs who do not wish for their children to have to jump through hoops to access nonobscene otherwise age appropriate library materials. Parents who object to the inclusion of LGBTQ affirming books have the ability to monitor their children's library use. They may opt out per *Mahmoud's* holding of whatever messages that conflict with their values. But the government may not avoid the strictures of the equal protection clause by deferring to the wishes or objections of some fraction of the body politic. That's from *Clayburn*. And private biases may be outside the reach of the law, but the law cannot directly or indirectly give them effect. That's from the same case quoting the *Palmyra* decision.

But, Your Honor, even if the heightened scrutiny that we submit does apply, if Your Honor believes it does not, we should prevail under any standard of review. And certainly at the motion to dismiss stage because there are more than

plausible allegations here that the challenged policies are inexplicable by anything but animus towards transgender and other LGBTQ individuals and a bear desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.

Now, my friends on the other side talked a lot about the *Skrmetti* decision. But notably the *Skrmetti* decision -- the law at issue in *Skrmetti* did not regulate any other behavior in which minors might engage or for the purpose of expressing their gender identity such as names, pronouns, hair styles, or attire, and all the justices agreed that a law requiring children to wear sex consistent clothing would be a facial sex-classification. Here we're talking about a policy that regulates content that explicitly includes even pronouns, even dress when it is affirming for the notion of gender transition.

Moreover, also the law, the *Skrmetti* decision noted that the plaintiffs in that case did not make the argument that the law was based in animus. There was not a significant record made. And, again, that argument was not made in that case. Here we are arguing that this case is based in animus. That there is a plentiful record even at the pleading stage of anti-LGBTQ discriminatory intent and moral disapproval motivating these decisions.

It's worth going back to the egregious examples that

*Pico* described. That is what almost all of the justices in that case agree would obviously violate the Constitution, like an all white school board motivated by racial animus removing all books by or about black people. In the way that that policy would be clearly racially discriminatory, so would a library policy requiring all depictions of women working outside of the home to be removed or moved in a separate -- placed in a separate section. That kind of policy would be sex discrimination. And so is this case. And for all these reasons, Judge, plaintiffs have more than met the plausibility standard to defeat defendants motion to dismiss, and we ask the Court to deny the motion in its entirety.

**THE COURT:** Let me ask this question, and I did not get into this with Mr. Coleman. I'm sure we'll talk about it when he steps back up.

With respect to the individual defendants, the defense has raised qualified immunity. Given the fact that there are cases across the spectrum as you and your opposing colleague have so capably argued this morning, is there any well-established constitutional right that these individuals have violated, or should the individual plaintiffs be subject to qualified immunity in this case?

**MS. KNIZHNIK:** Well, Your Honor, qualified immunity is clearly established. The qualified immunity does not apply to injunctive relief. We're not asking for damages in this

case. And so I think the law on that is extremely clear. The purpose of including the individual defendants is under the doctrine of ex parte *Young*, essentially that they are the individual officials. They're sued in their official capacity of course, not in their individual capacity or a private capacity. And so they are the individuals charged with enforcing what we obviously have submitted as an unlawful policy. And so in order to change that enforcement, they would have to be the ones enjoined. And so that is the only purpose of including the individual defendants. Qualified immunity does not apply.

**THE COURT:** Okay. Anything else?

**MS. KNIZHNIK:** No, Your Honor. I believe I've made all the arguments I wanted to make. I just wanted to point out also that the *Brown v Entertainment Merchants* case, that was a case about a Supreme Court case about violent video games in which the same argument that the defendants make in this case regarding the ability of parents to make decisions for their children by, in this case, books for their children; that case, video games. The Supreme Court rejected that decision in that case. And that was a case involving clearly age in some instances, what the Court described as disgusting violence. But disgust is not even -- in that situation disgust was not a valid reason to even limit the rights, the First Amendment rights at issue in that case. And here we're

talking about materials that are objectively not age inappropriate. A blanket policy.

I do want to actually re-address Your Honor's point and question with respect to the unwritten policy, because I do want to clarify that our claims with respect to the unwritten policy and the removals that have been made as a result of that policy are not specific to any particular book. And that makes this case somewhat different than a number a other cases involving challenges to individual book removals in which the courts have sometimes required there to be specific allegations made as to plans.

**THE COURT:** I was going to say, how does that affect your standing with respect to that claim?

**MS. KNIZHNIK:** Well, Your Honor, I would submit that, again, the fact that standing has been established as to at least one particular book with respect to plaintiff M.G.'s desire and attempt to check out the *Snapdragon* book, that has been established. But with respect to the removals, again, we're talking about an entire class of books, that this is a systematic removal of all or at least disparately impact a disproportionate number of LGBTQ positive materials. And so this is not about the challenge to one specific book, but it's a reasonable inference based on the allegations that we have made, that our plaintiffs, including the adult plaintiffs, have a desire and have an intention to check out books that

they simply cannot because they have been removed. And this connects the unwritten policy to the written policy because, again, we're not simply arguing that the plaintiffs have a right to demand any one particular book be included in the collection and placed where we ask for it to be placed. But there is -- we are asserting that there is a right to be able to browse public libraries without -- and be able to find books that represent individuals like yourself without the government telling you, without the government systematically removing those kinds of books.

**THE COURT:** With respect to the *Snapdragon* book, refresh my recollection. Was the plaintiff unable to check that book out because it had been removed or because she didn't have access to the new location, because I was thinking it was the latter?

**MS. KNIZHNIK:** It was, because it was classified as an adult book and she doesn't have access to it.

**THE COURT:** In regard to the unwritten policy and removal of some books or some class of books, none of these plaintiffs know of any specific book that has been removed or have tried to check out any book that they have later learned was removed; is that accurate?

**MS. KNIZHNIK:** Well, they in part don't know because they've been removed and you can't know what you don't know, Judge.

**THE COURT:** Oh, I understand that. But, I mean, when I'm trying to look at standing I'm trying to look at injury, I don't know that you get there by just some amorphous claim that, you know, because they have this unwritten policy and we've got some evidence of that as it is set out in the allegations in the complaint, we've got the evidence of the existence of this unwritten policy, and because of that we believe that certain books have been removed. Although we can't identify which ones, we can't identify exactly what the subject matter was, whether it was because of the presence of a character, the presence of a pronoun, or it was advocating some type of gender identity issue or transition issue. We don't know anything about the books, but we just don't think they should have removed those books because we think they relate to our protected class. I'm just not sure that that's definite enough to establish much of anything. That's my only concern about that.

**MS. KNIZHNIK:** I understand Your Honor's point. However, again, the notion that the government has the power to remove an entire category of books and that plaintiffs in order to challenge that --

**THE COURT:** But they have removed an entire category of books because a substantial number of those books still exist just in another section of the library.

**MS. KNIZHNIK:** Well, with respect to the unwritten

policy, the systematic removal of LGBTQ positive affirming materials, again, we have alleged upon information and belief, we have alleged that at least dozens of books were removed in 2023. We don't have the numbers as to 2024 and 2025, and require discovery to analyze --

**THE COURT:** Do LGBTQ positive reflection books still exist in the library?

**MS. KNIZHNIK:** There are books that still exist at the library, yes.

**THE COURT:** So even though they may have removed some books that fall within that category, other books that fall within that category still remain and are accessible through the library?

**MS. KNIZHNIK:** Yes, Your Honor. But it can be likened to a pattern or practice of discriminating against this category of books. And we submit that that is categorically different than the kinds of removals when we're talking about just one or two or even 17 books.

**THE COURT:** Okay. I understand your point. Anything else?

**MS. KNIZHNIK:** No, Your Honor. Thank you.

**THE COURT:** Thank you.

Mr. Coleman, I'll hear from you briefly. One thing I would like to hear from you about, because Ms. Knizhnik reminded me of it and it had troubled me a little bit when I

was reading the briefs in this case; it is my understanding that based upon this new policy and these books being moved to a new section of the library, that is a section that does not exist in all locations. As I recall maybe only exists in about half of the locations. And so from an accessibility standpoint, from an injury standpoint, I'd like for you to address that.

**MR. COLEMAN:** Certainly, Your Honor. I'll start there and I also will be cognizant of the briefness.

**THE COURT:** Yes, sir. I've read the briefs. I've heard you this morning. I pretty much know where both of you are, so...

**MR. COLEMAN:** Well, if I can without abusing the Court's patience, I'll address that. I've got seven points that I think I can do in probably 30 seconds each.

**THE COURT:** Okay. Take your time.

**MR. COLEMAN:** Very briefly. Let me start with the point you've brought up there. To back up a step, you're right. There's a failure of pleading here. There has not been a claim asserted under 1983, under *Menell*, that there's been any removal, that it's affected any one of these plaintiffs. That's an injury problem. End of the road.

In terms of the specific question about the fact that in allegedly about half of the library branch locations there isn't a PEC section. That doesn't change the analysis

because I was just at the Travelers Rest Library this past Saturday before the snow hit with my kids. I didn't look at every book they got. I just checked them out. I wanted some books too. And some of books I wanted weren't in Travelers Rest, but I can still get them. You know how? In the computer.

**THE COURT:** You can get the inter-library transfer system. But my question I guess would be better stated from a practical standpoint this way: Before these books were moved pursuant to this new policy, were they available in the children's and youth sections in all library locations and now they're only available in the PEC section in some library locations?

**MR. COLEMAN:** As a factual matter --

**THE COURT:** And I don't know that because, you know, as you said, not all books are in every location, and sometimes you have to, you know, get a book transferred from the main library or whatever. But that has been raised as an access issue. And so just as a practical matter, factual matter, you know, my question would be, did this new policy change that accessibility? We know that the PEC section only is available in certain branches. But the books are the issue. And were the books accessible in the children and youth sections in all branches? Did they generally circulate, generally be included in the collection in all branches before

the policy, and then after the policy there is a burden somewhat of getting to those books because of the limited locations even if it's, you know, in your view a very minor burden?

**MR. COLEMAN:** A few points in response, Your Honor. And the conclusion will be, I don't think it changes the analysis. First would be as a factual matter, an actual factual matter, I don't know. Second would be as a pleading matter, we don't know. Third, perhaps this is where we get to, it doesn't make a difference. As a pleading matter let's assume, let's assume the un-pled fact that maybe it used to be at the Pelham Road location and now it's at the Greer location. Just even if we assume that, which, given, hasn't been pled, there hasn't been an allegation that these plaintiffs needed it from a particular location much less what location, much less that it's not there anymore, much less that they can't drive 12 minutes the other direction to get there. So I think it makes no difference at the end of the day.

Let me try to run through my seven points without talking too fast but without me belaboring.

**THE COURT:** Take your time.

**MR. COLEMAN:** I'll take it in roughly the same order that they arose in plaintiffs' counsel's argument.

First is the allegation that this collection policy,

the policy itself is motivated by and infected with some sort of illicit discriminatory intent of moral disapproval. Few problems there. Number one, all the complaint alleges, and frankly incorporates by reference indicates at most that one, perhaps two members used those phraseologies. And that's the trap. That's the danger of looking at legislative intent. You can find anything in legislative intent. And just because one or two people said something doesn't mean that the entire law itself is infected with those allegedly not concededly discriminatory motivations, especially when the policy itself on its face relies on a plausible, legitimate, indeed a fundamental governmental interest in respecting the rights of parents over the education of upbringing of their children. Also supplemented by the fact that concurrent statements by the majority, or at least more board members emphasized that unobjected, unopposed basis as opposed to any personal or philosophical moral disagreement.

Number two, plaintiff's counsel stated that no court has held that a library collection is government speech. Your Honor, I'll let you decide. I'll point you to *People for the Ethical Treatment of Animals versus Gittens, (D.C. Cir. 2005)*. Quote: With respect to public library, the government speaks through its selection of which books to put on the shelves and which books to exclude. I'll point you to *Bryant versus Gates, (D.C. Cir. 2008)*, then Judge Kavanaugh. That the case

law makes clear, government speech include not only the words of government officials but also compilation of the speech of third parties by the government such as libraries. In analogous cases, not a public library but schools, the Eighth Circuit in *Walls v Sanders* just last year, also the Fifth Circuit. I'm not sure if it's Charis or *Chiras* case from 2005 concluded that the government selection of third-party written books constituted government speech. Take those for what you will.

Number three, opposing counsel stated -- has misperceived our position on the government's speech argument. I think we said in this briefing, I'll repeat it because it is important. Our position is not that government speech is insulated from, quote, any constitutional limits whatsoever. We haven't said that. We don't believe that. We do believe and the Supreme Court agrees that government speech is insulated against free speech clause rights. That doesn't mean it's insulated against the Constitution entirely. *Mahmoud*, that's government speech. That's the government picking which books they want to read to children in school. That's government speech all day long. But even so the free exercise right of the plaintiffs provided a constitutional check on that. So argument isn't nearly so broad or scary as they might make it seem.

Point number four, I think it's unremarkable and

undisputed, Your Honor, that minors' First Amendment rights are and can be more limited than adults. I'll point you, for example, to the Supreme Court's decision in *Ginsberg versus New York*, 1968 case, that upheld the constitutionality of a New York law that forbid the sale of, quote, girly magazines, to minors even though the statute covered material that wasn't obscene for adults. It was more restrictive of minors. That's not constitutionally permissible.

Number five. Your Honor, I can't imagine a case more analogous than *Little v. Llano County*. And to claim that it's somehow different or distinguishable is a stretch. I would point out too that *Little* is not an outlier as opposing counsel has claimed. In fact, just a little over five weeks ago the Supreme Court denied certiorari in *Little* because there's no circuit split, and likely because it didn't think *Little* needed to be corrected. *Little* is not an outlier. There's no circuit split there. *Little* is not an outlier.

Number six would be they mention *Doe Versus South Carolina*. That's the school bathroom case, budget proviso. Judge Gergel stayed the case to await the Supreme Court's resolution of *BPJ* and *Heco*x. Plaintiffs appealed that stay, sought a preliminary injunction pending appeal, which the Fourth Circuit divided, granted. The state then sought an emergency application from the U.S. Supreme Court. Three justices would have granted it, Thomas, Alito, and Gorsuch

would have granted it. And even the justices who didn't grant it put in unprecedented sentence in the denial of the emergency application specifically noting that the denial of that was not to be perceived as a view on the merits. Subsequently the plaintiffs withdraw that case. They withdrew -- they withdrew the appeal, I should say. It's still pending before Judge Gergel. So that IPA, injunction pending appeal granted by the Fourth Circuit I think tells us little or nothing.

And then I'll end. My last point here. Frankly, it's where we started. Plaintiffs haven't alleged any right, any claim, I should say, under 1983, under *Menell*, that the library much less Ms. James and Ms. Allen have removed any books from the library. There's not a claim there that they can make under Section 1983.

I think that covers the points I made. I thank you for your patience unless there's any other questions.

