No. 26-1844

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated; CHERYL ROGERS; GREG ROGERS; E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated; M.G., by and through her mother, Amber Galea; and W.M., by and through his mother, Kersey Clark,

*Plaintiffs-Appellees*,

v.

GREENVILLE COUNTY LIBRARY SYSTEM; BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System, and KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of South Carolina
Case No. 6:25-cv-02599-DCC

# DEFENDANTS-APPELLANTS' OPENING BRIEF

WILSON JONES CARTER & BAXLEY, P.A.
Charles F. Turner, Jr.
J. Nathan Ozmint
325 Rocky Slope Rd.
Suite 201
Greenville, SC 29607
(864) 672-3711

NELSON MULLINS RILEY & SCARBOROUGH LLP
Miles E. Coleman
2 West Washington Street
Suite 400
Greenville, SC 29601
(864) 373-2300
miles.coleman@nelsonmullins.com

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

STATEMENT OF JURISDICTION .......... 1

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

A. The Greenville County Library System and its Collection Policy .......... 3

B. The 2024 policies at issue .......... 4

C. Plaintiffs and their alleged injuries .......... 6

D. Procedural history .......... 7

E. The district court's order .......... 8

SUMMARY OF THE ARGUMENT .......... 10

STANDARD OF REVIEW .......... 13

ARGUMENT .......... 14

I. Plaintiffs lack Article III standing .......... 14

A. An impeded-access" theory fails where access was never denied by the Collection Policy. .......... 14

B. Inconvenience and displeasure are not concrete harm .......... 15

C. The Equal Protection claims also fail at the threshold. .......... 17

D. Plaintiffs fail to allege redressability for their ongoing or future injuries .......... 18

II. Public library patrons have no positive First Amendment right to receive information from the government. .......... 19

A. The Free Speech Clause restrains the government; it does not conscript it. .......... 20

B. Every right-to-receive case involves the government blocking an exchange between private parties. .......... 22

C. The Supreme Court's ruling in *Pico* produced no majority opinion and no precedential holding that binds or controls this Court ... 23

D. Courts have rejected the right to receive unfettered access to books. ... 26

E. The district court's rule has no limiting principle, and its consequences are untenable. ... 28

F. This case is weaker still, because the Library relocated books rather than removed them. ... 30

G. A shelving decision is not a ban, and the parental-rights cases confirm it. ... 31

H. Even if a right to receive exists, library shelves are not a forum for private speech. ... 33

III. Independently, a public library's curation decisions are government speech. ... 34

A. Curation is quintessentially expressive. ... 35

B. This Court's precedent points the same way, and neither *Whateley* nor the district court's distinctions change that. ... 37

C. The Collection Policy's disclaimers do not disavow the Library's own curation. ... 40

IV. The equal protection claims fail because the Collection Policy treats every similarly situated patron the same. ... 42

A. The equal protection claims are the First Amendment claims reshelved, and they fail for the same reason. ... 42

B. There is no disparate treatment, because the Policy classifies books, not people. ... 43

C. Neither disparate impact nor alleged stigma states an equal protection claim. ... 47

D. The Policy satisfies rational-basis review. ... 49

CONCLUSION ... 51

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) .......... 25

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) .......... 34

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982) .......... 9, 20, 24, 25, 26, 28, 30, 31

*Bostic v. Schaefer*,
760 F.3d 352 (4th Cir. 2014) .......... 16, 49, 50

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) .......... 32, 33

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008) (Kavanaugh, J., concurring) .......... 37

*Child Evangelism Fellowship of Md., Inc. v. Montgomery County Public Schools*,
457 F.3d 376 (4th Cir. 2006) .......... 35

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) .......... 38

*Davison v. Randall*,
912 F.3d 666 (4th Cir. 2019) .......... 24

*EEOC v. Seafarers Int'l Union*,
394 F.3d 197 (4th Cir. 2005) .......... 14

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) .......... 32, 33

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .......... 50

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) .......... 37

*Heckler v. Mathews*,
465 U.S. 728 (1984) .......... 49

*Hunter v. Erickson*,
393 U.S. 385 (1969) .......... 49

*Kreimer v. Bureau of Police for Town of Morristown*,
958 F.2d 1242 (3d Cir. 1992) .......... 22

*Lee v. York Cnty. Sch. Div.*,
418 F. Supp. 2d 816 (E.D. Va. 2006), *aff'd*, 484 F.3d 687 (4th Cir. 2007) .......... 44

*Little v. Llano Cnty.*,
138 F.4th 834 (5th Cir. 2025), *cert. denied*, 146 S. Ct. 886 (2025) .......... 20, 26, 27, 28, 30, 31, 32, 37, 39

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 34, 51

*Mainstream Loudoun v. Board of Trustees of Loudoun County Library*,
2 F. Supp. 2d 783 (E.D. Va. 1998) .......... 9, 20, 29

*Massachusetts Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976) .......... 45

*Meyer v. Nebraska*,
262 U.S. 390 (1923) .......... 51

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 36, 37

*Morrison v. Garraghty*,
239 F.3d 648 (4th Cir. 2001) .......... 19, 44, 48

*Muir v. Ala. Educ. Television Comm'n*,
688 F.2d 1033 (5th Cir. 1982) (en banc) .......... 25, 26

*Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*,
346 F.3d 585 (6th Cir. 2003) .......... 22

*O.R. et al v. Greenville Cnty. et al*,
No. 6:24-cv-02599-DCC (D.S.C. Mar. 26, 2025) .......... 6, 8

*Orin v. Barclay*,
272 F.3d 1207 (9th Cir. 2001) .......... 44

*Pahls v. Thomas*,
718 F.3d 1210 (10th Cir. 2013) .......... 22

*Penguin Random House, LLC v. Robbins*,
172 F.4th 581 (8th Cir. 2026) .......... 20, 27, 28, 31, 32

*People for the Ethical Treatment of Animals v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005) .................................................. 37

*Pers. Adm'r of Massachusetts v. Feeney*,
442 U.S. 256 (1979) .................................................. 48, 49

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
268 U.S. 510 (1925) .................................................. 51

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .................................................. 36, 41

*Polk v. Montgomery Cnty. Pub. Sch.*,
166 F.4th 400 (4th Cir. 2026) .................................................. 14

*Rossignol v. Voorhaar*,
316 F.3d 516 (4th Cir. 2003) .................................................. 24

*Shelley v. Kraemer*,
334 U.S. 1 (1948) .................................................. 45, 51

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) .................................................. 36, 40

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .................................................. 15, 19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .................................................. 45

*Toledo Area AFL-CIO Council v. Pizza*,
154 F.3d 307 (6th Cir. 1998) .................................................. 22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................................................. 11, 16, 18

*Troxel v. Granville*,
530 U.S. 57 (2000) (plurality opinion) .................................................. 51

*Tuffendsam v. Dearborn Cnty. Bd. of Health*,
385 F.3d 1124 (7th Cir. 2004) .................................................. 22

*United States v. Am. Libr. Ass'n, Inc.*,
539 U.S. 194 (2003) .................................................. 29, 39, 40

*United States v. Skrmetti*,
605 U.S. 495 (2025) .................................................. 46, 49, 50

*Vista-Graphics, Inc. v. Virginia Dep't of Transp.*,
682 F. App'x 231 (4th Cir. 2017) .......... 42

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) .......... 28, 38

*Whateley v. Lackey*,
184 F.4th 368 (4th Cir. 2026) .......... 38, 39, 40, 41

*White Tail Park, Inc. v. Stroube*,
413 F.3d 451 (4th Cir. 2005) .......... 5

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) .......... 16

*Willis v. Town of Marshall*,
426 F.3d 251 (4th Cir. 2005) .......... 22

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
516 U.S. 199 (1996) .......... 1, 14

**Rules**

Rule 12(b)(1) .......... 5

Rule 12(b)(6) .......... 14, 38

**Statutes**

28 U.S.C. § 1292(b) .......... 1

S.C. Code Ann. § 4-9-36(3) .......... 3

**Other Authorities**

David P. Currie, *Positive and Negative Constitutional Rights*,
53 U. CHI. L. REV. 864 (1986) .......... 22

Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation of the First Amendment*, 3 DUKE J. CONST. L. & PUB. POL'Y 113 (2008) .......... 22

Frederick F. Schauer, *Principles, Institutions, and the First Amendment*, 112 HARV. L. REV. 84, 106 (1998) .......... 30

Lillian R. Bevier, *Campaign Finance Reform: Specious Arguments, Intractable Dilemmas*, 94 COLUM. L. REV. 1258, 1277 (1994) .......... 22

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1292(b). The district court certified for interlocutory appeal its March 19, 2026 Order granting in part and denying in part the Motion to Dismiss Plaintiffs' Amended Complaint. *See* ECF Nos. 44 (the "Order") [JA1], 50 [JA288]. Defendants-Appellants timely petitioned for permission to appeal, which this Court granted. *See* Dkt. 2, No. 26-178 (4th Cir. June 8, 2026); Dkt. 17, No. 26-178 (4th Cir. July 2, 2026).

Plaintiffs object that "this Court lacks jurisdiction over Plaintiffs' equal protection claims." Dkt. 14 at 3. They are mistaken. Section 1292(b) authorizes an appeal from an "order," not from an issue or claim. 28 U.S.C. § 1292(b). *See* Dkt. 15 at 4-6. As the Supreme Court explained, "appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (emphasis in original).

