**No. 26-1844**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

O.R., by and through his parents,
CHERYL ROGERS and GREG ROGERS, *et al.*,

*Plaintiffs-Appellees*,

v.

GREENVILLE COUNTY LIBRARY SYSTEM, *et al.*,

*Defendants-Appellants*.

On Appeal from the U.S. District Court
for the District of South Carolina (Case No. 6:25-cv-02599-DCC)

# BRIEF OF AMICI CURIAE STATES OF WEST VIRGINIA, SOUTH CAROLINA, AND 14 OTHER STATES IN SUPPORT OF APPELLANTS AND REVERSAL

ALAN WILSON
*Attorney General*

THOMAS T. HYDRICK
*Solicitor General*

JOSEPH D. SPATE
*Deputy Solicitor General*

SOUTH CAROLINA OFFICE
OF THE ATTORNEY GENERAL
1000 Assembly St.
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for Amicus Curiae*
*State of South Carolina*

JOHN B. MCCUSKEY
*Attorney General*

MICHAEL R. WILLIAMS
*Solicitor General*

OFFICE OF THE
WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
(304) 558-2021
mwilliams@wvago.gov

*Counsel for Amicus Curiae*
*State of West Virginia*

## TABLE OF CONTENTS

Introduction And Interests Of Amicus Curiae....................................................1

Summary Of The Argument.................................................................................3

Argument..................................................................................................................5

I. Library curation is government speech, so the First Amendment does not apply ..........................................................................................................5

II. The right to receive information does not compel the government to provide specific books, so the First Amendment would be respected ..........................................................................................................16

A. Appellees lack standing to make a right-to-receive claim............17

B. A citizen's right to *receive* speech does not create a government duty to *subsidize* all speech ......................................21

C. The district court's standard is unworkable ..................................25

Conclusion.............................................................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*A.T. Massey Coal Co. v. Massanari*,
305 F.3d 226 (4th Cir. 2002) .......... 22

*ACLU of Fla., Inc. v. Mia.-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) .......... 22, 24

*Am. Libr. Ass'n v. Odom*,
818 F.2d 81 (D.C. Cir. 1987) .......... 19

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) .......... 11, 12, 21, 23, 24

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*,
529 U.S. 217 (2000) .......... 6

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986) .......... 22, 27

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982) .......... 21, 22, 23, 25, 27

*Bond v. Utreras*,
585 F.3d 1061 (7th Cir. 2009) .......... 19

*Boring v. Buncombe Cnty. Bd. of Educ.*,
136 F.3d 364 (4th Cir. 1998) .......... 24, 27

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008) .......... 11

*Courthouse News Serv. v. Smith*,
126 F.4th 899 (4th Cir. 2025) .......... 19

*Edwards v. Aguillard*,
482 U.S. 578 (1987) .......... 22

*Egli v. Chester Cnty. Libr. Sys.*,
394 F. Supp. 3d 497 (E.D. Pa. 2019) .......... 13

*Fields v. Speaker of Pa. House of Reps.*,
936 F.3d 142 (3d Cir. 2019) .......... 24

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025)....................27

*Ginsberg v. New York*,
390 U.S. 629 (1968)....................27

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024)....................24

*Harris v. McRae*,
448 U.S. 297 (1980)....................20, 28

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978)....................21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)....................10, 20

*Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*,
584 F.3d 719 (7th Cir. 2009)....................24

*Johanns v. Livestock Mktg. Ass'n*,
544 U.S. 550 (2005)....................6

*Keefe v. Adams*,
840 F.3d 523 (8th Cir. 2016)....................10

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)....................16

*L.A. Police Dep't v. United Reporting Pub. Corp.*,
528 U.S. 32 (1999)....................19

*Lamont v. Postmaster Gen.*,
381 U.S. 301 (1965)....................17

*Linda R.S. v. Richard D.*,
410 U.S. 614 (1973)....................20

*Little v. Llano Cnty.*,
138 F.4th 834 (5th Cir. 2025)....................7, 11, 13, 14, 20, 24, 28

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................18

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....................28

*Mia. Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974)....10

*Moody v. NetChoice*,
603 U.S. 707 (2024)....9, 10, 18

*Muir v. Ala. Educ. Television Comm'n*,
688 F.2d 1033 (5th Cir. 1982)....22

*Murthy v. Missouri*,
603 U.S. 43 (2024)....10, 18

*Nat'l Endowment for Arts v. Finley*,
524 U.S. 569 (1998)....7, 21, 22, 23

*Parnell v. Sch. Bd. of Escambia Cnty.*,
802 F. Supp. 3d 1361 (N.D. Fla. 2025)....9, 26

*Penguin Random House, LLC v. Robbins*,
172 F.4th 581 (8th Cir. 2026)....14, 22, 24

*PETA v. Gittens*,
414 F.3d 23 (D.C. Cir. 2005)....7, 24

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)....5, 6, 11, 19, 23

*Przybocki v. USDA*,
185 F.4th 891 (9th Cir. 2026)....18

*Regan v. Tax'n With Representation of Wash.*,
461 U.S. 540 (1983)....21

*Roy Exp. Co. Establishment of Vaduz v. Columbia Broad. Sys., Inc.*,
672 F.2d 1095 (2d Cir. 1982)....10

