UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 26-1844

---

O.R., et al.,

*Plaintiffs-Appellees,*

v.

GREENVILLE COUNTY LIBRARY SYSTEM, et al.,

*Defendants-Appellants.*

---

**BRIEF OF AMICUS CURIAE ASSOCIATION OF LIBRARY PROFESSIONALS IN SUPPORT OF DEFENDANTS-APPELLANTS**

---

DENISE MAYO HARLE
SARA E. SPEARS
ZACHARY A. RODIER
FLORIDA STATE UNIVERSITY
FIRST AMENDMENT CLINIC
425 W. Jefferson Street
Tallahassee, FL 32306
Telephone: 850-644-3255
dharle@law.fsu.edu
sspears@law.fsu.edu
zar24@fsu.edu

JASON GONZALEZ
ROBERT E. MINCHIN III
LAWSON HUCK GONZALEZ PLLC
101 E. College Avenue, 5th Floor
Tallahassee, FL 32301
Telephone: 850-825-4334
jason@lawsonhuckgonzalez.com
bob@lawsonhuckgonzalez.com

*Counsel for Amicus Curiae*
*Association of Library Professionals*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iii

IDENTITY AND INTEREST OF AMICUS CURIAE .......... 1

ARGUMENT .......... 3

I. Content-based judgment about what to acquire, what to withdraw, and where to shelve is the longstanding core professional function of a public librarian. .......... 5

A. A public library is a curated collection, and spatial and budgetary limitations make selection unavoidable. .......... 6

B. Selection is evaluative by design, and the profession's own criteria say so. .......... 8

C. Weeding is mandatory, continuous, and considers both content and viewpoint. .......... 10

D. Deciding which readers a work suits, and shelving it accordingly, is an ordinary act of professional judgment performed for every item. .......... 16

E. Reassigning a title from one collection to another is ordinary collection maintenance. .......... 20

II. Libraries have always made content-based judgments. .......... 22

A. Selection by judgment is as old as the American public library. .......... 23

B. The profession openly debated content and viewpoint—and answered with restricted shelving—in the 1880s .......... 25

C. Age-based separation of collections is roughly 150 years old, and it began as a professional innovation. .......................... 27

D. The young-adult collection was invented because adolescents were judged to need something different, and much of that invention happened in this Circuit. ....................... 30

E. The practice is universal today. ................................................... 32

III. The practice of content- and viewpoint-based judgment is pervasive, unitary, and governed by the profession's own guardrails. ....................................................................... 33

A. The volume of content- and viewpoint-based judgments is enormous. ....................................................................... 34

B. Selection, weeding, classification, and placement are one judgment. ....................................................................... 34

C. The profession has drawn lines within content- and viewpoint-based judgment, but those lines presuppose the practice itself. ....................................................................... 36

CONCLUSION ....................................................................................... 38

CERTIFICATE OF COMPLIANCE ........................................................... 40

## TABLE OF AUTHORITIES

**Administrative Rules** **Page(s)**

Ala. Admin. Code r. 520-2-2-.03(2)(k) (2024) .......... 33

**Other Authorities** **Page(s)**

Aldred, Thomas, *Book Selection and Rejection* (1901) .......... 15

Allison, Gladys, *Suggestions on Discarding* (1938) .......... 15

Am. Libr. Ass'n, *Access to Library Resources and Services for Minors: An Interpretation of the Library Bill of Rights* (adopted June 30, 1972; amended July 1, 1981; July 3, 1991; June 30, 2004; July 2, 2008; July 1, 2014; June 25, 2019; and May 29, 2025) .......... 37

Am. Libr. Ass'n, *Answering Questions about Youth and Access to Library Resources* (updated May 2017) .......... 6

Am. Libr. Ass'n, *Catalog of A.L.A. Library: 5,000 Volumes for a Popular Library* (U.S. Bureau of Educ. 1893) .......... 24, 25

Am. Libr. Ass'n, *Challenge Support* .......... 21

Am. Libr. Ass'n, *Collection Maintenance and Weeding*, Selection & Reconsideration Policy Toolkit (updated Jan. 2018) .......... 10

Am. Libr. Ass'n, *Labeling and Rating Systems: An Interpretation of the Library Bill of Rights* .......... 36

Am. Libr. Ass'n, *Margaret A. Edwards Award Facts* .......... 31

Am. Libr. Ass'n, *Marketing to Libraries: Reviews as a Selection Tool*, (updated Feb. 21, 2025) .......... 19

Am. Libr. Ass'n, *Restricted Access to Library Materials: An Interpretation of the Library Bill of Rights* .......... 23

Am. Libr. Ass'n, *Selection Criteria*, Selection & Reconsideration Policy Toolkit (updated Jan. 2018) .......... 5, 6, 8, 19

Am. Libr. Ass'n, *Weeding Library Collections: A Selected Annotated Bibliography for Library Collection Evaluation*, ALA Library Fact Sheet 15 .......... 12

Am. Libr. Ass'n, Off. for Intell. Freedom, *Censorship by the Numbers: Banned Books Data* .......... 21

Ass'n of Libr. Profs., Bylaws art. II, §3 (Sept. 22, 2023), https://alplibraries.org/alp-bylaws/ .......... 1

Ass'n of Libr. Profs., *Code of Ethics for Library Professionals* (Apr. 19, 2024), https://alplibraries.org/code-of-ethics/ .......... 2

Ass'n for Libr. Serv. to Child., *Competencies for Librarians Serving Children in Public Libraries* .......... 18

Boon, Belinda, *The CREW Method: Expanded Guidelines for Collection Evaluation and Weeding for Small and Medium-Sized Public Libraries* (Tex. State Libr. 1995) .......... 12

*Boston's Forbidden Books,* Boston Daily Globe, (Aug. 1, 1897) .......... 26

Carter, Betty, *Who Is Margaret Edwards and What Is This Award Being Given in Her Honor?, ALAN Rev.,* Spring 1992 .......... 22

Dana, John Cotton, *A Library Primer ch. XI (3d ed. 1903)* .......... 23, 24

Edwards, Margaret A., *The Fair Garrden and the Swarm of Beasts: The Library and the Young Adult (ALA ed. 1994)* ............................................ 31

