No. 26-1844

# In the United States Court of Appeals for the Fourth Circuit

O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated; Cheryl Rogers; Greg Rogers; E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated; M.G., by and through her mother, Amber Galea; W.M., by and through his mother, Kersey Clark,

*Plaintiffs-Appellees*,

v.

Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System; Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System,

*Defendants-Appellants*.

and

Greenville County, SC,

*Defendants*.

On Appeal from the United States District Court
for the District of South Carolina
Case No. 6:25-cv-02599-DCC

## BRIEF OF AMICUS CURIAE AMERICA FIRST LEGAL FOUNDATION IN SUPPORT OF DEFENDANTS-APPELLANTS

Christopher Mills
Spero Law LLC
557 East Bay Street, #22251
Charleston, South Carolina 29413
(843) 606-0640
cmills@spero.law

(additional counsel listed inside)

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940
jonathan@mitchell.law

*Counsel for Amicus Curiae*

Gene P. Hamilton
Nicholas R. Barry
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
nicholas.barry@aflegal.org

*Additional Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Table of contents ........................................ i

Table of authorities ........................................ iii

Interest of amicus curiae ........................................ 1

Statement of compliance with Rule 29 ........................................ 1

Summary of argument ........................................ 1

I. The complaint should be dismissed for lack of Article III standing because the alleged injuries fail to satisfy *TransUnion*'s "concreteness" requirement ........................................ 5

II. The plaintiffs' claims for prospective relief should be dismissed for lack of Article III standing because they failed to "clearly allege facts" showing that the requested relief will likely redress their future injuries ........................................ 6

III. The Speech Clause is inapplicable to public-library curation decisions ........................................ 8

A. A public library's curation decisions are government speech ........................................ 8

B. A public library does not "abridge" the freedom of speech by excluding, removing, or relocating books ........................................ 16

IV. It is absurd to prohibit public libraries from engaging in viewpoint discrimination or content discrimination when curating materials ........................................ 19

V. The Court should explicitly reject the reasoning of the *Pico* plurality ........................................ 21

A. The *Pico* plurality's attempt to distinguish a library's removal decisions from its initial-acquisition decisions is nonsensical ........................................ 21

B. The *Pico* plurality's test is unclear, contradictory, and incapable of principled application ........................................ 23

Conclusion ........................................ 26

Certificate of compliance ........................................................................ 27
Certificate of service ............................................................................... 28

# TABLE OF AUTHORITIES

**Cases**


*American Legion v. American Humanist Ass'n*, 588 U.S. 29 (2019) ........................... 5

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) ........................................................... 21, 22, 23, 24

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ................................................. 20

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ............................................ 7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................... 17

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ...................... 17

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ............................................................................ 6

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ........................................................ 3

*GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024) ................................................................. 2, 14

*Hutto v. Davis*, 454 U.S. 370 (1982) (per curiam) ............................................... 6

*Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) (en banc) .......... 2, 10, 11, 15, 19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................ 7

*Matal v. Tam*, 582 U.S. 218 (2017) ................................................................... 14

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................. 17

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ................................. 2, 12, 13, 14, 15

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ................................. 9

*PETA v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005) .............................................. 12, 16

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) .......................................... 9

*Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983) ............................................................................ 3

*Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995) ........................................................................... 10

*Rust v. Sullivan*, 500 U.S. 173 (1991) ........................................................... 9, 16

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) .......... 10

*Sierra Club v. Morton*, 405 U.S. 727 (1972) .......... 6

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .......... 2, 5, 7

*Stanley v. Georgia*, 394 U.S. 557 (1969) .......... 3, 4

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .......... 1, 5

*Tuffendsam v. Dearborn County Board of Health*,
385 F.3d 1124 (7th Cir. 2004) .......... 3

*United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003) .......... 10, 11, 13, 20

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669 (1973) .......... 5

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) .......... 6

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) .......... 9

*Webster v. Reproductive Health Services*, 492 U.S. 490 (1989) .......... 17

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) .......... 7

*Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353 (2009) .......... 3, 16, 17, 18

**Constitutional Provisions**

U.S. Const. amend. I .......... 3, 16

**Other Authorities**

David P. Currie, *Positive and Negative Constitutional Rights*,
53 U. Chi. L. Rev. 864 (1986) .......... 4

Erwin Chemerinsky, *What's Standing After Transunion LLC v. Ramirez*, 96 NYU L. Rev. Online 269 (2021) .......... 6

Daryl J. Levinson, *Framing Transactions in Constitutional Law*,
111 Yale L.J. 1313 (2002) .......... 18

Frederick Schauer, *Principles, Institutions, and the First Amendment*,
112 Harv. L. Rev. 84 (1998) .......... 4, 11

Kenneth A. Shepsle, *Congress Is a "They," Not An "It": Legislative Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992) .................................... 25

Cass R. Sunstein, *Injury in Fact, Transformed*, 2021 Sup. Ct. Rev. 349 (2021) ........................................................................ 5

## INTEREST OF AMICUS CURIAE

Amicus curiae America First Legal Foundation is a nonprofit organization dedicated to promoting the rule of law and defending individual rights guaranteed under the Constitution. America First Legal has an interest in this case because it believes that a proper understanding of constitutional rights must be informed by reference to their text and original meaning.