**THE COURT**: I don't think I have anything else. Thank you, very much.

**MR. COLEMAN:** Thank you, Your Honor.

**THE COURT**: All right. The Court will take this matter under advisement. I'll get an order out in due course. And I apologize for the length of time this matter has been pending. As you may know, our district is down at least one judge, and civil filings in particular have exploded over the

last few years. Not helped at all by the fact that Judge Gergel has a couple of MDLs that are taking up the vast majority of his time. And I say all that to say that we are running further behind than I would like, but we will get to this in due course.

Let me ask this: Assuming this action or some parts of it survive the motion to dismiss, it seems like because this is a public entity and you have meeting minutes, and you have resolutions, and as I may have indicated earlier this is an exceedingly detailed complaint because of all the information that is available, let me get counsel's feeling regarding discovery in this matter because it seems to me two things: Number one, that discovery, whatever is necessary, would be pretty limited in nature, and that it may be the type of case where once you ferret out a few things like, you know, my factual question about what was available and all the branches before and after and that type thing, to the extent that matters, maybe some depositions of board members about, you know, intent or discriminatory animus. The facts I think are, you know, at least from my observation are going to be fairly undisputed. I think it's entirely likely that you-all will pretty much agree as to what the facts are. It's just you're going to have a different view of what they mean from a legal standpoint. So I'd like to hear from you with regard to your thoughts at this point about the possibility of fairly

limited or targeted discovery and the possibility of this maybe being decided on cross motions for summary judgment. And since plaintiff is first on the caption, I'll let the plaintiff address that first.

**MR. CHANEY:** Thank you, Your Honor. That's something that we've talked about internally before coming today and sort of anticipating this question. I think it's somewhat different answers depending if we're talking about the written policy which in many ways speaks for itself. I think the Court's right to assume, we'd have some limited targeted discovery requests to fill in some of the gaps that exist. There are a lot more gaps when it comes to unwritten policy where we're sort of cobbling together what we think is the organizing structure around these removals and sort of discriminatory action. I think there's going to be a bit more discovery on that side. In the grand a scheme of civil cases is this an extraordinary burdensome discovery process? I don't think so. But I do agree that in any case, I think this is a case that's going to be tee'ed up well for resolution at summary judgment because it's going to be at least, as to the written policy, going to come down to what the facts and the legal impact of those facts. So if the Court's asking from like a scheduling perspective, I think some of that depends on what the Court does with the motions to dismiss and which ones, you know, which claims prevail.

**THE COURT:** I understand. The ground can shift beneath your feet here depending on what I do.

Mr. Coleman, what's the defense thought on that?

**MR. COLEMAN:** Your Honor, your suggestion is well taken, though I don't like to concede leaving my children behind these arguments that I think should end the case right now. But if --

**THE COURT:** You don't want to deal in hypotheticals, do you?

**MR. COLEMAN:** I don't because this case, we cut this thing --

**THE COURT:** I understand.

**MR. COLEMAN:** But your point is well taken. And frankly, what we would love to avoid is that sort of, what to us we perceive as a fishing expedition into these vague inchoate past practices that didn't affect any of these plaintiffs to our knowledge. Whether that takes the form of exploring stipulated facts, whether it takes the form of limiting the number of the scope of depositions to look particularly at perhaps the issue of intent or motivation, we'd certainly be very very open to in the event discovery is even necessary, entertaining some of those possibilities to tighten things up.

**THE COURT:** All right.

**MR. TURNER:** The only caveat I would raise, Judge, I

heard my colleague this morning say they're not seeking damages under 1983 which, if that's the case, that will certainly short-circuit some of the discovery in terms of the plaintiffs and their damages and the monetary piece of it, again, not --

**THE COURT:** Again, like I was saying with the plaintiff, they may want to take some board members depositions on intent, that type thing. You obviously are going to want to take plaintiffs depositions on, you know, access, how they use the library, what they've tried to find, all those kind of things.

**MR. TURNER:** Right. But that damages piece may short-circuit the discovery piece.

**THE COURT:** That would be one subject matter you don't have to explore.

**MR. CHANEY:** Just to add, as the Court's thinking about sort of next steps after the Court's ruling, as to the unwritten policy, I mean, just reading the tea leaves a bit on how things went today, I just want to point out that we do have a list of books we know have been removed. And whether the Court finds that so far we've sufficiently alleged an injury with respect to those book removals or not, I think there will be an opportunity for us to amend, secure that injury deficiency if the Court finds that there is one on the unwritten policy, because certainly it's the case as a matter

of fact. I can represent that the adult plaintiffs that we represent do want access to those books that have been removed and that have been removed in our view for impermissible reasons. And so there could be that sort of wrinkle in terms of how the case plays out as well.

**THE COURT:** We'll cross that bridge if we come to it.

**MR. TURNER:** I think the scheduling order has passed in terms of amending pleadings.

**THE COURT:** Yeah. I mean, we'll see. And part of that is that the Court's delay in getting to this, and so, you know, I would consider a motion to amend out of time if it is based on the Court's ruling on this motion. I'm not saying I would grant it. Depends on what the proposed amendment was. And, I mean, it might be futile. I mean, there's a lot of things that could happen. But with regard to the scheduling order, you know, we'll deal with that. But I just want to make sure both sides know, I'm going to deal with that from a practical standpoint given the delays inherent in the court system right now.

With regard to the scheduling order, I'm going to ask you-all to, in light of our discussion today and understanding that you won't be able to come to any final determination until you see what I do on this motion, but if the claims remain or some portion of them remain, I'm going to

ask you-all to get together and take a look at what you reasonably think you would need to do given that, how long it will take you, and let's try to come up with an amended scheduling order that would accommodate that. As I said, we'll try to get to this as quickly as we can. I know you've been waiting a while already. And once we issue the order, we'll see what we have and where we go from there. I appreciate your time and your arguments this morning. And as I said, we'll get this back to you. Thank you, very much.

**MS. KNIZHNIK:** Thank you, Your Honor.

**MR. COLEMAN:** Thank you, Your Honor.

(Court adjourned at 11:27 a.m.)

CERTIFICATE

I, Michele E. Becker, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Michele E. Becker Date: March 02, 2026

00IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated;<br><br>CHERYL ROGERS;<br><br>GREG ROGERS;<br><br>E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated;<br><br>M.G., by and through her mother, Amber Galea; and<br><br>W.M., by and through his mother, Kersey Clark;,<br><br>Plaintiffs,<br><br>v.<br><br>GREENVILLE COUNTY, SOUTH CAROLINA;<br><br>BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and<br><br>KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,,<br><br>Defendant. | No. 6:25-cv-02599-DCC<br><br>**ORDER** |

This matter is before the Court on Defendants' Motion to Dismiss. ECF No. 20. Plaintiffs filed a Response in Opposition, and Defendants filed a Reply. ECF Nos. 27, 33. Plaintiffs also filed two notices of supplemental authorities, to which Defendants filed one reply. ECF Nos. 37, 39, 38. For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

## I. BACKGROUND[1]

This case arises out of Greenville County Library System's (the "Library") enactment of policies, both written and unwritten, that target books portraying Lesbian, Gay, Bisexual, Transgender, and Queer ("LGBTQ") individuals. *See* ECF No. 5. The Library is a public library system operated by Defendant Greenville County (the "County"). *Id.* at 4. The Library is controlled and managed by a board of trustees ("the Board") appointed by the Greenville County Council. *Id.* Defendant Beverly James ("James") is the Executive Director of Greenville Library, and Defendant Karen Allen ("Allen") is the Youth Services Manager of Greenville Library. *Id.* at 5. James and Allen are responsible for carrying out policies enacted by the Board. *Id.*

Plaintiffs are residents of the County and patrons of the Library. *Id.* at 3–4. Plaintiff O.R. is 17 years old and brings his claims by and through his parents, Plaintiffs Cheryl Rogers and Greg Rogers. *Id.* at 3. Plaintiff O.R. brings his equal protection claims on behalf of himself and those similarly situated—namely, all minor, transgender library patrons who lack adult library cards. *Id.* at 4. Plaintiffs E.G. and M.G. are, respectively,

[1] On a motion to dismiss, a plaintiff's well-pled allegations are accepted as true. Accordingly, this recitation of facts is taken from Plaintiffs' Amended Complaint.

11 and 12 years old and live with their mother, Amber Galea. *Id.* Plaintiff E.G. brings her equal protection claims on behalf of herself and those similarly situated—namely, all individuals with adult Greenville County library cards who identify as LGBTQ. *Id.* Plaintiff W.M. is 9 years old and brings his claims by and through his mother, Kersey Clark. *Id.*

Over the last two years, the Library has systematically purged positive portrayals of transgender and non-conforming people through the use of both written and unwritten policies. *Id.* at 2. In 2024, the Library implemented two written policies (the "Written Policies"), which removed all material from the juvenile and young adult sections of the library that contain "illustrations, themes, or story lines [that] affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex" or with "illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning." *Id.* at 10–21. Pursuant to the Written Policies, these materials were moved to the "Parenting and Early Childhood" ("PEC") section from which minors with juvenile or young adult library cards cannot check out books.[2] *Id.* at 13. In enacting the Written Policies, Board members of the Library stated that "the presence of a transgender

[2] On February 13, 2026, Defendants filed a Motion for Extension of Time to File Supplemental Exhibit to their Motion to Dismiss. ECF No. 42. Defendants seek to file the declaration of James, who avers that each of the 13 locations of the Library now have a PEC section. ECF Nos. 42 at 2; 42-1 at 3. Defendants clarify that this supplemental document is meant only to support their arguments related to standing, for which the Court may consider it at this stage of litigation as it goes to the Court's jurisdiction. ECF No. 42 at 2–3. Defendants indicate that Plaintiffs opposed the requested extension and submission of a supplemental exhibit. *Id.* at 3. However, Plaintiffs filed no response in opposition to Defendants' Motion. Upon review of Defendants' Motion, the Court finds that consideration of the supplemental documentation for the sole purpose of determining Plaintiffs' standing is appropriate and has so considered it. Accordingly, Defendants' Motion is granted, and Defendants are directed to file the attached document as a supplemental exhibit to their Motion to Dismiss. The Court notes, however, that the information included in Defendants' supplemental exhibit did not materially alter or impact the Court's analysis of standing.

character in a book . . . is grounds for relocating it to the adult section," materials representing gender transition are "trash," and that the "idea" of "transgenderism" is a "dangerous thing" and part of "a radical agenda" that the Library has "every right . . . to take an ethical and moral stand" against. *Id*. at 13–15, 19–20. In implementing the Written Policies, the Library has removed many titles from the juvenile and young adult section that positively portrayed transgenderism, including *Julián is a Mermaid* by Jessica Love, *Ana on the Edge* by A.J. Sass, and *Red: A Crayon's Story* by Michael Hall. *Id.* at 2. Meanwhile, books that advocate against gender transition—such as the Christian-themed book, *God made Boys and Girls* by Marty Machowski—remain available in the juvenile section. *Id.*

The Library also enforces a widespread custom and practice of discriminating against the collection, retention, and display of library materials—including books for adults—that positively portray LGBTQ individuals (the "Unwritten Policy"). *Id.* at 21–25. Under the Unwritten Policy, Defendants have removed dozens of LGBTQ titles from the Library collection for both children and adults, disproportionately refused requests by Library patrons to order new LGBTQ materials, and granted over 50 requests from the Greenville County Republican Women's Club to remove LGBTQ materials. *Id.* at 3, 22–25. Defendants have also ordered librarians to remove book displays that feature LGBTQ materials, cancelled library events that involve LGBTQ individuals or themes, and removed promotional materials for a LGBTQ book club. *Id.* at 24–25.

Based on Defendants' conduct, Plaintiffs have asserted four causes of action: (1) Violation of the First Amendment based on the Written Policies ("Count One"); (2) Violation of the Fourteenth Amendment based on the Written Policies ("Count Two") ; (3)

Violation of the First Amendment based on the Library's widespread custom and practices pursuant to the Unwritten Policy ("Count Three"); and (4) Violation of the Fourteenth Amendment based on the Library's widespread custom and practices pursuant to the Unwritten Policy ("Count Four"). *Id.* at 31–36. Defendants responded to Plaintiffs' Amended Complaint with a Motion to Dismiss, arguing that the Plaintiffs lack standing to assert their claims and that Plaintiffs have failed to state any plausible claims for relief. ECF No. 20. Plaintiffs filed a Response in Opposition, and Defendants filed a Reply. ECF Nos. 27, 33. Plaintiffs have also filed two Notices of Supplemental Authority, to which Defendants replied only to the first Notice. ECF Nos. 37, 38, 39. On January 29, 2026, the Court held a hearing on Defendants' Motion to Dismiss. ECF No. 41. These Motions are now ripe for review.

## II. APPLICABLE LAW

### A. Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to deciding only actual "cases" and "controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). The doctrine of standing sets apart those "cases" and "controversies" that are of the justiciable sort referenced in Article III. *Id.* at 560. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

"To establish injury in fact, a plaintiff must show that he . . . suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). For an injury to be concrete, the Supreme Court has "emphasized repeatedly" that it "must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (alteration, internal quotation marks, and citation omitted).

**B. Failure to State a Claim**

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses . . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (internal quotation marks and citation omitted). In a Rule 12(b)(6) motion, the court is obligated "to assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). However, while the Court must accept the facts in the light most favorable to the

nonmoving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id*.

To survive a motion to dismiss, the complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the requirement of plausibility does not impose a probability requirement at this stage, the complaint must show more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

## III. DISCUSSION

### A. Standing

As an initial matter, the Court addresses the jurisdictional issue of whether Plaintiffs have Article III standing. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–102 (1998) (recognizing that standing to maintain a suit implicates the court's jurisdiction to entertain a suit and is thus a threshold question to be resolved before the merits); *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921 (4th Cir. 2022) ("Because standing is a threshold jurisdictional question, we address it first." (cleaned up) (citations omitted)). As outlined above, to establish standing, a party must allege that it suffered a "concrete" harm, there must be "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant[,]" and the harm must be redressable. *Steel Co.,* 523 U.S. at 103. The Supreme Court has also cautioned that the "absence of a valid . . . cause of action" does not implicate the court's "power to adjudicate the case." *Id.* at 89. Accordingly, the Fourth Circuit has emphasized a court should "take care not to conflate a standing inquiry with a merits inquiry." *Beyond Sys., Inc. v. Kraft Foods, Inc.*,

777 F.3d 712, 715–16 (4th Cir. 2015). Further, in analyzing standing, a plaintiff must establish standing as to "each claim" presented and "each form of relief" sought. *Davis v. FEC*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted). Only one plaintiff must have standing for the case to proceed. *See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 681 (4th Cir. 2020); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986). Accordingly, the Court addresses standing for each of the claims raised by Plaintiffs below.