## STATEMENT OF THE ISSUES

I. Whether Plaintiffs have Article III standing (a) to assert a First Amendment claim when no Plaintiff alleges denial of access to any book, every affected title remains on an open shelf in the same building, and the only alleged burden is having to walk to another section or ask a parent or older sibling to borrow, and (b) to assert an equal protection claim when Plaintiffs fail to allege that they've been treated differently from any similarly situated persons.

II. Whether public library patrons have a positive constitutional right to receive information from the government that prevents a public library from selecting or relocating books or limiting minors' access to them based on the books' contents or viewpoints.

III. Whether a public library's collection decisions, including the addition, removal, or relocation of books within the collection, are government speech that is exempt from Speech Clause scrutiny.

IV. Whether a public library's collection decisions conform with the Equal Protection Clause when they rest on rational, non-discriminatory reasons and apply equally to all similarly situated library patrons, regardless of the patrons' sexual orientation or gender identity.

## STATEMENT OF THE CASE

### A. The Greenville County Library System and its Collection Policy

Greenville County is the most populous county in South Carolina. ECF No. 5, First Am. Compl. ("Am. Compl.") ¶ 24 [JA46]. An 11-member county-appointed board (the "Board") governs the Greenville County Library System (the "Library"). Am. Compl. ¶¶ 13, 15-16 [JA49-JA50]. South Carolina law empowers the Board to: (i) "[a]cquire books and other library materials and provide for use thereof throughout the county," S.C. Code Ann. § 4-9-36(3); (ii) "[t]ake any actions deemed necessary and proper by the board to establish, equip, operate and maintain an effective library system," *id.* § 4-9-36(9); and (iii) "[a]dopt regulations necessary to insure effective operation, maintenance and security of the property of the library system," *id.* § 4-9-37(b).

The Board establishes and applies a Collection Development and Maintenance Policy ("Collection Policy"). Am. Compl. ¶¶ 18, 27 [JA50, JA52]; ECF No. 5-1 ("Ex. A") [JA83]. The Collection Policy sets out criteria that librarians apply when selecting materials. Am. Compl. ¶¶ 31-32 [JA53-JA54], Ex. A at 3-4 [JA85-JA86]. Those criteria include the "[c]omprehensiveness and depth of treatment" of a subject, the "[a]uthority, skill, competence and purpose of author/producer," and the "[v]itality and originality" of the work, to list a few. *Id.* [JA53-JA54]. The Collection Policy also establishes a formal reconsideration process for patrons who object to a particular title. Ex. A at 2 [JA84]; ECF No. 5-2 ("Ex. B") at 1-2 [JA96-JA97].

### B. The 2024 policies at issue

In 2024, the Board amended its Juvenile Collection policy and its Young Adult Collection policy. *See* Ex. A at 8-9, 13 [JA90-JA91, JA95]. Both policies address which sections of the Library's physical branches are the appropriate home for certain materials. The Juvenile Collection policy (audiences aged 0-12) provides, in relevant part:

> The Library recognizes parents/legal guardians are the primary source of education for their children, and that they have a fundamental right and responsibility to direct the upbringing and education of children under their care including issues of moral, social, physical, civic, and spiritual development.
>
> To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:
>
> - Social transitioning: Pronouns or dress inconsistent with biological sex for the purpose of affirming gender transitioning.
> - Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.
> - Gender fluidity: The possibility of changing genders at will or being no gender at all for the purpose of affirming gender transitioning.

Am. Compl. ¶ 74 [JA62-JA63]; Ex. A at 8 [JA90]. The Parenting and Early Childhood Collection is a section of each branch that contains materials on child development, parenting, and instruction for children. Am. Compl. ¶ 48 [JA58]; Ex. A at 9 [JA91]. The Young Adult Collection policy (teens aged 13-17) provides, in relevant part:

> The Library System recognizes that parents/legal guardians have a fundamental right to be involved in all aspects of their minor children's lives, especially in matters as life changing as gender identification.
>
> Therefore, materials targeting audiences aged 13-17 with characters who have transitioned or are in the process of transitioning from a gender that corresponds to their biological sex to a different gender will be located in the Adult Collection.
>
> This includes materials with illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning, whether changes are social (names, pronouns) or physical.

Ex. A at 13 [JA95].

Several features of these policies are worth noting at the outset. Critically, no book was removed from the Library's collection, and no book was moved to a different branch. Declaration of Beverly James ("James Decl."), ECF No. 46 ¶ 7 [JA268-JA269].[1] Affected titles were simply reshelved in the Parenting and Early Childhood sections, James Decl. ¶ 7 [JA268-JA269], and remain available to be read on site and borrowed by any patron with an unrestricted minor or adult card. Am. Compl. ¶¶ 140, 159 [JA73, JA76]. Each of the Library's 13 locations has a Parenting and Early Childhood section that holds material on child development, parenting, sex education, divorce, and more; they are not repositories for one subject. James Decl. ¶¶ 5, 8 [JA268-JA269].

Even with these policies, the Library held 628 books with LGBTQ-related themes in its collection and 261 books specifically addressing transgender topics. James Decl. ¶ 9 [JA269]. The Library continues to buy books categorized by topics including "LGBTQ," "transgender," and "gender identity," which are curated "in the same manner as any other section or topic." *Id.* [JA269]. And "Plaintiffs conceded that books with positive LGBTQ themes were still available for check out at the Library." Order at 14 [JA14].

[1] The district court considered the declaration only for standing. *See* Order at 3 n.2 [JA3]; *see also White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (district court may consider evidence outside the pleadings when evaluating standing).

### C. Plaintiffs and their alleged injuries

At the time of filing, Plaintiffs were four minors and two adult library patrons. *See* Am. Compl. ¶¶ 9-11 [JA49]. Their claimed injuries vary widely—and some are hard to square with the facts.

***O.R.*** was seventeen when Plaintiffs filed suit and identifies as transgender. Am. Compl. ¶¶ 9, 119 [JA49, JA71]. O.R. held a young-adult library card. *Id.* ¶ 127 [JA71]. O.R. is now at least eighteen and is eligible for an adult card. Even before that, O.R.'s parents could check books out for O.R. using their adult cards. *See id.* ¶ 128 [JA72]. O.R.'s core complaint is of feeling "not seen" by the Library's organizational choices. *Id.* ¶ 133 [JA55].

***E.G.*** was twelve when Plaintiffs filed suit and "identifies as queer." *Id.* ¶¶ 10, 134, 137 [JA49, JA73]. E.G. holds an unrestricted minors card, which allows E.G. to check out any book in the Library's collection—juvenile, young adult, or adult. *Id.* ¶ 140 [JA73]. E.G.'s grievance is having to walk "all over the library to find books," which makes E.G. feel "indignant" about the arrangement. *Id.* [JA73].

***M.G.*** was eleven when Plaintiffs filed suit; she holds a juvenile library card. Am. Compl. ¶¶ 10, 134, 136 [JA49, JA73]. M.G. identifies one specific book she couldn't check out with her own card: *Snapdragon*. *Id.* ¶ 141 [JA73]. But M.G. can still read *Snapdragon* in the library. *See id.* [JA73]. And her mother or her older sister E.G. can check it out for her. *See id.* ¶¶ 136, 140 [JA73].

***W.M.*** was nine when Plaintiffs filed suit; he holds a juvenile library card. *Id.* ¶¶ 11, 148 [JA49, JA74]. W.M. thinks the policy is "unfair" and says

he's "interested in" books that have been moved to the adult section, such as *Magnus Chase*. *Id.* ¶ 150 [JA74]. But W.M. never alleges he sought or was denied access to *Magnus Chase* or any other book. *See id.* ¶¶ 148-151 [JA74-JA75].

***Cheryl and Greg Rogers*** are library patrons and parents of O.R. *Id.* ¶¶ 9, 116 [JA49, JA70]. They "wish to be able to access the full array of LGBTQ-related books" in the general shelves rather than in the Parenting and Early Childhood (PEC) sections. *Id.* ¶ 131 [JA72]. Like the minor plaintiffs, they don't allege they've been denied access to any particular book—only that they object to O.R. "having to ask for his parents to check books out for him using their adult cards." *Id.* ¶ 128 [JA72].

Plaintiffs also allege an "unwritten policy"—a purported widespread custom of removing or suppressing LGBTQ-themed books beyond what the written policies require. Am. Compl. ¶¶ 5, 105 [JA48, JA68]. They tie this claim to more than 50 book-challenge requests submitted by the Greenville County Republican Women's Club. *Id.* ¶ 5 [JA48]. But they have not alleged the Library acted on those requests in any way that differs from its ordinary reconsideration process. *See generally id.* [JA48]. And that claim isn't before this Court anyway. *See* n.2, *infra*.

### D. Procedural history

Plaintiffs filed their original complaint on March 26, 2025, against the Library, Beverly James, in her official capacity as Executive Director of the Library, and Karen Allen, in her official capacity as Youth Services Manager of the Library (together, the "Library Defendants"). *See* Compl., *O.R. et al v.*

*Greenville Cnty. et al*, No. 6:24-cv-02599-DCC (D.S.C. Mar. 26, 2025) [JA36]. Plaintiffs filed an amended complaint on April 4, 2025, adding Greenville County as a defendant. Am. Compl. [JA46]. The Library Defendants moved to dismiss. ECF No. 20 ("Motion to Dismiss") [JA113]. The district court held a hearing on January 29, 2026, and issued its order on March 19, 2026. ECF Nos. 41, 44 [JA43].

### E. The district court's order

The Order granted in part and denied in part the Library Defendants' Motion to Dismiss. *See generally* Order [JA1].