*Rust v. Sullivan*,
500 U.S. 173 (1991)....7, 21

*Serra v. GSA*,
847 F.2d 1045 (2d Cir. 1988)....24

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)....12, 13, 15, 19

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....18

*Stanley v. Georgia*,
394 U.S. 557 (1969)....................17

*Stephens v. Cnty. of Albemarle*,
524 F.3d 485 (4th Cir. 2008)....................20

*Sutliffe v. Epping Sch. Dist.*,
584 F.3d 314 (1st Cir. 2009)....................10, 12, 24

*Thunder Studios, Inc. v. Kazal*,
13 F.4th 736 (9th Cir. 2021)....................16

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994)....................10

*United States v. Am. Libr. Ass'n, Inc.*,
539 U.S. 194 (2003)....................9, 13, 18, 23

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)....................18

*Via v. City of Richmond*,
543 F. Supp. 382 (E.D. Va. 1982)....................15

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015)....................5, 6, 7, 24

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025)....................19

*Whateley v. Lackey*,
184 F.4th 368 (4th Cir. 2026)....................15

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)....................28

*Zemel v. Rusk*,
381 U.S. 1 (1965)....................21

**Other Authorities**

BUREAU OF EDUC.,
DEP'T OF THE INTERIOR, PUBLIC LIBRARIES IN THE UNITED STATES OF AMERICA: THEIR HISTORY, CONDITION, AND MANAGEMENT (1876)....................15

F.B. Perkins,
*How To Make Town Libraries Successful*, *in* PUBLIC LIBRARIES IN THE UNITED STATES OF AMERICA 419 (1876) ....................3

Frederick Schauer,
*Is Government Speech a Problem?*, 35 STAN. L. REV. 373 (1983) ....................18

Frederick Schauer,
*Principles, Institutions, and the First Amendment*, 112 HARV. L. REV. 84 (1998) ....................25, 26

INST. OF MUSEUM & LIBR. SERVS.,
PUBLIC LIBRARIES IN THE UNITED STATES SURVEY FISCAL YEAR 2013 (2016), https://tinyurl.com/yukhp23t....................8, 10

Janice E. Kreuscher,
Note, *Remedy Without a Right:* Board of Education v. Pico, 16 IND. L. REV. 559 (1983) ....................25

Jay Alan Sekulow & Erik M. Zimmerman,
Pleasant Grove City v. Summum: *Upholding the Government's Authority to Craft Its Own Message Through Privately Donated or Funded Monuments, Memorials, and Artwork*, 3 CHARLESTON L. REV. 175 (2009)....................2

JESSE H. SHERA,
FOUNDATIONS OF THE AMERICAN PUBLIC LIBRARY (1949) ....................13

J.K. ROWLING,
HARRY POTTER AND THE SORCERER'S STONE (1997)....................28

Lester Asheim,
*Not Censorship But Selection*, WILSON LIBR. BULL., Sept. 1953 ....................26

*Library History*,
TOWN OF FRANKLIN, MASS., https://perma.cc/LTD5-G3UC (last visited Sept. 22, 2026) ....................1

Mark G. Yudof,
*Library Book Selection and the Public Schools: The Quest for the Archimedean Point*,
59 IND. L.J. 527 (1985) ........ 16

TRS. OF THE PUB. LIBR. OF THE CITY OF BOS.,
UPON THE OBJECTS TO BE ATTAINED BY THE ESTABLISHMENT OF A PUBLIC LIBRARY: REPORT (1852) ........ 26

Val Giordano,
*How Many Books Are In The World?*, ISBNDB,
https://tinyurl.com/3bn9wxj7 (last updated May 13, 2026) ........ 7

## INTRODUCTION
## AND INTERESTS OF AMICUS CURIAE

Libraries rank among government's most successful projects. Rightly so. With a library card, anyone can read what a college reserves for its students. A child living in a home with no books can visit a library and find a thousand. Or a person without access to music, the arts, or even the internet can find an internet terminal, a music collection, and a wall of art.

But a library isn't a warehouse, and its value doesn't come from hoarding as much material as possible. Great libraries reflect the judgments behind them: the daily and unglamorous work of deciding what to buy and what to pull, or what belongs on the shelf in the children's section and what belongs elsewhere. Librarians have exercised these kinds of judgments since the first public library opened its doors. Even Benjamin Franklin did much the same when he chose which books to donate to what would later become America's first public library. *See Library History*, TOWN OF FRANKLIN, MASS., https://perma.cc/LTD5-G3UC (last visited Sept. 22, 2026). Libraries necessarily require selection and exclusion.