Greenville County Library System, Reconsideration of Library Material Regulations (rev. June 24, 2024), https://www.greenvillelibrary.org/policies/422/reconsideration-of-library-material............................................................................................ 8

Gregory, Vicki L., Collection Development and Management for 21st Century Library Collections: An Introductions (2d ed. 2019).................. 11

Haverhill Pub. Libr., *Anne Carroll Moore Papers*, MSS 59, Finding Aid (rev. 2024) ........................................................................................ 28

Inst. of Museum & Libr. Servs., *Increased Public Library Usage Shown by IMLS Survey Data* (Sept. 2, 2025) ................................................... 5

Lareau, Louise, *NYPL's Anne Carroll Moore: A Pioneer Who Opened Library Doors to Kids . . . Literally, N.Y. Pub. Libr. Blog (Mar. 8,2021)* ........................................................................................................ 28

Larson, Jeanette, *CREW: A Weeding Manual for Modern Libraries* (Tex. State Libr. & Archives Comm'n rev. ed. 2012)........................................ 6

Libr. Hist. Round Table, Margaret A. Edwards (1902–1988), ALA Connect (2026) ........................................................................................ 31

Little, George T., *Selection of Books for Free Public Libraries, in Maine Public Documents 1897, vol. 3* (1897) ................................................... 24

Masarik, Sara, *Ask the Librarian: DIY Barcodes? The Card Catalog* (2024)............................................................................................. 19

Milliot, Jim, *Book Output Topped Four Million in 2025, Publishers Weekly (Mar. 17, 2026)* ............................................................................ 5

Novotny, Eric, *From Inferno to Freedom: Censorship in the Chicago Public Library, 1910–1936*, *63 Libr. Trends 27* (2014) ............................ 27

Peterson, Shannon, *YALSA Expected To Be Dissolved, Absorbed by ALSC in 2026, Sch. Libr. J.* (June 13, 2025) ............................ 32

Poole, William F., *The Organization and Management of Public Libraries*, in U.S. Bureau of Educ., *Public Libraries in the United States of America: Their History, Condition, and Management*, Special Report, pt. I (1876) ............................ 22

Potter, Marion E., *Children's Catalog: A Guide to the Best Reading for Young People Based on Twenty-Four Selected Library Lists* (H.W. Wilson 1909) ............................ 29

Seattle Pub. Libr., *2024 Annual Levy Report* (2025) ............................ 7

Seattle Pub. Libr., *Budget and Operations* ............................ 7

Stauffer, Suzanne, *The Band of American Ladies: Children's Librarians and the Creation of Children's Literature in the Long Nineteenth Century*, 18 Nineteenth-Century Gender Stud., no. 2 (2022) ............................ 22

Vnuk, Rebecca, The Weeding Handbook: A Shelf-by-Shelf Guide (2d ed. 2022) ............................ 11

Wiegand, Wayne A., *Part of Our Lives: A People's History of the American Public Library* (2015) ............................ 22

Young Adult Libr. Servs. Ass'n, *What Public Libraries Do for Teens* (infographic drawn from Pub. Libr. Ass'n, 2012 PLDS Statistical Report) ............................ 32

## IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus Association of Library Professionals is a 501(c)(3) nonprofit membership organization composed primarily of working library professionals, founded in 2023. Its members practice in public, school, and academic libraries in 39 U.S states and four Canadian provinces. Amicus's members include librarians who select, catalog, weed, and shelve collections and who serve children and teenagers in the ordinary course of their work.

Amicus's interest in the issues on appeal predates this litigation. Among the purposes Amicus adopted at its founding is the recognition, "in the case of minors, [of] the legitimate need for reasonable constraints" on access, "such that public libraries spatially organize their contents according to age range and reading levels with regard to the presence of adult themes and overt depictions of violence and sexuality, but allowing access to such content under supervision of a parent or guardian."[1] Amicus further articulates these professional

---

[1] Ass'n of Libr. Profs., Bylaws art. II, *§3* (Sept. 22, 2023), https://alplibraries.org/alp-bylaws/.

principles in its Code of Ethics by saying that librarians, "recognize that minor children require more careful guidance as pertains to their cognitive, educational, and moral development…[p]arents and legal caregivers have the chief responsibility of guiding their children…but the library also has an obligation to facilitate this process by providing tools, such as labeling or organizing materials according to reading and appropriate developmental level, so as to enable children and their parents or legal caregivers to readily distinguish between these levels in confidence and to make their decisions accordingly."[2] Amicus therefore holds a standing, publicly stated position on how public libraries should organize collections by age—a position formed as a matter of professional principle before any question about Greenville Library's policies arose.

Both of the First Amendment issues on appeal rest on premises about what public libraries do. They also imply that the content-based judgments at the core of librarianship may soon be laden with new

---

[2] Ass'n of Libr. Profs., *Code of Ethics for Library Professionals* (Apr. 19, 2024), https://alplibraries.org/code-of-ethics/.

constitutional weight. Whether patrons hold a right to receive information that constrains a library's collection decisions, and whether those decisions are government speech, should not be answered without an accurate account of the decisions themselves. Amicus writes to supply that account and asks that this Court decide these questions against an accurate picture of what public libraries and librarians do and have always done.

No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than Amicus, its members, or its counsel contributed money intended to fund this brief. All parties consent to the filing of this brief.

## ARGUMENT

When an item is selected for a public library, a librarian evaluates it, catalogs it, assigns it to a collection—children, teen, or adult—and shelves it. That sequence is central, and not incidental, to the library's work. It's repeated for every title. And it bears on the questions before the Court in three respects.

*First*, because no library can hold more than a sliver of what's published, content- and viewpoint-based judgment is the core professional function of a public library.

*Second*, there is a history of content-based selection and classification in American public libraries, particularly regarding age-based judgments.

*Third*, the practice is pervasive and unitary. A public library system makes thousands of content-based collection and placement decisions each year, and the same professional judgment produces selection, weeding, classification, and placement alike. Both Amicus and the American Library Association ("ALA"), one of the profession's oldest associations, have drawn lines around what it considers the appropriate bounds of age-based organization. Those lines may differ between organizations, but their existence presupposes a practice that is, and has always been, librarianship itself.