## STATEMENT OF COMPLIANCE WITH RULE 29

All parties have consented to this filing. No counsel for a party authored any part of this brief, and no one other than the amicus curiae or its members or counsel financed its preparation or submission.

## SUMMARY OF ARGUMENT

1. The Court should dismiss the complaint for lack of Article III standing because the plaintiffs failed to allege a "concrete" injury. The plaintiffs' supposed "injury in fact" is their inability to obtain (or their difficulty in obtaining) certain books from the Greenville County library system. But this injury does not satisfy Article III's "concreteness" requirement, as defined in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), because there is no "close historical or common-law analogue" for these asserted injuries. *See id.* at 424 ("[T]he concrete-harm requirement … asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury."). A library patron had no redress at common law if a library failed to place a desired book on its shelves, and there is no remotely analogous historical or

common-law action that would have vindicated the type of injuries that the plaintiffs are asserting.

2. The plaintiffs' claims for prospective relief should be dismissed because the complaint fails to allege facts showing that the plaintiffs' ongoing or future injuries will likely be redressed by the requested relief. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Where, as here, a case is at the pleading stage, the plaintiff must 'clearly … allege facts demonstrating' each element [of Article III standing.]" (citation omitted)). The complaint contains no factual allegations whatsoever regarding Article III's redressability requirement, and it cannot survive a motion to dismiss unless it "clearly … allege[s] facts demonstrating" how the sought-after declaratory and injunctive relief will redress the plaintiffs' ongoing or future injuries.

3. A public library is engaged in government speech when it removes or relocates library materials. *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), holds that curation decisions are speech of the curator—even when a curator is compiling works created by others. So a library engages in speech of its own when it culls or moves materials in its collection. The panel opinion in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024), erred by rejecting this government-speech argument and conflating the speech that appears inside library books with the speech of those who curate the library's collection. *See Little v. Llano County*, 138 F.4th 834, 864–65 (5th Cir. 2025) (en banc) (plurality).

4. The Speech Clause prohibits only laws that "abridge" the freedom of speech. *See* U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech"). The Supreme Court has interpreted "freedom of speech" to encompass the "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). But the Speech Clause does not require the government to subsidize or assist other people's efforts to access information and ideas. *See Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353, 355 (2009) ("The First Amendment prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use government … mechanisms for the purpose of obtaining funds for expression."); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right"). The First Amendment does not require Greenville County to provide libraries, and it does not require government-owned libraries to include any particular book in their collection. That is because the Constitution (as a general matter) protects only negative rights and not positive rights.[1] *See Ysursa*, 555 U.S. at 358 ("[T]he government … is not required to assist others in funding the expression of particular ideas"); *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1126 (7th Cir. 2004) (Posner, J.) ("The Constitution is, with immaterial exceptions, a charter of negative rather than positive liberties…. It limits the powers of government but

1. One notable exception is *Gideon v. Wainwright*, 372 U.S. 335 (1963), but *Gideon* has never been extended to the First Amendment.

does not give people legally enforceable rights to demand public services and to obtain damages or other legal relief if the government fails to provide them."); David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. Chi. L. Rev. 864 (1986). The Speech Clause prevents the government from punishing or penalizing a person for accessing information or ideas, *see Stanley*, 394 U.S. at 564, but it does not require the government to help a person access information or ideas by providing the sought-after materials in a library.

5. It is absurd to impose a "no viewpoint discrimination" rule on public libraries, as the plaintiffs urge. The Supreme Court has never imposed this requirement, and libraries are *supposed* to engage in viewpoint discrimination by excluding books that deny the Holocaust, promote crackpot conspiracy theories, or espouse obsolete and debunked scientific theories such as spontaneous generation or scientific racism. *See* Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 106 (1998) ("[One] would hardly disagree … with the ability of a librarian to select books accepting that the Holocaust happened to the exclusion of books denying its occurrence.").