1. First Amendment Claims

Plaintiffs assert two claims for violation of their First Amendment rights: one based on the Written Policies and another based on the Unwritten Policy. ECF No. 5 at 31–33; 34–35. Plaintiffs allege that they are all patrons of the Library and residents of Greenville County. *Id.* at 4. They also allege that the Library has removed books with LGBTQ themes from the juvenile and young adult sections of the Library and placed these books on separate shelves in the adult section of the Library, specifically the PEC section, pursuant to the Written Policies and that the Library also has an Unwritten Policy of removing books generally from all sections of the library that have positive LGBTQ themes as well as removing book displays and promotional material that feature LGBTQ themes and cancelling events that involve LGBTQ individuals or themes. *Id.* at 2–3. Plaintiffs allege that the motivation for implementing these policies was based on viewpoint discrimination towards LGBTQ individuals. *Id.* at 2, 10, 13, 16, 17, 19. Plaintiffs further allege that they intend to check out and access books with LGBTQ themes and Defendants' Written and Unwritten Policies make it difficult or impossible to do so. *Id.* at 26–30. Some Plaintiffs have identified specific book titles that they were interested in

checking out from the juvenile and young adult sections of the Library that have been impacted by the Written Policies. *Id*. at 28, 29.

Defendants argue these allegations are insufficient to confer standing on Plaintiffs as they have failed to alleged injury in fact. ECF No. 20 at 8–11. Defendants contend Plaintiffs' allegations are nothing more than "someday" intentions to check out books without any description of concrete plans to do so. *Id.* at 2. Defendants also argue that Plaintiffs do not allege that any book title has been made inaccessible by the Library's Written Policies as individuals may still walk to these books in the Library and check out titles that have been moved to the PEC section with an adult library card. *Id.* at 10. Defendants also assert that the Written Policies in question are aimed at children, who have fewer constitutional protections than adults and that the minor Plaintiffs have not suffered an Article III injury in light of the Library's recognition of and deference to the parents' right to supervise their children. *Id.* at 11. Additionally, to the extent Plaintiffs allege they feel the Written and Unwritten Policies are unfair, Defendants contend that feeling a policy is unfair is nothing more than a psychological injury insufficient to confer standing. *Id.* at 9, 12.

Plaintiffs contend that they have sufficiently alleged they have standing to bring their claims. ECF No. 27 at 8–14. According to Plaintiffs, the Written and Unwritten Policies burden all of Plaintiffs' ability to access restricted materials. *Id.* at 9. Plaintiffs assert that the Written and Unwritten Policies interfere with protected interests under the First and Fourteenth Amendments and they have alleged injury in fact based on the restriction on access to information. *Id*. Plaintiffs further assert that, while at least some have alleged an intent to access a specific book affected by the Written Policies, there is

no need to assert intent to access specific removed books to establish standing because, unlike in other cases, Defendants are not attempting to remove specific books but an entire class of ideas and perspectives. *Id.* at 11–13. According to Plaintiffs, their injuries result from restrictions to their Library access and is not a future injury but ongoing and will continue until their access is restored. *Id.* at 13. Plaintiffs further argue that Defendants' attempt to reduce Plaintiffs' injuries to mere psychological distress is unavailing, especially where feelings of marginalization have been recognized as cognizable forms of injury under the First Amendment. *Id.* at 13–14.

a. *Standing Exists as to Count One: The Written Policies*

As to the Written Policies, Plaintiffs allege at least one Plaintiff has attempted to check out a book from the Library but was unable to because of the Written Policies. Specifically, Plaintiffs E.G., M.G., and W.M. allege that they intended to check out specific titles that have been moved pursuant to the Written Policies, which restricts their First Amendment right to receive information. *Id.* at 28, 29. Courts have found that similar factual allegations satisfy the injury-in-fact requirement for standing. *See, e.g., E.K. by & through Keeley v. Dep't of Def. Educ. Activity,* 807 F. Supp. 3d 517, 532 (E.D. Va. 2025) (finding at least one plaintiff had suffered an injury in fact from book removals where she had attempted to check out three specific books that had been removed); *PEN Am. Cntr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1329–30 (N.D. Fla. 2024) (holding that student-plaintiffs had established standing on a First Amendment challenge to book removals where "the children intended to check out specific removed and restricted books during the upcoming (now, ongoing) school year, but they are unable to do so"); *ACLU of Florida, Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1194–95 (11th Cir. 2009)

(finding that a student had established an injury for standing purposes when he alleged that the school's policy of removing books prevented him from checking out a particular book that he intended to check out "after school resumed in six weeks"). The Court likewise finds Plaintiffs' allegations are sufficient to establish that Plaintiffs have suffered a concrete and particularized harm based on Defendants' implementation of the Written Policies.

Defendants' arguments to the contrary are unpersuasive. First, the minor Plaintiffs ability to browse the PEC section and check out books with parental consent does not address Plaintiffs allegations that the Written Policies are nevertheless restrictive, even if not tantamount to an outright prohibition. State action that impedes a plaintiff's ability to access information is sufficient to establish a concrete injury to confer standing for a First Amendment claim. *See, e.g.*, *Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2023 WL 5944154, at *3 (W.D. Ark. Sept. 12, 2023) ("When a plaintiff shows that her ability to access information has been impeded by state action, however minimally, then that is a sufficiently concrete injury to confer standing for a First Amendment claim." (citations omitted)). Second, Defendants' argument that Plaintiffs do not have standing because there is no right to receive information from the government overlooks both precedent in cases related to library services and the very purposes of the government services libraries generally are intended to fill. As outlined above, multiple courts have recognized standing to challenge book removals in publicly funded libraries pursuant to the First Amendment. Again, Defendants' argument overlooks the very purpose of libraries, and indeed, the alleged stated mission of the Library in this action—"[t]o champion literacy, inspire learning, and foster community connection," its vision is "[t]o be

Greenville County's first choice for exploration, discovery, and information," and it "remains dedicated to providing free access to materials, experiences, and resources to communities throughout Greenville County."[3] ECF No. 5 at 6–7.

Finally, Defendants' arguments that the minor Plaintiffs' rights have not been restricted or impeded because the Written Policies allow their parents to determine what is appropriate and thus have not suffered an injury in fact overextends the law in this area. Indeed, a parent's right to raise their children is imbedded in the Constitution. However, this does not mean that minors cannot suffer an injury in fact because a government entity enacts a regulation that restricts their access to certain speech. Indeed, the Supreme Court has found similar regulations did create a cognizable injury that could be redressed by the courts. *See, e.g.*, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) (finding that a regulation which only gave parents veto power over the government's own discretionary choice of what is best for their children violated the First Amendment). In that case, the Supreme Court explained "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. at 794

[3] Defendants' arguments related to the right to receive information from the government raised in the 12(b)(6) portion of their brief relies heavily on the reasoning in *Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir. 2025). ECF No. 20 at 2, 17. The Court addresses Defendants' 12(b)(6) arguments more fully below. As Defendants' argument concerning the right to receive information under the First Amendment relates to standing, however, the Court notes that in *Little*, the district court found that the plaintiffs had standing to bring their claim, and the Fifth Circuit, while acknowledging that standing was an issue before the district court, did not disturb the district court's standing finding on appeal. *See Little*, 138 F.4th at 839; *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *5 (W.D. Tex. Mar. 30, 2023); *see also In re United Operating, LLC*, 540 F.3d 351, 354 (5th Cir. 2008) (explaining that the court of appeals is "obliged to ensure [standing] is satisfied regardless whether the parties address the matter").

(alteration in original) (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975)).

Here, Plaintiffs allege that the Library has removed books from the juvenile and young adult sections where children and their parents would expect to find them and created a burden on the access of information. At least one Plaintiff has identified specific books of interest to her that have been impacted by the Written Policies. ECF No. 5 at 28, 29. This is a sufficiently concrete burden on Plaintiffs' ability to access information to give them standing to bring this lawsuit. Because at least one individual has standing as to this claim, the Court need not address standing of the other individual Plaintiffs. The fact that Plaintiffs have adequately pled standing as to this claim does not necessarily mean that they will be able to prevail on the merits of their claims. But Defendants' arguments about the alleged weaknesses in Plaintiffs claims of injuries blurs the lines between the whether Plaintiffs' claims of injury have merit and whether they have standing to bring their claims, which, as stated above, both the United States Supreme Court and the Fourth Circuit Court of Appeals strongly caution against.

b. *Standing Does Not Exist as to Count Three: The Unwritten Policy*

Turning to the Unwritten Policy, Plaintiffs allege that pursuant to this Policy, Defendants have removed dozens of LGBTQ titles from the Library collection for both children and adults, disproportionately refused requests by Library patrons to order new LGBTQ materials, and granted over 50 requests from the Greenville County Republican Women's Club to remove LGBTQ materials. Defendants have also ordered librarians to remove book displays that feature LGBTQ materials, cancelled library events that involve LGBTQ individuals or themes, and removed promotional materials for a LGBTQ book

club. Plaintiffs allege that "[u]pon information and belief, numerous additional LGBTQ-related juvenile and young adult titles have been removed from the Library system since October 2023," and provide a list of multiple titles that have allegedly been removed pursuant to the Unwritten Policy. ECF No. 5 at 23. Specifically, Plaintiffs allege that Plaintiffs Cheryl and Greg wish to be able to access the full array of LGBTQ-related books, including titles the Library has removed from its shelves. *Id.* at 27. Plaintiffs have identified 36 adult LGBTQ-related titles and 23 juvenile and young adult titles that have been removed entirely from the Library allegedly pursuant to the Unwritten Policy. *Id.* at 5–6.

Defendants' alleged actions could potentially cause injury to someone, but Plaintiffs fail to make any allegations to tie these potentially injurious actions to their own particularized and concrete injuries. Unlike their allegations regarding the Written Policies, Plaintiffs have not identified any specific books that they intended to check out that have been removed or denied procurement thereof pursuant to the Unwritten Policy nor do Plaintiffs allege that they wished to attend events or clubs that have been impacted by the Library's Unwritten Policy. *See id.* While Plaintiffs argue that their injuries are caused by the systematic removal of books that reflect an entire class of ideas and perspectives, they make no allegation that all books pertaining to LGBTQ individuals have been removed from the Library. Indeed, at the hearing, Plaintiffs conceded that books with positive LGBTQ themes were still available for check out at the Library. Again, this is unlike Plaintiffs' allegations concerning the Written Policies where all positive portrayals of transgender individuals were moved to a separate section of the Library.

Here, Plaintiffs only specific allegations of injury related to the Unwritten Policy are that Plaintiffs Cheryl and Greg would like to access LGBTQ-related books, including generally those that the Library has removed. *Id.* at 27. These allegations are far too remote and speculative to sufficiently allege an injury. *See, e.g.*, *Lujan,* 504 U.S. at 560 (explaining that to establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (explaining that standing requires that the plaintiff "'personally has suffered some actual or threatened injury'"). The Court finds that Plaintiffs have failed to allege with sufficient particularity an injury in fact based on these Policies. Accordingly, Plaintiffs' First Amendment claim based on the Unwritten Policy is dismissed for lack of standing.

2. <u>Equal Protection Claims</u>

Plaintiffs assert two causes of action based on the Equal Protection Clause of the Fourteenth Amendment: again, one based on the Written Policies and one based on the Unwritten Policy. ECF No. 5 at 33–34, 35–36. The Constitution instructs all who act for the government that they may not "deny to any person . . . the equal protection of the laws." U.S. Const. amend. XIV, § 1. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, . . . [t]he 'injury in fact' in an equal protection case of this variety is the

denial of equal treatment resulting from the imposition of the barrier." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Plaintiffs allege that the Written and Unwritten Policies discriminates against Library patrons, like Plaintiffs O.R. and E.G., on the basis of their transgender or LGBTQ status. ECF No. 5 at 33, 35. Defendants argue that Plaintiffs have failed to allege an injury in fact based on a denial of equal treatment because the barrier imposed by the Written and Unwritten Policies applies equally to all patrons. ECF No. 20 at 13. Plaintiffs argue that the barrier imposed by Written and Unwritten Policies have thwarted their attempts to receive the benefits of the Library, and this barrier that makes it harder for members of one group—members of the LGBTQ community—to obtain a benefit than it is for members of another group—non-members of the LGBTQ community. ECF No. 27 at 10, 14.

The Court finds that Plaintiffs have made sufficient allegations to show they have suffered an injury in fact caused by both the Written Policies and the Unwritten Policies. As relevant to these claims, Plaintiffs O.R. and E.G. allege they are members of a protected class of individuals, as a transgender boy and a queer-identifying girl. ECF No. 5 at 30–31. O.R. and E.G. are both minor patrons of the Library and residents of the County. O.R. does not have access to the adult section of the Library and so may not check out books from the PEC section on his own behalf, and thus O.R. may not check out books with positive portrayals of transgender characters pursuant to the Written Policies. However, under the Written Policies, O.R. may check out books that advocate against transgenderism, such as *God Made Boys and Girls*, that are still available to him for check out in the juvenile section. Similarly, E.G., who has an adult library card and

may check out books on her own from the PEC section, at the age of 12 is unable to find and check out books positively reflecting LGBTQ characters like her in the section of the Library targeting her age group but can find books in the section targeting her age group that negatively portray characters like her. O.R. and E.G. also allege that the Unwritten Policy has caused stigmatic harm when the Library removed books containing LGTBQ themes or characters, refused requests for new materials, cancelled LGBTQ events or clubs, and prohibited promotions of LGBTQ events or clubs. *Id.* at 30, 31.

Defendants' argument that the Written and Unwritten Policies equally affect all patrons, regardless of transgender status, ignores those equal protection cases based on facially neutral laws. It is, by definition, the case that a facially neutral law will, "on its face," treat all citizens "in an identical manner." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969). The Equal Protection Clause also provides protection from facially neutral laws where "the reality is that the law's impact falls on the minority." *Id.* In the instant case, Plaintiffs allege that Defendants' Written and Unwritten Policies result in just that. According to Plaintiffs, it is transgender and LGBTQ individuals who will find that books relating to their lived experiences have been segregated or removed altogether from the Library. Indeed, taking all inferences in Plaintiffs' favor, under the Written Policies, Defendants have removed only the *positive* portrayals of transgender characters from the juvenile and young adult sections of the Library and left arguably stigmatizing negative portrayals of transgenderism. Courts have found such stigmatization by a government entity could constitute an injury in fact under the Equal Protection Clause. *See, e.g. Heckler v. Mathews*, 465 U.S. 728, 739–40, 104 S. Ct. 1387, 1395, 79 L. Ed. 2d 646 (1984) ("[W]e have repeatedly emphasized, discrimination itself, by perpetuating 'archaic

and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." (citing *Mississippi University for Women v. Hogan,* 458 U.S. 718, 725 (1982)). Likewise, Plaintiffs allege they have suffered similar stigmatization from the Unwritten Policy. While Plaintiffs' claims of injury based on the Unwritten Policy are somewhat thin, at this stage of litigation and accepting Plaintiffs' allegations as true and making all inferences in their favor, the Court finds they have sufficiently alleged an injury in fact to confer standing. At this stage of litigation, the Court finds Plaintiffs' allegations are sufficient to allege that the Written and Unwritten Policies resulted in the denial of equal treatment and are accordingly sufficient to allege injury caused by the denial of the equal protection of the laws.