***Standing:*** Based on the written policies, the court credited Plaintiffs' allegations that placement in the Parenting and Early Childhood "created a burden"—however modest—to accessing certain books, and the court concluded that sufficed to allege standing for the First Amendment claim challenging the Library's written Collection Policy. *Id.* at 7-13 [JA7-JA13]. But the court held that Plaintiffs lacked standing to bring a First Amendment challenge to the unwritten policy and, therefore, dismissed that claim. *Id.* at 13-15 [JA13-JA15].[2] The court also found that Plaintiffs had standing for their Equal Protection claims. *Id.* at 15-18 [JA15-18].

***Government Speech Doctrine:*** The court held that the Library's curation decisions did not constitute government speech because of its

[2] Because this claim was dismissed and Plaintiffs have not cross-appealed, the Library's alleged unwritten collection policies, practices, and refusals to purchase desired books are not before the Court.

"multitude of messages delivered through [a] variety of books." *Id.* at 20-22 [JA20-JA22].

***First Amendment Claim:*** The district court rejected the Library Defendants' argument that a majority of the justices in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), refused to recognize a constitutional right for public-school students to receive information from the government, and, therefore, there is no constitutional right for a library patron to receive information from the government either. Order at 24-26 [JA24-26]. Instead, the court applied a framework it divined from the *Pico* plurality opinion and from *Mainstream Loudoun v. Board of Trustees of Loudoun County Library*, 2 F. Supp. 2d 783 (E.D. Va. 1998), and found that Plaintiffs plausibly alleged that the Library Defendants restricted access based on the content or viewpoints expressed in the relocated books. Order at 23-30 [JA23-JA30].

***Equal Protection Claims:*** The court concluded that Plaintiffs had alleged an equal-protection violation because the Library Defendants' policies "result in transgender-based disparate treatment because they allow for books that negatively portray Plaintiffs' protected class to remain readily available while restricting access to positive portrayals," and the Plaintiffs had alleged the Library Defendants' implementation of the policies failed both intermediate scrutiny and rational basis review. *Id.* at 32-34 [JA32-JA34].

## SUMMARY OF THE ARGUMENT

Every library, every day, decides the same three things: (1) what to buy; (2) what to keep; and (3) where to shelve what it buys and keeps. Those decisions—guided by professional judgment, community values, and available space—are the essence of what it means to curate a collection. This case asks whether federal courts now supervise that work. They don't. Public library patrons hold no positive right to receive information from the government. The government's decision not to provide (or to stop providing) a particular book doesn't implicate the Speech Clause. Library shelves are not a forum for private speech. Instead, a library's collection decisions are government speech. And a policy that applies equally to all similarly situated patrons denies no one equal protection.

1. As a threshold matter, Plaintiffs lack Article III standing. No Plaintiff alleges that the Library's Collection Policy denied them access to any book. Every affected title remains on an open shelf in the same building, available to read on site and to borrow with an unrestricted minor or adult card. The only alleged burdens are walking to another section or asking a parent or older sibling to borrow the book. That isn't a "concrete" injury to a legally protected interest under *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). Plaintiffs have also failed to allege facts showing that their ongoing or future injuries will likely be redressed by the requested prospective relief.

2. Turning to the merits, Plaintiffs' First Amendment claim fails because there is no right to receive information from the government. The

Speech Clause is a restraint, not a requisition form. True, the Supreme Court has held that the government may not block a private speaker from reaching a private listener in a private-party exchange. But none of those cases confer a positive right to receive information *from the government*. And recent appellate decisions reject the right Plaintiffs assert. Nor does the one Supreme Court decision on library book removals supply the rule the district court found in it. That case produced no majority rationale, and a majority of the Justices refused to recognize a constitutional obligation for libraries to keep providing particular books. This case is weaker still, as the Library merely relocated rather than removed the disputed books.

Even if some right to receive existed, Plaintiffs' claim still fails because library shelves are not a forum for private speech: the Library does not open its shelves to private speakers but selects, purchases, owns, and arranges what sits on them.

3. Separately, Plaintiffs' First Amendment claims fail because a public library's decisions about which books to acquire and keep and where to shelve them are government speech. The Supreme Court has held that the Speech Clause restricts government regulation of private speech; it does not regulate government speech. Library curation is quintessentially expressive: it involves deciding what third-party speech will be included in or excluded from a compilation—and then organizing and presenting it. The district court thought the collection was too large and too varied to be anyone's message, but the Supreme Court has squarely rejected that reasoning. This Court's

most recent government speech decision confirms the distinction that matters: a government that merely screens what private parties submit isn't speaking, while one that selects each item for itself is. The Library chooses every title on its shelves. Because the Library's collection decisions are government speech, the Free Speech Clause doesn't reach them, and the First Amendment claim fails for this independent reason.

4. Finally, the Equal Protection claims fail because the Collection Policy classifies only by age and subject matter—not by sex, sexual orientation, or transgender status. So rational basis review governs. Recent decisions of the Supreme Court and this Court confirm that a rule classifying by subject and age doesn't become suspect because one group cares more about the regulated subject. And the Policy treats every similarly situated patron alike. A minor with a restricted card faces the same limits whether they are LGBTQ-identifying or not; a minor with an unrestricted minor card may borrow anything in the building whether they are LGBTQ-identifying or not; and every adult has the same access. That's equal treatment. What Plaintiffs seek isn't equal treatment but affirmation: a right to have the government curate, purchase, and shelve materials of their liking on the shelves where they prefer to find them. No court has recognized that right.

This Court should reverse the district court's ruling and remand for dismissal of the entire suit.

## STANDARD OF REVIEW

In hearing an interlocutory appeal from a district court's denial of a motion to dismiss, this Court "employ[s] the usual appellate standard governing motions to dismiss," considering questions of law de novo and construing factual allegations in the light most favorable to the non-movant. *EEOC v. Seafarers Int'l Union*, 394 F.3d 197, 200 (4th Cir. 2005); *see also Polk v. Montgomery Cnty. Pub. Sch.*, 166 F.4th 400, 411 (4th Cir. 2026) (applying de novo review to the dismissal of Free Exercise and Free Speech claims pursuant to Rule 12(b)(6)).

This Court reviews the certified *order*—not merely the questions the district court chose to certify. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996); *see also* Dkt. 15 (explaining and supporting that proposition at length).

## ARGUMENT

### I. Plaintiffs lack Article III standing.

To have standing, "plaintiff[s] must 'clearly allege facts demonstrating' each element" of Article III standing: (1) an injury in fact, that is (2) traceable to the conduct of the named defendants and (3) likely to redressed by the requested relief. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up). Here, the plaintiffs have failed to "clearly allege facts demonstrating" injury in fact or redressability.

#### A. An "impeded-access" theory fails where access was never denied by the Collection Policy.

Plaintiffs do not (and cannot) allege denial of access, as every affected title remains on an open shelf in the same building where it already sat. Any patron may walk to the Parenting and Early Childhood section, pull a book down, and read it. The district court said as much. *See* Order at 11 [JA11] (noting "the minor Plaintiffs' ability to browse the PEC section"). Any patron with an unrestricted minor or adult card may borrow it. *See* Am. Compl. ¶¶ 128, 136, 140, 142 [JA72-JA74]. And any parent may obtain an unrestricted minor card for a minor on request. ECF No. 43 at 14:18-24 [JA221]. The adult plaintiffs concede as much but have chosen not to obtain unrestricted minor cards for their minor children. *See* Am. Compl. ¶¶ 129, 142, 149 [JA72, JA74].

Instead, what Plaintiffs describe is inconvenience: walking to a different section, *see id.* ¶ 140 [JA73], or asking a parent or older sibling to borrow a book, *see id.* ¶¶ 128, 136, 142 [JA72-JA74]. That isn't an invasion

of a legally protected interest that is "distinct and palpable, as opposed to merely abstract." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citations and marks omitted) (cleaned up). And it does not qualify as "concrete" harm under *TransUnion LLC v. Ramirez*, as there is no "close historical or common-law analogue for their asserted injury" and the plaintiffs make no attempt to identify one. 594 U.S. 413, 424 (2021); *see also id.* ("[T]he concrete-harm requirement . . . asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury.").

M.G. comes closest to alleging denial of access. She alleges she tried to check out *Snapdragon* on her juvenile card and couldn't. Am. Compl. ¶ 141 [JA73]. But she doesn't allege that book was unavailable to her. She doesn't allege she asked her mother or her older sister E.G.—who holds an unrestricted minor card—to check it out. *See id.* ¶¶ 136, 140, 142 [JA73-JA74]. And she doesn't allege that either refused. No other Plaintiff alleges even that much. *See id.* ¶¶ 130-31, 133, 138-140, 150 [JA72-JA74]. Indeed, Plaintiffs conceded below that books with positive LGBTQ themes remain available for checkout. Order at 14 [JA14]. Plaintiffs, thus, cannot identify a "concrete interest with respect to which he or she is personally subject to discriminatory treatment." *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (citation and marks omitted) (cleaned up).