The First Amendment doesn't oblige the government to abandon the very function—curation—that makes libraries worth having. But ultimately, that's what Appellees demand. According to them, the question of what books

should go in a public library (and even *where* in a public library) is a constitutional one, rather than issue resolved by the professional judgment and democratic accountability of librarians and legislators combined. That can't be right. "[W]hile *The Great Gatsby* is admittedly not itself government speech, the selection of that book for placement on a public library's shelves is government speech." Jay Alan Sekulow & Erik M. Zimmerman, Pleasant Grove City v. Summum: *Upholding the Government's Authority to Craft Its Own Message Through Privately Donated or Funded Monuments, Memorials, and Artwork*, 3 CHARLESTON L. REV. 175, 190 (2009). And a "right to receive" is no reason to find differently; the public can still receive whatever information isn't found on a library's shelves in places like bookstores, private collections, and any number of other sources.

Amici States operate and fund public library systems serving tens of millions of residents, and they set the policies under which those systems buy, catalog, shelve, and lend. The decision below labels curation decisions viewpoint discrimination, subjecting every one of those judgments to federal second-guessing anytime someone—an author, a patron, a publisher, or otherwise—is unhappy with the choice. And it strips the States of a power they have always held: to set age-based conditions on minors' access to certain

material in aid of parental authority. Amici thus have a direct interest in ensuring that the First Amendment is not read to convert their librarians into defendants and their acquisition budgets into a federal entitlement.

Really, this issue is not new. An 1876 report published by the Bureau of Education cautioned town libraries against assuming that anything capable of being represented in text is a proper subject for dissemination to all. *See* F.B. Perkins, *How To Make Town Libraries Successful*, *in* PUBLIC LIBRARIES IN THE UNITED STATES OF AMERICA 419, 421 (1876). But the decision below is novel in that it makes a misguided assumption—the idea that *every* book must be found in a library—a constitutional command. Yet the Constitution calls for no such thing. This Court should thus reverse.

## SUMMARY OF THE ARGUMENT

The district court's decision fails on two independent bases.

*First*, Appellees' First Amendment claim never gets off the ground, as the decisions at issue are the government's own expression. Choosing among the works of others—what to display, where, and for whom—has long counted as expression in itself, whether the chooser is a parade organizer, an editor, a broadcaster, or a city deciding which monuments belong in its parks. Governments curate too, and when they do, the check is the ballot box rather

than the jury box. Each consideration the Supreme Court weighs in identifying government speech—the practice's pedigree, how ordinary observers understand it, and who holds final editorial authority—points to Appellants as the *government* speaker. If courts were to hold differently and forbid libraries from preferring some works over others, then they could not operate as libraries at all.

*Second*, Appellees' fallback theory fails at both the threshold and the merits. A listener complaining about speech she did not receive must identify someone willing to speak to her. No one fits that description here: the government has declined to deliver the message Appellees want, and the authors' ability to reach them is untouched by anything Appellants did. That double-failing deprived Appellants of standing. On the merits, the guarantee Appellees invoke keeps the government from severing communications between private parties. It has never required the government to furnish materials, still less to pay for them and provide unrestricted access. Declining to underwrite expression is not suppressing it. Perhaps the lone authority suggesting otherwise drew three of nine votes, has gone unendorsed by any majority in the four decades since, and disclaimed the very power the district

court assumed. And the rule below would be unadministrable. It offers judges no standard for deciding which titles a collection must contain.

From top to bottom, the decision below was mistaken. It installs district courts as acquisitions librarians for every municipality in this Circuit. And it voids an age-based limit that parents may waive—the very sort of limit that States have always been free to adopt. The Court should therefore reverse and direct the district court to dismiss this suit.

## ARGUMENT

### I. Library curation is government speech, so the First Amendment does not apply.

When it comes to the First Amendment, the speaker's identity matters. While the Free Speech Clause "restricts government regulation of private speech," "it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). In other words, "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

That distinction makes sense. Otherwise, "government would not work." *Walker*, 576 U.S. at 207. Indeed, "it is not easy to imagine how government could function if it lacked [the] freedom" to curate its own speech.

*Summum*, 555 U.S. at 468. For "[h]ow could a state government effectively develop programs designed to encourage and provide vaccinations," for example, "if officials also had to voice the perspective of those who oppose this type of immunization?" *Walker*, 576 U.S. at 207-08. No, a government is supposed to govern, and "to govern, government has to say something." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 574 (2005) (Souter, J., dissenting).

That's not to say that government speech is unconstrained—it's just that the constraints come from outside the courts. Government speech reflects "the democratic electoral process that first and foremost provides a check on government speech." *Walker*, 576 U.S. at 207. The government is, "in the end, accountable to the electorate and the political process for its advocacy." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). And "if the citizenry objects, newly elected officials later could espouse some different or contrary position." *Id.*

Government speech can't encompass every conceivable viewpoint. But the selectivity that reality produces doesn't constitutionally injure those individuals whose contrary viewpoints the government is consequently forced to exclude. The exclusion of certain viewpoints is a feature, not a flaw, of our

system of government. In fact, "it is the very business of government to favor and disfavor points of view." *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment). So the government "is entitled to promote a program, to espouse a policy, or to take a position." *Walker*, 576 U.S. at 208. In doing so, "it represents its citizens and it carries out its duties on their behalf." *Id.* Holding otherwise "would render numerous Government programs constitutionally suspect." *Rust v. Sullivan*, 500 U.S. 173, 194 (1991).