## I. Content-based judgment about what to acquire, what to withdraw, and where to shelve is the longstanding core professional function of a public librarian.

More than four million books were published in the United States in 2025.[3] In the face of that tsunami, the nation's roughly 9,000 public library systems must decide what to buy, what to keep, and where to put it, within finite budgets and limited shelving.[4] The profession's own standards direct that judgment. The American Library Association ("ALA") has selection criteria that call for the evaluation of a work's authority, objectivity, currency, quality, and suitability for its intended audience, and instructs that libraries serving minors should consider age, social and emotional development, intellectual level, interest level, and reading level.[5] Deciding which users a book or other item suits,

---

[3] Jim Milliot, *Book Output Topped Four Million in 2025*, PUBLISHERS WEEKLY (Mar. 17, 2026), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/99943-book-output-topped-4-million-in-2025.html.

[4] Inst. of Museum & Libr. Servs., *Increased Public Library Usage Shown by IMLS Survey Data* (Sept. 2, 2025), https://content.govdelivery.com/accounts/USIMLS/bulletins/3f09e4a [hereinafter *IMLS Survey Data*].

[5] Am. Libr. Ass'n, *Selection Criteria*, Selection & Reconsideration Policy Toolkit (updated Jan. 2018),

shelving it accordingly, and moving titles from one collection to another are routine tasks at every library.[6]

### A. A public library is a curated collection, and spatial and budgetary limitations make selection unavoidable.

Let's begin with the arithmetic. Bowker, the official ISBN agency for the United States, reports that more than four million books were published in this country in 2025: 642,242 by traditional publishers and more than 3.5 million self-published.[7] Self-published juvenile nonfiction alone accounted for 401,716 titles that year, and self-published juvenile fiction for 265,615.[8] Against that output stand approximately 9,000 public library systems operating more than 17,000 central libraries, branches, outlets, and bookmobiles.[9]

---

https://www.ala.org/tools/challengesupport/selectionpolicytoolkit/criteria [hereinafter *ALA Selection Criteria*].

[6] *See* Am. Libr. Ass'n, *Answering Questions about Youth and Access to Library Resources* (updated May 2017), https://www.ala.org/tools/challengesupport/youthresourcesFAQ [hereinafter *ALA Youth FAQ*]; Jeanette Larson, *CREW: A Weeding Manual for Modern Libraries* 22 (Tex. State Libr. & Archives Comm'n rev. ed. 2012), https://archive.org/details/crewmethod12 [hereinafter *CREW*].

[7] Milliot, supra note 2.

[8] *Id.*

[9] *IMLS Survey Data*, supra note 3.

Even the largest systems acquire just a small fraction of what's published. The Seattle Public Library, with a Central Library and twenty-six branches, holds about 2.4 million items in total.[10] In 2024, it added roughly 168,000 physical items and about 45,000 digital titles.[11] A single year's national output thus exceeds the entire holdings of one of the country's major urban systems and dwarfs what any library can add in a year.

These numbers mean that every acquisition is a choice among alternatives, and every choice rests on a judgment about each book and item—what it's about, its literary or cultural value, the audience intended by the author, publisher, or creator, and where, based upon local policy and other considerations, it should be placed in the library's collections. A library that could not make such judgments could not function. It could only be a storage warehouse accepting whatever items

---

[10] Seattle Pub. Libr., *Budget and Operations*, https://spl.org/about-us/the-organization/budget-and-operations.
[11] Seattle Pub. Libr., *2024 Annual Levy Report* (2025), https://www.spl.org/Seattle-Public-Library/documents/about-us/levy/reports/2024%20Q4%20%26%20Annual%20Library%20Levy%20Report.pdf.

are created. But that isn't (and has never been) how libraries work. Selectivity is inevitable.

### B. Selection is evaluative by design, and the profession's own criteria say so.

The library profession does not leave selection to instinct or whim. The ALA's Selection & Reconsideration Policy Toolkit ("Toolkit"), prepared by its Office for Intellectual Freedom, directs that every library "should have a comprehensive written policy that guides the selection, deselection or weeding, and reconsideration of library resources" and that the policy "should include criteria to guide in the resource selection process."[12] Those criteria, the Toolkit explains, should address "excellence (artistic, literary, visual, etc.), appropriateness to level of user, authoritative and varying perspectives on controversial issues, accessibility, and ability to stimulate further intellectual and

---

[12] ALA Selection Criteria, supra note 4. Greenville County Library System's reconsideration policy contains similar principles. *See* Greenville County Library System, Reconsideration of Library Material Regulations (rev. June 24, 2024), https://www.greenvillelibrary.org/policies/422/reconsideration-of-library-material.

social development."[13] Then, specifically "[f]or libraries serving minors, librarians should consider age, social and emotional development, intellectual level, interest level, and reading level."[14]

The Toolkit's model criteria for public libraries make the content-based character of selection explicit. Its "General Criteria" include "[s]uitability of subject and style for intended audience," "[i]mportance as a document of the times," and "[r]elation to the existing collection and to other materials on the subject."[15] Its "Content Criteria" include "[a]uthority," "[c]omprehensiveness and depth of treatment," "[o]bjectivity," "[c]onsideration of the work as a whole," "[c]urrency," "[r]epresentation of diverse points of view," "[e]ffective characterization," and "[a]uthenticity of history or social setting."[16] A librarian can't apply a single one of these criteria without evaluating the item and forming a judgment about its content. The same document contrasts that judgment with censorship while acknowledging that the

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

judgments are—at least in part—based on subject matter: "Works are not excluded or included in the collection based ***solely*** on subject matter or on political, religious, or ideological grounds."[17] In other words, the profession understands selection as a discipline of content-based judgment exercised for reasons of quality, accuracy, and audience.