6. This Court should explicitly repudiate the reasoning of the *Pico* plurality. The *Pico* plurality's attempt to distinguish a library's removal decisions from its initial-acquisition decisions is nonsensical, and its "test" for library-book removals is unclear, contradictory, and incapable of principled application. It should not be adopted as the law of the Fourth Circuit.

## I. The Complaint Should Be Dismissed For Lack Of Article III Standing Because The Alleged Injuries Fail To Satisfy TransUnion's "Concreteness" Requirement

The plaintiffs accuse the defendants of removing or excluding materials that the plaintiffs wish to read from the Greenville Library System, as well as moving certain books to the adult section where it is somewhat more burdensome for minors to check out materials. Before *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), and *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), these alleged harms would easily qualify as "injury in fact." *See, e.g.*, *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("[A]n identifiable trifle is enough for standing" (citation and internal quotation marks omitted)); *American Legion v. American Humanist Ass'n*, 588 U.S. 29, 36 (2019) (unwanted contact with a religious display sufficient to confer standing).

In *TransUnion*, however, the Supreme Court decreed that an injury cannot satisfy Article III's "concreteness" requirement unless the plaintiffs identify "a close historical or common-law analogue for their asserted injury." *TransUnion*, 594 U.S. 424; *see also id.* ("[T]he concrete-harm requirement … asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury.").[2] And there is no conceivable "his-

2. *TransUnion* is wrongly decided and this Court should say so. *See* Cass R. Sunstein, *Injury in Fact, Transformed*, 2021 Sup. Ct. Rev. 349 (2021). *TransUnion* is also incompatible with numerous Supreme Court precedents conferring standing on Article III litigants who alleged harms with no conceivable historical or common-law analogue. *See, e.g.*, *Sierra Club v.*

torical or common-law analogue" for the injuries that the plaintiffs are asserting, as a disappointed library patron had no redress at common law if a library failed to include a desired book within its collection. It is the plaintiffs' burden to explain how they satisfy the "concreteness" requirement, and they have not attempted to do so at any stage of these proceedings.

## II. The Plaintiffs' Claims For Prospective Relief Should Be Dismissed For Lack Of Article III Standing Because They Failed To "Clearly Allege Facts" Showing That The Requested Relief Will Likely Redress Their Future Injuries

Even if the plaintiffs had alleged a "concrete" injury, their claims for prospective relief must *still* be dismissed because the complaint fails to allege facts showing that the requested prospective relief is likely to redress their ongoing or future injuries.[3]

---

*Morton*, 405 U.S. 727, 734 (1972) (aesthetic injuries confer Article III standing); *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 183 (2000) (same); Erwin Chemerinsky, *What's Standing After Transunion LLC v. Ramirez*, 96 NYU L. Rev. Online 269, 286 (2021) ("There are countless examples of federal court decisions allowing standing based on federal statutes creating rights where there is no common-law or historical analogue of such rights."). This Court, however, must faithfully apply *TransUnion* and its requirement that the plaintiffs show "a close historical or common-law analogue for their asserted injury" until the Supreme Court decides to overrule it. *See Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.").

3. The plaintiffs' past injuries can be redressed with an award of nominal damages. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 283 (2021) ("[A]n

At the motion-to-dismiss stage, a plaintiff needs only to allege and not prove the elements of Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). But the Supreme Court requires plaintiffs to "clearly … allege facts demonstrating each element" of Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also id.* ("Where, as here, a case is at the pleading stage, the plaintiff must 'clearly … allege facts demonstrating' each element [of Article III standing]." (citation omitted)); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("[P]laintiffs bear the burden of pleading and proving concrete facts showing" the elements of Article III standing); *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990) ("The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements. A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.").

The complaint fails to plead any facts showing how the requested declaratory and injunctive relief will restore the removed or relocated books to their previous places on the shelves. Nor does it plead facts showing this requested relief will prevent the library from continuing to exclude or relocate materials that the plaintiffs wish to read. The plaintiffs are demanding a declaratory judgment that would disapprove recent amendments to the libraries' "collection policies," as well as the alleged "pattern and practice of discriminating

---

award of nominal damages by itself can redress a past injury."); JA 82; DE 5 at 37 (requesting nominal damages). So the plaintiffs' claims for nominal damages should not be dismissed on redressability grounds.

against library materials that positively portray LGBTQ characters or themes." JA 81; DE 5 at 36. The plaintiffs are also demanding an injunction that would restrain the defendants from "enforcing" the disputed amendments to their collection policies, or the supposed "custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials." *Id.* But none of that requires the defendants to return any library book that was previously removed or relocated to a different shelf. Nor does it prevent the defendants from continuing to exclude or relocate materials that they want to keep out of their libraries or away from children. The plaintiffs need to allege facts showing that this requested relief is "likely" to redress their Article III injuries, and they have not done so.