**B. Failure to State a Claim**

Defendants also assert that Plaintiffs have failed to state a claim upon which relief can be granted. The Court addresses each of Plaintiffs' claims below.

1. Count One: First Amendment Claim

Defendants contend that Plaintiffs have failed to state a claim for violation of their First Amendment rights based on the Written Policies. ECF No. 20 at 24–37. While Defendants concede the First Amendment limits the government's power to prevent a person from receiving another's speech, they argue it also does not obligate the government to provide access to that speech either. *Id.* at 24–27. Defendants further contend that the Library's selection and placement of materials in their facilities constitutes government speech, which the First Amendment does not regulate. *Id.* at 27–

34. Defendants assert the Written Policies are viewpoint neutral because they apply to all books geared towards 0- to 12- and 13- to 17-year-olds that deal with gender transitioning. *Id.* at 34–37.

Plaintiffs argue that Defendants' Written Policies selectively punish or suppress speech and that the First Amendment prohibits removal or restriction of library materials based on viewpoint discrimination. ECF No. 27 at 14–25. Plaintiffs assert that their allegations are sufficient to state a claim because the First Amendment prohibits government actors, like Defendants, from removing books from library shelves because they dislike the ideas contained in those books. *Id*. at 15–20. Plaintiffs argue that even though the government may make content-based distinctions to ensure speech is compatible and reasonable in light of the purpose of that forum when it creates a nonpublic forum, any restrictions must still be viewpoint neutral. *Id.* at 17. According to Plaintiffs, the Written Policies are not viewpoint neutral and instead are aimed at suppression of ideas, which would distort the usual function of the Library and be inconsistent with its purpose. *Id.* at 20–22. Specifically, Plaintiffs contend their allegations that the Written Policies were adopted with goal of taking an ethical and moral stance against the so-called "dangerous" and "radical" agenda of transgenderism are a paradigmatic example of unconstitutional viewpoint discrimination. *Id.* at 20. Plaintiffs further argue that the Library's curation actions are not government speech and that Defendants, as government actors, are bound by the First Amendment and not protected by it. *Id.* at 22–25. Plaintiffs assert that invocation of parental rights does not justify the

Written Policies because rather than enforcing parental authority they impose government authority subject only to a parental veto. *Id.* at 25.

a. *Government Speech*

First, concerning the Library's curation decisions pursuant to the Written Policies, the Court is not convinced that Defendants' decisions regarding the shelving of books at their facilities constitute government speech. Ordinarily, the First Amendment's Free Speech Clause "restricts government regulation of private speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). However, the "government speech doctrine" creates a rare and limited exception where when the government speaks, "it naturally chooses what to say and what not to say" without the restrictions of viewpoint neutrality under the First Amendment. *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022); *see also Pleasant Grove*, 555 U.S. at 467 ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.") (citations omitted). In *Shurtleff*, the Supreme Court laid out a "holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." 596 U.S. at 252. This inquiry considers evidence of "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* As noted by other courts, these factors "are fact-intensive and generally not amenable to resolution at the motion to dismiss stage." *See, e.g.*, *PEN Am*, 711 F. Supp. 3d at 1331; *Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573, 2025 WL 902041, at

*8 (M.D. Fla. Feb. 28, 2025); *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 76 (11th Cir. 2022).

Based on alleged purpose of the Library, and "the fact that the traditional purpose of a library is to provide information on a broad range of subjects and viewpoints," the Court is not convinced that the contents of the Library constitute the government's endorsement of the views expressed in the books in its circulation. *PEN Am.*, 711 F. Supp. 3d at 1331. The controlling case law regarding the government speech doctrine cited by Defendants is readily distinguishable. *See, e.g.*; *Pleasant Grove*, 555 U.S. at 472–74 (finding that the city's decisions in curating monuments for display in a public park constituted government speech); *ACLU of N. Carolina v. Tennyson*, 815 F.3d 183 (4th Cir. 2016) (finding that the state's decision to approve and offer a "Choose Life" license plate while rejecting a pro-choice plate amounted to government speech). Because a library collection is a varied collection of numerous ideas, some of which are readily contradictory, the Court finds that it is materially different from government-sponsored speech such as license plates, art exhibits, and monuments on public property, where a single message is meant to be conveyed. Indeed, it is entirely plausible, based on the multitude of messages delivered through the variety of books in the Library, that the Library's curated collection should be viewed as private, not government, speech. As to those cases that find that a library engages in government speech through its curation decisions, there are as many cases that find it does not. *Compare, e.g.*, *People for the Ethical Treatment of Animals v. Gittens,* 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put

on the shelves and which books to exclude."); *Bryant v. Gates,* 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries[.]"); *Little*, 138 F.4th at 865 (Duncan, J., plurality op.) (finding that a public library's collection decisions are government speech), *with PEN Am.,* 711 F. Supp. 3d at 1331 (declining to apply the government speech doctrine to a library collection because a library collection "is materially different from the speech embodied in government-sponsored parades, prayers, art exhibits, and monuments on public property"); *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024) (finding the government speech doctrine inapplicable to the placement and removal of books in public school libraries as "public school libraries do not share the characteristics of monuments in a park" because there is no coherent message spoken by library curation which amount to more than "babbling prodigiously and incoherently" and also considering the Supreme Court's directive to "exercise great caution before extending our government-speech precedents" (citing *Matal v. Tam*, 582 U.S. 218, 235 (2017)).

Given this contradictory persuasive precedent, the readily distinguishable factual background in the controlling precedent, the Supreme Court's directive to apply caution in extending the government speech doctrine, and the procedural posture of this action, the Court declines to find the government speech doctrine extends to library curation at this juncture. Having found that, based on Plaintiffs' allegations, the Written Policies are not immune from First Amendment scrutiny under the government speech doctrine, the

Court turns its attention to whether Plaintiffs have plausibly alleged a First Amendment claim against Defendants.

b. *First Amendment Claim*

As an initial matter, the Parties disagree on whether the right asserted by Plaintiffs exists under the First Amendment. *See* ECF Nos. 20 at 24–27; 27 at 15–22. Defendants assert that Plaintiffs have no "right to receive" information from the Library, and the government cannot be compelled to provide certain information to the public under the First Amendment. ECF No. 20 at 24–27. Based on Defendants' arguments, it is their position that they acted within constitutional bounds when they imposed the Written Policies, which removed books containing positive portrayals of transgenderism from the juvenile and young adult sections and placed them in the PEC section, which indisputably has restrictions that inhibit checking out books from this section by minors without an adult library card. *Id*. Plaintiffs argue that Defendants' conduct is exactly the type of viewpoint discrimination proscribed by the First Amendment. ECF No. 27 at 15, 22. Thus, the issue before the Court is whether a public library may, without violating the First Amendment, enforce a policy that results in moving books based on their content to a separate, more restrictive section of the library.

First and foremost, the right under the First Amendment not only to share information but also to receive it has been recognized in certain contexts. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas."); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972) (citing cases). Here, the question is whether this right exists in the context of a public

library. The Parties disagree as to whether one of the singular Supreme Court cases on point, *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), is of value in the Court's analysis of whether Plaintiffs' alleged First Amendment right exists given that it is a plurality decision. Defendants cite several circuit court decisions where other courts have found that *Pico* has minimal value in aiding with the lower court's decision on First Amendment issues. ECF No. 20 at 35. At oral argument, the Court acknowledged that "*Pico* is kind of like Forrest Gump's box of chocolates. It just depends on which opinion you reach into as to what you get." ECF No. 43 at 6. However, the Fourth Circuit has never made a finding that *Pico* was of no value, and other district courts within this circuit have repeatedly relied on *Pico* for guidance, including in the context of public library curation decisions. *See, e.g.*, *E.K.,* 807 F. Supp. at 539–44; *Cline v. Fox*, 319 F. Supp. 2d 685, 690–91 (N.D.W. Va. 2004); *Mainstream Loudoun v. Board of Trustees of the Loudoun County Library, et al.,* 2 F. Supp. 2d 783, 794–95 (E.D. Va. 1998). Likewise, the Court finds *Pico* provides guidance for the scope of First Amendment rights in this context.

In *Pico*, the Supreme Court was tasked with reviewing the decision of a local board of education to remove certain books from school libraries based on the board's belief that the books were "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy." 457 U.S. at 856 (alteration original). The Second Circuit had reversed the district court's grant of summary judgment to the school board on plaintiff's First Amendment claim. A divided Supreme Court voted to affirm the appellate court's decision to remand the case for a determination of the school board's motives, but no majority opinion was issued.

Justice Brennan, joined by three Justices, issued the plurality opinion, which held that the First Amendment necessarily limits the government's right to remove materials on the basis of their content from a school library. *See id.* at 864–69 (plurality op.). Justice Brennan reasoned that the right to receive information is inherent in the right to speak and that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Id.* at 866 (quoting *Griswold v. Connecticut,* 381 U.S. 479, 482 (1965); *Stanley,* 394 U.S. at 564). Accordingly, Justice Brennan extended the so-called "right to receive information" to a limited extent to the context of public school libraries and held that the school board members could not remove books "simply because they dislike the ideas contained [in them]," thereby "prescrib[ing] what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Id.* 457 U.S. at 872 (quoting *W. Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943)) (internal quotation marks omitted). Justice Brennan noted that the limit on this right to receive information in the context of public-school libraries was the great discretion entitled to public schools "to establish and apply their curriculum in such a way as to transmit community values" and thus public-school libraries may remove books for reasons of educational suitability, for example pervasive vulgarity. *Id.* at 863–64, 872. Thus, under Justice Brennan's plurality, the state actor's motivation in implementing the restrictive policy was key in determining whether its action violated the First Amendment. *Id.* at 871.

In his concurring opinion, Justice Blackmun agreed that schools could not impermissibly suppress books based on the ideas within them absent sufficiently compelling reasons, though he adopted a narrower view of the constitutional "right to

receive information." *Id.* at 877–78 (Blackmun, J., concurring). Justice Blackmun recognized though, even considering the dissent's discussion of the unique role of a school board as educators, that "surely difficult constitutional problems would arise if a State chose to exclude 'anti-American' books from its public libraries—even if those books remained available at local bookstores." *Id.* at 881. Justice White's concurrence, on the other hand, concurred only in the judgment and found it unnecessary to "issue a dissertation on . . . the First Amendment" absent further findings of fact from the district court. *Id.* at 883 (White, J., concurring).

Chief Justice Burger, in his dissent, agreed that "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" but rejected the idea "of a 'right' to have the government provide continuing access to certain books" and that "school in particular ought not be made slavish courier of the material of third parties," especially where these "[b]ooks may be acquired from bookstores, *public libraries*, or other alternative sources unconnected with the unique environment of the local public schools." *Id.* at 886–92 (Burger, J., dissenting) (emphasis added). Finally, Justice Rehnquist, in dissent, found that past decisions by the Supreme Court recognizing the right to receive information under the First Amendment were unlike this case "where the removed books are readily available to students and non-students alike at the corner bookstore or the public library." *Id.* at 912. Justice Rehnquist recognized the unique nature of libraires in public schools, which unlike university or public libraries, "are not designed for freewheeling inquiry" but instead "are tailored, as the public[-]school curriculum is tailored to the teaching of basic skills and ideas." *Id.* at 915.

As recognized by Justices in both the plurality, concurrences, and dissents of *Pico*, public libraries offer a slightly different context for First Amendment analysis, as opposed to public-school libraries. In the context of *Pico*'s applicability to public libraries, the Court finds *Mainstream Loudoun v. Board. of Trustees of Loudoun County Library*, 2 F. Supp. 2d 783 (E.D. Va. 1998), to be instructive. In *Mainstream*, the district court was tasked with determining whether the public library's policy restricting internet access to adult-oriented websites violated the First Amendment. *Id.* at 787. The library board moved to dismiss the action and argued that "any limitation on their discretion to remove materials would force them to act as an unwilling conduit of information, and urge this [c]ourt to adopt the position of the *Pico* dissent," by Justice Burger that "the right to receive information and ideas does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." *Id.* at 794. The district court explained that adopting this position would "require this Court to ignore the *Pico* plurality's decision to remand the case" and also to ignore the context of the *Pico* decision in the public school library context, wherein "all the Justices, including the dissenters, recognized that any discretion accorded to school libraries was uniquely tied to the public school's role as educator." *Id.*

The district court explained further that "neither the dissent nor the plurality of *Pico* can be said to support defendants' argument that public libraries enjoy unfettered discretion to remove materials from their collections." *Id.* The district court concluded that, to the extent that *Pico* was applicable, it stood "for the proposition that the First Amendment applies to, and limits, the discretion of a public library to place content-based

restrictions on access to constitutionally protected materials within its collection." *Id.* at 794. Thus, "[c]onsistent with the mandate of the First Amendment, a public library, 'like other enterprises operated by the State, may not be run in such a manner as to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at 794–95 (quoting 876 (Blackmun, J., concurring)).

Plaintiffs plausibly allege that the Written Policies do not pass constitutional muster under this standard. As outlined above, Plaintiffs allege the Written Policies resulted in a restriction of access to books with positive portrayals of transgenderism because minors cannot freely check out books from the PEC section of the Library. Plaintiffs further put forth multiple allegations that plausibly support that this restriction on access to materials was based on Defendants' ideological objections to the books, including Defendants' alleged statements in enacting the Written Policies. Based on these allegations, there is a plausible inference that the decision to enact the Written Policies was based on Defendants' ideological objections to the books' content or disagreement with their messages or themes rather than a viewpoint neutral reason.[4] The Court's decision does

[4] These allegations sufficiently support the inference that the Written Policies were enacted as a form of viewpoint discrimination against positive speech about LGBTQ individuals and transgenderism. The Fourth Circuit has explained that, in all types of forums, "a policy . . . that does not provide sufficient criteria to prevent viewpoint discrimination . . . generally will not survive constitutional scrutiny" and further that "viewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 387, 384 (4th Cir. 2006) (emphasis in original) (citations omitted). Accordingly, because it is plausible, drawing all inferences in Plaintiffs' favor, that Defendants' alleged conduct would not survive under any level of scrutiny, the Court does not engage in a full forum analysis at this time.

not compel Defendants to provide certain information to Plaintiffs. Rather it enforces limited First Amendment protections because Defendants "[h]av[e] chosen to provide access" to the speech in these books and they "may not thereafter selectively restrict certain categories of . . . speech because it disfavors their content." *Id.* at 795–96; *see also Lamont v. Postmaster Gen. of U. S.,* 381 U.S. 301, 310 (1965) (Brennan, J., concurring) ("If the Government wishes to withdraw a subsidy or a privilege, it must do so by means and on terms which do not endanger First Amendment rights.").