### B. Inconvenience and displeasure are not concrete harm.

*TransUnion* requires a plaintiff to identify a concrete harm with a "close historical or common-law analogue." *TransUnion*, 594 U.S. at 424;

*see also* America First Legal Foundation Amicus Br. 5-6. Plaintiffs identify no such harm, but merely describe inconvenience or displeasure with a government policy:

- E.G. holds an unrestricted minor card and concedes she "can check out any book in the library"—she complains only that she must walk "all over the library," Am. Compl. ¶ 140 [JA73];
- W.M. says the policy is "unfair," but alleges no denial of access to *Magnus Chase* or any other book, *id.* ¶¶ 148-51 [JA74-JA75];
- O.R. feels that he is "not seen," *id.* ¶ 133 [JA72];[3]
- The Rogerses hold adult cards—they complain that O.R. must ask them to borrow on his behalf, Am. Compl. ¶¶ 128, 131 [JA72];
- M.G. comes closest: she tried to borrow *Snapdragon* on a juvenile card and could not. *Id.* ¶ 141 [JA73]. But she does not allege *Snapdragon* was unavailable, or that she could not find it. *See id.* ¶ 138 [JA73]. Nor does she allege she asked her mother, or her older sister—both of whom could have borrowed it. *Id.* ¶¶ 136, 142 [JA73-JA74]. Nor does she allege she asked for an unrestricted minor card of her own; if a parent applies, the Library issues one. ECF No. 43

[3] O.R.'s claim has thinned with time. He was seventeen when the Amended Complaint was filed. *See* Am. Compl. ¶ 9 [JA49]. At that time, he held a young adult card. *Id.* ¶ 127 [JA71]. O.R. is now at least eighteen; he is eligible for an adult card. O.R. also purported to represent a class of "all *minor*, transgender library patrons who lack adult library cards." *Id.* ¶¶ 9, 153 [JA49, JA75] (emphasis added). O.R. shouldn't be a member of that class. And he can identify no concrete harm.

at 14:18-24 [JA221]. Most importantly, the harm she alleges—the ability freely to read the book in the library but not to take it home without asking a parent or sibling to assist—has no "close historical or common-law analogue." *TransUnion*, 594 U.S. at 424.

What Plaintiffs allege—at most—is a restriction on who may borrow, not a concrete harm.

**C. The Equal Protection claims also fail at the threshold.**

Count Two alleges unequal treatment "by preventing [Plaintiffs] from accessing library materials positively reflecting themselves and their families." Am. Compl. ¶ 171 [JA78]. Count Four also relies on the Fourteenth Amendment. Am. Compl. ¶ 180 [JA80]. It's the same inconvenience or displeasure issue addressed above.

Nor does the Amended Complaint address differential treatment. Borrowing privileges turn on card category, not identity: M.G. and W.M. (and, at the time the suit was filed, O.R., *see* n.3, *supra*) hold juvenile cards, *id.* ¶¶ 136, 148 [JA73-JA74], E.G. holds an unrestricted minor card and may borrow anything in the collection, *id.* ¶ 140 [JA73], and the Rogerses hold adult cards, *id.* ¶ 128 [JA72].

The Collection Policy sorts materials by target-audience age and subject matter and never asks how the patron identifies. *See* Ex. A at 8, 13 [JA90, JA95]. E.G. and M.G. are sisters, one year apart, in the same household; they differ in access because they hold *different cards*, not because one identifies as queer and the other does not. *Id.* ¶¶ 134, 136-37,

140, 148-49 [JA73-JA74]. This Court requires an Equal Protection plaintiff to allege he was treated "differently from others with whom he is *similarly situated*." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (emphasis added). Plaintiffs make no such allegation because they experienced no such treatment.

### D. Plaintiffs fail to allege redressability for their ongoing or future injuries.

The Plaintiffs have also failed to allege facts showing that their ongoing or future injuries are "likely" to be redressed by the requested relief. They must "clearly" allege these facts in their complaint, *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), yet their Amended Complaint remains entirely silent on redressability and says nary a word about how the requested declaratory and injunctive relief will restore the removed books to the shelves—or eliminate or ameliorate *any* of the ongoing or future harms that the plaintiffs allege.

So even if the plaintiffs had alleged a "concrete" injury, their claims for prospective relief must *still* be dismissed because the complaint fails to allege facts showing that the requested prospective relief is likely to redress their ongoing or future injuries. *See* America First Legal Foundation Amicus Br. 6-8. The Court should dismiss the claims for prospective relief for failure to allege redressability.

## II. Public library patrons have no positive First Amendment right to receive information from the government.

Every one of Plaintiffs' claims rest on the same premise: that library patrons hold a constitutional "right to receive information" from the government. Am. Comp. ¶ 7 [JA48]. Pull that premise out and the whole structure collapses. Yet the district court accepted it, finding that the *Pico* plurality opinion limits a public library's discretion to restrict access to materials based on content. *See* Order at 24-28 [JA24-JA28] (citing *Pico*, 457 U.S. at 863-72 (plurality op.)). That was error. The First Amendment contains no such rule, *Pico* establishes no such rule, and every circuit to recently confront the question has said so.

Two Circuits have now squarely rejected this purported right. *See Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir. 2025) ("A plaintiff may not invoke that right to challenge a library's decisions about which books to buy, which books to keep, or which books to remove."), *cert. denied*, 146 S. Ct. 886 (2025); *Penguin Random House, LLC v. Robbins*, 172 F.4th 581, 586 (8th Cir. 2026) ("The First Amendment does not guarantee students the right to access books of their choosing at taxpayer expense."). The district court nonetheless found it in the First Amendment, drawing not on any decision of this Court or the Supreme Court but on a 28-year-old district court opinion about internet filters. *See* Order at 27-28 [JA27-JA28] (citing *Mainstream Loudoun v. Bd. of Trs. of the Loudoun Cnty. Libr.*, 2 F. Supp. 2d 783 (E.D. Va. 1998)). It erred.

### A. The Free Speech Clause restrains the government; it does not conscript it.

Start with the text. The First Amendment provides that Congress "shall make no law . . . *abridging* the freedom of speech." U.S. Const. amend. I (emphasis added). That's a prohibition. It tells the government what it may not do. But it says nothing about what the government must do, and it contains no command to speak, subsidize speech, or acquire and distribute anyone's preferred information.

The Supreme Court has read the Clause the same way. In *Ysursa v. Pocatello Education Ass'n*, the Court held that the First Amendment "prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use government . . . mechanisms for the purpose of obtaining funds for expression." 555 U.S. 353, 355 (2009) (holding a payroll-deduction system comported with the First Amendment). And in *Regan v. Taxation With Representation of Washington*, the Court held that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." 461 U.S. 540, 549 (1983) (holding a decision not to subsidize lobbying by charities did not violate the First Amendment). A payroll-deduction system and a tax subsidy are both government mechanisms. The principle doesn't change when the mechanism is a library bookshelf.

Judge Posner described that prohibition well: "The Constitution is . . . a charter of negative rather than positive liberties. It limits the powers of government but does not give people legally enforceable rights to demand

public services and to obtain damages or other legal relief if the government fails to provide them." *Tuffendsam v. Dearborn Cnty. Bd. of Health*, 385 F.3d 1124, 1126 (7th Cir. 2004) (internal citation omitted).[4]

Other circuits have applied that understanding directly to the Free Speech Clause. *See Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 319 (6th Cir. 1998) ("[T]he First Amendment . . . protects individuals' 'negative' rights to be free from government action and does not create 'positive' rights-requirements that the government act") (citation omitted) (cleaned up); *Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013) ("The First Amendment does not impose upon public officials an affirmative duty to ensure a balanced presentation of competing viewpoints" because "freedom of speech is a negative liberty.").[5] So whether the government mechanism is

---

[4] Commentators have described the Free Speech Clause the same way. *See* Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation of the First Amendment*, 3 DUKE J. CONST. L. & PUB. POL'Y 113, 140 (2008) (explaining the right to receive information is a negative right to be free from "government interference with the exchange of information by private citizens"); Lillian R. Bevier, *Campaign Finance Reform: Specious Arguments, Intractable Dilemmas*, 94 COLUM. L. REV. 1258, 1277 (1994) (explaining the First Amendment "is a source of negative rights against government, not a repository of positive entitlement to government favors"); David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. CHI. L. REV. 864 (1986).

[5] The right-to-receive cases pertaining to public libraries are consistent with this understanding. *See, e.g.*, *Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th Cir. 2003); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1247-48 (3d Cir. 1992); *Willis v. Town of Marshall*, 426 F.3d 251, 260 (4th Cir. 2005). These cases stand for the proposition that the government cannot categorically exclude someone from entering or using a public library (*i.e.*, a negative right that

a payroll deduction, a tax subsidy, or a library bookshelf, the principle holds: the Speech Clause forbids the government silencing private speech, but it does not conscript the government into supplying the speech—or books—a plaintiff wants to receive.

### B. Every right-to-receive case involves the government blocking an exchange between *private* parties.

True, the Supreme Court has recognized that the First Amendment sometimes limits the government's power to keep one person from receiving another person's speech. But look at what those cases actually involved. In *Martin v. City of Struthers*, a city made it a crime to knock on doors to distribute handbills; the Court disapproved the ordinance because it blocked a private distributor from reaching willing private listeners. 319 U.S. 141, 149 (1943). In *Thomas v. Collins*, a state court barred a union organizer from addressing company employees; the Supreme Court reversed, holding the bar unconstitutionally intruded on the speech and assembly rights of the willing private speaker and listeners. 323 U.S. 516, 518 (1945). In *Lamont v. Postmaster General*, the government conditioned delivery of mailed political literature on the addressee's affirmative request; the Court held that requirement unconstitutional because it imposed on the recipient an "affirmative obligation" that amounted to an unconstitutional limitation of

---

prohibits the government from excluding the individual). But not being excluded is a far cry from having the right to access specific information or books from the government. Neither the precedents of the Supreme Court nor the federal circuits support the recognition of such a right.

his rights under the First Amendment. 381 U.S. 301, 306-07 (1965). And *Kleindienst v. Mandel* upheld a visa denial that kept a foreign speaker from addressing American academics. 408 U.S. 753, 762-70 (1972).