Public libraries are no different. When public libraries speak, it's government speech. The government-speech doctrine does not contain a library exception.

How does a library speak? It speaks "by selecting some books over others and presenting that collection to the public." *Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir.) (plurality opinion), *cert. denied*, 146 S. Ct. 886 (2025). In other words, it "expresses itself by deciding how to shape its collection," *id.*—that is, "through its selection of which books to put on the shelves and which books to exclude," *PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005). After all, 160 million unique books exist today. *See* Val Giordano, *How Many Books Are In The World?*, ISBNDB, https://tinyurl.com/3bn9wxj7 (last

updated May 13, 2026). Yet the median public library collection contains fewer than 50 thousand items, including printed materials, e-books, audio, and video. *See* INST. OF MUSEUM & LIBR. SERVS., PUBLIC LIBRARIES IN THE UNITED STATES SURVEY FISCAL YEAR 2013 9 (2016), https://tinyurl.com/yukhp23t. Government-run libraries can thus offer only a small percentage of available materials for public use. That physical constraint requires some tough curation decisions. And those decisions require value judgments. When the government makes such value judgments by offering some materials for public use and declining to offer others, that selection process conveys a message.

The district court suggested that curation of library books might not be government speech because "a library collection is a varied collection of numerous ideas, some of which are readily contradictory." JA21. But the district court's lack of imagination is not dispositive of how government speech works. Public library curation does not have to be exclusively one-sided to count as government speech. For example, if a public library offers multiple religious texts from competing religions, the government message might be that "religion is good for society, and the community should explore different religious texts to decide what they believe for themselves." While different

texts espouse different viewpoints, the decision of *which* books and *which* viewpoints to highlight is up to the library all that same. That's so even if it doesn't amount to full-throated endorsement of every view expressed within each text selected.

What's more, "when the government decides which books to choose, it is not creating a forum for others to speak." *Parnell v. Sch. Bd. of Escambia Cnty.*, 802 F. Supp. 3d 1361, 1367 (N.D. Fla. 2025). Libraries are not necessarily designed to host diverse views from private voices. They do not exist to "provide a public forum for the authors of books." *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 206 (2003). Instead, "libraries collect [and display] books that the government deems to be of 'requisite and appropriate quality.'" *Parnell*, 802 F. Supp. 3d at 1368 (quoting *Am. Libr. Ass'n, Inc.*, 539 U.S. at 206). Otherwise, the government wouldn't even need librarians; it would just randomly select some subset of the works published to buy each year.

Curation as speech is nothing new. In *Moody v. NetChoice*, the Supreme Court recognized that a social media platform's "expressive activity includes presenting a curated compilation of speech originally created by others." 603 U.S. 707, 728 (2024). In other words, "[w]hen the platforms … decide which

third-party content those feeds will display, or how the display will be ordered and organized, they are making expressive choices." *Id.* at 740. The same is true in the context of cable operators, newspapers, and parade organizers, just to name a few. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 636 (1994) (cable programmers); *see Mia. Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (newspaper publishers); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995) (parade organizers). While the context may vary, the underlying principle is the same: "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own. And that activity results in a distinctive expressive product." *Moody*, 603 U.S. at 731; *see also, e.g.*, *Keefe v. Adams*, 840 F.3d 523, 532 (8th Cir. 2016) (selection of materials for school curriculum is government speech); *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 331 (1st Cir. 2009) (same as to town's choice of hyperlinks for town website). Indeed, even outside the First Amendment context, courts have recognized the "skill and creativity in selecting and assembling an original arrangement of those works, even if no new material is added." *Roy Exp. Co. Establishment of Vaduz v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1103 (2d Cir. 1982).

This distinct expressive activity is just as present in the public context as the private. "Like a private person, a government may express itself by crafting and presenting a collection of third-party speech." *Little*, 138 F.4th at 852. Which is to say, "government speech can include not only the words of government officials but also compilation of the speech of third parties by government entities such as libraries." *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) (cleaned up). Just as a legal brief can advance a message by collecting diverse quotes and authorities, so too can a government speak by presenting the words of others.

For example, "[w]hen a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). So too in the public monument context. Government officials "*select* the monuments that portray what they view as appropriate for the place in question." *Summum*, 555 U.S. at 472 (emphasis added). The monuments that are chosen are "meant to convey and have the effect of conveying a government message, and they thus constitute government speech." *Id.*

Public libraries are no different. Like the placement of a permanent monument in a public park, the selection, curation, and placement of books in

a public library conveys a government message. Like a public broadcaster, a public library exercises its editorial discretion when it chooses certain books over others. Like a town that selects which hyperlinks to place on its town website, a public library "uses its discretion to select between the speech of third parties for presentation" in a way that is "independent of the message of the third-party speech." *Sutliffe*, 584 F.3d at 330. And "like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum," a public library will "facilitate the expression of some viewpoints instead of others." *Forbes*, 523 U.S. at 674.