### C. Weeding is mandatory, continuous, and considers both content and viewpoint.

What is true of acquisition is equally true of withdrawal. The ALA Toolkit is categorical: "Weeding or the deselection of material is critical to collection maintenance and involves the removal of resources from the collection. All materials are considered for weeding based on accuracy, currency, and relevancy."[18] "[A]n optimal library collection is one that is reviewed on a consistent basis for accuracy, currency, usage, diversity, and subject area gaps."[19] The Toolkit's model public-library policy begins: "The library continually withdraws items from the

---

[17] *Id.* (emphasis added).
[18] Am. Libr. Ass'n, *Collection Maintenance and Weeding*, Selection & Reconsideration Policy Toolkit (updated Jan. 2018), https://www.ala.org/tools/challengesupport/selectionpolicytoolkit/weeding [hereinafter *ALA Weeding*].
[19] *Id.*

collection, basing its decisions on a number of factors, including publishing date, frequency of circulation, community interest, and availability of newer or more valid materials."[20]

Foundational treatises for librarians agree. "Just as no garden can prosper if left unweeded, so will a library collection inevitably fall into disrepair, if not outright ruin, if methodical and careful approaches to deselection are not undertaken."[21] Weeding "helps users access collections and use them more efficiently by making what *is* available more relevant, more valuable, and easier to find."[22]

The profession's benchmark instrument for this work is the CREW method—Continuous Review, Evaluation, and Weeding—developed by the Texas State Library as a manual in 1976 and revised

---

[20] *Id.*

[21] Vicki L. Gregory, COLLECTION DEVELOPMENT AND MANAGEMENT FOR 21ST CENTURY LIBRARY COLLECTIONS: AN INTRODUCTION 152 (2d ed. 2019).

[22] Wayne Disher, CRASH COURSE IN COLLECTION DEVELOPMENT 87 (2d ed. 2014); *see also* Rebecca Vnuk, THE WEEDING HANDBOOK: A SHELF-BY-SHELF GUIDE 1–2 (2d ed. 2022).

in 1995 and 2012.[23] The ALA describes it this way: "Since its inception in 1976, *The CREW Method* has become the benchmark tool for weeding library collections."[24] The manual reports that although "written primarily with the needs of small and medium sized public libraries in mind, it has proven to be useful to libraries of all types and sizes," and that the method "is used by librarians in many other states."[25]

At CREW's core is a set of six criteria summarized by the acronym MUSTIE. An item is a candidate for weeding if it is:

- **M**isleading (factually inaccurate),
- **U**gly (worn beyond mending),
- **S**uperseded (by a new edition or a better work),
- **T**rivial (of no discernible literary or scientific merit),
- **I**rrelevant to the needs and interests of the community, or

---

[23] *CREW*, *supra* note 6, at 7; Belinda Boon, *The CREW Method: Expanded Guidelines for Collection Evaluation and Weeding for Small and Medium-Sized Public Libraries* (Tex. State Libr. 1995).
[24] Am. Libr. Ass'n, *Weeding Library Collections: A Selected Annotated Bibliography for Library Collection Evaluation*, ALA Library Fact Sheet 15, https://www.ala.org/tools/libfactsheets/alalibraryfactsheet15.
[25] *CREW*, *supra* note 6, at 7.

- obtainable **E**lsewhere.[26]

Under the heading "Poor Content," the manual directs librarians to consider withdrawing works with "[o]utdated and obsolete information," "[t]rivial subject matter," "[m]ediocre writing style," "[i]naccurate or false information," and "[m]aterial that contains biased, racist, or sexist terminology or views."[27] It cautions that "[s]ome criteria are objective, but most include some degree of subjectivity that will require the professional knowledge of the librarian in making the final decision about a particular item."[28] Three of the manual's observations bear directly on the questions raised here.

The first is that selection and weeding decisions may consider a book's viewpoint. A library can aim to shelve a variety of viewpoints on debated topics while recognizing that some views exceed societal or ethical norms and thus should not be selected or retained, e.g.,

---

[26] *Id.* at 57.
[27] *Id.* at 19.
[28] *Id.*

"[m]aterial that contains biased, racist, or sexist . . . views."[29] Different libraries may demarcate the precise boundary differently.

The second concerns scale: "A rule of thumb held by many library professionals is that about 5% of the collection be weeded every year," and "[i]n general, you should weed about the same amount as you are adding to the collection."[30]

The third concerns the unity of the enterprise:

> Materials selection and deselection are similar activities. First, they are both necessary parts in an effective collection development program; and second, both require the same type of decision-making criteria. The same factors that lead to the decision to add an item can also lead to a decision to remove that item sometime later.[31]

This practice isn't new. The manual's epigraphs include a 1901 observation that "[w]eeding out requires more knowledge, forethought[,] and power of discrimination than is ordinarily brought to bear in the

[29] *Id.*
[30] *Id.* at 17.
[31] *Id.*

selection of books"[32] and a 1938 concession that "[w]e all make mistakes but most of these mistakes I am convinced stand on the shelves."[33]

The consequence of failing to weed isn't trivial. The manual explains that "[p]atrons expect that library materials are selected by experts and that the information is up-to-date and reliable," and that "[f]or many users, especially younger people, the mere fact that a book is in the library lends authority to it."[34] Children "are particularly susceptible to outdated or inaccurate information since they do not always have the knowledge base to distinguish it, assuming that if it's in the library, it must be both true and current."[35]

---

[32] Thomas Aldred, BOOK SELECTION AND REJECTION (1901), *quoted in CREW*, *supra* note 6, at 5.
[33] Gladys Allison, SUGGESTIONS ON DISCARDING (1938), *quoted in CREW*, supra note 6, at 5.
[34] *CREW*, *supra* note 6, at 16.
[35] *Id.* at 33.

### D. Deciding which readers a work suits, and shelving it accordingly, is an ordinary act of professional judgment performed for every item.