## III. The Speech Clause Is Inapplicable To Public-Library Curation Decisions

If the Court reaches the merits, it should hold that the Speech Clause is inapplicable to a public library's curation decisions. This is so for two separate and independent reasons. First, a public library's curation decisions are government speech. Second, even apart from the government-speech doctrine, a public library does not and cannot "abridge" anyone's freedom of speech by removing or failing to include a particular book in its collection.

### A. A Public Library's Curation Decisions Are Government Speech

When the government joins or assists others in propagating a message, it is engaged in government speech. In these situations, the government may choose the speech that it will subsidize or support without encountering

rules against content or viewpoint discrimination. *See Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015) ("Texas offers [specialty license] plates that say 'Fight Terrorism.' But it need not issue plates promoting al Qaeda." (citation omitted)); *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("It is the very business of government to favor and disfavor points of view" (citation and internal quotation marks omitted)); *National Endowment for the Arts v. Finley*, 524 U.S. 569, 590–600 (1998) (Scalia, J., concurring in the judgment); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism." (citation omitted)).

That remains the case even when the government-supported speech is created by private citizens[4] or delivered by private citizens.[5] The government may choose the artwork that hangs on the walls of government buildings, the quotations that appear on national monuments, the license-plate designs proposed by members of the public that appear on state-issued license plates, and the books housed in a government-owned library. All of these are creations of private citizens—the artwork, the quotations, the license-plate designs, and the books. But the use of government resources to promote and

4. *See Walker*, 576 U.S. at 217 (license-plate designs created and proposed by private citizens); *Summum*, 555 U.S. at 470–72.

5. *See Rust*, 500 U.S. at 179–81.

convey these ideas and messages is government speech, and it remains government speech even when it is boosting or propagating another person's handiwork.

The only exception to this principle arises when the government's assistance or subsidies create a "forum" for private speech. *See, e.g.*, *Shurtleff v. City of Boston*, 596 U.S. 243 (2022); *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995). In these situations, the courts will not allow the government to characterize its facilitation or funding of private speakers as its own speech, because the benefits are so broadly conferred that the selective withholding of these perks from a disfavored speaker seems more akin to a penalty that "abridges" the freedom of speech, rather than the government acting as a participant in the marketplace of ideas. *See Shurtleff*, 596 U.S. at 248 ("The city did not deny a single request to raise a flag until, in 2017, Harold Shurtleff … asked to fly a Christian flag."); *Rosenberger*, 515 U.S. at 830 ("'[I]t discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and childrearing except those dealing with the subject matter from a religious standpoint.'" (citation omitted)).

But a public library does not and cannot serve as a "forum" for private speech. *See United States v. American Library Ass'n Inc.*, 539 U.S. 194, 205 (2003) (plurality) ("[F]orum analysis and heightened judicial scrutiny are … incompatible with the discretion that public libraries must have to fulfill their traditional missions."); *Little*, 138 F.4th at 859 (plurality) ("[I]t makes no

sense to apply forum analysis to a library's collection.... Forum analysis has no place on a library's bookshelves."). A public library does not seek to accumulate as many publications as possible, and it does not allow its collection to serve as a dumping ground for any author or publisher who wants to propagate their intellectual property. Quite the opposite: A public library is *supposed* to curate its collection and retain only the materials that are useful, relevant, and appropriate for the community that it serves.

Public librarians must also provide quality control when selecting or retaining materials. They are supposed to weed books with poor content, mediocre writing style, inaccurate information, or biased, racist, or sexist terminology or views. *See also American Library Ass'n*, 539 U.S. at 204 (plurality) ("'The librarian's responsibility ... is to separate out the gold from the garbage, not to preserve everything'" (quoting W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)); *Little*, 138 F.4th at 863 (plurality) (quoting library weeding manuals that instruct librarians to remove books with "[b]iased, racist, or sexist terminology or views" and "[o]utdated philosophies on ethics and moral values"). This compels librarians to discriminate not only on the basis of content, but also against viewpoints and ideas that are inaccurate, biased, racist, or sexist. *See id.* at 859 (plurality) ("Libraries choose certain viewpoints (or range of viewpoints) on a given topic. But they may exclude others. A library can have books on Jewish history without including the Nazi perspective."); Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 106 (1998)

("[One] would hardly disagree … with the ability of a librarian to select books accepting that the Holocaust happened to the exclusion of books denying its occurrence."). Libraries and librarians must separate "the gold from the garbage," and the "garbage" will include materials with disreputable viewpoints and ideas, such as discredited scientific theories, as well as viewpoints and ideas that may not have been considered racist or offensive when originally published but are no longer compatible with modern sensibilities. *See PETA v. Gittens*, 414 F.3d 23, 29 (D.C. Cir. 2005) ("The government … may run museums, libraries, television and radio stations, primary and secondary schools, and universities. In all such activities, the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech.").