Defendants' arguments that Plaintiffs have failed to state a claim because minors do not have the same protections under the Constitution as adults are also unconvincing. As outlined above, even considering parents' constitutional right to raise their children, minors are still entitled to broad First Amendment protection. *Brown*, 564 U.S. at 794 (quoting *Erznoznik*, 422 U.S. at 212–13). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213–14). While Defendants without a doubt have the authority to enforce a prohibition that a parent puts in place to prevent their child from accessing information, the Supreme Court found this authority to enforce does not equate to authority to block minors' access to constitutionally protected speech until their parents give their consent. *See id.* Plaintiffs have alleged that the Written Policies create the same parental veto-only block of constitutionally protected speech. Accordingly, the Court finds that Plaintiffs' allegations are sufficient to state a First Amendment claim

based on the Written Policies and Defendants' Motion to Dismiss is denied as to this claim.

2. Counts Two and Four: Equal Protection Claims

Plaintiffs assert two claims for equal protection: one based on the Written Policies and one based on the Unwritten Policy. ECF No. 5 at 33–34, 35–36. Defendants argue that both of these claims should be dismissed. ECF No. 20 at 37–41. According to Defendants, Plaintiffs' equal protection claims are nothing more than reframing of his First Amendment claims because they allege that Plaintiffs are subject to unequal treatment because they are preventing them from accessing certain library materials, which is effectively the same as Plaintiffs' right to receive information argument under their First Amendment claims. *Id.* at 37–38. Defendants further contend that Plaintiffs have failed to state a claim because they have not sufficiently alleged how the Written and Unwritten Policies discriminate based on the sex or LGBTQ status of patrons. *Id.* at 38–41. Plaintiffs argue that they have sufficiently alleged that the Written and Unwritten Policies led to different treatment for LGBTQ Plaintiffs, as well as the classes they seek to represent, because the Written and Unwritten Policies create a system where transgender and LGBTQ patrons are uniquely banished to a separate section of the Library to attempt to find stories that represent their experiences. ECF No. 27 at 26–36. Plaintiffs further argue that the Written and Unwritten Policies intentionally inflict stigma upon LGBTQ patrons by segregating these materials and that the equal application reasoning has repeatedly been rejected by other courts. *See id.*

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The equal protection requirement 'does not take from the States all power of classification,' but 'keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 271 (1979); *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992)). To succeed on an equal protection claim, Plaintiffs "must first demonstrate that [they] ha[ve] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001). If Plaintiffs make this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*

First, as to Defendants' argument that Plaintiffs' equal protection claims are nothing more than a repackaging of their First Amendment claims, the Court disagrees. Plaintiffs allege they are members of an identifiable group, specifically LGBTQ-identifying Library patrons, and that this membership forms the basis of their equal protection claims. Plaintiffs allege that the Written and Unwritten Policies inflict equal protection injuries based on the impediment on their "ability to access library materials positively reflecting themselves and their families," and also the "dignitary harm and unconstitutional stigma" of their LGBTQ "identities and experiences" being treated as "unacceptable and unworthy of inclusion in public space." ECF No. 5 at 33, 35. These allegations, while related to Plaintiffs' First Amendment claims, are distinguishable because they discuss the Written

and Unwritten Policies' impact on an identified group of the Library's patrons. Unlike the cases cited by Defendants, Plaintiffs have alleged more than just disparate treatment through discrimination against their viewpoint. Accordingly, the Court finds that Plaintiffs have sufficiently alleged an equal protection claim that is separate from their First Amendment claim.

Turning to the sufficiency of Plaintiffs' allegations, the Court finds Plaintiffs' allegations are sufficient to show "[they] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison,* 239 F.3d at 654. Here, Plaintiffs have alleged that they are members of a recognized class—LGBTQ-identifying Library patrons—and that Defendants' Policies explicitly classify books that positively reflecting this protected status for removal and segregation, resulting in unequal treatment of the Plaintiffs and a powerful stigma against them. Specifically—and significantly—Plaintiffs allege that books that negatively portray their protected status remain readily available and unaffected by Defendants' Policies. Furthermore, Plaintiffs have included allegations of comments by the Board which plausibly suggest that the motivation for implementing these Policies was based in animus related to Plaintiffs' protected status rather than a compelling government interest. Moreover, the alleged language of the Written Policies specifically targets positive portrayals of transgender individuals.

At this early stage of the litigation, the Court must assume the facts alleged in the Amended Complaint to be true and draw all reasonable inferences in Plaintiffs' favor. *See Iqbal*, 556 U.S. at 678. In doing so, the Court finds that Plaintiffs have alleged sufficient

facts to suggest that Defendants' Policies result in transgender-based disparate treatment because they allow for books that negatively portray Plaintiffs' protected class to remain readily available while restricting access to positive portrayals. *Cleburne* 473 U.S.at 448 ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)); *C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) (explaining that discriminatory purpose implies that the decisionmaker in enacting the policy "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' [their] adverse effects upon an identifiable group" (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 279 (1979)).

Turning to the second inquiry, whether the disparity in treatment can be justified under the requisite level of scrutiny, the Court also finds Plaintiffs' allegations are sufficient at this stage of litigation. Under controlling law, classifications based on sex—including status as LGBTQ and transgender—are subject to intermediate, or "quasi-suspect," scrutiny. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607–08 (4th Cir. 2020); *Obergefell v. Hodges*, 576 U.S. 644, 674 (2015). Governmental action that discriminates on the basis of sex, transgender status, or gender identity must be found unconstitutional "unless [it is] substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985)). "To survive intermediate scrutiny, the state must provide an 'exceedingly persuasive justification' for its classification." *Id.* (citation omitted). The alleged results and motivations of the Policies as outlined above are more than sufficient

"to establish that the principal purpose and the necessary effect of this law are to demean those persons who" identify as transgender and LGBTQ. *United States v. Windsor*, 570 U.S. 744, 774 (2013). In short, Plaintiffs allegations suggest that Defendants' implementation of the Written and Unwritten Policies was not substantially related to a sufficiently important governmental interest. However, the Court notes that even if the more deferential standard of rational basis were to apply, Plaintiffs have still alleged sufficient facts to proceed with their claims at this stage in litigation.[5] Based on Plaintiffs' allegations, Defendants did not have a rational basis for their alleged discriminatory conduct, because, as discussed above, the Written Policies took the constitutionally protected decisions on how to raise children away from parents instead of merely supporting it and no basis has been provided for the implementation of the Unwritten Policy. Accordingly, Defendants' Motion to Dismiss is denied as to Plaintiffs' equal protection claims.

3. Qualified Immunity

Defendants argue that Defendants James and Allen are entitled to qualified immunity to the extent that Plaintiffs seek civil liability or an award of monetary damages against them. *See* ECF No. 20 at 42. Plaintiffs contend that Defendants' assertion of qualified immunity is immaterial because qualified immunity does not apply to claims for prospective relief, which is the only kind of relief Plaintiffs seek in this action. ECF No. 27 at 38. In their Reply, Defendants do not address whether qualified immunity applies to

[5] The Court applies rational-basis review when a government imposed a regulation does not involve a suspect class and will uphold the law if it rationally relates to a legitimate government objective. *Cleburne*, 473 U.S. at 440.

Plaintiffs' requested relief, and it appears they have abandoned their qualified immunity arguments. *See* ECF No. 33.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, "qualified immunity does not apply against . . . prospective relief." *Henderson v. Harmon*, 102 F.4th 242, 251 n.6 (4th Cir. 2024) (citation omitted). Qualified immunity also does not prevent an award of attorneys' fees pursuant to 42 U.S.C. § 1988 against public officials acting in their official capacity. *See Pulliam v. Allen,* 466 U.S. 522, 543–44 (1984). Here, Plaintiffs' requested relief is prospective, and Defendants' qualified immunity defense is accordingly inapplicable. ECF No. 5 at 36–37.[6]

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss [20] is **GRANTED IN PART** and **DENIED IN PART** as set out above.

IT IS SO ORDERED.

**s/ Donald C. Coggins, Jr.**
United States District Judge

March 19, 2025
Spartanburg, South Carolina

[6] Defendants also raise the merits of Plaintiffs' request for class certification. *See* ECF No. 20 at 43–44. As Defendants recognize, however, Plaintiffs' class allegations and request for class certification are not yet before the Court. *See id*. Accordingly, the Court declines to address the merits of Plaintiffs' class certification allegations at this time.

*O.R. et al. v. Greenville County, South Carolina et al.*

# Supplemental Exhibit

to the Library Defendants' Motion to Dismiss
(filed pursuant to the Court's Order [ECF 44] at 3 n.2)

Declaration of Beverly James (February 11, 2026)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated;<br><br>CHERYL ROGERS;<br><br>GREG ROGERS;<br><br>E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated;<br><br>M.G., by and through her mother, Amber Galea; and<br><br>W.M., by and through his mother, Kersey Clark,<br><br>*Plaintiffs*,<br><br>v.<br><br>GREENVILLE COUNTY, SOUTH CAROLINA;<br><br>GREENVILLE COUNTY LIBRARY SYSTEM;<br><br>BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and<br><br>KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,<br><br>*Defendants*. | C/A No. 6:25-cv-02599-DCC |

**DECLARATION OF BEVERLY JAMES**

I, Beverly James, declare pursuant to 28 U.S.C. § 1746 as follows:

1. My name is Beverly James. I am over the age of 18 and am competent to make this declaration. I am a citizen and resident of South Carolina. The facts stated herein are true of my own personal knowledge, and if called to testify, I would so testify.

2. I am the Executive Director of the Greenville County Library System (the "Greenville Library") in Greenville, South Carolina. I have served in this role for 25 years. Prior to that time, I served as the Director of Libraries at the city of Roanoke, Virginia. I have a master's

degree in Library Science from the University of Kentucky. I also have a master's degree in Public Administration from Virginia Tech.

3. As the Executive Director of the Greenville Library, I am responsible for, among other things, strategic planning, budgeting, personnel management, overseeing daily operations, and managing collections.

4. I am familiar with the factual allegations and claims made in the Amended Complaint in this case. I am also familiar with the information and materials described in this declaration.

5. Each of the 13 locations of the Greenville Library has a Parenting and Early Childhood ("PEC") section. The PEC sections contain a variety of books about topics including sex ed, divorce, potty training, and more. In addition, the PEC sections contain any books that are relocated from the Children's and Young Adults' pursuant to the Greenville Library's Collection Development and Maintenance Policy revisions adopted on February 26, 2024, and August 16, 2024. The PEC sections are not limited to books relocated from the juvenile sections or to books about sexual orientation or gender identity.

6. Prior to the Library Board's vote on February 26, 2024, to amend the collection policy, not every Greenville Library location had a PEC section. As of February 26, 2024, however, and consistent with the policy revision adopted that day, planning began for any Greenville Library location containing books that were to be relocated to the PEC section to have a PEC section to hold those books at that same location.

7. No books have been removed from any Greenville Library location or have been moved from one location to another because of the Library Board's policy revisions adopted on February 26, 2024, or August 16, 2024. Rather, any books that were to be reshelved in a PEC

section pursuant to those revisions were relocated to the PEC section in the same Greenville Library location where they were located at the time of those policy revisions.

8. At the time this litigation commenced on March 26, 2025, every Greenville Library location had a PEC section and still does today.

9. As of February 11, 2026, the Greenville Library's collection includes books categorized under the computer searchable subjects "LGBTQ"(628 books), "transgender"(261 books), "LGBTQIA"(268 books), "gender identity"(185 books), "gender identity – juvenile fiction"(24 books), "gender identity – juvenile literature"(13 books), and "gender identity – comic books, strips, etc."(14 books). Although the exact number of books in a given category can change from one day to the next if books are lost, withdrawn due to damage, or new books are acquired, the presence of these categories and the numbers of books in them today are generally representative of the Greenville Library's collection in the past two years. Books from each of these categories (though not *all* the books from each category) are included in the PEC sections of various library locations. The PEC sections and the category topics listed in this paragraph are curated in the same manner as any other section or topic, including by the ongoing acquisition of new, relevant material.

10. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 11th day of February 2026.

Beverly James

Beverly James

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated;<br><br>CHERYL ROGERS;<br><br>GREG ROGERS;<br><br>E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated;<br><br>M.G., by and through her mother, Amber Galea; and<br><br>W.M., by and through his mother, Kersey Clark,<br><br>*Plaintiffs*,<br><br>v.<br><br>GREENVILLE COUNTY, SOUTH CAROLINA;<br><br>GREENVILLE COUNTY LIBRARY SYSTEM;<br><br>BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and<br><br>KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,<br><br>*Defendants*. | Civil Action No. 6:25-cv-02599-DCC |

## MOTION TO CERTIFY FOR INTERLOCUTORY APPEAL (UNOPPOSED BY ANY PARTY) OR, ALTERNATIVELY, TO RECONSIDER OR STAY

WILSON JONES CARTER & BAXLEY, P.A.
Charles F. Turner, Jr.
John P. "Jack" Riordan
J. Nathan Ozmint
325 Rocky Slope Rd., Suite 201
Greenville, South Carolina 29607
(864) 672-3711

NELSON MULLINS RILEY & SCARBOROUGH LLP
Miles E. Coleman
2 West Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300

*Attorneys for Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System; and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ....................1

STANDARD OF REVIEW ....................3

TIMELINESS....................5

ARGUMENT ....................6

I. The Court should certify the March 19, 2026 Order for immediate, interlocutory appeal because it satisfies the statutory requirements of 28 U.S.C. § 1292(b).....................6

A. The Order raises a controlling question of law. ....................7

B. There is substantial ground for difference of opinion as to the question of law raised in the Order. ....................9

C. Immediate appeal of the Order is likely to advance the ultimate termination of the litigation. ....................11

II. The Court should reconsider its Order denying in part the Library Defendants' Motion to Dismiss....................12

III. Alternatively, the Court should stay this litigation pending the resolution of an appeal already before the Fourth Circuit that could also resolve the threshold legal issues in this litigation....................14

CONCLUSION....................16

## INTRODUCTION AND SUMMARY

Greenville County Library System, Beverly James, and Karen Allen (together, the "Library Defendants") move this Court to (1) amend its Order of March 19, 2026, by certifying it for an interlocutory appeal of the potentially dispositive threshold legal issues, (2) reconsider the Order, or (3) stay this case to await the Fourth Circuit's ruling in a soon-to-be-argued appeal raising similar questions in an analogous fact pattern that could be instructive in or dispositive of this case.

**1. Certification.** The Court's Order satisfies the statutory criteria for interlocutory appeal. *See* 28 U.S.C. §1292(b). It "involves a controlling question of law." *Id.* "There is substantial ground for difference of opinion" on the novel question of controlling law. *Id*. And an immediate appeal would "materially advance the ultimate termination of the litigation." *Id.*

Here, the Order considered threshold legal issues that have not yet been decided by the Supreme Court (or the Fourth Circuit) and that, if decided differently, would materially advance the conclusion of the litigation. Those questions are:

(a) Whether public library patrons have a constitutional right to receive information that prevents a public library from removing books or limiting minors' access to them based on the books' contents or viewpoints.