Each of those cases involved: (i) a willing private speaker, (ii) a willing private listener, and (iii) the government standing between them. None of them involved a demand that the government supply content out of its own holdings. The Supreme Court has never held or even suggested that the First Amendment obliges the government to provide information to anyone. Yet Plaintiffs invoke cases about the government getting out of the way and ask this Court to convert them into cases about the government being pressed into service. *See, e.g.*, Pls. Resp. in Opp'n., ECF No. 27 at 12 [JA163] (invoking *Rossignol v. Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003) and *Davison v. Randall*, 912 F.3d 666, 685 (4th Cir. 2019)). A case about the government silencing a private newspaper or excluding a speaker from a forum it opened to the public tells this Court nothing about whether a library must shelve a particular book in a particular aisle.

### C. The Supreme Court's ruling in *Pico* produced no majority opinion and no precedential holding that binds or controls this Court.

The district court found guidance in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). *See* Order at 24-29 [JA24-29]. *Pico* cannot bear that weight.

*Pico* produced seven separate opinions and no majority. Justice Brennan's plurality opinion drew only two votes in full—Justices Marshall

and Stevens—with Justice Blackmun joining in part. And the Court divided four to four on whether and how the First Amendment limits a school board's discretion to remove library books. Justice White cast the ninth vote and declined to reach that question: "The plurality seems compelled to go further and issue a dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library. I see no necessity for doing so at this point." *Pico*, 457 U.S. at 883 (White, J., concurring in the judgment). So no rationale commanded a majority, and none of the opinions supply a rule this Court could apply. Other courts have said so. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009) ("*Pico* is a non-decision so far as precedent is concerned. It establishes no standard."); *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (en banc) ("*Pico* is of no precedential value as to the application of the First Amendment to these issues."). And the district court itself put the problem more memorably at the hearing below: "*Pico* is kind of like Forrest Gump's box of chocolates. It just depends on which opinion you reach into as to what you get." ECF No. 43 at 6:3-5 [JA213].[6] A box of chocolates is not a rule of decision.

[6] The district court suggested that Justice White's vote to remand the case for factfinding indicates that a majority of the *Pico* Court believed the Speech Clause constrains a public school's prerogative to remove books from its libraries. Order at 27 [JA 27] (claiming that adopting the *Pico* dissenters' position would "require this Court to ignore the *Pico* plurality's decision to remand the case"). Not so. Justice White voted to remand the case so the Supreme Court could later determine whether it would even be necessary to weigh in on the First Amendment questions in the first place.

But suppose the Court looks to *Pico* anyway. It doesn't help Plaintiffs; it helps the Library. The one proposition that commanded a majority of the *Pico* Justices is that there is no First Amendment obligation on the government to keep providing particular books. *See Little v. Llano Cnty.*, 138 F.4th 834, 844 n.15 and accompanying text (5th Cir. 2025) ("[A] majority of the Justices rejected the idea that someone's 'right to receive information' requires a library to shelve particular books."); *Muir*, 688 F.2d at 1045 n.30 (noting that a "majority" of *Pico's* Justices "agree[d] . . . that there is no First Amendment obligation upon the State to provide continuing access to particular books"). Chief Justice Burger said it directly: "the right to receive information and ideas does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." *Pico*, 457 U.S. at 888 (Burger, C.J., dissenting) (citation and marks omitted). Justice Rehnquist made the practical observation that answers this case: "the most obvious reason" a student isn't denied access to a book by its removal from a library is "the ready availability of the books elsewhere." *Id.* at 915 (Rehnquist, J., dissenting). Even the Brennan plurality confined itself to "the discretion to *remove* books," disclaiming any holding about the discretion to acquire them—and by extension, about where within a building a library chooses to shelve what it has. *Id.* at 871-72 (plurality op.).

So even on its own terms, *Pico* gives Plaintiffs nothing. The decision that supposedly limits the Library's discretion says nothing about acquisition, nothing about shelving, and—on the one point a majority of the

Justices actually agreed—nothing that requires the Library to keep any book on any particular shelf.

### D. Courts have rejected the right to receive unfettered access to books.

The district court described this area of law as unsettled. *See* ECF No. 50 at 8-9 [JA295-JA296]. Unsettled, perhaps, given that *this* Court has not yet spoken. But the two courts of appeal that have confronted the question answer it the same way—and not in Plaintiffs' favor.

In *Little*, the en banc Fifth Circuit confronted a case materially like this one: library patrons sued after county officials removed 17 books, including books concerning sexuality and gender identity. *See Little*, 138 F.4th at 838-39. The en banc court dismissed the free speech claims:

> The only sensible course—and, happily, the one supported by reams of precedent—is to hold that the right to receive information does not apply here. A plaintiff may not invoke that right to challenge a library's decisions about which books to buy, which books to keep, or which books to remove.

*Id.* at 837. Ten of the seventeen judges joined that portion of the opinion, and the court overruled its precedent that had applied a right to receive information to school library removals. *Id.* at 835 n.†, 848-51.[7]

The Eighth Circuit recently reached the same conclusion on the right-to-receive question, which has arisen in both the public-school and public-library contexts. In *Penguin Random House, LLC v. Robbins*, the court held

---

[7] A plurality of the Fifth Circuit also opined that a public library's collection decisions are government speech. *Id.* at 865 (plurality op.). The Library addresses that ground in Part III below.

that "the removal of a book from a school library does not prevent a student from 'receiving' the information" and that "[t]he First Amendment does not guarantee students the right to access books of their choosing at taxpayer expense." 172 F.4th 581, 586 (8th Cir. 2026). There is no "supercharged right to receive information in public schools."[8] *Id.* (quoting *Walls v. Sanders*, 144 F.4th 995, 1003 (8th Cir. 2025)).

Just three months later, the Eighth Circuit returned to the subject in *Fayetteville Public Library v. Crawford County*, reversing a judgment that had enjoined enforcement of an Arkansas statute requiring public libraries to adopt policies governing the "selection, relocation, and retention" of materials. 183 F.4th 1020, 1029 (8th Cir. 2026). The majority resolved the case on standing, overbreadth, and vagueness without reaching the right to receive question. *Id.* at 1030-39. But Chief Judge Colloton, concurring in the judgment, addressed it directly, concluding that the overbreadth claim failed "because third-party library patrons have no constitutional right to receive unfettered access to books of their choice at taxpayer expense." *Id.* at 1039 (citing *Little*, 138 F.4th at 842-48; *Pico*, 457 U.S. at 888-89 (Burger, C.J., dissenting); *id.* at 915 (Rehnquist, J., dissenting)).

Two courts of appeal have now taken up the question across three decisions, and not one has recognized the positive right to receive

---

[8] While *Robbins* arose in the public-school setting, the Eighth Circuit declined to hold that the placement of books in a school library is government speech, *id.* at 588—a question the Library addresses in Part III.

information that Plaintiffs assert. Set against that, the district court's rule relying on *Mainstream Loudoun v. Board of Trustees of the Loudoun County Library*, 2 F. Supp. 2d 783 (E.D. Va. 1998)—a single district court decision about internet filtering, decided 28 years ago, which this Court has never adopted. That is thin ground to support recognition a right that two courts of appeal have already denied.

### E. The district court's rule has no limiting principle, and its consequences are untenable.

Ask what the district court's rule would require in practice. A library has finite shelf space and a finite budget, yet faces an effectively infinite universe of books. So every day, librarians must decide what to buy, what to exclude, what to keep, what to discard, and where to put what remains. Every one of those decisions turns on content and viewpoint. *See* Ass'n of Libr. Pro. Amicus Br. "Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them," and "[t]o fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 204-05 (2003) (plurality op.). Justice Breyer agreed that heightened scrutiny "would unreasonably interfere with the discretion necessary to create, maintain, or select a library's collection." *Id.* at 217 (Breyer, J., concurring in judgment) (marks omitted).

If content- or viewpoint-based curation were a constitutional problem, then librarians violate the First Amendment by declining to stock flat-earth

atlases, passing over books celebrating the Klan, or putting the sex-education titles in locations where a seven-year-old looking for dinosaurs won't find them by accident. That can't be right. *See* Frederick F. Schauer, *Principles, Institutions, and the First Amendment*, 112 HARV. L. REV. 84, 106 (1998) ("[One] would hardly disagree . . . with the ability of a librarian to select books accepting that the Holocaust happened to the exclusion of books denying its occurrence."). But the district court's reasoning supplies no way to distinguish those situations from this one, because it identifies no standard at all. *See* ECF No. 50 at 7 [JA294] ("[T]he Court did not determine at this stage of litigation what level of scrutiny would apply to these claims"). The Fifth Circuit identified the same problem. *See Little*, 138 F.4th at 837 ("No one in this case—not plaintiffs, nor the district court, nor the panel—can agree on a standard.").

Trying to apply a right to receive information in the form of taxpayer-funded library books "would be a nightmare. How would judges decide when removing a book is forbidden? . . . May a library remove a book because it dislikes its ideas? Because it finds the book vulgar? Sexist? Inaccurate? Outdated? Poorly written? Heaven knows." *Little*, 138 F.4th at 836-37. The practical consequence of Plaintiffs' theory is that every public library in this Circuit becomes a defendant-in-waiting, and every shelving decision an invitation to litigation. That's one of the many pathologies and inevitable byproducts of adopting the *Pico* plurality opinion as governing law. *See* America First Legal Foundation Amicus Br. 19-25. This Court should

explicitly disavow the *Pico* plurality opinion as other courts of appeals have done.