If these precedents weren't enough to resolve the issue, the factors identified in *Shurtleff v. City of Boston* resolve the question definitively. There, the Supreme Court held that the City of Boston did not engage in government speech when it allowed private parties to fly flags of their choosing on a city flagpole. 596 U.S. 243, 248 (2022). The court looked to three factors: "[(1)] the history of the expression at issue; [(2)] the public's likely perception as to who (the government or a private person) is speaking; and [(3)] the extent to which the government has actively shaped or controlled the expression." *Id.* at 252.

Here, all three *Shurtleff* factors support the conclusion that public library curation decisions amount to government speech.

First consider the history of public library expression. Public libraries and their curated collections have been around since the mid-19th century. *See Little*, 138 F.4th at 861 (citing JESSE H. SHERA, FOUNDATIONS OF THE AMERICAN PUBLIC LIBRARY (1949)). These libraries developed their collections to foster education and virtue. *Id.* (citing SHERA, *supra*, at 222-25). They "pursue[d] the worthy missions of facilitating learning and cultural enrichment." *Am. Libr. Ass'n, Inc.*, 539 U.S. at 203 (plurality opinion). So the content of materials selected by those early public libraries was crucial, as that content was intended to advance specific public purposes.

By shaping their collections, public libraries were telling their patrons: "[t]hese books will educate and edify you. But the books we have kept off the shelves … aren't worth your time." *Little*, 138 F.4th at 862. And while concepts of "virtue" may have shifted since the mid-19th century, the library's function remains the same. Through their curation decisions, public libraries tell the public which books will promote education and virtue and which will not. *See Egli v. Chester Cnty. Libr. Sys.*, 394 F. Supp. 3d 497, 504 (E.D. Pa. 2019) ("Libraries are not required to accommodate every book or proposed

talk, but instead must determine based on their professional judgment which materials are deemed to have 'requisite and appropriate quality' to occupy the limited space available." (cleaned up)). One public library might find some ideal worthy of being conveyed through its selection, while another might not. Either way, "the public library's judgment is 100-proof government speech." *Little*, 138 F.4th at 863.

Under the second factor, public perception, the public understands a library's collection reflects the library's own judgment. *Cf. Penguin Random House, LLC v. Robbins*, 172 F.4th 581, 587 (8th Cir. 2026) (public school library). The Fifth Circuit offered a useful illustration: If a library patron looking for a Stephen King novel wanted to lodge a complaint against the library for choosing not to stock King's novels, then "should he address his complaint to (a) the Library Board; (b) other patrons; or (c) Stephen King? *Answer*: (a). Any reasonable library patron would grasp this instantly." *Little*, 138 F.4th at 864. The public understands that public libraries curate the books on their shelves, so the words that land on library shelves aren't just the result of third-party choices.

The final factor of the analysis, the extent of government control, is straightforward here as well. This factor asks whether "the government is

exercising the '*type* of control' that would indicate the government intends to speak for itself," and "whether 'the government has actively shaped or controlled the expression,' maintaining 'direct control' over the message." *Whateley v. Lackey*, 184 F.4th 368, 381 (4th Cir. 2026) (quoting *Shurtleff*, 596 U.S. at 252, 256). For starters, if public libraries and officials did not actively shape their collections or maintain direct control over the content of those collections, it would seem doubtful that Appellees would have brought this case against Appellants in the first place. But more to the point, no library book lands on the shelves without the express approval of a governmental actor. Most often, that means making a deliberate choice to purchase a title. Even in the case of donated books, though, the library will decide when and how the message will be presented within its four walls. *See, e.g.*, *Via v. City of Richmond*, 543 F. Supp. 382, 385 (E.D. Va. 1982) (granting summary judgment to library on claimed First Amendment violation from refusal to accept gift subscription to atheist magazine).

Appellees also have not alleged that public libraries and officials like Appellants lack exclusive editorial control over what is placed on their shelves. Even if Appellants asked the citizens of Greenville County what materials they *should* curate, Appellants would still retain the final say as to what they *will*

include. The record also reflects that Appellants actively shaped and controlled their expression. For example, Appellants removed certain books from the juvenile and young adult sections and placed them in a section only adult library card holders could access. JA23. Appellants' message about the age-appropriateness of certain materials was Appellants' to shape—and thus the governments' voice.

## II. The right to receive information does not compel the government to provide specific books, so the First Amendment would be respected.

Even if this case didn't involve government speech (and therefore implicated the First Amendment more directly), Appellees could not establish a First Amendment violation. "The First Amendment protects speech for the sake of both the speaker and the recipient." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743 (9th Cir. 2021). This right to receive information might apply in "a variety of contexts." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). Broadly, the right prevents the government from blocking the flow of information between willing private speakers and willing listeners. *See* Mark G. Yudof, *Library Book Selection and the Public Schools: The Quest for the Archimedean Point*, 59 IND. L.J. 527, 545 (1985). The right might therefore prevent the government criminalizing the private possession of materials in

the home. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Or it might prevent governments from obstructing the delivery of mail a recipient wishes to receive. *Lamont v. Postmaster Gen.*, 381 U.S. 301, 305-07 (1965). But each of these situations presumes a willing speaker, an eager listener, and a government putting up barriers in between.