Physical placement isn't separate from collection development. It's part of it. The ALA's guidance to libraries on youth services answers the question directly:

> **How do librarians decide where the materials should be shelved?** Librarians divide the collection into sections, so that patrons can find what they need more easily. Nonfiction, reference, fiction, YA/teens, children, graphic novels, and movies are sections found in most public libraries. Some fiction books could fit in two categories (for example: a book for "tweens," i.e., older children or young teenagers). Librarians are familiar with their library's collection development policies, which, among other things, outline the needs and interests of the community, and give a framework for each section of the collection. Librarians usually rely on their own professional assessment of the book, along with professional reviews and a good knowledge of the community.[36]

The same document tells parents that a "librarian will ask you and your child questions, then make suggestions based on your child's age, maturity level, knowledge and interest," and that "[c]hildren are

---

[36] ALA Youth FAQ, *supra* note 5.

generally not attracted to materials that are too advanced for their reading or maturity levels."[37]

The benchmark weeding manual is organized around the same age-based divisions. It devotes a separate section to "CREWing Children's Materials" and provides separate guidelines for easy readers and picture books, juvenile fiction, young adult fiction, and juvenile and young adult nonfiction.[38] It opens the children's section with a sentence that states the professional premise plainly: "Juvenile collections are as different from adult collections as children are from adults, and require different considerations for selection and deselection."[39] For juvenile and young adult materials it adds a distinct set of factors, including "[r]eading level—is the level too high or too easy for young patrons who would be interested in the item?"[40] And it insists that this work be done by someone qualified to do it: a sound weeding process for children's

---

[37] *Id.*
[38] *CREW*, *supra* note 6, at 33–36, 81–82.
[39] *Id.* at 33.
[40] *Id.* at 21.

materials "requires the judgment of a person who knows children's literature, as well as the audience the collection serves."[41]

That judgment is trained and credentialed. The Association for Library Service to Children, a division of the ALA, "strongly recommends a master's degree in Library and Information Science from an ALA-accredited graduate school as the appropriate professional degree for the librarian serving children in the library," and expects that "[t]hrough specialized coursework in undergraduate and graduate study, on-the-job training, and continuing education opportunities," librarians serving children will "achieve and maintain" the competencies the Association enumerates.[42]

Nor does the librarian work alone. Recommended audience is built into the book trade before a title reaches the library. Publishers assign works to categories such as picture book, early reader, middle grade,

---

[41] *Id.* at 33.
[42] Ass'n for Libr. Serv. to Child., *Competencies for Librarians Serving Children in Public Libraries*, https://www.ala.org/alsc/edcareers/alsccorecomps (rev. 2020).

and young adult, and frequently print an age or grade range.[43] The ALA's own review journal, *Booklist*—which the ALA Toolkit lists first among recommended reviewing sources for public libraries[44]—identifies the age group for which each reviewed title is suited. Booklist has been published by the ALA since 1905, reviews "books for youth (children and young adults)" as well as adult titles, and its online database is searchable by grade level.[45] A public library that shelves by audience, informed by expertise, recommendations, reviews, and the needs, interests, and values of the library's community, is not inventing a system on the fly but rather is applying an industry-wide approach to classification.

---

[43] *See* Sara Masarik, *Ask the Librarian: DIY Barcodes?, The Card Catalog (2024)*, https://thecardcataloglibrarians.com/ask-the-librarian/15.

[44] *ALA Selection Criteria*, *supra* note 4.

[45] Am. Libr. Ass'n, *Marketing to Libraries: Reviews as a Selection Tool,* (updated Feb. 21, 2025), https://libguides.ala.org/marketing-to-libraries/reviews [hereinafter *Reviews as a Selection Tool*]; Booklist Online, Advanced Search, https://www.booklistonline.com (search filter for "Grade").

### E. Reassigning a title from one collection to another is ordinary collection maintenance.

The profession distinguishes between removing an item and moving it, and it treats the latter as ordinary maintenance. The ALA Toolkit defines collection maintenance to include "accurate and efficient shelving (and re-shelving), shelf-reading, shifting, and cleaning."[46] The CREW manual goes further, presenting reclassification and transfer as alternatives to discard. "If you can't bear to let go of a beautiful book that is in good condition, consider whether it is classified properly," the manual advises, and consider re-cataloging it"[47] Superseded reference editions, the manual explains, may be handled by "transferring the older edition to the circulating collection if appropriate"[48]; older almanacs and dictionaries are "transferred" or "moved to the circulating collection"[49]; older repair manuals "should be moved to the circulating collection"[50]; and where a community has a substantial homeschooling

---

[46] *ALA Weeding*, *supra* note 17.
[47] *CREW*, *supra* note 6, at 22.
[48] *Id.* at 37.
[49] *Id.* at 39.
[50] *Id.* at 41.

population, the manual suggests that “older textbooks” that “may be of interest” to such patrons be placed “in a separate section where they will be readily accessible.”[51] The manual’s own disposal slip—the form a librarian completes for each item reviewed—offers, alongside “Discard,” “Bindery,” and “Replacement,” a line reading “Sent To.”[52]

The profession’s vocabulary reflects the same distinction. The ALA’s guidance on challenged books and other items defines a “banning” as “the removal” of materials, a distinct outcome from relocation and restriction.[53] Put simply, moving a title between collections is a recognized disposition within collection management, and it leaves the title selected, cataloged, owned, and—for the patrons entitled to borrow from the receiving collection—available.

---

[51] *Id.* at 36.
[52] *Id.* at 29.
[53] Am. Libr. Ass’n, *Challenge Support*, https://www.ala.org/tools/challengesupport; Am. Libr. Ass’n, Off. for Intell. Freedom, *Censorship by the Numbers: Banned Books Data*, https://www.ala.org/bbooks/book-ban-data [hereinafter *ALA Book Ban Data*].

## II. Libraries have always made content-based judgments.

Since their inception, American public libraries have selected books and other items by using content-based judgment.[54] They debated openly, in the 1870s and 1880s, whether and how to shelve fiction.[55] They created the children's room in the 1880s and 1890s as a deliberate professional determination that children need different materials in a separate space.[56] They invented the young-adult collection because adolescents were judged to need something different from both.[57] Age-based organization of collections is now found in nearly every public

---

[54] William F. Poole, *The Organization and Management of Public Libraries*, *in* U.S. Bureau of Educ., *Public Libraries in the United States of America: Their History, Condition, and Management*, Special Report, pt. I, at 476, 479 (1876).

[55] Wayne A. Wiegand, *Part of Our Lives: A People's History of the American Public Library* (2015), excerpted at Lit Hub (Oct. 9, 2015), https://lithub.com/part-of-our-lives-a-peoples-history-of-the-american-public-library [hereinafter Wiegand].

[56] Suzanne Stauffer, *The Band of American Ladies: Children's Librarians and the Creation of Children's Literature in the Long Nineteenth Century*, 18 Nineteenth-Century Gender Stud., no. 2, ¶ 5 (2022).