A library's selection and weeding decisions are no less its own "speech" than a social-media company's decisions regarding the third-party speech that it chooses to convey on its platforms. *See NetChoice*, 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). As the Supreme Court explained in *NetChoice*:

> An entity "exercis[ing] editorial discretion in the selection and presentation" of content is "engage[d] in speech activity." *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666 (1998). And that is as true when the content comes from third parties as when it does not. (Again, think of a newspaper opinion page or, if you prefer, a parade.) Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive ac-

> tivity of its own. And that activity results in a distinctive expressive product.

*Id.* at 731. And "none of that changes just because a compiler includes most items and excludes just a few." *Id.* at 732; *see also id.* at 738 ("That those platforms happily convey the lion's share of posts submitted to them makes no significant First Amendment difference."). Most libraries are willing to carry the vast majority of available books, but that does not mean that they are no longer engaged in "speech" when they exclude certain materials from their collections. *See American Library Ass'n*, 539 U.S. at 204 (plurality) ("[L]ibraries collect only those materials deemed to have 'requisite and appropriate quality.'").

And a library's acquisition and weeding decisions remain its own "speech" even though a library is conveying the speech of others when making curation decisions. Like a social-media platform, a library is "in the business … of combining 'multifarious voices' to create a distinctive expressive offering." *NetChoice*, 603 U.S. at 738. As *NetChoice* explains:

> The individual messages may originate with third parties, but the larger offering is the platform's. It is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality.

*Id.* So too with a library. The "individual messages" originate with the authors, but "the larger offering" is the library's speech. *See id.* And a library's

acquisition and weeding decisions "rest on a set of beliefs about which [materials] are appropriate" to include in the library's collection and "which [materials] are not." *Id.* Finally, the aggregate of the library's curation decisions gives the collection "a particular expressive quality" unique to that library. A library is therefore "engage[d] in speech activity"[6] when it curates its collection, and that means its removals, exclusions, and relocations of books qualify as government speech immune from constitutional attack under the Speech Clause.[7]

The Eighth Circuit's opinion in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024), erred by claiming that this government-speech argument would make the content of library books into government speech. *See id.* at 668 ("[I]f placing these books on the shelf of public school libraries constitutes government speech, the State 'is babbling prodigiously and incoherently.'" (quoting *Matal v. Tam*, 582 U.S. 218, 236 (2017))). That is demonstrably untrue, as *NetChoice* and the *Little* plurality opinion explain how the act of curation is speech distinct from the speech that appears within the curated materials. *See* pp. 12–13, *supra*. No one is claiming that the content of public-library books becomes government

6. *NetChoice*, 603 U.S. at 731 (quoting *Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)).

7. A government-speech holding will not immunize public-library curation decisions from *all* forms of constitutional attack, as it remains possible to challenge library-book removals or exclusions on Establishment Clause or Equal Protection grounds. JA 78–81; DE 5 at 33–36 (raising equal-protection challenge to library-curation policies).

speech. But when a public or private library removes or relocates books, those curation decisions are the speech of the library—and that speech remains distinct from the speech of the authors that appears inside the library books. *See NetChoice*, 603 U.S. at 728 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). As the plurality in *Little* cogently explained:

> [T]he Eighth Circuit misunderstood the government "speech" at issue. It is not the words of the library books themselves.... Rather, the government speaks through its *selection* of which books to put on the shelves and which books to exclude.
>
> The Eighth Circuit also misapplied *Summum*.... The city's message was its *selection and display* of the monuments, not the monuments themselves. That maps precisely onto a library collection: the library conveys its *own* message (which books are worth reading) by collecting third-party speech (books). But the Eighth Circuit's reasoning makes *Summum* impossible: the only "speech" the court saw was by the books' *authors*, not the library's *choosing* some books over others. By that reasoning, when the City of Pleasant Grove displayed the Ten Commandments, it was speaking as God.

*Little*, 138 F.4th at 864–65 (plurality) (footnote omitted) (citations and some internal quotation marks omitted).

Finally, *GLBT Youth* makes no attempt to reconcile its stance with *NetChoice*, which holds that curation decisions are speech of the curator—even when the curator is compiling the speech of others. The Court should

disavow *GLBT Youth* and join the D.C. Circuit[8] and the *Little* plurality in holding that public-library curation decisions are government speech.