(b) Whether a public library's collection decisions, including the addition, removal, or relocation of books within the collection, is government speech that is not subject to or constrained by the Free Speech Clause.

Certification, though rare, is warranted here. If such relief is granted, the Library Defendants also request an order staying further proceedings in this Court pending the outcome of the appeal if accepted by the Court of Appeals for the Fourth Circuit.

**2. Reconsideration.** The Court's partial denial of the Library Defendants' Motion to Dismiss misapprehends the applicable law of equal protection. Just weeks ago, the Fourth Circuit ruled that—as the Library Defendants argued here—even if a facially neutral policy allegedly

affects primarily (or even exclusively) members of the LGBTQ community, the policy doesn't violate the Equal Protection Clause if there's any conceivable rational basis for it. So too here.

**3. Stay.** Alternatively, the Library Defendants ask that this case be stayed to await the Fourth Circuit's ruling in a pending appeal that's set for oral argument on May 5, 2026, and which raises some of the same potentially dispositive issues as this case. That appeal—*SC State Conference of the NAACP et al. v. Weaver et al.*, 3:25-cv-00487-SAL (D.S.C.) (filed Jan. 27, 2025), *appeal docketed*, No. 25-2216 (4th Cir. Oct. 14, 2025)—arises from a public-school district's removal of a book from its high school library, allegedly for viewpoint-discriminatory reasons. The issues before the Fourth Circuit in that case (as in this one) include (a) whether there is a cognizable right to receive information from the government, (b) whether the curation of a public library (in that case a public school library) is government speech that's not subject to or constrained by the Free Speech Clause, and (c) whether a failed First Amendment claim can be refashioned into an Equal Protection claim. The Fourth Circuit's holding in that case has the potential to instruct or completely resolve this litigation. A stay of this case to await ruling in that appeal would aid judicial economy and could save the parties the time, expense, and burden of potentially needless litigation.

In support of reconsideration, certification, or stay, the Library Defendants submit the following analysis and application of the governing law. [1 & 2]

---

[1] Pursuant to Local Civil Rule 7.04 (D.S.C.), a full explanation of this motion is contained herein, and a separate memorandum would serve no useful purpose.

[2] Pursuant to Local Civil Rule 7.02 (D.S.C.), consultation with the other parties' counsel is not required for a dispositive motion (here, the request for reconsideration) or for a Motion for a Stay. As to the portion of this Motion seeking certification, however, counsel for the Library Defendants conferred with Plaintiffs' counsel, who stated, "Plaintiffs do not object to the Court certifying its order to allow Defendants to pursue interlocutory review," but they "object to all of the other relief [that the Library] Defendants seek." Counsel for the Library Defendants also conferred with co-defendant Greenville County's counsel, who stated that the County does not oppose this motion.

## STANDARD OF REVIEW

**Certification of Interlocutory Appeal.** Pursuant to 28 U.S.C. § 1292(b), "[w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a *controlling question of law* as to which there is *substantial ground for difference of opinion* and that an immediate appeal from the order may *materially advance the ultimate termination of the litigation*," the district judge may certify the order for immediate appeal by making note of such findings in its order (emphasis added).

Courts are afforded broad discretion when deciding whether to certify. *See, e.g.*, *In re Trump*, 928 F.3d 360, 368–69 (4th Cir. 2019), *pet. den'd on reh'g en banc,* 958 F.3d 274 (4th Cir. 2020), *cert. granted, judgment vacated as moot sub nom. Trump v. D.C.*, 141 S. Ct. 1262 (2021) ("To be sure, the discretion conferred on district courts by § 1292(b) is broad.") (citing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 47 (1995)). However, if the Court determines that the statutory requirements have been met, "it has a duty to allow an immediate appeal to be taken." *Id.* (cleaned up) (quoting *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000)). The Supreme Court has encouraged lower to courts to certify orders for appeal when the issue raised "involves a new legal question or is of special consequence." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110–11 (2009).

**Reconsideration.** Under Rule 54(b) of the Federal Rules of Civil Procedure, "[a]n interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment." *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469–70 (4th Cir. 1991). Courts in the Fourth Circuit look to the standards governing Rule 59(e) motions for guidance in analyzing a motion to reconsider an interlocutory order, although courts are not necessarily bound by the strictures of Rule 59(e). *See, e.g., Superior Bank F.S.B. v. Tandem Nat'l Mortg., Inc.,* 197 F. Supp. 2d 298, 332 (D. Md. 2000); *R.E. Goodson Constr. Co., Inc, v. Int'l Paper Co.*, No. 4:02-

cv-4184, 2006 WL 1677136, at *1 (D.S.C. June 14, 2006). A district court has the discretion to grant a Rule 59(e) motion "to correct a clear error of law or prevent manifest injustice." *Hill v. Braxton*, 277 F.3d 701, 708 (4th Cir. 2002) (internal quotation marks omitted); *see also Collision v. Int'l Chem. Workers Union, Local 217*, 34 F.3d 233, 236 (4th Cir. 1994). "[T]he rule permits a district court to correct its own errors, 'sparing the parties and the appellate courts the burden of unnecessary appellate proceedings.'" *Pacific Ins. Co. v. Am. Nat. Fire. Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (internal citation omitted).

**Stay Pending Outcome of an Associated Case.** "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936); *see also* Loc. Civ. R. 16.00(C) (D.S.C.). This power extends to situations in which one litigation is stayed to await the outcome of another which would significantly impact its final resolution. *Id.*; *see also S.C. State Conf. of NAACP v. McMaster*, 572 F. Supp. 3d 215, 220 (D.S.C. 2021) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before, it, pending resolution of independent proceedings which bear upon the case.") (quoting *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F. 2d 857, 862 (9th Cir. 1979)). Courts have discretion in how to exercise the power to stay proceedings and "must weigh competing interests and maintain an even balance." *Landis*, 299 U.S, at 245–55. "The party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983).

**TIMELINESS**

This motion is timely filed 20 days after the order to be reconsidered or certified. *See* Rule 54(b), Fed. R. Civ. P. (orders that adjudicate fewer than all the claims may be revised at any time before entry of a judgment adjudicating all claims); Loc. Civ. R. 16.00(C) (D.S.C.) (setting no deadline for a motion to stay). While 28 U.S.C. § 1292(b) does not contain a deadline for a motion to certify an order for immediate appeal, this motion is timely brought within a reasonable time. *See Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 675–76 (7th Cir. 2000) ("[T]here is no statutory deadline for the filing of the petition in the district court," but "the petition must be filed in the district court within a ***reasonable time*** after the order sought to be appealed.") (emphasis in original); *see also* Rule 5, Fed. R. App. P., Cmt. Notes (1967) (discussing certification and noting that a "district court can amend an order by supplying the statement required by § 1292(b) at any time after entry of the order"); *id*. Cmt. Notes (1998) (noting that the ten-day window to petition the Circuit Court for an interlocutory appeal refers to a deadline that begins to run only after the district court amends its order to include the prescribed certification language).

Courts in this district have previously certified the interlocutory appeal of orders that were over a year old. *See Municipal Ass'n of S.C. v. Serv. Ins. Co., Inc.*, No. No. 3:08-03072-MBS, 2011 WL 1325448, at *3 (D.S.C. Sept. 21, 2011) (certifying order for appeal even though "'approximately thirteen months have elapsed since this Court issued its order'"). And, in that instance, the Fourth Circuit agreed to accept the interlocutory appeal. *Municipal Ass'n of S.C. v. USAA Gen. Indemn. Co.*, 709 F.3d 276, 282 (4th Cir. 2013) ("Appellants moved the district court to certify this matter for interlocutory appeal, and the district court granted the certification. We accepted the appeal."). Here, the Library Defendants' motion, filed only 20 days after the Order, is timely. *Cf. Morris v. Flaig*, 511 F.Supp.2d 282, 314–15 (E.D.N.Y. 2007) (collecting cases indicating that only delays of two months or more in seeking certification were unreasonable).

## ARGUMENT

### I. The Court should certify the March 19, 2026 Order for immediate, interlocutory appeal because it satisfies the statutory requirements of 28 U.S.C. § 1292(b).

Certification of the Court's Order of March 19, 2026, is warranted because it satisfies the statutory criteria and because it involves important, novel questions that are arising with increasing frequency. The crux of the Order is "whether a public library may, without violating the First Amendment, enforce a policy that results in moving books based on their content to a separate, more restrictive section of the library." (ECF 44, at 23.) The Court determined that, theoretically, a public library could re-section books based on their content but that the decision to do so would be subject to stringent review over their motivations for doing so. (*Id.* at 28–29.) By countenancing the Plaintiffs' novel theory that they have a right to receive information from the government, the Court applied new First Amendment restrictions to the activities performed by every library every day—culling, maintaining, and structuring its catalogue. (*Id.*) So too, the Court's ruling has effectively expanded the Free Speech Clause to restrict the government's own speech through the selection and curation of the messages it wishes to convey. To counsel's knowledge, this decision is the first of its kind in this Circuit (though it won't be the last) and it raises a novel, complex issue not yet decided by the Fourth Circuit or other courts within this District.

Respectfully, the Library Defendants disagree with the Court's holding and ask that the Court certify this Order for immediate, interlocutory appeal under 28 U.S.C. § 1292(b). Even if the Court is unpersuaded by the Library Defendants' position on the merits, it should recognize that this is precisely the type of case in which interlocutory appeal is appropriate and would ultimately simplify this case, streamline litigation, and avoid wasting judicial resources. In such instances, courts are compelled to certify pursuant to § 1292(b). *See, e.g.*, *In re Trump*, 928 F.3d 360, 368–69 (4th Cir. 2019), *pet. den'd on reh'g en banc,* 958 F.3d 274 (4th Cir. 2020), *cert.*

*granted, judgment vacated as moot sub nom. Trump v. D.C.*, 141 S. Ct. 1262 (2021) (quoting *Ahrenholz v. Bd. of Trs. of the Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000)).

For an order to be certified for immediate appeal under § 1292(b), the movant must show the following: (1) the order raises a controlling question of law, (2) there is substantial ground for difference of opinion as to that question, and (3) an immediate appeal may materially advance the ultimate termination of the litigation. As discussed below, the Library Defendants can show that the Order satisfies each of these statutory requirements. Therefore, the Court should amend the Order to add a certification that it is appropriate for immediate, interlocutory appeal under 28 U.S.C. § 1292(b). Upon certifying the Order, the Court should also stay this litigation pending the resolution of the petition for interlocutory review and the appeal.

**A. The Order raises a controlling question of law.**

Plaintiffs' First Amendment claims are based on a central question novel to this Circuit—do individuals have a positive right to receive information from a public library? If yes, Plaintiffs have cleared at least that threshold jurisdictional bar and the analysis may proceed. But if not, their First Amendment claims necessarily fail. Plaintiffs' claims raise another threshold issue that's novel as well: whether a public library's collection decisions are government speech that's not subject to or constrained by the Free Speech Clause. It's difficult to imagine questions of law more appropriate for interlocutory review than those.

Certification of immediate appeal is appropriate for "an order presenting a 'pure question of law'" that does not require "delv[ing] beyond the surface of the record in order to determine the facts." *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340–41 (4th Cir. 2017). "A question of law is generally considered to be controlling within the meaning of § 1292(b) if the action would have been terminated had the district court ruled the opposite way." *City of Charleston, S.C. v. Hotels.com, LP*, 586 F. Supp. 2d 538, 542 (D.S.C. 2008). Courts have also

recognized that a question is controlling if it "would materially affect the litigation's outcome," even if it doesn't necessarily terminate the action. *See Consub Delaware LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007), *aff'd*, 543 F.3d 104 (2d Cir. 2008); *see also Gilmore v. Jones*, No. 3:18-CV-00017, 2019 WL 4417490, at *3 (W.D. Va. Sept. 16, 2019) (acknowledging that a question of law may be controlling when it "substantially shorten[s] the litigation") (internal quotation omitted); *Coal. For Equity & Excellence In Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, No. CIV. CCB-06-2773, 2015 WL 4040425, at *4 (D. Md. June 29, 2015) (acknowledging that "a question also may be controlling 'if interlocutory reversal might save time for the district court, and time and expense for the litigants'") (quoting 16 Wright et al., Federal Practice & Procedure § 3930).

Determining the existence of a supposed positive right to receive information from the government would materially impact this litigation—if not completely resolve it. In deciding this issue, a higher court would not need to address any facts of the dispute and is free to base its conclusion entirely on questions of law. Courts have certified similar legal issues as controlling for purposes of § 1292(b). *See, e.g.*, *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011) (noting in a case with "First Amendment implications" that "the requirements of § 1292(b) are clearly satisfied in this case" because "[w]e are faced with a pure question of law and our resolution of it terminates the case"); *Kennedy v. Villa St. Catherine, Inc.*, No. No. PWG–09–3021 (WDQ), 2010 WL 9009364, at *1 (D. Md. June 16, 2010) ("A question of law as used in section 1292(b) has reference to a question of the meaning of a statutory or constitutional provision[.]") (cleaned up).

For these reasons, the Order presents a controlling question of law and should be certified for immediate, interlocutory appeal.

**B. There is substantial ground for difference of opinion as to the question of law raised in the Order.**

Plaintiffs' novel theory of law is untested in this district and the Fourth Circuit. Across the country, courts are trying to answer similar questions, meaning these questions are of national significance. Indeed, First Amendment jurisprudence in the library context has long been disputed and unsettled, as shown by the fractured decisions in *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982). To the extent courts have addressed the right-to-receive-information issue, the results so far are mixed. This Court's recent ruling, for example, is inescapably inconsistent with *Little v. Llano County*, 138 F.4th 834, 848, 850–51 (5th Cir. 2025) (*en banc*) (finding there is no constitutional right for library patrons to receive or to have continued access to a book of their choosing from a public library).[3] And just two days ago (a few weeks after the Order in this case), the Eighth Circuit weighed in on an analogous case and adopted a similar analysis to that of *Little*. *See Penguin Random House, LLC v. Robbins*, No. 25-1819, slip op. at 5–6 (8th Cir. April 6, 2026) ("[T]he removal of a book from a school library does not prevent a student from 'receiving' the information" and acknowledging that "[t]he First Amendment does not guarantee students the right to access books of their choosing at taxpayer expense"). The same is true of the government speech question. In *Little*, a plurality (though not a majority) of the en banc Fifth Circuit concluded that a public library's collection curation was government speech not subject to or constrained by the Free Speech Clause. 138 F.4th at 860–61, 865.[4]

---

[3] The parallels between this case and *Little* are notable. Of the 17 books the public library in *Little* had removed, four were "young adult books touching on sexuality and homosexuality" and two were books "centering on gender identity and dysphoria." *Little v. Llano Cnty*., 103 F.4th 1140, 1144 (5th Cir. 2024) rev'd by *Little v. Llano Cnty*., 138 F.4th 834 (5th Cir. 2025) (*en banc*).