### F. This case is weaker still, because the Library relocated books rather than removed them.

In *Little*, *Robbins*, and *Pico*, books were removed from libraries. *See Little*, 138 F.4th at 836 ("public library's removal of books"); *Robbins*, 172 F.4th at 586 ("removal of books from school libraries"); *Pico*, 457 U.S. at 866 ("removal of books from the shelves of a school library"). Not so here. Instead, affected titles were reshelved within the same building—often just a few feet away—and remain available on open shelves to be read on site (by anyone) and borrowed (by anyone with an unrestricted minor or adult card. *See* Factual Background, *supra* at 5. All that Plaintiffs allegedly lack is the ability for a minor with a restricted card to borrow from the Parenting and Early Childhood section without a parent's involvement.[9]

Eighth Circuit Chief Judge Colloton described that arrangement, and rejected a challenge to it, a mere two months ago: "A public library, or a State that regulates a public library, may place certain books in a particular section of the facility, to shield younger minors from harm, without violating the First Amendment rights of other patrons who would prefer to have the collection made available in a different manner." *Fayetteville*, 183 F.4th at 1039 (Colloton, C.J., concurring in the judgment). Like *Fayetteville*,

[9] Plaintiff E.G. doesn't lack even that. She holds an unrestricted minor card and concedes she may check out any book in the library; her objection is that she "finds it frustrating to walk all over the library." Am. Comp. ¶ 140 [JA73].

Plaintiffs are just patrons who would prefer the collection be made available in a different manner.

If the Constitution has nothing to say about a library's decision to remove a book altogether—and both courts of appeals to reach the question have so concluded—it surely has nothing to say about a library's decision about which aisle to put it in. *See Little*, 138 F.4th at 837 ("A plaintiff may not invoke that right to challenge a library's decisions about which books to buy, which books to keep, or which books to remove."); *Robbins*, 172 F.4th at 586 ("[T]he removal of a book from a school library does not prevent a student from 'receiving' the information."). Plaintiffs' claim is therefore weaker than the claims rejected in *Little* and *Robbins*. The plaintiffs in those cases lost access to the books at a public library. Plaintiffs here did not.

### G. A shelving decision is not a ban, and the parental-rights cases confirm it.

The district court relied on *Brown* and *Erznoznik* for the proposition that the Written Policies impose an unconstitutional "parental veto" on minors' access to protected speech. *See* Order at 12-13, 29-30 [JA12-JA13, JA29-JA30] (first citing *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011); then citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)). Neither case involved a policy like this one.

*Brown* disapproved a California statute that prohibited the sale or rental of violent video games to minors and imposed a civil fine of up to $1,000 per violation. *Brown*, 564 U.S. at 789. *Erznoznik* invalidated an

ordinance that made it a public nuisance and a punishable offense for a drive-in theater to exhibit films containing nudity when the screen was visible from a public street. *Erznoznik*, 422 U.S. at 206-07. Each involved a penalty-backed prohibition on disseminating speech to minors. Neither required *the government* to shelve its own collection in a particular section.

That distinction answers the overbreadth reasoning the district court borrowed. *Erznoznik*'s ordinance failed as a child-protection measure because it "sweepingly forbid[ ] display of all films containing any uncovered buttocks or breasts, irrespective of context," and so would "bar a film containing a picture of a baby's buttocks." *Erznoznik*, 422 U.S. at 213. The problem was the ban, not the classification. A library that shelves a title in one section rather than another bars nothing; the book stays in the building, on an open shelf, accessible to any patron, and borrowable by any patron with an unrestricted minor or adult card.

If anything, *Brown* confirms the point. The Court's objection was to "punishing third parties for conveying protected speech to children *just in case* their parents disapprove," and to an Act "vastly overinclusive" as parental aid because "[n]ot all of the children who are forbidden to purchase violent video games on their own have parents who *care*." *Brown*, 564 U.S. at 802-04 (emphasis in original). No one is punished here, and nothing is forbidden. Even Justice Breyer, dissenting, would have upheld California's law as "no more than a modest restriction" because "it prevents no child or adolescent from obtaining a game provided a parent is willing to help." *Id.* at

848-49 (Breyer, J., dissenting).

The Written Policies impose no prohibition, no penalty, and no ban. Their operative language is locational: materials "will be located in" the Parenting and Early Childhood or Adult collection. *See* Ex. A at 8, 13 [JA90, JA95]. They place books in a different section of the same building. James Decl. ¶ 7 [JA268-269]. Patrons may find them there, *see* Am. Compl. ¶ 138 [JA73], and any patron with an adult or unrestricted minor card may borrow them, *see id.* ¶¶ 128, 136, 140, 142 [JA72-JA74]. The policies therefore do not block a private speaker from reaching a private listener. They govern the Library's own arrangement of its collection.

And the interest the Collection Policy serves is one the Supreme Court reaffirmed last Term in *Mahmoud v. Taylor*, 606 U.S. 522 (2025). The Court held that parents' right to direct the upbringing of their children "extends to the choices that parents wish to make for their children outside the home," and doesn't stop at the door of a public institution. *Id.* at 546-47. A policy that channels decisions about a minor's access to contested material about gender to their parents advances that interest. It does not displace it.

### H. Even if a right to receive exists, library shelves are not a forum for private speech.

Even if some residual right to receive information exists, library shelves are not a forum of any kind. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-78 (1998) (recognizing a location category of "not a forum at all"). The Library does not open its shelves to private speakers. It

selects, purchases, owns, and arranges the materials in its collection. *See* James Decl. ¶¶ 3, 9 [JA268-JA269]. If any forum analysis applied, the Written Policies are reasonable and viewpoint neutral. They reach all materials for the specified age bands whose illustrations, themes, or storylines "affirm, portray, or discuss" changing a minor's gender, regardless of the view taken. Ex. A at 8 [JA90]. The Young Adult provision reaches materials with characters who have transitioned or are transitioning and likewise addresses illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning. *See* Am. Compl. ¶ 79 [JA63-JA64], Ex. A at 13 [JA95]. The rule therefore addresses the subject across the relevant age band; it does not choose between favorable and unfavorable viewpoints.

The district court skipped this step entirely. In a footnote, it substituted *Child Evangelism Fellowship of MD, Inc. v. Montgomery County Public Schools*, 457 F.3d 376 (4th Cir. 2006)—an unbridled-discretion case about access to a government forum—for the forum analysis it declined to perform. *See* Order at 28 n.4 [JA28]. That case does not decide whether library shelves are a forum or whether these policies are reasonable and viewpoint neutral. The Court should reach those questions in the alternative, and the answer favors the Library. Judgment on this issue should be reversed.

## III. Independently, a public library's curation decisions are government speech.

Even if some residual right to receive information survived the analysis above, the claims would still fail because a public library's collection

decisions are government speech. The rule is straightforward: "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). And when the government speaks, "it naturally chooses what to say and what not to say." *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). Thus, the place to fight over a library's collection decisions is "the ballot box," not a federal courtroom, with judges serving as the library board reviewing every shelving decision in the Circuit. *See id.* at 252. Three points confirm as much: (1) curation is quintessentially expressive; (2) this Court's precedent treats the selection and arrangement of private content as the government's own speech; and (3) the Library's policy disclaims only endorsement, not control.

### A. Curation is quintessentially expressive.

The Supreme Court's decision in *Moody* answers the question of whether curation is speech. *Moody v. NetChoice, LLC*, 603 U.S. 707, 731-32 (2024). "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Id.* at 731. And the analysis doesn't change "just because a compiler includes most items and excludes just a few." *Id.* at 732. The district court counted the competing decisions and found them evenly matched. *See* Order at 21-22 [JA21-JA22]. But *Moody* is binding; and it resolves the only question those cases are divided over: whether assembling and arranging a collection of third-party material

is itself expression. It is. *See Moody*, 603 U.S. at 731 ("First Amendment offers protection" for "compiling and curating others' speech").

Yet, the district court thought it "entirely plausible" that a government collection delivering a "multitude of messages" is private rather than government speech. Order at 21 [JA21]. That misunderstands both the question and the answer. Sure, the message conveyed in any given book is the author's, but the Library's selection and arrangement of the books is the Library's own expressive speech. *Moody* isn't the only authority saying so. The D.C. Circuit was the first to apply this principle to public libraries. *See People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."). Then-Judge Kavanaugh explained, "'[G]overnment speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries." *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) (quoting *Gittens*, 414 F.3d at 28). And seven of the judges of the en banc Fifth Circuit concluded that public library curation is government speech. *See Little*, 138 F.4th at 865 (plurality). The district court cited each of those cases, but disregarded them. *See* Order at 21-22 [JA21-JA22].[10]

---

[10] Although the Eighth Circuit rejected the government-speech argument in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024), it erred for the reasons explained in *Little*, 138 F.4th at 864-65 (plurality); *see also* America First Legal Foundation Amicus Br. 14-16.

The principle isn't confined to libraries, either. School curriculum selection is government speech too. *See, e.g.*, *Walls*, 144 F.4th at 1002-03 (rejecting students' claim that a state law barring critical-race-theory instruction violated their First Amendment rights, because the government's selection of third-party speech for its curriculum is its own speech—and "citizens cannot require the government to express a certain viewpoint or maintain a prior message"); *Chiras v. Miller*, 432 F.3d 606, 618-20 (5th Cir. 2005) (affirming Rule 12(b)(6) dismissal of a textbook author's and a student's challenge to a state board's refusal to approve an environmental science textbook, because "the selection of curricular materials by the Board is clearly government speech" and "students have no constitutional right to compel the Board to select materials of their choosing"). If the government's selection of a textbook for classroom use is speech, then its selection of a book for a library shelf is no less so.

### B. This Court's precedent points the same way, and neither *Whateley* nor the district court's distinctions change that.

The relevant speech here is the act of selecting, retaining, and arranging the collection—not the contents of any book.