Although the challengers here invoke the right to receive information, their case presents none of the usual elements. For one, there's no willing speaker—and thus no standing for the challengers to bring this suit at all. For another, they seek to change the right from a *prohibition* on certain government regulation into an affirmative *obligation* for the government to supply content on demand. The affected books here can obviously still be sold and read in South Carolina; the challengers just say that the government must disseminate them, too. Neither legal authorities nor practical realities support their novel approach. Altogether, the district court wrongly converted the right to receive information into a right to receive *subsidized* information.

### A. Appellees lack standing to make a right-to-receive claim.

Every case starts with standing—but the district court stumbled at that first step here. The familiar three "irreducible constitutional minimum" elements of standing are an (1) injury in fact, (2) a causal connection between

that injury and the defendant's conduct, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Under the "first and foremost" of the elements, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up), certain standing requirements attach when "we focus on … listeners" "as the end result of our concern," Frederick Schauer, *Is Government Speech a Problem?*, 35 STAN. L. REV. 373, 384-85 (1983). Specifically, to assert a cognizable injury in right-to-receive cases, there must be a "willing speaker," *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976), and the listener must have a "concrete, specific connection to th[at] speaker," *Murthy v. Missouri*, 603 U.S. 43, 75 (2024); *see also, e.g.*, *Przybocki v. USDA*, 185 F.4th 891, 897-98 (9th Cir. 2026) (applying requirements).

Communication begins with the speaker, so it makes sense for the Court to do the same. The government is an "entity" like any other—"engag[ed] in … compiling and curating others' speech" into an "expressive product" "of its own." *Moody*, 603 U.S. at 731. And in curating that message, the government can largely say what it wants. The government "has broad discretion to make content-based judgments in deciding what private speech to make available to the public." *Am. Libr. Ass'n*, 539 U.S. at 204 (opinion of Rehnquist, C.J.). It

may "select the views that it wants to express." *Summum*, 555 U.S. at 468. And it can "declin[e] to express a view" altogether. *Shurtleff*, 596 U.S. at 251.

Thus, a government's discretion doesn't change in the context of right-to-receive claims. The right to receive information "cannot be used to require the government to provide a message it no longer is willing to say." *Walls v. Sanders*, 144 F.4th 995, 1002 (8th Cir. 2025). If the government doesn't want to speak, it doesn't have to. *See Am. Libr. Ass'n v. Odom*, 818 F.2d 81, 86-87 (D.C. Cir. 1987) (Ginsburg, R.B., J.). And the government can be an *un*willing speaker just as any other speaker can. *See Courthouse News Serv. v. Smith*, 126 F.4th 899, 917 (4th Cir. 2025). In other words, no law suggests that a government entity *must* be a willing speaker. It can exercise the same discretion as any other. *See, e.g.*, *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40 (1999) (explaining how "a governmental denial of access to information in its possession" does not raise First Amendment concerns because a government "could decide not to give out [that] information at all").

Here, the government isn't a willing speaker. *See Bond v. Utreras*, 585 F.3d 1061, 1078 (7th Cir. 2009) (noting how "[e]very circuit to have considered the question of standing in the context of a right-to-receive claim" requires a willing speaker). It does not want to say certain things to its young library

patrons. Appellees do not dispute that they received the government's curated message—what was said and what was left "unsaid." *Hurley*, 515 U.S. at 573 (cleaned up). Because "[no] speaker [is] willing to convey the information to" them, they cannot claim standing to assert the right. *Stephens v. Cnty. of Albemarle*, 524 F.3d 485, 492 (4th Cir. 2008).

Appellees, of course, argue that the book authors themselves are willing speakers. But even if the Court ignores the fact that the government is the speaker when it curates third-party speech, but the law doesn't foreclose any person from receiving the authors' messages by buying, borrowing, listening, or reading through any number of means. In other words, "by removing a book, the library does not prevent anyone from 'receiving' the information in it." *Little*, 138 F.4th at 848. So there's no actual nexus between the supposed willing speaker and the law being challenged. *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973) ("[A] plaintiff must show a logical nexus between the status asserted and the claim sought to be adjudicated." (cleaned up)); *cf. Harris v. McRae,* 448 U.S. 297, 316-18 (1980) (the government need not remove obstacles "not of its own creation").

### B. A citizen's right to *receive* speech does not create a government duty to *subsidize* all speech.

The Supreme Court has been clear. "[N]o basis [exists] for the claim that the First Amendment compels others—private persons or governments—to supply information." *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (opinion of Burger, C.J.). "The right to speak … does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). And the government doesn't have to "subsid[ize]" Appellees' right to receive information by allocating funds to every viewpoint imaginable. *Finley*, 524 U.S. at 587-88; *Forbes*, 523 U.S. at 674. A decision "not to subsidize the exercise of a fundamental right does not infringe the right." *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 545, 549 (1983). The Government can decline to fund information on a constitutionally protected subject without violating a right to receive that information; the listener's ability to receive the information by other means "remains unfettered." *Rust,* 500 U.S. at 193, 203.