[57] Betty Carter, *Who Is Margaret Edwards and What Is This Award Being Given in Her Honor?*, ALAN Rev., Spring 1992, at 45, *reprinted at* https://www.ala.org/alsc/awardsgrants/bookmedia/edwards/who-was-mae.

library in the country, and the ALA's interpretation of its Library Bill of Rights acknowledges that libraries may organize collections by reading level, ability, grade, or age.[58]

### A. Selection by judgment is as old as the American public library.

The public libraries of the mid-nineteenth century built their collections from donations and from purchases chosen by boards and committees, and the profession's earliest writers argued not about *whether* to select but about *who* should do it and *how*.[59] In the federal government's 1876 survey of American public libraries, William F. Poole—later president of the ALA—described selection as the work of directors and library committees rather than librarians, and insisted that a library "furnish reading for all classes in the community, and reading which shall be adapted to their various capacities."[60] By the

[58] Am. Libr. Ass'n, *Restricted Access to Library Materials: An Interpretation of the Library Bill of Rights*, https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/restrictedaccess [hereinafter *ALA Restricted Access*].
[59] *Compare* Poole, *supra* note 52, at 479 (selection by "the directors, or their library committee"), *with* John Cotton Dana, *A Library Primer* ch. XI, at 39 (3d ed. 1903) (selection "should be left to the librarian").
[60] Poole, *supra* note 52, at 479.

turn of the century, John Cotton Dana's *A Library Primer*, a standard handbook, urged that "[t]he selection of books should be left to the librarian, under the general direction of trustees or book committee," and set out criteria for it: the presence of other libraries nearby, the money available, how the books will be used, "[t]he class of people by whom they are to be used, and if children, whether for school work only, or for general reading, or for both," and "[t]he occupations and leading local interests of the community."[61] A contemporaneous Maine report listed among the "factors that must affect the selection of books for any particular library" the nearness of other libraries, "the use of the library by school children," the community's leading occupations, and "the traditions and social customs of the town."[62] In 1893, the ALA itself published the *Catalog of A.L.A. Library: 5,000 Volumes for a Popular Library*, described by its committee not as an ideal selection but as "a good working library, representing the best thought of competent judges

---

[61] Dana, *supra* note 57.
[62] George T. Little, *Selection of Books for Free Public Libraries*, in MAINE PUBLIC DOCUMENTS 1897, vol. 3, at 19, 19–20 (1897).

in various departments," in which "[t]he number of volumes in each subject is the result of careful study."[63]

### B. The profession openly debated content and viewpoint—and answered with restricted shelving—in the 1880s.

The best-documented early controversy concerned fiction, which by the late nineteenth century accounted for the majority of public library circulation and which many librarians regarded as harmful, particularly to the young.[64] The national debate of 1881 was ignited by a Boston Public Library cataloger who "castigated the Boston Public Library for circulating series fiction to children" and complained that libraries furnished such books "mainly . . . to the school-children."[65]

The Boston Public Library's response is instructive. Rather than discard the disputed titles, the Library established a restricted room, known as the "Inferno," and required patrons seeking access to it to obtain a librarian's permission.[66] To borrow a book from the Inferno, "a

[63] Am. Libr. Ass'n, *Catalog of A.L.A. Library: 5,000 Volumes for a Popular Library* at vii (U.S. Bureau of Educ. 1893).
[64] Wiegand, *supra* note 53.
[65] *Id.*
[66] *Id.*

patron had to fill out a slip giving age and occupation, a character reference, and reason for requesting the book," and "[t]his slip must receive the endorsement of the librarian before the request is complied with."[67] The Inferno, Wiegand observes, "provided a solution to a perpetual problem—what to do with titles some thought their community should have in its public library, while others did not."[68] The Library's editor and cataloger explained the arrangement to the *Boston Globe* in terms any youth-services librarian would recognize: the Inferno "is open to readers as well as any other part of the library, but we may have to discriminate between them," and he didn't believe "that parents or guardians of the younger class of library readers" would want otherwise.[69] The Chicago Public Library maintained its own restricted collection, also called an "Inferno," in which "works of questionable merit were hidden from immature readers," and

---

[67] *Id.*
[68] *Id.*
[69] *Boston's Forbidden Books*, BOSTON DAILY GLOBE, Aug. 1, 1897, at 28.

"[p]atrons, especially juveniles, needed to convince a librarian of their honorable intentions before being granted access."[70]

These historic curation practices considered both content and viewpoint. For instance, in the 1920s, every library and librarian commissioner who responded to the *Library Journal's* "survey on questionable books" responded that "they regularly restricted access to a portion of their collection" such as "'extreme socialistic books.'"[71]

Amicus offers these episodes not as models but rather as evidence that the relationship between an item's content, viewpoint, and its placement—including placement by reference to the age of the reader—has been a subject of open professional deliberation for nearly a century and a half.

### C. Age-based separation of collections is roughly 150 years old, and it began as a professional innovation.

Generally, age-based cultivation is far from censorship. Indeed, history shows that the opposite is true. For much of the nineteenth

[70] Eric Novotny, *From Inferno to Freedom: Censorship in the Chicago Public Library*, 1910–1936, 63 LIBR. TRENDS 27, 27 (2014).
[71] *Id*. at 29.

century, public libraries didn't serve children at all.[72] The first known collection of literature for children under fourteen in an American public library was assembled in 1876 by Minerva A. Sanders, director of the Pawtucket, Rhode Island, public library.[73] In 1888, the New York Free Circulating Library designated a space exclusively for children; the Brookline, Massachusetts, public library opened a children's room in 1890; and Minneapolis opened the first circulating children's collection in 1893.[74] Anne Carroll Moore, who took charge of the children's room at the Pratt Institute Free Library in 1896, was elected in 1901 the first chair of the ALA's newly created Section for Children's Librarians,[75] and from 1906 to 1941 served as the New York Public Library's Superintendent of Work with Children, opening the Central Children's Room at Fifth Avenue in 1911.[76]