### B. A Public Library Does Not "Abridge" The Freedom Of Speech By Excluding, Removing, Or Relocating Books

Even if this Court rejects the government-speech argument, it should *still* hold that a public library's curation decisions are categorically immune from scrutiny under the Speech Clause. That is because the government does not and cannot "abridge"[9] a constitutional right by withholding assistance from those seeking to exercise a constitutional prerogative. *See Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353, 359–60 & n.2 (state law that "removes politically related deductions from an existing system" is not an "abridgment of the unions' speech," even though it revokes assistance that the state had previously provided to the unions' speech activities); *Rust*, 500 U.S. at 200 ("[T]he Government may choose not to subsidize speech"); *id.* at 201 ("The Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected").

Suppose that Greenville County decided to open and operate a county-owned gun store that allows its residents to borrow weapons in the same way that they borrow library books—by checking them out for a few weeks and

8. *See PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude.").

9. U.S. Const. amend. I ("Congress shall make no law … abridging the freedom of speech").

promising to return them. The government-speech doctrine would not apply to the county's decisions to stock and shelve weaponry in this store, as assembling a collection of firearms is conduct rather than propagation of a government-sponsored message. Yet if the county suddenly decided to purge all handguns from this government-owned store, that would not "infringe" the right to keep and bear arms—even though the Second Amendment protects the right to "receive" handguns as much as the First Amendment protects a right to "receive" information and ideas.[10] The removal of handguns from this government-owned store is constitutionally permissible not because the state is engaged in "government speech," but because a state does not "infringe" (or "abridge") the right to keep and bear arms (or any other constitutional right) by removing handguns from a government-owned store that it had no obligation to open or operate in the first place. *See Ysursa*, 555 U.S. at 359.

Or suppose that Greenville County operated a public hospital before *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), that offered abortions and other medical procedures to its residents. None of these services qualify as "government speech," yet the county could still remove abortion services from the menu without "abridging" or violating the erstwhile right to abortion. *See Webster v. Reproductive Health Services*, 492 U.S. 490, 510 (1989) ("Nothing in the Constitution requires States to enter or re-

10. *See District of Columbia v. Heller*, 554 U.S. 570, 628–32 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

main in the business of performing abortions."). This prerogative comes not from the government-speech doctrine, but from the fact that the Constitution does not require the government to assist or facilitate efforts to exercise a constitutional entitlement.[11] *See Ysursa*, 555 U.S. at 359–60 & n.2.

The analysis is no different when public libraries remove or relocate books. A library does not (and cannot) "abridge" the right to receive information and ideas by excluding a book from its collection, even though its actions make it slightly more inconvenient for library patrons to access the excluded materials. *See Ysursa*, 555 U.S. at 359–60 & n.2; *see generally* Daryl J. Levinson, *Framing Transactions in Constitutional Law*, 111 Yale L.J. 1313 (2002). Members of the public remain free to access the desired books from other sources (such as Amazon.com or private bookstores) without fear of punishment or penalty. And although Greenville County is no longer *facilitating* efforts to obtain those books, that does not violate or even implicate anyone's constitutional rights, any more than a decision to exclude handguns from a government-owned store or withdraw abortion services from a government-owned hospital. As the en banc Fifth Circuit explained in *Little*:

> [P]laintiffs cannot invoke the right to receive information to challenge the library's removal of the challenged books.... It is one thing to tell the *government* it cannot stop *you* from receiving a book. The First Amendment protects your right to do that. It is another thing for *you* to tell the *government* which books it

11. The right to counsel for criminal defendants is one notable exception to this rule. *See* note 1, *supra*.

> must keep in the library. The First Amendment does not give you the right to demand that.

*Little*, 138 F.4th at 845 (majority). The Fifth Circuit's analysis is unassailable, and the district court did not acknowledge it or explain why it thought the Fifth Circuit was wrong.[12] The Court cannot affirm the district court's order without creating a split with the Fifth Circuit on this point.

## IV. It Is Absurd To Prohibit Public Libraries From Engaging In Viewpoint Discrimination Or Content Discrimination When Curating Materials

The plaintiffs contend that the Speech Clause prohibits public libraries from engaging in "viewpoint discrimination" when curating their collections. JA 77; DE 5 at 32 ("Viewpoint discrimination … is *per se* unconstitutional"); *id.* (claiming that the collection-policy amendments violate the Speech Clause because they "were not adopted based on viewpoint-neutral and non-discriminatory principles of library curation."). The district court went further and held that the First Amendment prohibits public libraries from removing or restricting access to materials based on viewpoint or content. JA 28; DE 44 at 28 (denying the motion to dismiss because "there is a plausible inference that the decision to enact the Written Policies was based on De-

12. In a footnote that appears in its discussion of Article III standing, the district court acknowledged that the defendants "rel[y] heavily on the reasoning of *Little*" and promised to address the defendants' arguments in its subsequent Rule 12(b)(6) discussion. JA 44; DE 44 at 12 n.3. Yet the district court said nary a word about the *Little* majority's holding or analysis when it discussed the First Amendment claim. JA 23–30; DE 44 at 23–30.

fendants' ideological objections to the books' content or disagreement with their messages or themes rather than a viewpoint neutral reason."). Each of these ideas is nonsensical and unsupported by case law.