[4] Ten of the 17 judges of the Fifth Circuit joined the part of the opinion holding that the defendants' decision to remove the 17 books did not infringe plaintiffs' alleged right to receive information. The divergent viewpoints on this issue among the en banc court reinforce the fact that, in the words of § 1292(b), there is substantial ground for difference of opinion on the controlling issues of law.

There is substantial ground for difference of opinion when "controlling law is unclear." *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) (citing *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010)). Courts generally find that there is substantial ground for disagreement when circuits disagree on the issue of law, the relevant court of appeals has not spoken on the issue, or the issue is novel and without significant legal guidance. *See, e.g.*, *id.* ("[C]ourts find substantial grounds 'where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.'"); *Nat'l Veterans Legal Servs. Program v. United States*, 321 F. Supp. 3d 150, 155 (D.D.C. 2018) ("A substantial ground for difference of opinion is often established by a dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits."); *DRFP, LLC v. Republica Bolivariana de Venezuela*, 945 F. Supp. 2d 890, 918 (S.D. Ohio 2013) ("[A] substantial ground for difference of opinion exists only when 1) the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions; 2) the question is difficult and of first impression; 3) a difference of opinion exists within the controlling circuit; or 4) the circuits are split on the question.") (internal citation omitted). Courts may recognize that substantial ground for disagreement exists, even if the Court ultimately finds the arguments unpersuasive. *See, e.g., Nat'l Veterans Legal Servs. Program v. United States*, 321 F. Supp. 3d 150, 155 (D.D.C. 2018); *Kennedy v. Villa St. Catherine, Inc.*, No. PWG-09-3021 WDQ, 2010 WL 9009364, at *3 (D. Md. June 16, 2010).

When faced with legal issues of particular significance, courts are more likely to determine that there is substantial ground for disagreement. *See, e.g., Coal. For Equity & Excellence in Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, No. CIV. CCB-06-2773, 2015 WL 4040425, at *6 (D. Md. June 29, 2015) ("The level of uncertainty required to find a substantial

ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case.") (quoting 16 Wright et al., Federal Practice & Procedure § 3930.); *In re Health Diagnostic Lab'y, Inc.*, No. 15-32919-KRH, 2017 WL 2129849, at *4 (E.D. Va. May 16, 2017) (same); *see also Kennedy v. Villa St. Catherine*, No. PWG-09-3021 WDQ, 2010 WL 9009364, at *3 (D. Md. June 16, 2010) (acknowledging that substantial grounds for disagreement "may be found by virtue of the strong public policy purpose served by [the at-issue statute]" and the fact that the order's impact "permits government intervention into a religious organization").

The legal questions presented in this litigation—and addressed in the Order—are novel, nationally important, and unsettled. For these reasons, the Order raises a question on which there is substantial ground for disagreement and should be certified for immediate, interlocutory appeal.

**C. Immediate appeal of the Order is likely to advance the ultimate termination of the litigation.**

By its very nature, this case is likely to result in lengthy, expensive, and resource-intensive litigation. Because Plaintiffs assert a novel theory of law with their alleged positive right to receive information from a public library, significant judicial resources will be expended to resolve the nature, scope, and existence of that right. It is very possible that the parties will invest years into this case, only for the Court (or a subsequent appellate court) to determine that there was never any cognizable right in the first place.

Immediate appeal of an Order materially advances the ultimate termination of the litigation when it deters "protracted and expensive litigation." *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 951 (D. Md. 2019) (citing *Fannin v. CSX Transp., Inc.*, 873 F.2d 1438, 1989 WL 42583, at *2 (4th Cir. 1989)). Courts commonly consider whether immediate appeal would result in a shorter trial, easier and more efficient discovery, simplified issues due to resolution of complex areas of law, or even the conclusion of the dispute altogether. *See, e.g.*, *Lynn v. Monarch*

*Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 626 (D. Md. 2013) ("In determining whether certification will materially advance the ultimate termination of the litigation, a district court should consider whether an immediate appeal would: '(1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly.'") (citing *Orson, Inc. v. Miramax Film Corp*., 867 F. Supp. 319, 322 (E.D. Pa. 1994)); *In re Health Diagnostic Lab'y, Inc*., No. 15-32919-KRH, 2017 WL 2129849, at *4 (E.D. Va. May 16, 2017) (same); *Eckmann v. Tchrs. Ins. & Annuity Ass'n of Am.*, No. 3:24-CV-00001, 2025 WL 2731839, at *10 (W.D.N.C. Sept. 25, 2025) (same).

By certifying this question for immediate appeal, the Court creates an opportunity to determine the key issue in this litigation, reducing the need for extensive motions practice, discovery, and perhaps even trial. For these reasons, this Order should be certified for immediate, interlocutory appeal because such an appeal would materially advance this litigation.

## II. The Court should reconsider its Order denying in part the Library Defendants' Motion to Dismiss.

In addition to the threshold issues noted above, the Order of March 19, 2026 erred by allowing an Equal Protection claim to proceed despite the fact that the Amended Complaint alleges only that the Library Defendants treated *materials* discriminatorily and there's no dispute that the library's policies treat every similarly situated *person* the same. Plaintiffs cannot plausibly allege an Equal Protection claim when, as here, every child, teen, and adult patron—regardless of their sexual orientation or gender identity or any other factor—has exactly the same access to the same materials as every other child, teen, or adult patron. In the Court's view, however, this facially equal treatment could nevertheless constitute disparate treatment in violation of the Equal Protection Clause because Plaintiffs allege that "the law's *impact* falls on the minority." (ECF No. 44, at 17–18) (quotation omitted) (emphasis added).

The Library Defendants already explained how the Supreme Court's ruling in *Skrmetti* rebuts that view here. And just a few weeks ago, the Fourth Circuit rebutted that point again and bolstered the argument the Library Defendants raised here. *See Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026) (holding that a state Medicaid plan's denial of coverage for sex change surgeries did not violate the equal protection rights of the transgender plaintiffs). The *Anderson* court repeatedly explained that when a law applies equally without reference to a person's gender identity, it doesn't violate the Equal Protection Clause:

> At its core, the Clause prevents States from "treating differently persons who are in all relevant respects alike." [] Yet this prohibition's scope should not be exaggerated. "The Equal Protection Clause does not forbid classifications' categorically, and laws often deal in classifications to solve particular problems or to achieve targeted outcomes. . . . '[U]neven effects upon particular groups within a class are ordinarily of no constitutional concern." . . . Generally speaking, *laws that apply evenhandedly to all 'unquestionably comply'* with the Equal Protection Clause. . . . Indeed, the Supreme Court has made clear that the mere fact that a law primarily—or even exclusively—affects a protected class cannot alone establish an equal protection claim.

*Id*. at 482–84 (citations omitted) (emphasis added). In *Anderson*, for example, even though the *effect* of the challenged policy allegedly fell *exclusively* on transgender people, the Fourth Circuit nevertheless expressly concluded that the policy didn't discriminate on the basis of transgender status and was constitutional. *Id*. at 486 n.9. The same reasoning applies here. Even assuming that the effect of the challenged library policies falls especially (or even exclusively) on LGBTQ library patrons, the policies do not discriminate on the basis of that status. So, as long as the Court can discern from the record (the Amended Complaint and the materials incorporated therein) any possible rational, non-discriminatory reason for the even-handed policy—and here, it can—the policies survive constitutional muster.[5] *See id*. at 491 (noting that in such a situation the court will

[5] The Fourth Circuit's ruling in *Anderson* came after an extensive procedural history, including a ruling on summary judgment below, a prior appeal, and summary vacatur and remand from the Supreme Court. The Circuit Court's reasoning, however, was not dependent on that posture, and

uphold an enactment "so long as there is '*any* reasonably *conceivable* state of facts that could provide a rational basis'" for it) (quoting *Skrmetti*, 605 U.S. at 522)) (emphasis added).

### III. Alternatively, the Court should stay this litigation pending the resolution of an appeal already before the Fourth Circuit that could also resolve the threshold legal issues in this litigation.

If this Court determines that it will not reconsider or certify the Order for immediate appeal, the Library Defendants ask that the above-captioned case be stayed pending resolution of *SC State Conference of the NAACP et al. v. Weaver et al.*, 3:25-cv-00487-SAL (D.S.C.) (filed Jan. 27, 2025), *appeal docketed*, No. 25-2216 (4th Cir. Oct. 14, 2025), which is pending appeal in the United States Court of Appeals for the Fourth Circuit. The appeal will be argued less than a month after this motion is filed.

The *Weaver* appeal arises from a suit alleging that (i) a public school violated the First Amendment by removing a book from its high-school library, allegedly for viewpoint-discriminatory reasons, and (ii) the state Department of Education allegedly infringed on students' right to receive information by declining immediately to assign a permanent course code to an African American Studies class. It is very possible that the Fourth Circuit will address legal issues raised in *Weaver* that are exceedingly similar to those presented in this case, including whether the curation of a public-school library is government speech that's not subject to or constrained by the Free Speech Clause, whether public school students have a cognizable right to receive (or have continued access to) information provided by a government entity, and whether a failed First

---

it applies equally here: even when a facially neutral policy has an effect that allegedly falls primarily or even exclusively on a protected class, the policy does not violate the Equal Protection clause so long as there is "*any* reasonably *conceivable*" non-discriminatory basis for the challenged action. Here, there was, and it's expressly discernable from the Amended Complaint, namely the Library Board's contemporaneous, stated desire (which was explicitly incorporated into the written policy that's challenged in this suit) to acknowledge and defer to the fundamental constitutional right of parents to direct the upbringing and education of their children. *See* Am. Compl. (ECF 5) at ¶¶ 47, 54, 64, 74, 79; Library Collection Policy (ECF 5-1) at 3, 8–9, 13.

Amendment claim can be refashioned into an Equal Protection claim even though the challenged action treats every similarly situated person equally.

The impact of such a holding would be significant and could even resolve this litigation in its entirety. Waiting for the Fourth Circuit to make its determination would give this Court the benefit of the Fourth Circuit's guidance on the legal issues in this case, which is particularly useful as this case raises novel issues with very little legal precedent.

This Court commonly applies the following factors when deciding whether to stay a proceeding: "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *S.C. CVS Pharmacy, LLC, v. SCP 2001A-CSF-75 LLC, et al.*, No. 2:24-525-JDA-SVH, 2026 WL 524730, at *2 (D.S.C. Jan. 22, 2026) (quoting *Goose Creek Physical Med. v. Kennedy*, No. 2:22-CV-03932-DCN, 2025 WL 2085939, at *2 (D.S.C. July 24, 2025)); *Impulse Monitoring, Inc. v. Aetna Health*, No. 3:14-CV-02041-MGL, 2014 WL 4748598, at *1 (D.S.C. Sept. 23, 2014) (same); *Johnson v. DePuy Orthopaedics*, No. 3:12-CV-2274-JFA, 2012 WL 4538642 , at *2 (D.S.C. Oct. 1, 2012) (same).

Here, judicial economy is best served by staying this case until the Fourth Circuit resolves the appeal in *Weaver*. It is possible that the Fourth Circuit's ultimate decision in that matter will significantly impact if not outright decide the legal issues raised in this litigation. Waiting for that order could provide this Court with useful guidance and avoid the risk of issuing decisions conflicting with those of the Fourth Circuit. In the interim, if this case is not stayed, the Library Defendants would expend significant time and resources litigating this case without the benefit of the Fourth Circuit's ruling. This hardship is compounded by the fact that there is already very little binding precedent to direct this lawsuit. All parties—including Plaintiffs—would benefit from a potential ruling by the Fourth Circuit. If Plaintiffs face any prejudice at all, it is surely outweighed by the benefits of staying this case.

Accordingly, the Library Defendants respectfully ask this Court to stay the above-captioned case pending resolution of *NAACP et al. v. Weaver et al.*, which will be argued in just a few weeks.

## CONCLUSION

For the foregoing reasons, the Library Defendants respectfully request—without opposition from any party—that the Court certify its March 19, 2026 Order for immediate, interlocutory appeal pursuant to 28 U.S.C. § 1292(b). In the alternative, the Library Defendants request the Court reconsider its March 19, 2026 Order, and/or stay this case pending resolution of the soon-to-be-argued appeal in *NAACP et al. v. Weaver et al.*

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ Miles E. Coleman
Miles E. Coleman (Fed. Bar No. 11594)
E-Mail: miles.coleman@nelsonmullins.com
2 W. Washington Street / Suite 400
Greenville, SC 29601
(864) 373-2300

WILSON JONES CARTER & BAXLEY
Charles F. Turner, Jr. (Fed. ID No. 05849)
E-Mail: cfturner@wjcblaw.com
J. Nathan Ozmint (Fed. ID No. 14360)
E-Mail: jnozmint@wjcblaw.com
John P. "Jack" Riordan (Fed. ID No. 07314)
E-Mail: jpriordan@wjcblaw.com
325 Rocky Slope Rd., Suite 201
Greenville, South Carolina 29607
(864) 672-3711

*Attorney for the Greenville County Library System, Beverly James, in her official capacity as Executive Director of the Greenville County Library System, and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

Greenville, South Carolina
April 8, 2026

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated;<br><br>CHERYL ROGERS;<br><br>GREG ROGERS;<br><br>E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated;<br><br>M.G., by and through her mother, Amber Galea; and<br><br>W.M., by and through his mother, Kersey Clark,<br><br>Plaintiffs,<br><br>v.<br><br>GREENVILLE COUNTY, SOUTH CAROLINA;<br><br>BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System;<br><br>KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System, and<br><br>GREENVILLE COUNTY LIBRARY SYSTEM,<br><br>Defendants. | No. 6:25-cv-02599-DCC<br><br>**ORDER** |

This matter is before the Court on Defendants Beverly James, Karen Allen, and

Greenville County Library System's (the "Library") (collectively, the "Library Defendants") Motion to Certify for Interlocutory Appeal or, Alternatively, to Reconsider or Stay and Defendant Greenville County's (the "County") Motion for Reconsideration and/or Clarification. ECF Nos. 47, 48. For the reasons set forth below, the Library Defendants' Motion is granted as to the primary relief sought and denied as moot as to the alternative relief sought, and the County's Motion is granted.