Start with this Court's cases. *ACLU of North Carolina v. Tennyson* held that North Carolina's specialty-plate program was government speech and that the State could reject designs with which it disagreed. 815 F.3d 183, 185 (4th Cir. 2016). True, this Court held just weeks ago that the character combinations on Virginia's vanity plates are private speech. *See Whateley v.*

*Lackey*, 184 F.4th 368, 372, 381-82 (4th Cir. 2026). But public libraries are more akin to the government-curated plates in *Tennyson* and are the opposite of personalized license plates in *Whately*. The distinction is apparent from the three relevant analytical factors in *Whately*: history, public perception, and control.

History cuts sharply in the Library's favor. In *Whateley*, the Commissioner couldn't "point to a single instance in which Virginia communicated an expressive *message* . . . through its license plate registration numbers." *Id.* at 377 (emphasis in original). Public libraries are the opposite. "[L]iterally from the moment they arose in the mid-19th century, public libraries have been shaping their collections for specific educational, civic, and moral purposes." *Little*, 138 F.4th at 865 (plurality op.). The Supreme Court has said the same: "Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them," and that discretion "depends on its traditional role in identifying suitable and worthwhile material." *Am. Libr. Ass'n*, 539 U.S. at 205, 208 (plurality op.); *see also* Am. Libr. Pro. Amicus Br.

Here, the Library's Collection Policy describes that institutional function in those terms. *See* Ex. A at 1-2 [JA83-JA84] (showing the policy sets out "the philosophy and rationale used to make collection development and maintenance decisions," and provides that "[c]ollection decisions are based on the merit of the work as it relates to the Library's mission and the

work's ability to meet the expressed or anticipated needs and interests of the community").

Public perception points the same way. A vanity plate is read as the driver's own message—one of "hundreds of thousands of disparate messages that appear on drivers' vanity plates." *Whateley*, 184 F.4th at 379. A library's decisions, by contrast, are read as the institution's deliberate professional judgment about what to buy, keep, and shelve. *See* Ex. A at 1 [JA83] (in making selections, staff "consult a variety of reviewing sources and community members with expertise in certain areas"); *Am. Libr. Ass'n*, 539 U.S. at 205 (plurality op.) ("[L]ibrary staffs . . . enjoy broad discretion" in making collection decisions). Patrons need not believe the Library endorses every book to understand that the Library chose the collection.

Control is the decisive difference, and *Whateley* said so. "This factor can be the 'most salient feature' of the analysis . . . ." *Whateley*, 184 F.4th at 380 (quoting *Shurtleff*, 596 U.S. at 252). There, Virginia did not "set out an affirmative vision for the messages" or "edit the messages once submitted;" it exercised "a form of final control through a discrete set of negative prohibitions on certain offensive content," which was "not enough" for government speech. *Id.* at 382. The Library's role is the opposite. It selects each title against written general and content criteria, buys it with public funds, owns it outright, houses it in its own buildings, and decides by policy where it sits. Ex. A at 3-4, 8, 13 [JA85-JA86, JA90, JA95]. Consider the distinction between a player and a spectator: A coach picks each player based

on his merits and what he'll contribute, but the gate staff admit any spectator with a ticket unless he brings something prohibited. The Library is a coach assembling a roster, while Virginia in *Whately* merely worked the gate—it turned away the vanity plates that broke its rules and let the rest through. No one would mistake a spectator's message for the team's.

On every *Whateley* factor—history, perception, and control—the Library is the speaker. That leaves only the disclaimers in the Collection Policy, which disclaim endorsement, not control.

### C. The Collection Policy's disclaimers do not disavow the Library's own curation.

Plaintiffs will presumably point to the Collection Policy's statement that the Library "will neither promote nor censor any particular religious, moral, philosophical or political conviction or opinion" and that "[t]he inclusion of an item in the collection does not represent an endorsement of its contents," Ex. A at 2 [JA84], to suggest the Library has disclaimed any expressive role in its own collection—and so it cannot be speaking when it decides what to buy, keep, and shelve. That conflates endorsement with selection.

Monuments and brochures likewise carried third-party content the government did not author. Yet each was government speech, because the government selected the items and displayed them as its own. *See, e.g.*, *Summum*, 555 U.S. at 472 (holding that monuments in a public park are government speech, even when donated to the government by a private

entity, because such monuments "are meant to convey and have the effect of conveying a government message"); *Vista-Graphics, Inc. v. Virginia Dep't of Transp.*, 682 F. App'x 231, 237 (4th Cir. 2017) (holding that the display of privately published tourism guides displayed at state rest areas is government speech and declining "to adopt a rule that would require a state to display guides espousing every potential point of view, even those contrary to the state's chosen message"). A government speaker doesn't forfeit the government-speech doctrine by declining to adopt every idea in every item it selects.

Indeed, the Library's own policies draw that line. The Collection Policy disclaims endorsement of an item's "contents," yet just pages later prescribes what staff may display and where, based on its content. *See* Ex. A at 2, 8 [JA84, JA90] (books that discuss "changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex" will be located in the Parenting and Early Childhood section). And it reserves authority to the Executive Director to remove any item she deems "overtly political, provocative, inappropriate, or not relevant." Am. Compl., ECF No. 5-3 ("Ex. C") at 1-2 [JA100-JA101]. That is a document separating endorsement from control—not disclaiming both.

Whether analyzed under a history-perception-control framework or a curation doctrine, a public library's decisions about what books to buy, keep, and where to shelve them are government speech, and Plaintiffs' First Amendment claim fails for this independent reason. *See* America First Legal

Foundation Amicus Br. 8-16 (explaining how library-curation decisions qualify as "government speech").

## IV. The equal protection claims fail because the Collection Policy treats every similarly situated patron the same.

The district court denied Defendants' motion to dismiss as to two equal protection claims—Count Two (challenging the "Written Policies") and Count Four (challenging the alleged "Unwritten Policy"). *See* Am. Compl. ¶¶ 169-74, 180-83 [JA78-JA81]; Motion to Dismiss at 28-32 [JA140-JA144]; Reply at 10-12 [JA202-JA204]; Order at 30-34 [JA30-JA34]. The district court's ruling rested on the theory that the Collection Policy produces "more than just disparate treatment through discrimination against the[] viewpoint" of LGBTQ-identifying Library patrons, because it restricts access to books positively portraying gender transitioning while leaving negative portrayals in the juvenile and young adult sections. Order at 32-33 [JA32-JA33]. That theory fails for multiple reasons.

### A. The equal protection claims are the First Amendment claims reshelved, and they fail for the same reason.

Start with what the claims actually say: Count Two alleges that the Written Policies "subject LGBTQ children and their parents to unequal treatment by *preventing them from accessing library materials* positively reflecting themselves and their families." Am. Compl. ¶ 171 [JA78] (emphasis added). Count Four alleges that the Unwritten Policy "subject[s] LGBTQ library patrons to unequal treatment by *infringing on their ability to access library materials* positively reflecting themselves and families." *Id.*

¶ 180 [JA80] (emphasis added). Each claim rests on the same premise as the First Amendment claims: a right to access particular government-provided content. That right doesn't exist for all the reasons explained above. *See supra* at Part II. Relabeling it as an "equal protection" claim doesn't make it one nor can it revive a failed First Amendment claim.

Courts have recognized this point. As the Ninth Circuit put it, an equal protection claim that is "no more than a First Amendment claim dressed in equal protection clothing" is "subsumed by, and co-extensive with" the underlying First Amendment claim. *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001); *see also Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 834 (E.D. Va. 2006), *aff'd*, 484 F.3d 687 (4th Cir. 2007) (declining to address an equal protection argument that was "a mere rewording of a First Amendment claim") (citation and marks omitted). If the First Amendment doesn't protect the interest at the core of these claims, the Equal Protection Clause doesn't either.

### B. There is no disparate treatment, because the Policy classifies books, not people.

An equal protection claim requires a plaintiff to "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). The Equal Protection Clause guarantees that no State shall "deny to *any person* within its jurisdiction the equal protection of the laws." U.S. Const.

amend. XIV, § 1 (emphasis added); *see Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 202 (2023) ("provisions of the Fourteenth Amendment apply to all persons") (citation and marks omitted); *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) ("The rights established are personal rights."). The Equal Protection Clause doesn't protect books. And it doesn't protect fictional characters.

Look at how the Collection Policy actually operates. Every minor with a restricted card can access the same books as every other minor with a restricted card. Every minor with an unrestricted minor card can access the same books as every other minor with an unrestricted minor card. Every adult has the same access as every other adult. No ten-year-old—LGBTQ-identifying or not—can check out a book shelved in the Parenting and Early Childhood section without an adult card or unrestricted minor card. The Policy nowhere refers to a patron's sex, sexual orientation, gender identity, or transgender status. It classifies books by subject matter and target-audience age. Its only classification of patrons is by age. *See* Ex. A at 4-5, 8, 13 [JA86-JA87, JA90, JA95]. But age isn't a suspect or quasi-suspect class. *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312-14 (1976). Thus, the Policy need only satisfy rational-basis review. *Id.* at 314. It does.

The district court merely concluded the Policy creates "transgender-based disparate treatment" because books *positively* portraying gender transitioning are relocated while books *negatively* portraying it remain in place. Order at 32-33 [JA32-JA33]. That's a classification of materials, not

people. To hold otherwise would mean that a library's decision to shelve a children's book in the adult section—because its content is unsuitable for young audiences—violates the equal protection rights of every adult who would prefer it elsewhere. That can't be the case.