Still, reaching beyond these clear precedents, the district court relied heavily on *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), to compel the government to provide Appellees' requested information. JA24-28. In *Pico*, a local school board removed certain books from school libraries, believing them antithetical to its duty to protect

children from moral danger. 457 U.S. at 855-58. The Court fractured on virtually all the First Amendment issues, but a plurality ultimately remanded the case for a determination of the school board's motives.

The district court's reliance on *Pico* is misplaced for several reasons.

*First*, *Pico*'s right-to-receive analysis is not precedential. Only three justices joined the plurality's expansive version of the right-to-receive rationale. *Pico*, 457 U.S. at 867-69. This "narrowest opinion" does not "represent[] a common denominator of the Court's reasoning" and cannot "embod[y] a position implicitly approved by at least five Justices who support the judgment." *A.T. Massey Coal Co. v. Massanari*, 305 F.3d 226, 236 (4th Cir. 2002) (cleaned up). Because the Court splintered in this way, many circuits consider *Pico* "a non-decision so far as precedent is concerned." *ACLU of Fla., Inc. v. Mia.-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009); *see also Robbins*, 172 F.4th at 586-87; *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (en banc). Indeed, no Supreme Court majority has cited the *Pico* plurality's right-to-receive analysis since its decision over forty years ago. *See Finley*, 524 U.S. at 584; *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986).

*Second*, *Pico* does not compel the government to provide requested materials. The plurality opinion made it clear that "nothing in [its] decision" "affects in any way the discretion of a local school board to choose books to add to the libraries of their schools." *Pico*, 457 U.S. at 871 (cleaned up). And the dissenting justices agreed with that baseline. *See id.* at 888 (Burger, C.J., dissenting) ("[T]he right to receive information … does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." (cleaned up)). In all, eight members of the *Pico* court agreed that the government may not be compelled to provide specific books in a specific way based on the right to receive information. That agreement is enough here, as Appellees seek exactly such affirmative provision—a demand that the library stock and freely circulate specified titles to unaccompanied minors.

*Third*, since *Pico*, the Supreme Court has repeatedly *affirmed* government content curation choices. It has done so when the government selects books and other resources in public libraries, *Am. Libr. Ass'n*, 539 U.S. at 203-05, monuments in public parks, *Summum*, 555 U.S. at 472, art funding, *Finley*, 524 U.S. at 585, and public television broadcasts, *Forbes*, 523 U.S. at

673. It has even upheld government content decisions when issuing "specialty license plates." *Walker*, 576 U.S. at 208-09.

This Court has held likewise in analogous situations. For example, in *Lee v. York County School Division*, a public school administrator "removed … items" from a school bulletin board. 484 F.3d 687, 690 (4th Cir. 2007). This Court upheld the administrator's choice, recognizing that the bulletin board "plainly constitute[d] school-sponsored speech bearing the imprimatur of the school." *Id.* at 698, 700. Content decisions of this type are best "entrusted" "to the local … authorities who are in some sense responsible." *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 371 (4th Cir. 1998) (en banc).

And this Court is hardly alone; many circuit courts have held the same in similar situations. *See*, *e.g.*, *Gittens*, 414 F.3d at 25 (outdoor exhibits); *Sutliffe*, 584 F.3d 314 (town websites); *Serra v. GSA*, 847 F.2d 1045 (2d Cir. 1988) (sculptures); *Fields v. Speaker of Pa. House of Reps.*, 936 F.3d 142 (3d Cir. 2019) (legislative prayers); *Little*, 138 F.4th at 836 (public library books); *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*, 584 F.3d 719 (7th Cir. 2009) (park pamphlets); *Robbins*, 172 F.4th at 585 (public school library books); *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024) (same); *Mia.-Dade Cnty. Sch. Bd.*, 557 F.3d at 1230 (same). This long

and heavy line of authority saying the opposite of *Pico*'s three-person minority shows that the decision prematurely adopted a remedy "without waiting to find or define a right." Janice E. Kreuscher, Note, *Remedy Without a Right: Board of Education v. Pico*, 16 IND. L. REV. 559, 579 (1983).

As the district court acknowledged, "*Pico* is kind of like Forrest Gump's box of chocolates. It just depends on which opinion you reach into as to what you get." JA24. Given its non-decision on the right-to-receive analysis, this Court should follow the other circuits in rejecting *Pico* as binding precedent for this case altogether.

**C. The district court's standard is unworkable.**

For many of the reasons already raised, allowing every library patron to receive any book they request, as the district court's ruling suggests, comes with damaging constitutional and practical consequences.