---

[72] Stauffer, *supra* note 54, ¶ 4.
[73] *Id.* ¶ 5.
[74] *Id.*
[75] *Id.*
[76] Haverhill Pub. Libr., *Anne Carroll Moore Papers*, MSS 59, Finding Aid 1–2 (rev. 2024), https://haverhillpl.org/wp-content/uploads/2024/04/Anne_Carroll_Moore_Papers_Finding_Aid_rvsd2024.pdf; *see also* Louise Lareau, *NYPL's Anne Carroll Moore: A Pioneer Who Opened Library Doors to Kids . . . Literally*, N.Y. PUB. LIBR. BLOG (Mar. 8, 2021),

The children's room wasn't a restriction imposed on children. It was a determination—made by librarians and institutionalized by their national association—that children need materials chosen for them, in a space of their own, selected by staff trained for the purpose. The tools of that selection followed: H.W. Wilson's *Children's Catalog*, first published in 1909, guided librarians to "the best reading for young people" from preschool through sixth grade and supplied age and readability guidance for the titles it listed.[77] The ALA's *Booklist* was founded in 1905 and has served as a buying guide for librarians ever since.[78]

---

https://www.nypl.org/blog/2021/03/08/nypls-anne-carroll-moore-a-pioneer-who-opened-library-doors-to-kids.

[77] Marion E. Potter, CHILDREN'S CATALOG: A GUIDE TO THE BEST READING FOR YOUNG PEOPLE BASED ON TWENTY-FOUR SELECTED LIBRARY LISTS preface (H.W. Wilson 1909), available at https://archive.org/details/childrenscatalog0000unse (last visited Sept. 24, 2026).

[78] *Reviews as a Selection Tool*, *supra* note 43.

### D. The young-adult collection was invented because adolescents were judged to need something different, and much of that invention happened in this Circuit.

One of the categories at issue in this case—the young adult collection—exists because the profession concluded that teenagers need materials and services distinct from both children's and adults'. The ALA's own account of Margaret A. Edwards describes the moment:

> During the mid-point of [the twentieth] century, when adolescence was just being recognized as a distinct age different from both childhood and adulthood, Margaret A. Edwards recognized that teenagers needed—and by all rights should expect—library programs different in both style and substance from those traditionally offered to older and younger patrons.[79]

Edwards did that work at the Enoch Pratt Free Library in Baltimore.[80] Hired in 1932 by the Pratt's director, Joseph L. Wheeler, she was first assigned to a small collection of young adult fiction kept at the back of the "Popular" materials section; by 1940 she had established young adult sections in every branch of the system, and she

---

[79] Carter, *supra* note 55, at 45.

[80] Baltimore's Enoch Pratt Free Library is a different institution from Brooklyn's Pratt Institute Free Library, where Anne Carroll Moore began. *See* Carter, *supra* note 55, at 45; Stauffer, *supra* note 54, ¶ 5.

administered young adult services at the Pratt for more than thirty years.[81] Her 1969 book, *The Fair Garden and the Swarm of Beasts: The Library and the Young Adult*, became the profession's standard text on the subject and remains in print through the ALA.[82] Edwards's philosophy included an explicit concept of age-graded transition between collections: "The librarian should know his readers and books well enough to be able to introduce readable, appealing adult titles at the propitious time."[83]

The institutional history tracks the same judgment. The ALA organized children's and young people's services together in a single Division of Libraries for Children and Young People in 1941, then separated them in 1957 into distinct divisions for children and for

---

[81] Margaret A. Edwards, THE FAIR GARDEN AND THE SWARM OF BEASTS: THE LIBRARY AND THE YOUNG ADULT 11 (ALA ed. 1994); Libr. Hist. Round Table, Margaret A. Edwards (1902–1988), ALA Connect (2026); Am. Libr. Ass'n, *Margaret A. Edwards Award Facts*, https://www.ala.org/alsc/awardsgrants/bookmedia/edwards/mae-awd-facts [hereinafter *Award Facts*].
[82] Edwards, *supra* note 78.
[83] *Id.* at 63.

young adults, on the premise that each group required its own professional focus.[84]

**E. The practice is universal today.**

The ALA states that "YA/teens" and "children" are among the "sections found in most public libraries."[85] The Public Library Association's 2012 statistical survey found that 97 percent of public libraries "offer a dedicated section for teen books and materials."[86] And the ALA's own interpretation of the Library Bill of Rights, in the course of cautioning about the practice, acknowledges it as a practice: "Libraries may organize collections by reading level, ability, grade, or age."[87]

---

[84] Shannon Peterson, *YALSA Expected To Be Dissolved, Absorbed by ALSC in 2026*, SCH. LIBR. J. (June 13, 2025). Effective September 1, 2026, the young adult division has been reunited with the children's division for financial reasons. *Id.* The professional category of the teen collection did not change; only the association's organizational chart did.

[85] *ALA Youth FAQ*, *supra* note 5.

[86] Young Adult Libr. Servs. Ass'n, *What Public Libraries Do for Teens* (infographic drawn from Pub. Libr. Ass'n, 2012 PLDS Statistical Report), available at https://www.ala.org/sites/default/files/yalsa/content/Infographic2_FINAL.pdf (last visited Sept. 24, 2026).

[87] ALA Restricted Access, *supra* note 56.

Age-tiered borrowing has a comparable history. Before the children's room, children often weren't admitted to public libraries at all[88]; the Boston Inferno conditioned access on age and a librarian's endorsement[89]; and today a number of states and library systems maintain juvenile cards with borrowing privileges that differ from adult cards, including regulations by state.[90]

## III. The practice of content- and viewpoint-based judgment is pervasive, unitary, and governed by the profession's own guardrails.

Two facts about the practice follow from Parts I and II, and a third qualifies them. The volume of content- *or* viewpoint-based judgments a public library makes is immense, and those judgments aren't separable: the same professional act that selects a title decides where it goes and, later, whether it stays. The profession disciplines that act through written policy, published criteria, trained staff, and reconsideration

---

[88] Stauffer, *supra* note 54, ¶ 4.
[89] *Supra* Part II.B.
[90] *See, e.g.*, Ala. Admin. Code r. 520-2-2-.03(2)(k) (2024). Amicus notes, and addresses below, that the ALA has opposed age-based restrictions on library cards since 1972.

procedures. It also has drawn lines within the practice of age-based organization, which Amicus sets out below.

### A. The volume of content- and viewpoint-based judgments is enormous.

If a public library follows the profession's rule of thumb and weeds about five percent of its collection each year,[91] a system holding a million items makes some fifty thousand individual deselection judgments annually, each turning on accuracy, currency, condition, and relevance. It makes a comparable number of acquisition judgments, and for every one of those it makes a placement judgment as well, because every item must be cataloged and assigned to a collection before it can be shelved.[92] Seattle's 168,000 physical additions in 2024 were 168,000 such placements.[93]

### B. Selection, weeding, classification, and placement are one judgment.

Selection, weeding, classification, and placement aren't four functions that happen to be performed by the same staff. They're a

---

[91] *CREW*, *supra* note 6, at 17.
[92] *Id.* at 12.
[93] *Supra* Part I.A.

single, integrated function viewed at different moments. The CREW manual describes library service as a cycle in which "Selection" and "Acquisition," "Cataloging (including classification)," and "Circulation and Reference" flow into "Continuous Review, Evaluation, and Weeding," which in turn "is generating information on the current strengths, weaknesses, gaps, and saturation points of the collection that the librarian can use for another round of Selection and Acquisition."[94] "At each step, the library professional uses special knowledge of library science and library materials, as well as information about the particular community being served."[95] That includes evaluating books' "views," whether "racist or sexist" or otherwise inappropriate.[96] The same judgment that puts an item on a shelf decides which shelf and later decides whether it stays.

---

[94] *CREW*, *supra* note 6, at 12–13.
[95] *Id.* at 13.
[96] *Id.* at 19 (cleaned up).

### C. The profession has drawn lines within content- and viewpoint-based judgment, but those lines presuppose the practice itself.

In the interest of candor, Amicus sets out what the profession's primary association says about the limits of age-based organization. The ALA's *Restricted Access* interpretation, immediately after acknowledging that libraries "may organize collections by reading level, ability, grade, or age," warns that "[t]his practice can restrict access and make users uncomfortable selecting resources from sections that don't match their assigned category."[97] It lists "[c]reating 'adults only' or 'restricted' sections" among measures that "can unintentionally support censorship," and it states that "[r]estricting materials because they contain controversial, unusual, or sensitive subjects is censorship."[98]

The ALA's *Labeling and Rating Systems* interpretation provides that "[l]ibraries should resist policies that restrict access based on a user's reading or age level."[99] Since 1972, the ALA has maintained that

---

[97] *ALA Restricted Access*, *supra* note 56.
[98] *Id.*
[99] Am. Libr. Ass'n, *Labeling and Rating Systems: An Interpretation of the Library Bill of Rights*, https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/labelingratingsystems.

"[a]ny restriction based solely on" a user's "age," "apparent maturity," "educational level," "literacy skills," or "legal status" violates Article V of the Library Bill of Rights, and that "[o]nly parents or guardians should restrict their own children's access to library materials and services."[100] The ALA's Office for Intellectual Freedom counts relocation among "access restrictions" that it classifies as censorship.[101] And the ALA Toolkit, having called weeding "essential," adds that "it should not be used as a deselection tool for controversial materials."[102]

Amicus doesn't ask the Court to disregard any of this. It asks only that this Court take notice of two observations that follow from these statements. The first is that each statement presupposes the practice it

---

[100] Am. Libr. Ass'n, *Access to Library Resources and Services for Minors: An Interpretation of the Library Bill of Rights* (adopted June 30, 1972; amended July 1, 1981; July 3, 1991; June 30, 2004; July 2, 2008; July 1, 2014; June 25, 2019; and May 29, 2025), https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/minors. As set out in Amicus's founding statements, stated in the Statement of Identity and Interest, *supra*, Amicus and the ALA agree on this point. Where they diverge is on terminology. Because parents can restrict access only to the extent made possible by a library's content placement, what the ALA calls censorship Amicus calls responsible librarianship on this finer point in the larger subject of content-based judgment.
[101] *ALA Book Ban Data*, *supra* note 51.
[102] *ALA Weeding*, *supra* note 17.

cautions about. The ALA doesn't say that organizing collections by age is foreign to librarianship; it says libraries "may" do so, and then draws what it considers appropriate lines about how. The ALA doesn't say that relocation is not a collection decision; it says relocation "can be" censorship, which is to say that sometimes it is and sometimes it isn't, depending on considerations the profession assesses through the policies, criteria, and procedures described above.

The second observation is that the lines the ALA draws are professional lines, addressed to librarians and to the boards that approve their policies, and enforced through the profession's own instruments. The questions raised in this appeal present the category of decision—content-based judgment about acquisition, withdrawal, and placement—and as to that category, the profession's own standards, its benchmark manual, and a century and a half of history all say the same thing: this is what public libraries do.

## CONCLUSION

Age- and content-based organization of library collections isn't a recent innovation, and the profession hasn't historically regarded it as

censorship; it names its awards for the librarians who pioneered it.[103] Amicus asks that the Court view the certified questions through the lens of what public libraries actually do and have done since there were public libraries: select by judgment, withdraw by judgment, and shelve by judgment—informed by expertise, recommendations, reviews, and the needs, interests, and values of the library's community within the confines of available space and finances.

Dated: October 1, 2026 Respectfully Submitted,

/s/ *Denise Mayo Harle*
DENISE MAYO HARLE
SARA E. SPEARS
ZACHARY A. RODIER
FLORIDA STATE UNIVERSITY
FIRST AMENDMENT CLINIC
425 W. Jefferson Street
Tallahassee, FL 32306
Telephone: 850-644-3255
dharle@law.fsu.edu
sspears@law.fsu.edu
zar24@fsu.edu

JASON GONZALEZ
ROBERT E. MINCHIN III
LAWSON HUCK GONZALEZ PLLC
101 E. College Avenue, 5th Floor
Tallahassee, FL 32301
Telephone: 850-825-4334
jason@lawsonhuckgonzalez.com
bob@lawsonhuckgonzalez.com

*Counsel for Amicus Curiae*
*Association of Library Professionals*

---

[103] *See Award Facts*, *supra* note 78.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the word count limit of Federal Rule of Appellate Procedure 29(a)(5).

*/s/ Denise Mayo Harle*
*Attorney for Amicus*