Content discrimination is not only permissible but inevitable when libraries make collection decisions. *See American Library*, 539 U.S. at 205 (plurality) ("Public library staffs *necessarily consider content* in making collection decisions and enjoy broad discretion in making them." (emphasis added)). Libraries are supposed to establish standards for materials in their collections, and they must ensure that limited shelf space is reserved for quality publications. "Viewpoint discrimination" is equally unavoidable, and there is nothing wrong with viewpoint-based exclusions of library books that deny the Holocaust, promote crackpot conspiracy theories, or espouse obsolete and debunked scientific theories such as spontaneous generation or scientific racism. Of course, the government could never ban or censor a publication on these grounds, nor could it discriminate against these views in a traditional public forum. But libraries are not "forums" of any sort,[13] and they *must* impose content-based (and viewpoint-based) standards when deciding how to allocate their limited shelf space. *See American Library*, 539 U.S. at 204 (plurality); *Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005). A public library cannot function if librarians are prohibited from making content- or view-

13. *See American Library*, 539 U.S. at 205 (plurality) ("[F]orum analysis and heightened judicial scrutiny … are also incompatible with the discretion that public libraries must have to fulfill their traditional missions.").

point-based curation decisions, or if its librarians can be sued whenever someone suspects that a book removal or relocation was influenced by the book's content or viewpoints.

## V. The Court Should Explicitly Reject The Reasoning Of The *Pico* Plurality

The Court should explicitly reject the *Pico* plurality opinion and instruct district courts in this circuit not to follow it.

### A. The *Pico* Plurality's Attempt To Distinguish A Library's Removal Decisions From Its Initial-Acquisition Decisions Is Nonsensical

The *Pico* plurality opinion imposes no constitutional constraints on a library's refusal to add new materials to its collection. *See Pico*, 457 U.S. at 871–72 (plurality) ("[N]othing in our decision today affects in any way the discretion of a local school board to choose books to *add* to the libraries of their schools…. [O]ur holding today affects only the discretion to *remove* books."). This attempt to distinguish removals from additions is untenable.

A library that refuses to add a book to its collection because it disapproves of the book's "viewpoint" imposes a greater injury on patrons who wish to read that book than a library that removes that book after adding it to its collection. The library that initially allows a book into the library, but later changes its mind and removes it, has at least provided *some* access to the disputed material. But the library that refuses to purchase that book in the first instance has never offered *any* library access to the contested tome. If a public library's decision to remove a particular book "abridges" a library pa-

tron's First Amendment rights, then a refusal to purchase that book in the first place has *a fortiori* "abridged" the First Amendment rights of the library patrons who wish to access that book.

It is also easy to evade a rule that limits book removals while leaving libraries with a free hand to exclude materials at the acquisition stage. Suppose that this Court affirms the district court and adopts the *Pico* plurality opinion as the law of the Fourth Circuit. In response, a library patron checks out an LGBTQ book and then loses or damages the book (either by accident or on purpose). Then the county refuses to authorize purchase of a replacement copy. None of that will violate (or even implicate) the *Pico* plurality opinion because the public library is refusing to add materials to its collection. So adopting the *Pico* plurality opinion will create a farcical regime in which a public library refuses to buy replacement copies if the books that it wants to remove get damaged or lost, and then leave it to library vigilantes (who are private citizens not subject to the First Amendment) to deep-six the unwanted materials.

As Justice O'Connor observed in *Pico*:

> If the school board can … determine initially what books to purchase for the school library, it surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it.

*Pico*, 457 U.S. at 921 (O'Connor, J., dissenting). Justice O'Connor is correct, and Justice Brennan is wrong. If a library has carte blanche to exclude mate-

rials at the initial-acquisition stage, then it can remove those materials if it regrets or wants to undo its previous decision.

### B. The *Pico* Plurality's Test Is Unclear, Contradictory, And Incapable Of Principled Application

The *Pico* plurality opinion contains no fewer than three formulations of its test for distinguishing permissible library-book removals from impermissible ones.

The first formulation appears on page 870:

> Petitioners rightly possess significant discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner.

*Pico*, 457 U.S. at 870 (plurality opinion). So "partisan" and "political" book removals are acceptable (according to Justice Brennan) as long as they do not enter the realm of "narrowly" partisan or political book removals. How a court is supposed to distinguish a "narrowly" partisan or political book removal from a merely "partisan" or "political" decision is anyone's guess.

The second formulation appears on page 871:

> [W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution.

*Id.* at 871 (plurality) (footnote omitted). In a footnote, Justice Brennan elaborated on the meaning of "decisive factor": "By 'decisive factor' we mean a

'substantial factor' in the absence of which the opposite decision would have been reached." *Id.* at 871 n.22 (plurality).

The third formulation appears on page 872:

> [W]e hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."

*Id.* at 872 (plurality) (citation omitted).

If this Court adopts the *Pico* plurality opinion as the law of the Fourth Circuit, then it will need to decide which of these three formulations represents the proper test for determining when library-book removals violate the Speech Clause. They are all different. Under the third test, a public library can defeat a Speech Clause claim by showing that it was motivated (even in part) by any reason other than mere "dislike" of the "ideas" contained in the book. A public library can also defeat a Speech Clause claim by refuting accusations that it was seeking to prescribe orthodoxy, even when its sole motivation for removing the book was dislike of its ideas. That is a far cry from the second test, which asks whether the library intended to "deny" patrons "access" to the ideas in the removed books, and whether that intent was the but-for cause of the book-removal decision.

There are other problems with the *Pico* plurality opinion. It acknowledges that the Speech Clause allows libraries to remove books that are "pervasively vulgar" or lack "educational suitability." *Pico*, 457 U.S. at 871 (plurality). But

book removals based on vulgarity or lack of "educational suitability" will reflect a "dislike" or "disagreement" with the vulgar or educationally unsuitable ideas in those books. They will also reflect a desire to "prescribe" orthodoxy by excluding materials deemed vulgar or educationally unsuitable. Justice Brennan made no attempt to reconcile these caveats with the tests that appear elsewhere in his opinion.

Finally, the *Pico* plurality opinion requires judges to play mind reader and attempt to divine the subjective motivations and thought processes of library employees and county officials. But libraries are governed by different individuals, each of whom has their own unique thoughts and their own reasons for supporting removal of a particular book. It is impossible to attribute a singular "intent" to a collective entity. *See* Kenneth A. Shepsle, *Congress Is a "They," Not An "It": Legislative Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992). And it will often be impossible for courts to determine the intentions or motivations of library officials who remove or relocate books. A board can vote to remove library books without discussion, and a librarian can remove or relocate books without documenting or remembering her reasons. In these situations, a court can do nothing more than guess about what the relevant motivations might have been.

## CONCLUSION

The district court's order denying the defendants' motion to dismiss should be vacated.

Respectfully submitted.

/s/ Jonathan F. Mitchell

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Christopher Mills
Spero Law LLC
557 East Bay Street, #22251
Charleston, South Carolina 29413
(843) 606-0640 (phone)
cmills@spero.law

Gene P. Hamilton
Nicholas R. Barry
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721 (phone)
gene.hamilton@aflegal.org
nicholas.barry@aflegal.org

Dated: September 25, 2026

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements,
and type-style requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Amicus Curiae*

Dated: September 25, 2026

## CERTIFICATE OF SERVICE

I certify that on October 3, 2026, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fourth Circuit and served through CM/ECF upon:

MILES E. COLEMAN
Nelson Mullins Riley & Scarborough LLP
2 West Washington Street, Suite 400
Greenville, South Carolina 29601
(864) 373-2300
miles.coleman@nelsonmullins.com

CHARLES F. TURNER, JR.
JOHN P. "JACK" RIORDAN
J. NATHAN OZMINT
Wilson Jones Carter & Baxley, P.A.
325 Rocky Slope Road, Suite 201
Greenville, South Carolina 29607
(864) 672-3711
cfturner@wjcblaw.com
jpriordan@wjcblaw.com
jnozmint@wjcblaw.com

*Counsel for Defendants-Appellants*

SHANA KNIZHNIK
JOSHUA BLOCK
ACLU Foundation
125 Broad Street, Floor 18
New York, New York 10004
(212) 549-2500
sknizhnik@aclu.org
jblock@aclu.org

ALLEN CHANEY
ACLU of South Carolina
Post Office Box 1668
Columbia, South Carolina 29202
(864) 372-6881
achaney@aclusc.org

*Counsel for Plaintiffs-Appellees*

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Amicus Curiae*