## II. APPLICABLE LAW

### A. Certificate of Appeal under 28 U.S.C. § 1292

"[28 U.S.C. §] 1292(b) provides a mechanism by which litigants can bring an immediate appeal of a non-final order upon the consent of both the district court and the court of appeals." *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 623 (D. Md. 2013) (quoting *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982)). Pursuant to 28 U.S.C. § 1292(b), an interlocutory appeal may be sought for an order that is not otherwise appealable when the district court is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." As such, a district court may certify an order for interlocutory appeal when: "1) such order involves a controlling question of law, 2) as to which there is substantial ground for difference of opinion, and 3) an immediate appeal from that order may materially advance the ultimate termination of the litigation." *Mun. Ass'n of S.C. v. Serv. Ins. Co., Inc.*, 2011 WL 13253448, at *3 (D.S.C. Sept. 21, 2011) (internal quotations omitted). All three requirements must be met. *Id.*

**B. Reconsideration under Rule 54**

Any order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The Fourth Circuit has held that that motions under Rule 54(b) are "not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003); *see also Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1472 (4th Cir. 1991) (finding it "unnecessary to thoroughly express [Fourth Circuit's] views on the interplay of Rules 60, 59, and Rule 54"). In deciding these motions, district courts have looked to the standards of motions under Rule 59 for guidance. *Sanders v. Lowe's Home Ctrs, LLC*, C.A. No. 0:15-cv-02313-JMC, 2016 WL 5920840, at *2 (D.S.C. Oct. 11, 2016). "Therefore, reconsideration under Rule 54(b) is appropriate on the following grounds: (1) to account for an intervening change in controlling law; (2) to account for newly discovered evidence; or (3) to correct a clear error of law or prevent manifest injustice."[1] *South Carolina v. United States*, 232 F. Supp. 3d 785, 793 (D.S.C. 2017).

[1] Courts in this district have recognized that:

> The Fourth Circuit has suggested that the law of the case doctrine has evolved as a means of guiding a district court's discretion in deciding a Rule 54(b) motion for reconsideration of an interlocutory order. *Am. Canoe Ass'n*, 326 F.3d at 515. Under the law of the case doctrine, an earlier decision of the court becomes the law of the case and must be followed unless "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Sejman v. Warner–Lambert Co., Inc.,* 845 F.2d 66, 69 (4th Cir.

A motion to reconsider an interlocutory order is not an appropriate vehicle to rehash arguments already considered by the court because the movant is displeased with the outcome. *See Ashmore v. Williams*, 8:15-cv-03633-JMC, 2017 WL 24255, at *3; *Sanders v. Wal-Mart Stores E.*, No. 1:14-cv-03509-JMC, 2016 WL 6068021, at *3 (D.S.C. Oct. 17, 2016). Nor may a movant raise new arguments or evidence that could have been raised previously. *See Nationwide Mut. Fire Ins. Co. v. Superior Solution, LLC*, No. 2:16-cv-423-PMD, 2016 WL 6648705, at *2 (D.S.C. Nov. 10, 2016); *Regan v. City of Charleston*, 40 F.Supp.3d 698, 701 (D.S.C. 2014). In assessing a motion under Rule 54(b), these standards are not as strictly applied as they would be if the order were a final judgment and reconsideration were sought under Rule 59(e). *Am. Canoe Ass'n*, 326 F.3d at 514–15.

**III. BACKGROUND**

This action arises out of dispute over the constitutionality of policies implemented by the Library Defendants. *See* ECF No. 5. On June 27, 2025, the Library Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint. ECF No. 20. On March 19,

---

> 1988) (internal quotation marks omitted), *cited with approval in Am. Canoe Ass'n*, 326 F.3d at 515. This court notes that the three reasons for overcoming the law of the case doctrine mirror the three reasons for granting relief under Rule 59(e). *See United States v. Duke Energy Corp.*, No. 1:00cv1262, 2014 WL 4659479, at *3 n.4 (M.D.N.C. Sept. 17, 2014).

*South Carolina v. United States*, 232 F. Supp 3d at 793. The Fourth Circuit has clarified that "[t]his standard closely resembles the standard applicable to motions to reconsider final orders pursuant to Rule 59(e), but it departs from such standard by accounting for potentially different evidence discovered during litigation as opposed to the discovery of new evidence not available at trial." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (internal quotation marks and citation omitted).

2026, the Court granted in part and denied in part the Library Defendants' Motion. ECF No. 44. On April 8, 2026, the Library Defendants filed their Motion to Certify for Interlocutory Appeal or, Alternatively, to Reconsider or Stay. ECF No. 47. The Library Defendants represent that there was no opposition by Plaintiffs or the County as to their requested primary relief—a certificate of appealability. *See id.* at 1, 4 n.2. No response in opposition was filed within the time to do so.[2] On April 16, 2026, the County filed its Motion for Reconsideration and/or Clarification or Amendment of Court Order. ECF No. 48. No response in opposition was filed.

## III. DISCUSSION

### A. The Library Defendants' Motion for Certificate of Appealability

The Library Defendants ask the Court for an Order certifying the March 19, 2026, Order, which denied the Library Defendant's Motion to Dismiss in part. *See* ECF Nos. 47, 44. The Library Defendants specifically assert that they wish to appeal the Court's findings on Plaintiffs' First Amendment claims,[3] and they contend that they have

[2] In the Library Defendants' Motion, they represent that Plaintiffs were consulted as to all relief that the Library Defendants request and that Plaintiffs "do not object to the Court certifying its order to allow Defendants to pursue interlocutory review," but they "object to all other relief [that the Library] Defendants seek." ECF No. 47 at 4 n.2. On May 13, 2026, Plaintiffs filed a Motion for Leave to File Out of Time a response in opposition to the Library Defendants' Motion to the extent it seeks alternative relief in the form of reconsideration or a stay. *See* ECF No. 49. Since the Court ultimately grants the unopposed, primary relief sought by the Library Defendants, the Court need not reach the requested alternative relief for reconsideration or to stay raised by the Library Defendants. Accordingly, Plaintiffs Motion for Leave to File Out of Time, ECF No. 49, is denied as moot.

[3] The Library Defendants refer to the Court's ruling on Plaintiffs' First Amendment claims. The Court notes that one of Plaintiffs' two First Amendment claims was dismissed for lack of standing. ECF No. 44 at 13–15. The Library Defendants do not discuss the

demonstrated all three elements are applicable and met for these claims. ECF No. 47 at 8–14.[4] Neither Plaintiffs nor the County oppose Defendants' Motion to Certify for Interlocutory Appeal. *See* ECF Nos. 47 at 1, 4 n.2; 49 at 1, 2 n.1.

In denying the Library Defendants' Motion to Dismiss Plaintiffs' First Amendment claims, the Court considered "whether a public library may, without violating the First Amendment, enforce a policy that results in moving books based on their content to a separate, more restrictive section of the library." ECF 44 at 23. Neither the Fourth Circuit nor the Supreme Court has directly addressed this issue, so the Court turned to the Supreme Court's plurality decision in *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), as well as other courts' interpretations of that decision, for guidance. *See id.* at 23–28. Because, based on Plaintiffs' allegations, "there is a plausible inference that the decision to enact the Written Policies[5] was based on

Court's ruling on this First Amendment claim in their Motion, and, instead, focus their argument for certificate of appeal solely on the Court's ruling on Plaintiffs' other First Amendment claim. *See* ECF No. 47. Accordingly, the Court's analysis is limited to the relief that the Library Defendants specifically seek in their Motion.

[4] The Library Defendants also move for reconsideration or to stay. *See* ECF No. 47. While their request for relief related to the reconsideration or to stay address the Plaintiffs' Equal Protection claims, which the Court also declined to dismiss, it appears to the Court that the Library Defendants only seek a certificate of appealability as to the Court's ruling on one of Plaintiffs' First Amendment claims. *See id.* Accordingly, the Court's analysis is limited to the relief that the Library Defendants specifically seek in their Motion.

[5] "Written Policies" was defined in the Court's prior Order as the two written policies implemented by the Library in 2024, which removed all material from the juvenile and young adult sections of the library that contain "illustrations, themes, or story lines [that] affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex" or with "illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning." ECF No. 44 at 3 (citations omitted).

Defendants' ideological objections to the books' content or disagreement with their messages or themes rather than a viewpoint neutral reason," the Court denied the Library Defendants' Motion to Dismiss. *Id.* at 28. As noted by the Court, "drawing all inferences in Plaintiffs' favor, that Defendants' alleged conduct would not survive under any level of scrutiny," but the Court did not determine at this stage of litigation what level of scrutiny would apply to these claims. *Id.* at 28 n.4. Further, the Court declined to find that the government speech doctrine extended to library curation at the motion-to-dismiss stage based on the presence of contradictory persuasive precedent, the readily distinguishable factual background in the controlling precedent, the Supreme Court's directive to apply caution in extending the government speech doctrine, and the procedural posture of this action. *Id.* at 20–23.

The Library Defendants assert that "[c]ertification of the Court's Order of March 19, 2026, is warranted because it satisfies the statutory criteria and because it involves important, novel questions that are arising with increasing frequency." ECF No. 47 at 8. For the following reasons, the Court determines that certification is proper under 28 U.S.C. § 1292(b).

First, the Library Defendants assert that Plaintiffs' First Amendment claims raise central questions of law that are novel to this Circuit, including whether individuals have a positive right to receive information from a public library under the First Amendment and whether a public library's collection decisions are government speech. ECF No. 47 at 9. The Court finds that, based on these proposed questions, the Library Defendants seek to raise controlling questions of law on appeal that would be dispositive of the litigation. *See*

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 6:15-MN-2613-BHH, 2016 WL 7320864, at *5 (D.S.C. July 18, 2016) ("A controlling question of law is a narrow question of pure law whose resolution would be completely dispositive of the litigation, either as a legal or practical matter." (quoting *Michelin N. Am., Inc. v. Inter City Tire & Auto Ctr., Inc.*, 6:13-1067-HMH, 2013 WL 5946109, at *3 (D.S.C. Nov. 6, 2013))). The resolution of either of these questions would materially impact the outcome of this litigation and, indeed, resolution in the Library Defendants' favor could completely resolve this action. Further, the particular facts of this dispute need not be addressed in order to resolve these questions. *See Randolph v. ADT Sec. Servs., Inc.*, No. CIV.A. DKC 09-1790, 2012 WL 273722, at *5 (D. Md. Jan. 30, 2012) ("Even where the question presented is a legal one, if resolution of that issue is rooted in the facts of a particular case, the question is not proper for interlocutory review." (citing *Fannin v. CSX Transp., Inc.,* 873 F.2d 1438, at *5 (4th Cir.1989) (unpublished opinion))). Thus, the Court finds that its prior Order involves a controlling question of law.

Second, the Library Defendants contend that the novel theories of law described above are untested both in this district and the Fourth Circuit and that First Amendment jurisprudence in the library context has long been disputed and remains unsettled, as demonstrated by the Supreme Court's decision in *Pico*, 457 U.S. 853. ECF No. 47 at 11. According to the Library Defendants, other courts who have addressed the issue have produced mixed results. *Id.* Based on case law as it currently stands, the Library Defendants contend there are substantial grounds for differences of opinion as the law in this area is unclear. *Id.* at 12–13. The Court agrees that the questions presented in this

litigation are novel and unsettled and there are substantial grounds for disagreement, which support a certificate of appeal on these issues. *See, e.g.*, *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) (finding substantial grounds supporting a certificate of appealability "where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented"); *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (explaining that "district courts should not hesitate to certify an interlocutory appeal" under § 1292(b) when a decision "involves a new legal question or is of special consequence"); *but see In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) ("[M]ere presence of a disputed issue that is a question of first impression, standing alone, is insufficient." (citations omitted)).

Third, the Library Defendants argue that immediate appeal of the Court's Order would materially advance the ultimate termination of the litigation in this action given the novelty of the legal questions at issue. ECF No. 47 at 13–14. The Library Defendants further contend similar questions of law have recently been raised and dealt with differently among the circuits, meaning that there is potential that, after expending significant funds to litigate this matter, there could be a dispositive ruling by either the Fourth Circuit or the Supreme Court that would materially impact this case. *Id.* at 13. Under the third prong, certification of an interlocutory appeal is appropriate only "in exceptional situations in which doing so would avoid protracted and expensive litigation." *Fannin*, 1989 WL 42583, at *2 (quoting *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982)); *see Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir.

2011) (holding that an interlocutory appeal would materially advance resolution of litigation where reversal by the appellate court would dismiss one defendant and resolve multiple claims against all defendants, even though it would not resolve the entire case). As noted above, dependent on the resolution of these legal questions, some or all of the pending litigation may be concluded based upon the Fourth Circuit's ruling in this matter. Further, the Library Defendants have presented compelling, and unopposed, arguments that such a ruling would potentially save the Parties significant costs in litigating the matter. Thus, the Court finds that immediate appeal of the issues raised by the Library Defendants may materially advance the ultimate termination of the litigation.

For these reasons, the Court finds that its March 19, 2026, Order should be certified for immediate, interlocutory appeal on the issues described herein and set out in the Library Defendants' Motion. *See* ECF No. 47 at 8–14. Accordingly, the Library Defendants' Motion is granted as to the primary relief request—a certificate of appealability—and denied as moot as to the alternative relief sought—reconsideration or to stay.

**B. The County's Motion for Reconsideration or Clarification**

The County moves pursuant to Federal Rule of Civil Procedure 54(b) for "reconsideration or more specifically clarification or amendment of the Court's Order filed March 19, 2026," and specifically seeks clarification by the Court that the Library is still a party to this action and that the County has not filed any dispositive motions and did not join the Motion to Dismiss filed by the Library Defendants. ECF No. 48 at 1–2. Neither Plaintiffs nor the Library Defendants filed a response to the County's Motion.

Plaintiff seeks relief under Fed. R. Civ. P. 54(b), which empowers this Court to revise any order at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities. As noted above, under Rule 54(b), reconsideration "is appropriate on the following grounds: (1) to follow an intervening change in controlling law; (2) on account of new evidence; or (3) to correct a clear error of law or prevent manifest injustice." *Ashmore v. Williams*, No. 8:15-cv-03633, 2017 WL 24255, at *2 (D.S.C. Jan. 3, 2017). This revisory power is committed to the discretion of the court, with the goal being "to reach the correct judgment." *Cohens v. Md. Dept. of Human Resources*, 933 F.Supp.2d 735, 741 (D. Md. 2013) (quoting *Netscape Commc'ns Corp. v. ValueClick, Inc.*, 704 F. Supp.2d 544, 547 (E.D. Va. 2010)); *see also Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003). Some courts have relied on the authority of Rule 54 to clarify prior Orders. *See, e.g.*, *Thompson v. Garnett*, No. CV 18-1022, 2020 WL 7351953 (D. Md. Dec. 15, 2020).[6]

The Court finds that clarification is appropriate to correct any inadvertent confusion caused by omissions or clerical errors in the Court's prior Order. Therefore, the Court clarifies that the Library is still party to this action and that the County was not party to the Motion to Dismiss filed by the Library Defendants. Accordingly, the County's Motion is granted to the extent it seeks clarification of the Court's prior Order.

[6] Further, under Federal Rule of Civil Procedure 60(a), "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice." While relief may be granted under Rule 54(b), the Court finds that Rule 60(a) is another appropriate means for the relief that the County seeks.

## IV. CONCLUSION

For the reasons set forth above, the Library Defendants' Motion to Certify for Interlocutory Appeal [47] is **GRANTED** as to the primary requested relief and **DENIED AS MOOT** as to the alternative relief sought. Further, the County's Motion for Reconsideration or Clarification [48] is **GRANTED** as set forth herein.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

May 28, 2026
Spartanburg, South Carolina