The district court's premise—that the Policies "allow for books that negatively portray Plaintiffs' protected class to remain readily available while restricting access to positive portrayals"—fails on the text. *Id.* at 33 [JA33]. The Juvenile provision reaches materials whose illustrations, themes, or storylines "affirm, portray, or discuss" changing a minor's gender. Ex. A at 8 [JA90]. It isn't limited to favorable treatments. The Young Adult provision reaches materials with "characters who have transitioned or are in the process of transitioning." *Id.* at 13 [JA95]. Whether a particular title (such as *God Made Boys and Girls*) was correctly classified is an application question; it cannot render the Policy facially discriminatory as alleged by Plaintiffs' equal protection claim. *See* Am. Compl. ¶¶ 4, 169 [JA47, JA78] (alleging the Policies "facially classify materials for exclusion based on sex and transgender status").

The district court's approach cannot be squared with *United States v. Skrmetti*, 605 U.S. 495 (2025). There, Tennessee's law regulated medical treatments related to gender transitioning for minors. *Id.* at 505-06. The Court held that the law classified by age and medical use—not sex or transgender status—and applied rational-basis review. *Id.* at 517-23. Were there transgender minors in Tennessee especially interested in the regulated

treatments? Absolutely. But that was not enough. Interested and uninterested minors were treated alike. *Id.* at 511-15. Equal protection looks to the classification the law draws, not to which group is more interested in the regulated activity. The same is true here. All minors with the same library-card classification have the same access. The fact that some minors may be more interested in the relocated books than others doesn't convert a content-based book classification into a patron-based classification.

*Grimm v. Gloucester County School Board* doesn't rescue the district court's analysis either. 972 F.3d 586 (4th Cir. 2020). The court invoked *Grimm* to support its claim that policies touching gender transition trigger intermediate scrutiny. *See* Order at 33 [JA33]. *Grimm* held no such thing. It addressed a school policy that sorted students by "biological gender" and barred Gavin Grimm (a biological girl) from restrooms reserved for boys. *Grimm*, 972 F.3d at 605-15. The classification ran to the student, and the exclusion followed from the student's biological sex. *Id.* Nothing like that is alleged here. The Collection Policy sorts books by target-audience age and subject matter, Ex. A at 8, 13 [JA90, JA95], and no patron is denied anything another similarly situated patron may have.

*Grimm* classified people on account of their biological sex. The Collection Policy classifies content. That distinction resolves the first step: Plaintiffs cannot show they "ha[ve] been treated differently from others with whom [they are] similarly situated," because every patron in a given age-and-card category is treated the same. *Morrison*, 239 F.3d at 654. What remains

of Plaintiffs' theory isn't disparate treatment at all, but the assertion that the Policy falls harder on LGBTQ patrons than on others. That is a disparate-impact argument, and it fails, too.

### C. Neither disparate impact nor alleged stigma states an equal protection claim.

Even assuming the Collection Policy has a disproportionate effect on LGBTQ-identifying minors—because they may, as a group, be more interested in the relocated books than other minors—that's not enough. "[T]he Fourteenth Amendment guarantees equal laws, not equal results." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 273 (1979). A plaintiff must show that the decisionmaker acted "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 279. Plaintiffs have alleged no such thing.

This Court's decision in *Anderson v. Crouch* forecloses the argument. 169 F.4th 474 (4th Cir. 2026). There, Medicaid participants challenged West Virginia's exclusion of coverage for gender-dysphoria surgeries, contending that because only transgender people experience gender dysphoria, the exclusion discriminated against them. *Id.* at 480-81. This Court rejected that theory: "[T]he mere fact that a law primarily—or even exclusively—affects a protected class cannot alone establish an equal protection claim." *Id.* at 484 (citation omitted). Discriminatory intent may be presumed only where a law "*both* overwhelmingly affects a suspect class *and* there's no logical reason for the distinction the law makes other than targeting that suspect class." *Id.*

(emphasis in original). And "if [the Court] can identify rational, nondiscriminatory reasons why the law targets who or what it does, then [it] cannot presume an intent to discriminate." *Id.* So too here. The Collection Policy's stated reason—respecting the role of parents in directing their children's upbringing—is a rational, nondiscriminatory one, and it appears in the Policy's own text. Ex. A at 8-9 [JA90-JA91].

The district court read *Hunter v. Erickson*, 393 U.S. 385 (1969), to mean that a facially neutral policy violates the Equal Protection Clause whenever "the law's impact falls on the minority." Order at 17 [JA17] (quoting *Hunter*, 393 U.S. at 391). *Hunter* held nothing so broad. It involved a charter amendment that required a citywide referendum before any fair-housing ordinance could take effect, while all other ordinances took effect normally. *Id.* at 386-89. That is a group-specific restructuring of the political process. Nothing like it exists here. And, in any event, the more recent and more analogous rule in *Skrmetti* forecloses the principle the district court sought to extract from *Hunter*.

The stigma theory advanced below doesn't supply an injury or a violation either. *See* Order at 17-18 [JA17-JA18] (citing *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984)). *Heckler* requires that a plaintiff be "personally denied equal treatment." *Heckler*, 465 U.S. at 740. And *Bostic* requires a plaintiff claiming stigmatic injury to identify a "concrete interest with respect to which he or she is personally subject to discriminatory

treatment." *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (citation and marks omitted). Plaintiffs identify none.

That leaves Plaintiffs with the segregation framing—"[s]omething like separate but equal," as the district court put the question below, ECF No. 43 at 17:18 [JA224], or, as Plaintiffs argued, that transgender patrons are "banished to a separate section," ECF No. 27 at 23 [JA174]. It fails on its own terms. Segregation separates *people*. The Collection Policy shelves *books*. No patron is sent to a different room, a different branch, or a different line, and every patron may walk to the Parenting and Early Childhood section and read what is there.

### D. The Policy satisfies rational-basis review.

Because the Collection Policy classifies only content, it need only survive rational-basis review. Under that standard, the Court will uphold the Policy if "any reasonably conceivable state of facts" could provide a rational basis for it. *Skrmetti*, 605 U.S. at 522 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). The Library doesn't have to reach for a conceivable justification here, because the Policy states its own. Its text recognizes that "parents/legal guardians are the primary source of education for their children, and that they have a fundamental right and responsibility to direct the upbringing and education of children under their care." Ex. A at 8 [JA90]. That's not merely a rational basis. It's a constitutionally grounded one. The Supreme Court has treated parental rights as fundamental for more than a century. *See Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923)

(recognizing the right to "establish a home and bring up children" and "to control the education of their own"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) ("[T]he interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this Court"). And last Term the Court confirmed that those rights do not stop just because the child steps into a government facility and encounters books chosen and purchased by the government. *Mahmoud*, 606 U.S. at 529-30.

A policy built to facilitate parental decisions about a minor child's exposure to age-sensitive content clears the rational-basis bar comfortably. The district court never said otherwise. It declined to decide the level of scrutiny at all, reasoning that the alleged conduct "would not survive under any level of scrutiny." Order at 28 n.4 [JA28]. But that skipped the antecedent question: whether any protected interest of a person was burdened in the first place. A policy that treats every patron in a given category identically, and classifies only content, burdens no one's personal right to equal protection. *See Shelley*, 334 U.S. at 22.

In sum, the equal protection claims fail at every step. They are repackaged First Amendment claims that fall with the right-to-receive theory beneath them. The Collection Policy classifies books, not people, and every

similarly situated patron is treated the same. Any disparate impact, even if shown, cannot substitute for discriminatory purpose. Neither can stigma or a separate-but-equal framing. The Policy rests on a rational—indeed constitutionally grounded—interest in parental authority. The Order denying dismissal of the equal protection claims should be reversed.

## CONCLUSION

The Court should reverse the portions of the district court's order that declined to dismiss Plaintiffs' claims.

Plaintiffs lack Article III standing. No Plaintiff alleges that the Library denied access to any book; every affected title remains on an open shelf in the same building; and inconvenience is not injury. The Court should vacate the Order as to Counts One, Two, and Four and remand with instructions to dismiss those claims (along with the already dismissed Count Three) for lack of jurisdiction.

If the Court reaches the merits, four independent grounds compel the same result: (1) public library patrons hold no positive First Amendment right to receive information from the government; (2) library shelves are not a forum for private speech, and the Written Policies are reasonable and viewpoint neutral in any event; (3) the Library's decisions about what to buy, keep, and where to shelve it are government speech; and (4) the Collection Policy treats every similarly situated patron alike. On any of those grounds, the Court should reverse the denial of dismissal as to Count One (First Amendment, Written Policies), Count Two (Equal Protection, Written

Policies), and Count Four (Equal Protection, Unwritten Policy), and remand with instructions to dismiss those claims.

Dated: September 30, 2026

Respectfully submitted,


*/s/ Miles E. Coleman*

Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 West Washington Street / Suite 400
Greenville, SC 29601
(864) 373-2300
miles.coleman@nelsonmullins.com

Charles F. Turner, Jr.
J. Nathan Ozmint
WILSON JONES CARTER & BAXLEY, P.A.
325 Rocky Slope Rd. / Suite 201
Greenville, SC 29607
(864) 672-3711
cfturner@wjcblaw.com
jnozmint@wjcblaw.com

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,000 words, including the words in the text boxes on page 4 of the brief, and excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Georgia Pro.

Dated: September 30, 2026

*/s/ Miles. E. Coleman*
Miles E. Coleman

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2026, I electronically filed this brief with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. Service was accomplished on all parties or their counsel of record through the CM/ECF system, which will send a Notice of Electronic Filing to all registered users.

Dated: September 30, 2026

*/s/ Miles E. Coleman*
Miles E. Coleman