To start, library content curation is unavoidably content- and viewpoint-based. "[P]ublic libraries" "make their necessarily content-based and frequently viewpoint-based acquisition decisions by use of their own employees." Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 HARV. L. REV. 84, 114 (1998). Even when striving for broad book access, the first public library in the country recognized that its collection

was subject to subjective content curation decisions like whether the book was "safe[]," "respectable," and "[]healthy." *See* TRS. OF THE PUB. LIBR. OF THE CITY OF BOS., UPON THE OBJECTS TO BE ATTAINED BY THE ESTABLISHMENT OF A PUBLIC LIBRARY: REPORT 17, 20 (1852). And again, for one hundred fifty years, librarians have wrestled with how to define "good" content choices. *See, e.g.*, BUREAU OF EDUC., DEP'T OF THE INTERIOR, PUBLIC LIBRARIES IN THE UNITED STATES OF AMERICA: THEIR HISTORY, CONDITION, AND MANAGEMENT 414-18 (1876); Lester Asheim, *Not Censorship But Selection*, WILSON LIBR. BULL., Sept. 1953, at 63.

The district court's ruling places judges in the driver's seat to make these choices. But judicial actors are especially ill-suited to make these costly decisions. *See, e.g., Parnell*, 802 F. Supp. 3d at 1369 (describing these challenges). For one, courts lack judicially manageable standards to pick out books. If the Court were to substitute its own judgment to ensure what it views as "evenhanded" and "neutral," it would soon be forced to promote ideas that lack any merit, like views "denying the Holocaust." *See* Schauer, *Principles*, *supra*, at 104 n.97. For another, without some stopping point, requiring acquisition of every book a person requests would drain resource-scarce public library systems at taxpayer expense.

When federal judicial actors make these decisions, they also invite conflict with other superseding constitutional concerns like federalism and the separation of powers. "The First Amendment leaves undisturbed States' traditional power to prevent minors" from accessing certain kinds of speech. *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 478 (2025). So when a federal court orders state public libraries to implement federal judicial content restrictions and erase locally imposed age limitations, it acts as a state lawmaker effectively micromanaging municipal library systems. All nine justices in *Pico* "acknowledged that the [government] has the authority to remove books" for reasons like vulgarity. *See Fraser*, 478 U.S. at 684. If citizens have a problem with state curation choices, the remedy belongs in the state ballot box, not before the federal bench. *See Boring*, 136 F.3d at 370-71.

The ruling also intrudes on parental prerogatives. Minors do not have a heightened right to receive information in a public library. Appellees try to recast the libraries' decision to relocate these books as a total removal of them, but that characterization hides what this policy really is: an age-based access restriction subject to parental consent. Such restrictions are deeply rooted in this Nation's history, tradition, and precedent. *See Paxton*, 606 U.S. at 472; *Ginsberg v. New York*, 390 U.S. 629, 639 (1968). That principle holds even

when it comes to accessing politically divisive materials like "LGBTQ+-inclusive storybooks." *Mahmoud v. Taylor*, 606 U.S. 522, 563 (2025) (cleaned up). Laying claim to a library's age-restricted material continues to puff the imagination of schoolchildren who know they likely will not receive permission. *See* J.K. ROWLING, HARRY POTTER AND THE SORCERER'S STONE 198, 205-06 (1997) (sneaking into the Hogwarts library's Restricted Section). But the absence of likely parental permission is no reason to do away with the government's ability to curate its content in a way that encourages parents to fulfill their proper role in directing the "nurture and upbringing of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

In any case, the library's policies here don't prevent Appellees' receipt of the materials. The library did not remove the books but only moved them to another section. JA3. Adults have always been able to access the materials. And the minor Appellees can access them with parental consent, just as they could with any other age-restricted material. The books are also available elsewhere for purchase. So the free exchange of ideas continues, even if the government chooses—for whatever reason—not to ease that exchange by offering the ideas for free. *Little*, 138 F.4th at 848, 850-51; *cf. McRae*, 448 U.S.

at 316 (explaining how the government does not have to “remove” “obstacles” to a fundamental right that are “not of its own creation,” like indigency).

## CONCLUSION

At bottom, Appellees received the government’s speech and didn’t like it. But a policy disagreement doesn’t create a cognizable injury. And disagreement with a message is no reason to compel the government to espouse a view it doesn’t share. This Court should reverse and instruct the district court to grant Appellants’ motion to dismiss.

Respectfully submitted,

ALAN WILSON
*Attorney General*

s/ Thomas T. Hydrick
THOMAS T. HYDRICK
*Solicitor General*
JOSEPH D. SPATE
*Deputy Solicitor General*

SOUTH CAROLINA OFFICE
OF THE ATTORNEY GENERAL
1000 Assembly St.
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for Amicus Curiae*
*State of South Carolina*

JOHN B. MCCUSKEY
*Attorney General*

/s/ Michael R. Williams
MICHAEL R. WILLIAMS
*Solicitor General*

OFFICE OF THE
WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
(304) 558-2021
mwilliams@wvago.gov

*Counsel for Amicus Curiae*
*State of West Virginia*

Dated: October 1, 2026

## ADDITIONAL LEGAL REPRESENTATIVES OF THE STATES

STEVE MARSHALL
Attorney General
State of Alabama

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

RAÚL LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

CATHERINE HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

D. ANDREW WILSON
Attorney General
State of Ohio

JONATHAN SKRMETTI
Attorney General and Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

## CERTIFICATE OF COMPLIANCE

1. This amicus curiae brief complies with Fed. R. App. P. 29(a)(5) because it contains 6,127 words.

2. This amicus curiae brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams